UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE HUT 8 CORP. SECURITIES LITIGATION<br><br>This Document Related To:<br><br>ALL ACTIONS. | Lead Case No. 1:24-cv-00904-VM<br><br><u>CLASS ACTION</u><br><br>Hon. Victor Marrero |

### <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'</u><br><u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF CONTENTS -------------------------------------------------------------------------- ii

TABLE OF AUTHORITIES ------------------------------------------------------------------ iii

PRELIMINARY STATEMENT ----------------------------------------------------------------- 1

STATEMENT OF FACTS -------------------------------------------------------------------- 3

    I.    The Parties------------------------------------------------------------------------- 3

    II.    The Merger and Diligence Period----------------------------------------------- 4

    III.    Plaintiff's Allegations ----------------------------------------------------- 5

        A.    Allegations Regarding USBTC's Financial Condition ----------------------------- 5

        B.    Energy and Connectivity Allegations --------------------------------------------- 6

    IV.    J Capital's Short Report ------------------------------------------------------- 7

ARGUMENT -------------------------------------------------------------------------------- 8

    I.    Each of Plaintiff's Claims Should Be Dismissed for the Single Reason that No Actionable Misstatements or Omissions of Material Fact Are Pled.------------------------------ 9

        A.    Plaintiff Fails to Plead Falsity. ----------------------------------------------------- 9

        B.    The Challenged Statements Are Forward-Looking.--------------------------------13

        C.    Plaintiff Improperly Relies Upon Inactionable Puffery.----------------------------15

        D.    Plaintiff Does Not Allege Any False or Misleading Statement Amounting to Violations of Item 303 of Regulation S-K.-------------------------------------------------------18

        E.    Plaintiff Does Not Allege Any False or Misleading Statement Amounting to Violations of Item 105 of Regulation S-K.-------------------------------------------------------19

    II.    Plaintiff Fails to Adequately Plead Facts That Would Provide a Strong Inference That Defendants Acted with Scienter. ------------------------------------------------------------21

    III.    Plaintiff Fails to Plead Loss Causation. ----------------------------------------------24

        A.    Plaintiff Fails to Plead that the Drop is Attributable to a Corrective Disclosure. -------24

        B.    Plaintiff Failed to Allege that Hut 8's Shares were Artificially Inflated by Fraudulent Misrepresentation. -----------------------------------------------------------------27

    IV.    Individual Defendants Cannot Be Held Liable for Statements They Are Not Alleged to Have Personally "Made."---------------------------------------------------------------28

    V.    Plaintiff Lacks Standing to Bring Section 10(b) Claims Based on Any Pre-Merger Statements About USBTC.----------------------------------------------------------------29

CONCLUSION--------------------------------------------------------------------------------30

## TABLE OF AUTHORITIES

**Cases**

*In re Advanced Battery Techs., Inc.,*
781 F.3d 638 (2d Cir. 2015)...................................................................................23

*Altayyar v. Etsy, Inc.,*
242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...................................................................16

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)...............................................................................................18

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO,*
811 F. Supp. 2d 853 (S.D.N.Y. 2011)....................................................................21

*Boluka Garment Co., Ltd. v Canaan Inc.,*
547 F.Supp.3d 439 (S.D.N.Y. 2021).....................................................................26

*In re CarLotz, Inc. Sec. Litig.,*
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) .......................................................30

*In re CarLotz, Inc. Sec. Litig.,*
667 F. Supp. 3d 71 (S.D.N.Y. 2023)......................................................................30

*Central States, Southeast and Southwest Areas Pension Fund v. Federal Home
Loan Mortg. Corp.,*
543 Fed. App'x. 72 (2d Cir. 2013)..........................................................................27

*In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.,*
2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ...........................................................21

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen.
Holdings Corp.,*
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ..........................................................22

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
752 F.3d 173 (2d Cir. 2014)...............................................................................5, 15

*City of Roseville Emps. Ret. System v. Energy Solutions, Inc.,*
814 F. Supp. 2d 395 (S.D.N.Y. 2011)....................................................................29

*In re Coty Inc. Sec. Litig.,*
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .......................................................19

*In re Draftkings Inc. Sec. Litig.,*
650 F. Supp. 3d 120 (S.D.N.Y. 2023)....................................................................11

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005)...............................................................................................24

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009)..............................................................................17, 21

*In re EHang Holdings Ltd. Sec. Litig.*,
    646 F. Supp. 3d 443 (S.D.N.Y. 2022)............................................................................26, 27

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
    2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)......................................................................17

*Garnett v. RLX Tech. Inc.*,
    632 F. Supp. 3d 574 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, No.
    22-2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) ......................................................10

*In re Garrett Motion Inc. Sec. Litig.*,
    2023 WL 2744029 (S.D.N.Y. Mar. 31, 2023) ......................................................................12

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).............................................................................23, 24

*Gordon Partners v. Blumenthal*,
    2007 WL 1438753 (S.D.N.Y. 2007), *aff'd*, 293 Fed. App'x. 815 (2d Cir.
    2008) ..........................................................................................................................27

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021).........................13

*Gross v. AT&T Inc.*,
    2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021)..................................................................14, 15

*Gross v. GFI Grp., Inc.*,
    784 F. App'x 27 (2d Cir. 2019) ........................................................................................16

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015).............................................................................12, 25

*Hawes v. Argo Blockchain
    plc,* 2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ..................................................................14

*IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank
    of Scotland Grp.*,
    783 F.3d 383 (2d Cir. 2015)..............................................................................................16

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)................................................................................................19

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)................................................................................................23

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).....................................................................................................28, 29

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................................................21, 22

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)......................................................................16

iv

*Leadersel Innotech ESG v. Teladoc Health, Inc.*,
  2024 WL 4274362 (2d Cir. Sept. 24, 2024) ..................................................................20

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)..........................................................................................27

*Leonard F. v. Israel Discount Bank of New York*
  (2d Cir. 1999)...................................................................................................................5

*Lipow v. Net1 UEPS Techs.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015)............................................................................22

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)............................................................................23

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)......................................................................11, 18

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)..............................................................................10

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024).......................................................................................................19

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87 (S.D.N.Y. 2011) .....................................................................................26

*Medina v. Tremor Video, Inc.*,
  2015 WL 1000011 (S.D.N.Y. March 5, 2015) .........................................................14, 16

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
  54 F.4th 82 (2d Cir. 2022) .............................................................................................29

*Menorah Mivtachim Ins. Ltd. v Sheehan*,
  2024 WL 1613907 (2d Cir Apr. 15, 2024) .....................................................................24

*In re Morgan Stanley Info. Fund Secs. Litig.*,
  592 F.3d 347 (2d Cir. 2010).............................................................................................8

*In re Mylan N.V. Sec. Litig.*,
  666 F Supp 3d 266 (S.D.N.Y. 2023)...............................................................................28

*N. Collier Fire Control*, 2016 WL 5794774, *adopted*, 2015 WL 5255469
  (S.D.N.Y. Sept. 9, 2015).................................................................................................17

*In re Nokia Oyj Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006).......................................................................16, 17

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................11, 12, 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)............................................................................................24

*In re Phillip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) ....................................................................................8

*Reed v. Amira Nature Foods Ltd.*,
    2016 WL 6571281 (C.D. Cal. 2016).......................................................................26

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) *aff'd*, 604 F. App'x 62 (2d Cir. 2015)...................8, 9, 10, 20, 30

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris*
    *Companies, Inc.*,
    75 F.3d 801 (2d Cir. 1996)......................................................................................12

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................................24

*In re Seadrill Ltd. Sec. Litig.*,
    2016 WL 3461311 (S.D.N.Y. June 20, 2016) .........................................................16

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64, 85 (2d Cir. 2021)................................................................................20

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)..............................................................................13, 15

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................28, 29

*In re Stac Elecs. Secs. Litig.*,
    89 F.3d 1399 (2d Cir. 1996)......................................................................................9

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019).....................................................................16

*Stoneridge Inv. Partners, LLC v. Sci. Atlanta, Inc.*,
    552 U.S. 148 (2008)...................................................................................................8

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2021)...................................................................................................9

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008).....................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................................9, 21, 24

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...............................................................................11, 17

*Town of Davie Police Officers Ret. Sys. v. Nat. Gen. Hldgs. Corp.*,
    2021 WL 5142702 (2d Cir. Nov. 5, 2021)..............................................................22

*In re Uipath, Inc. Sec. Litig.*,
    2024 WL 4667269 (S.D.N.Y. Nov. 4, 2024)..........................................................11

*In re Xunlei Ltd. Sec. Litig.*,
    2019 WL 4276607 (S.D.N.Y. Sept. 10, 2019)...........................................................................26

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*,
    214 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................................................................16

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
    379 F. Supp. 3d 164 (E.D.N.Y. 2019) .................................................................................26

**Statutes**

15 U.S.C. § 77k(a) ...........................................................................................................................10

15 U.S.C. § 78t(a) ..............................................................................................................................9

15 U.S.C. § 78u-4(b)(1) .....................................................................................................................9

15 U.S.C. § 78u-4(b)(2)(A)................................................................................................................9

15 U.S.C. § 78u-5(c) ..........................................................................................................................2

15 U.S.C. § 78u-5(i)(1)(c)−(d)........................................................................................................13

**Regulations**

17 C.F.R. § 229.105 ...................................................................................................................19, 20

17 C.F.R. § 229.303(b)(2)(ii)..........................................................................................................19

17 C.F.R. § 240.10b-5(b) ................................................................................................................28

Defendant Hut 8 Corp. ("Hut 8" or the "Company"), and Asher Genoot, Michael Ho, Jaime Leverton, and Shenif Visram (collectively, the "Individual Defendants" and together with Hut 8, "Defendants") hereby move to dismiss the Consolidated Amended Complaint (hereafter "CAC" or cited as "¶__"), Dkt. 39.

## PRELIMINARY STATEMENT[1]

This case arises from a short seller's attempt to obtain a monetary gain on its short position in Hut 8, at the expense of ordinary shareholders.  These "short and distort" schemes are all too frequently followed by shareholder class actions that parrot the short seller's negative views and label the report a "corrective" disclosure.  Without more, these short-and-distort cases are regularly dismissed.  This case should be dismissed too.

In January 2024, activist short seller J Capital Research engaged in a campaign to sink Hut 8's stock for its own gain by publishing a short report (the "Short Report") based on publicly available information—much provided by Hut 8 itself—and ambiguous comments from unnamed individuals.  Despite a brief dip in price following the report—as is common— Hut 8's stock price fully recovered and has *increased* by roughly 300% since the Short Report was published.  Plaintiff's attempt to conjure a securities fraud claim based on the vague and speculative Short Report is a failed strategy that courts repeatedly reject.

Plaintiff's claims under Section 10(b) of the Securities Exchange Act of 1934 and Sections 11 and 15 of the Securities Act of 1933 are predicated upon a handful of alleged misstatements and omissions regarding USBTC's projected financial condition before the merger with Hut 8 and

---

[1]  For the Court's convenience, attached hereto as Appendix A is a chart of the statements challenged by Plaintiff. All internal citations are omitted unless otherwise indicated.  Numbered exhibits are attached to the Declaration of Mary Beth Maloney, filed concurrently herewith.

alleged energy and internet connection issues at a data mining site partially owned by USBTC. These claims fail as a matter of law for at least *five* independent reasons:

*First*, Plaintiff does not—and cannot—allege with any particularity that the alleged misrepresentations were false or misleading when made.

*Second*, the PSLRA's "safe harbor" provisions and the "bespeaks caution" doctrine preclude claims based on "forward-looking" statements. 15 U.S.C. § 78u-5(c). Between February 13, 2023 and January 18, 2024 (the "Class Period"), Hut 8 Mining Corp. and USBTC repeatedly warned investors about the risks that Plaintiff now complains were realized, rendering inactionable the challenged statements.

*Third*, nearly all of the alleged misstatements are aspirational and banal corporate puffery too generic to allege reasonable reliance.

*Fourth*, the CAC fails to plead a strong inference of scienter, including that any Defendant had a motive to defraud, relying instead on conclusory assertions about what Defendants knew or should have known based on their titles—a pleading approach rejected by the Second Circuit.

*Fifth*, Plaintiff fails to plead loss causation, as it does not (and cannot) allege any corrective disclosure. This Court has repeatedly held that a short seller's report cannot be a corrective disclosure when, as here, it consists of conclusions based on *public* information.

At a minimum, the Section 10(b) claims based on statements made before the merger must be dismissed because Plaintiff lacks standing. In addition, Plaintiff fails to allege that Leverton and Visram "made" all but one of the statements.

For these reasons, the Court should dismiss the CAC with prejudice.

2

**STATEMENT OF FACTS**

### I.    The Parties

Hut 8 is an energy infrastructure operator and Bitcoin miner.[2]  ¶ 2.  The Company develops data centers that power compute-intensive workloads such as Bitcoin mining, high performance computing, and artificial intelligence.  *Id.*  The Company derives revenue from digital asset mining, managed services, high performance computing, and "Other," which includes hosting and equipment sales and repairs.  *Id.*  Hut 8 was formed in connection with a November 2023 merger between Hut 8 Mining Corp. ("Legacy Hut") and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC") (the "Merger").  ¶ 3.

Defendant Asher Genoot is the Chief Executive Officer ("CEO") of Hut 8 and previously served as Hut 8's President, ¶ 18, and as the President and director of USBTC.  *Id.*  Defendant Michael Ho has been the Chief Strategy Officer of Hut 8 at all relevant times and previously served as the CEO and chairman of the board of USBTC.  ¶ 19.  Prior to the Merger, Defendant Jaime Leverton was the CEO of Legacy Hut.  *Id*.  Defendant Shenif Visram was the Chief Financial Officer ("CFO") of Hut 8 during the relevant time period and was the CFO of Legacy Hut.  ¶ 21.

Lead Plaintiff Abhishek Maheshwari allegedly purchased Hut 8 securities traceable to the Registration Statement (as defined below) or the Forms S-8 (as defined below) from November 9, 2023 through January 18, 2024. ¶ 16; Dkt. No. 28-1, Lead Pl.'s Damages Analysis and Holdings. He purports to assert claims on behalf of himself and all persons and entities that purchased or otherwise acquired Hut 8 securities during the Class Period.  ¶ 1.

---

[2] Bitcoin is a decentralized, peer-to-peer virtual currency that exists solely in electronic form.  ¶ 23.  Bitcoin mining is the process used to create new blocks in the Bitcoin blockchain.  ¶ 30.  Bitcoin miners are rewarded with Bitcoin after successfully adding a block to the blockchain.  ¶ 33.

## II.    The Merger and Diligence Period

Legacy Hut was a public company based in Canada, with one of the highest inventories of self-mined Bitcoin of any publicly traded company.  ¶¶ 36, 38.  USBTC was a privately held Nevada company and an industrial-scale operator of Bitcoin mining sites.  ¶¶ 39–40.  In 2022, Legacy Hut began exploring potential growth opportunities. Ex. 2 at 82–83.  Independently and simultaneously, USBTC was undertaking its own strategic review to help scale its business.  *Id.* Between June and September 2022, Legacy Hut and USBTC independently engaged third parties related to potential strategic transactions.  *Id.* at 83–84.

In November 2022, Legacy Hut and its financial advisors held several meetings with USBTC "to pursue a possible business combination involving [a] merger of relative equals."  *Id.* at 84–85.  From the end of December through the signing of the Business Combination Agreement on February 6, 2023, executives from USBTC and Legacy Hut met frequently and conferred with their legal and financial advisors.  *Id.* at 86-87.  In deciding to move forward with the Merger, Legacy Hut "considered a variety of factors, including its knowledge of USBTC's business, operations, financial condition, results of operations and prospects, as well as the risks in achieving those prospects, including uncertainties associated with achieving financial forecasts."  *Id.* at 87.

On February 7, 2023, Legacy Hut and USBTC announced that their boards had unanimously approved a business combination agreement ("Business Combination Agreement"), pursuant to which they would merge to form Hut 8.  ¶ 48.  On February 13, 2023, Hut 8 filed an initial registration statement on Form S-4 announcing the proposed business combination and filed seven amendments to the registration statement over the next several months.  ¶¶ 53, 55.  On November 9, 2023, the SEC declared Hut 8 Corp.'s registration statement on Form S-4 effective.

¶ 56; Ex. 3.[3]  The same day, Hut 8 filed a final prospectus on Form 424(b)(3) ("Prospectus") (and collectively with the registration statement, as amended, "Registration Statement")).  ¶ 57.  The Company also filed three registration statements on Form S-8 ("Forms S-8") on November 29, 2023, which incorporate the Prospectus.  ¶ 58.  The Merger closed on November 30, 2023.  ¶ 59.

### III.    Plaintiff's Allegations

Plaintiff alleges that Defendants failed to disclose two categories of false statements in the Registration Statement, Forms S-8, and Form 10-Q filed on December 19, 2023 ("December 2023 10-Q"): (1) that USBTC was supposedly on the brink of bankruptcy before the Merger and (2) that there were energy and connectivity issues at a data mining site partially owned by USBTC (the "King Mountain JV").  ¶¶ 60–100.  Plaintiff also alleges that the failure to disclose these categories of information violates SEC Regulation S-K.  *Id.* ¶ 101–112.[4]

### A.  Allegations Regarding USBTC's Financial Condition

Plaintiff challenges USBTC's future projections about its financial condition in the Company's initial registration statement on Form S-4, amendments thereto, the Prospectus, and the December 2023 10-Q.  *See* Appendix A, Statements A1–A7.  Plaintiff alleges the statements— that USBTC believed its cash on hand would be sufficient to meet operating and capital requirements for the next twelve months and that USBTC did not anticipate it would continue to incur net losses for the foreseeable future—were misleading because "historical financial statements included in the Registration Statement" show that USBTC would continue to incur net

---

[3] The Court may consider documents Plaintiff incorporated by reference in the Complaint. *See Leonard F. v. Israel Discount Bank of New York*, (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.")).  In the Second Circuit, courts may consider "public disclosure documents required by law to be, and that have been, filed with the SEC[.]" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014).

[4] Plaintiff initially alleged scheme liability under Section 10(b) and Rule 10b-5 promulgated thereunder, ¶¶ 175-77, but have since abandoned that theory, *see* Dkt. 48-2 at 2.

losses.  ¶¶ 70−71.  But, the CAC acknowledges, "the source of truth"—the historical financial statements – were wholly disclosed.  ¶ 61.  In the "Liquidity and Financial Condition" section, the Company provided explicit disclosures of USBTC's financial position, ¶ 61, accompanied by cautionary language, in its "Risk Factors" section.  Ex. 2 at 41−49.  For example, the Prospectus provided that "USBTC has incurred losses as set forth below and *may never become profitable*" and urged investors to "consider USBTC's prospects in light of the costs, uncertainties, delays, and difficulties frequently encountered by companies in the *early stage of development*."  *Id*. at 41−42 (emphases added).  The Company also stated that "[USBTC] has *experienced losses since inception*" and that "[t]o date, [USBTC], has in large part, relied on equity and debt financings to fund its operations."  *Id*. at F-8 (emphasis added).

Plaintiff's only other support for the allegations regarding USBTC's financial condition is a confidential witness ("CW") who was employed by the Company in the months before the Merger and "thereafter," and claims that Leverton made a single comment—that the Merger saved USBTC from bankruptcy—during a Company retreat *45 days after* the Merger.  ¶ 81.

## B.  Energy and Connectivity Allegations

Plaintiff alleges that statements about the benefits of the Merger were "materially misleading because they failed to disclose" energy issues and internet disruptions at the King Mountain JV.  ¶¶ 89–91.  At the same time, Plaintiff acknowledges that the Registration Statement disclosed the risks of energy issues and internet disruptions.  *Id.* ¶¶ 90, 92.  To support his claims, Plaintiff again relies on generalized statements by the same single CW.  CW, a low-level "data analyst," purportedly had "daily discussions with the [unnamed] Director of Infrastructure before the Merger about the ongoing energy issues with the King Mountain JV."  ¶ 93.  Tellingly, Plaintiff does not attribute the knowledge of any of these issues to any Defendants.  ¶¶ 93−94.

6

### IV. J Capital's Short Report

Plaintiff's substantive allegations of purported fraud (¶ 113–121; Dkt. 48-2 at 3) are largely cribbed from the January 18, 2024 report published by J Capital Research, titled "The Coming HUT Pump and Dump: Management hiding stock ownership through undisclosed related party, a stock-promotor cabal, and a host of left-for-dead assets." ¶¶ 113–121; Ex. 4.

The Short Report admits: "J Capital Research (along with or through its members, partners, affiliates, employees, and/or consultants), clients, and investors, and/or their clients and investors *have a short position* in the securities of a Covered Issuer (and options, swaps, and other derivatives related to these securities), and *therefore will realize significant gains in the event that the prices of [Hut 8's] securities decline*." Ex. 4 at 1 (emphasis added). The Short Report's views are generally based on publicly available information, other than three anonymous statements that claim USBTC was headed for bankruptcy—even though they provide no information on any source's particular position, scope of knowledge, or other indicia of reliability or credibility. Ex. 4 at 2, 5. *See, also* ¶¶ 116–19 (discussing King Mountain issues and citing the Short Report which in turn cites publicly available court filings and news articles); *see also* Ex. 4 at 21 (citing to online news article), 22-23 (citing to the Company's S-4 and publicly available court filings); 26–28 (citing to Company press releases, Hut 8's SEC filings, and news articles).

The Short Report alludes to financial challenges, but never says it straight; only that it "*suspect[s],*" *id*. at 22, or is "*highly skeptical* that the King Mountain JV is worth the $105 mln paid,*" *id.* at 21, that "USBTC *could probably have paid less,*" *id.* at 25, that it "*believe[s]* USBTC is massively over-valued," *id.* at 21, and that it "*question[s]* whether USBTC's disclosures can be trusted," *id.* at 28. On January 24, 2024, Hut 8 issued a press release denying the opinions expressed in the Short Report (¶ 83) and explaining that "the report is filled with inaccuracies, misrepresented data, speculative claims, and unfounded character attacks." Ex. 5.

On the day the Short Report was released, Hut 8's stock fell by $2.16.  ¶ 10.  The Company's share price rose a week later unrelated to any disclosure.  The stock fully rebounded in less than a month.  It is currently trading at roughly 201% above its pre-Short Report price, and roughly 300% above its post-Short Report price.

## ARGUMENT

To state a claim under Section 10(b) of the Securities Exchange Act, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Phillip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (citing *Stoneridge Inv. Partners, LLC v. Sci. Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  To state a claim under Section 11 of the Securities Act, "the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010).  The test for whether a statement is materially misleading under Section 10(b) and Section 11 is the same: "whether representations, viewed as a whole, would have misled a reasonable investor." *See Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004).

Section 15 of the Securities Act extends liability to "individuals or entities that 'control[ ] any person liable'" under Section 11.  *In re Morgan Stanley*, 592 F.3d at 358.  Thus, Plaintiff's Section 15 claim depends on his "ability to demonstrate primary liability under section[ ] 11." *Id.*

Similarly, Section 20(a) of the Exchange Act creates liability for "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b).  15 U.S.C. § 78t(a).

> **I.    Each of Plaintiff's Claims Should Be Dismissed for the Single Reason that No Actionable Misstatements or Omissions of Material Fact Are Pled.**

All of Plaintiff's "claims are premised on fraud" and must comply with "the heightened pleading standard of Federal Rule 9(b)." *In re Synchrony Fin. Sec. Litig*., 988 F.3d 157, 173 (2021) (citing *Rombach*, 355 F.3d at 171); *see also In re Stac Elecs. Secs. Litig*., 89 F.3d 1399, 1405 n.2 (2d Cir. 1996) (applying Rule 9(b) to Section 11 and Section 10(b) claims).  To comply with Rule 9(b) in this context, "a plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Synchrony Fin*., 988 F.3d at 167 (*Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted).

Like Rule 9(b), the PSLRA requires plaintiffs to allege with particularity "each statement alleged to have been misleading" and "why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and these allegations must "giv[e] rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2)(A).  Thus, Plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  As shown in Appendix A, the challenged statements fall into two categories: (1) statements regarding USBTC's financial condition (the "Financial Condition Statements"); and (2) statements regarding alleged energy and connectivity issues at the King Mountain JV (the "Energy and Connectivity Statements").

### A.  Plaintiff Fails to Plead Falsity.

For Section 11 claims, the plaintiff must allege the statement was false at the time it was

made. *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 602−03 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) (Plaintiff failed to plausibly plead a misleading statement or omission when they could not demonstrate that statements were false at the time they were made); see 15 U.S.C. § 77k(a). Similarly, "[a] violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made. Put another way, without contemporaneous falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). "The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—'they must demonstrate with specificity why that is so.'" *Id.* (citing *Rombach*, 355 F.3d at 174), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Accordingly, Plaintiff cannot identify a single statement regarding USBTC's financial condition that was not already disclosed. Plaintiff instead resorts to a fraud-by-hindsight theory, resting its claims on an alleged comment made by Leverton at a company retreat 45 days after the Merger closed, ¶ 81, vague accusations from the Short Report purportedly by an individual the CAC does not identify, ¶¶ 114–15, and the Company's January 24, 2024 Press Release refuting the Short Report, ¶¶ 82–84. None of the allegations go to the veracity of the Company's disclosed financial condition or its *opinion* that it had sufficient liquidity for 12 months at the time those statements were made.

The CAC does not plausibly allege any circumstances constituting fraud, much less with the specificity required by Rule 9(b) and the PSLRA. The CAC falls well beneath that bar and does not allege the claims plausibly *or* with particularity. Plaintiff points to the statements of an anonymous source as reported in the Short Report that "USBTC would have been bankrupt within weeks." ¶¶ 114−115. As is the case here, allegations by unnamed sources lacking specificity are "to be discounted or disregarded," as are "uncorroborated statements of CWs who are sourced

10

secondhand—with whom plaintiffs' counsel have not themselves interacted." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 (S.D.N.Y. 2020). And courts have held that "to the extent that open-market securities fraud complaints use as the source for adverse factual allegations about a public issuer a report by a short seller—an entity with an economic interest in driving down the company's stock price—these allegations must be considered with caution*." In re Draftkings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023).

Plaintiff cobbles together various *public* financial statements in the Registration Statement to claim that "historical financial statements support that USBTC would have continued to incur net losses." ¶¶ 70−79. But that is not a plausible basis for a claim of fraud, where the Company "made ample disclosures regarding" its financial metrics and risks. *In re Uipath, Inc. Sec. Litig.*, 2024 WL 4667269, at *8 (S.D.N.Y. Nov. 4, 2024) (dismissing categories of alleged misstatements for failing to plausibly plead falsity where company disclosed its financial metrics and risk factors); ¶ 70 (discussing statements that USBTC would be able to meet its financial requirements for the next twelve months because the "historical financial statements included in the Registration Statement support otherwise"). Even the CAC itself merely describes USBTC's projections of future performance as "flawed," ¶ 75 and "overoptimistic." ¶ 79. Critically, the CAC does not challenge the veracity of the financial statements. Nor does the CAC engage with why, if Defendants were attempting to defraud investors, they would have included financial statements that purportedly conflict with other statements in the *same* filings. As the Second Circuit has explained, "investor[s] read[ ] each statement within such a document . . . in light of all its surrounding text, including hedges, disclaimers, and *apparently conflicting information*." *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (emphasis added) (quoting *Omnicare, Inc. v Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)).

11

While Plaintiff and J Capital may disagree with USBTC's opinion regarding its future prospects, the underlying financial statements forming the basis for its opinion were publicly disclosed in the very same filings, the Registration Statement, and the December 2023 10-Q.[5] *See* ¶¶ 73–74. Plaintiff does not allege that those historical financial statements were untrue or misstated in any way. Plaintiff instead argues that USBTC's historical financial data demonstrated that USBTC "faced imminent bankruptcy," ¶ 69, and that USBTC's views of its financial condition were "overoptimistic," ¶ 79. These allegations fail, as disagreement with USBTC's "judgment calls is insufficient" to allege that USBTC "misstated facts in its consolidated financial statements in violation of § 10(b) of the Exchange Act, or that [USBTC] violated § 11 of the Securities Act by incorporating those financial statements into its prospectus and offering statements." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (company's comment that it "should deliver income growth consistent with its historically superior performance" not actionable). Even assuming USBTC did face "imminent bankruptcy," such circumstances do not render the forward-looking statements false. *In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *16 (S.D.N.Y. Mar. 31, 2023) (holding plaintiffs failed to allege specific facts showing falsity where plaintiffs argued "every statement in the Class Period implying that [the company] was not inevitably headed for bankruptcy or 'court-supervised restructuring' is misleading"). Plaintiff fails to explain why the Company's predictions of future results are false or misleading under the federal securities laws, let alone that they were not "believed at the time made." *Omnicare*, 575 U.S. at 182–85; ¶¶ 69, 73–75, 79. Because the CAC

---

[5] Plaintiff concedes that he is not alleging that Defendants concealed, mischaracterized, or falsified any of USBTC's financial statements giving rise to his securities law claims. *See* Dkt. No. 47, Pl.'s September 11, 2024 Letter to Defs., at 2 n.4 (citing ¶¶ 69-79).

lacks particularized facts that would render his theory of fraud plausible, Plaintiff's claims based on the statements regarding USBTC's financial condition must be dismissed.

## B. The Challenged Statements Are Forward-Looking.

Each allegedly false statement is a forward-looking statement accompanied by "meaningful cautionary language" that renders it inactionable. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021). The PSLRA's safe harbor shields from liability forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," such as statements "of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission," and "the assumptions underlying or relating to" such a statement. 15 U.S.C. § 78u-5(i)(1)(c)−(d); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010).

As the Second Circuit has explained, investors can identify forward-looking statements through "linguistic cues like 'we expect' or 'we believe' "which, "generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." *Slayton*, 604 F.3d at 769. The Financial Condition Statements, Statements A1−A7, alleged to be false or misleading are that "[USBTC] *believes* its current cash on hand, proceeds from the sales of cryptocurrency and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these consolidated financial statements are issued" and "[USBTC] *does not anticipate* it will continue to incur net losses for the foreseeable future." *See* ¶¶ 65–68 (emphases added). These statements—USBTC *believes* and *does not* anticipate—are classic examples of forward-looking statements of opinion. *See, e.g.,*

13

*Medina v. Tremor Video, Inc.*, 2015 WL 1000011, at *3 (S.D.N.Y. March 5, 2015) (finding "[w]e believe our market opportunity and growth prospects will be enhanced" to be a forward-looking statement); *Hawes v. Argo Blockchain plc,* 2024 WL 4451967, at *3 (S.D.N.Y. Oct. 9, 2024) (describing "we expect" or "we believe" as examples of forward-looking statements).

The statements here are nearly identical to those in *Hawes*, a case where the company "indicated that it believed that its sources of liquidity and capital resources . . . would be sufficient to meet the company's existing needs for the next 12 months." 2024 WL 4451967, at *10 (S.D.N.Y. Oct. 9, 2024). The court held that such statements were not actionable because they were forward-looking, and the plaintiff had failed to demonstrate that the defendants did not harbor that belief when the statement was made. *Id.* ("While Plaintiff alleges that this statement was misleading because it failed to disclose that Argo was undercapitalized and did not have enough cash to continue operations, not a single factual allegation in the pleading suggests that anyone believed that, or had reason to believe it [at the time of filing].").

In addition, as detailed in Appendix A, each of the alleged misstatements is paired with language disclosing the state of USBTC's financial condition. The Registration Statement warns that "USBTC is an early-stage company with limited operating history and may never become profitable." Exhibit 2 at 41–42. The Company provided investors with clear warnings about USBTC's incurred losses and the possibility that it "may never become profitable." Because all alleged false statements are forward-looking statements of opinion, and the CAC is devoid of any facts from which "the Court can reasonably infer that the statements were false at the time they were made," such statements are inactionable. *Gross v. AT&T Inc.*, 2021 WL 9803956, at *3 (S.D.N.Y. Sept. 27, 2021).

The Energy and Connectivity Statements B1, B3, and B4 are prototypically forward looking and inactionable. The risk disclosures challenged by Plaintiff, ¶ 90, warn that the grids that USBTC relies on *"may not be able* to operate as planned, which *may"* have an adverse impact on USBTC, *"subject[ ] USBTC to a variety of risks,"* and *"may impact* USBTC's ability to conduct its businesses efficiently." Prospectus at 64. The Energy and Connectivity Statements were also paired with numerous, robust disclosures warning of the very issues Plaintiff claims were omitted. Indeed, the Prospectus includes the following disclosure about the King Mountain JV's potential energy and connection issues:

> "Any failure in the critical systems of any hosting facility operated by USBTC or services provided by USBTC, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, **power supplies or network connectivity**, whether or not within the company's control, could result in service interruptions to the company's customers and/or damage to equipment, which **could significantly disrupt the normal business operations of the company's customers, harm the company's reputation, and reduce the company's revenue**. Temporary downtime at any hosting facility operated by USBTC could reduce the amount of Bitcoin mined by the company and thereby reduce the profitability of its hosting customers."

Ex. 2 at 45-46.

Statements of what may or could happen are forward-looking statements of opinion. *Slayton*, 604 F.3d at 769. These forward-looking statements are inactionable because they cannot be false when made. *See Gross*, 2021 WL 9803956, at *3.

## C. Plaintiff Improperly Relies Upon Inactionable Puffery.

Statements A1−A7 and C1 are quintessential statements of opinion, general corporate optimism, or statements not "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome[.]" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183, 185 (2d Cir. 2014). The challenged statements incorporate qualifiers, such as we "believe" and we "do[] not anticipate," that indicate they are

15

mere opinions and puffery.  *See XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.,* 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016) (aspirational terms such as "aim to" and "believe deeply" are inactionable puffery); Ex. 2 at 61, 185.  "Such language, at a minimum, signals to prospective investors that the predictions of the Company may not come to fruition." *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at \*13 (S.D.N.Y. Sept. 30, 2008) (Statements such as "we believe" and "we expect" are "couched in subjective terms of belief, expectation, and intention" and are "deemed immaterial"); *In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006) (statement that "[w]e expect to see continued momentum . . . going into the fourth quarter" could not sustain a securities fraud claim "because it is a general statement of optimism"); *see also Medina v. Tremor Video, Inc.*, 2015 WL 1000011, at \*3 (S.D.N.Y. Mar. 5, 2015) (statements beginning with "we believe" and "we expect" found inactionable).

Further, Statements B1–B2 conveying expectations about the Merger are statements of general corporate optimism that "do not give rise to securities violations." *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Grp.,* 783 F.3d 383, 392 (2d Cir. 2015); *see also Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 30 (2d Cir. 2019) (language such as "singular" and "unique" opportunities "too open-ended and subjective to constitute a guarantee").  Statement B1, which states USBTC will bring "significant leadership" which will "enhance the [Company's] ability to better plan" is an inactionable opinion, "not quantifiable or factual" and "subject to interpretation." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. 2017); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) ("[w]e believe we are well positioned to maintain this growth" is a statement of opinion); *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at \*11 (S.D.N.Y. June 20, 2016) ("we feel increasingly comfortable" is a statement of opinion).

16

As the Supreme Court has explained, "[a]n opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 135. Where allegations are limited to the theory that "statements were misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections," as they are here, *Omnicare* "imposes no such disclosure requirements." *Tongue*, 816 F.3d at 212. Courts thus have dismissed claims of alleged overstated financial performance even in egregious circumstances. *See, e.g.*, *N. Collier Fire Control*, 2016 WL 5794774, at *1, *3, *10–11 (asset not overstated under *Omnicare* even though subsidiary had "effectively ceased operations" and was "poorly performing or defunct"); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *18–20 (S.D.N.Y. Aug. 19, 2015) (R. & R.) (statement that asset was "well positioned for growth" not misleading under *Omnicare* even though "generally poor infrastructure and lack of investment in improvement" had rendered stated projections "impossible"), *adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

Much like positive statements associated with the Merger, the Energy and Connectivity Statements were statements of "corporate optimism" that are not capable of being misleading. *See In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d at 398. Furthermore, such statements of corporate optimism cannot be material to a reasonable investor. Materiality depends on whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotes omitted). In other words, the materiality test asks whether there is "a substantial likelihood that" the false or misleading statement "would have been viewed by the reasonable investor as having altered the 'total mix' of information made available" such that the investor would consider it important in deciding whether to buy or sell shares of stock.

17

*Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  King Mountain is a consolidated joint venture, that accounts for a small part of Hut 8's business—it is not the only data mining site operated by Hut 8, which does far more than mining.  There is no allegation that there has been a negative impact on the price of mining Bitcoin (the risk warned-of) or even USBTC or Hut 8 as a whole due to an energy or connectivity issue.

Nor can the allegations of the CW save these claims.  While CW purportedly had discussions regarding vague energy issues before the Merger, ¶ 93, he does not claim to have had such discussions with any Defendant.  Furthermore, the CAC fails to explain what those issues were, let alone demonstrate that the substance of those issues would have been material to a reasonable investor.  Plaintiff does not specify any details about the energy and internet issues CW claims were occurring, including the magnitude of the issues, when exactly they occurred, or even whether any of the "dips" in service took place before the Merger or during CW's tenure with the Company "thereafter," ¶¶ 93, 97, what impact they had on the Company, or whether anyone, let alone Defendants, knew they were likely to continue in the future.  *See Long Miao*, Inc., 442 F. Supp. 3d at 800 (finding that confidential witness allegations should be "discounted or disregarded" when they are "insufficiently particular").

Merely claiming that the King Mountain JV experienced "energy issues"  and that outages were "often significant," ¶¶ 93, 96, 98, cannot establish materiality, especially when they would not impact a reasonable investor's decision in light of the Company's robust disclosures about these specific issues and the publicly available information regarding this site.  *See* ¶¶ 116-120.

### D.  Plaintiff Does Not Allege Any False or Misleading Statement Amounting to Violations of Item 303 of Regulation S-K.

Item 303 of SEC Regulation S-K requires an issuer to "[d]escribe any known trends or uncertainties" that the company "reasonably expects will have a material favorable or unfavorable

impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii); *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 260 (2024). Plaintiff asserts that the Company was required to disclose that the net losses experienced by USBTC in the past were a "known trend" that it expected to continue. ¶ 106. Plaintiff has not established that Defendants knew USBTC's financial position would not improve, much less that such information was "known" to Defendants at the time of any statement. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016); *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty."). Indeed, given USBTC's short history, to even attempt to describe a "known trend" would have been wildly speculative.

Plaintiff's Item 303 claim is omissions-based and is therefore barred under Supreme Court precedent. *Macquarie*, 601 U.S. at 265. As the CAC repeatedly emphasizes, USBTC's past financial results were disclosed in the Registration Statement. Plaintiff fails to demonstrate that the Company violated Item 303.

### E. Plaintiff Does Not Allege Any False or Misleading Statement Amounting to Violations of Item 105 of Regulation S-K.

Item 105 requires an issuer to disclose "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Plaintiff contends that the following warning, Statement C2, was misleading because the Company did not disclose that connectivity issues had occurred in the past, ¶ 108–109:

> ***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.***
>
> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to

19

contribute computing power to pools that mine Bitcoin[,]

Plaintiff has not alleged that internet issues at King Mountain JV were already causing the warned-of risk—"an adverse effect on the price of Bitcoin," ¶ 108—with a material adverse impact on the Company or that Hut 8 knew with "virtual certainty," that the risk would occur such that it should be considered a "material factor" that made the investment "speculative or risky," *see* 17 C.F.R. § 229.105; *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (critical distinction when evaluating forward-looking risk factor was defendants' knowledge that past harm was "virtually certain" to materialize again); *Rombach*, 355 F.3d at 173–74 (falsity not pleaded where allegedly omitted events were "short of financial peril or instability," the warned-of risk in the offering materials).  Accordingly, Plaintiff's Item 105 claim cannot stand.  *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, 2024 WL 4274362, at *3 (2d Cir. Sept. 24, 2024) (rejecting argument that cautionary statements were misleading because plaintiff "fail[ed] to plead specific facts leading up to the filing of the 2020 Form 10-K that would plausibly support a claim that risks materialized in a manner that was inconsistent with the cautionary statements").

Plaintiff ignores the robust and numerous warnings of the connectivity risk the Company made in disclosures.  *See, e.g.*, Prospectus at 45–46 ("Since the company's ability to attract and retain customers depends on its ability to provide a reliable service, even minor interruptions in service could harm the company's reputation and negatively impact its revenue and profitability. Any of these events may result in financial penalty, which could have a material adverse effect on its business, financial condition, and results of operations."), *id.* at 44 ("USBTC recently acquired its 50% interest in the King Mountain JV . . . on an "as is" basis from a bankruptcy administrator or trustee with limited representations, which limits USBTC's recourse against the sellers of the interest after closing, which in turn may expose us to unexpected material losses or expenses after the closing. USBTC's diligence investigations with respect to the King Mountain JV were limited,

20

which may also expose us to unexpected material losses or expenses after the closing.").

Accordingly, the CAC's claims alleging violations of Regulation S-K warrant dismissal.

**II.     Plaintiff Fails to Adequately Plead Facts That Would Provide a Strong Inference That Defendants Acted with Scienter.**

The CAC is bereft of particularized allegations supporting a strong inference of scienter, which the Supreme Court has held must include facts demonstrating a "cogent" and "compelling" inference of fraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). To allege scienter, Plaintiff must plead "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW*, 553 F.3d at 198. To plead motive, the Second Circuit requires particularized allegations of a "concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiff's 39-page complaint, however, makes no attempt to "describe, as it must" a "concrete and personal" benefit beyond "motives common to corporate officers," such as "the desire for the corporation to appear profitable and the desire to keep stock prices high." *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711 at *6–7 (S.D.N.Y. Mar. 7, 2016) (quotations omitted).

Because Plaintiff does not attempt to establish a motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (citations omitted), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc)). Plaintiff, however, fails to "plead conduct that 'at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d

853, 869 (S.D.N.Y. 2011).

The CAC does not allege *any* facts known to *any* Defendant that renders *any* alleged statement false at the time it was made. Instead, Plaintiff argues that each of the Individual Defendants had "actual knowledge" "by virtue of their positions at the Company." ¶ 178. "Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Lipow v. Net1 UEPS Techs.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (quoting *City of Brockton Retirement Sys. v. Avon Products, Inc.*, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)). Such conclusory allegations of knowledge are insufficient to plead scienter, which requires pleading particularized facts that show Defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) ("[B]are assertions that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, without any further facts or details will not suffice to create a strong inference of scienter") (quoting *Okla. Firefighters Pension & Retirement Sys. v. Lexmark Intern., Inc.*, 367 F.Supp.3d 16, 37 (S.D.N.Y. 2019)).

Plaintiff also fails to "specifically identify the reports or statements containing this information." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (rejecting inference of scienter where plaintiff had "not specifically identified any reports or statements that…would have demonstrated the falsity of the allegedly misleading statements"); *Mechel OAO*, 811 F. Supp. 2d at 869. The Second Circuit has also squarely rejected attempts to infer scienter from "pre-acquisition due diligence," *Town of Davie Police Officers Ret.*

22

*Sys. v. Nat. Gen. Hldgs. Corp.*, 2021 WL 5142702, at \*2 (2d Cir. Nov. 5, 2021), or by claims about what a defendant "would have learned" had it "performed the 'due diligence' it promised." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015).

Plaintiff's heavy reliance on the allegations of one low-level, confidential witness also fails to demonstrate knowledge. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (finding "assertions that the information presented by confidential witnesses was known or common knowledge within the company . . . too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity."). Such allegations say nothing about what Defendants knew at the time of the statements, nor does Plaintiff demonstrate that CW's observations were reported upwards to any Defendant. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460−61 (S.D.N.Y. 2010) (discounting low-level employee CWs who "had no access to aggregated data" or "contact with the Individual Defendants"). Moreover, "[w]here a defendant is a corporation," a plaintiff must "plead[ ] facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quotation omitted).

CW's allegation of a single comment made 45 days *after* the Merger does not demonstrate that the statements were false when made, nor does it reveal anything about any Defendant's knowledge at the time the alleged false statements were made. Likewise, an alleged complaint about efficiency at unspecified "general meetings" or "daily discussions with the Director of Infrastructure before the Merger," ¶¶ 93, 94, 134, lack any detail necessary to allege scienter, including whether anything that conflicted with the alleged misstatements was reported to management senior enough to impute scienter to the Company. *Local No. 38*, 724 F.Supp.2d at

23

461 (allegations insufficient in "the absence of any allegation that such data had been presented to management"). Rather than permitting an inference of culpability, discussions regarding a site's efficiency raise the unremarkable inference that any senior executive desires to improve efficiency. *See Glaser*, 772 F. Supp. 2d at 586; *cf. Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019). Where, as here, a "plausible nonculpable explanation[]" is more likely than fraud, plaintiff has failed to establish scienter. *Tellabs, Inc.*, 551 U.S. at 323–24.

## III.    Plaintiff Fails to Plead Loss Causation.

To plead loss causation for the Section 10(b) and 20(a) claims, Plaintiff must demonstrate that (1) they purchased a security at a market price that was artificially inflated by a fraudulent misrepresentation; *and* (2) the artificial inflation was removed from the market price because of a corrective disclosure revealing the truth to the market. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342–47 (2005). Plaintiff fails to satisfy both requirements.

### A. Plaintiff Fails to Plead that the Drop is Attributable to a Corrective Disclosure.

Plaintiff's failure to allege any corrective disclosure is fatal. Plaintiff claims the "truth" was "revealed to the market" by the Short Report, but fails to cite a single "then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); ¶¶ 113–121. Tellingly, the CAC never refers to the Short Report as a corrective disclosure. Nor could it.

As the Second Circuit recently reaffirmed, "a negative characterization of already-public information" cannot support loss causation, even if a "generalized investor reaction of concern caus[ed] a temporary share price decline." *Menorah Mivtachim Ins. Ltd. v Sheehan*, 2024 WL 1613907, at *2 (2d Cir Apr. 15, 2024) (quoting *Omnicom*, 597 F.3d at 512). Here, the CAC "fails plausibly to allege that the [Short] Report was a *corrective* disclosure" because the "Report did not

24

'correct' public knowledge about the company." *Harris*, 135 F. Supp. 3d at 173 n.30 (emphasis in original).

On the very first page, the Short Report warns readers that J Capital Research "will realize significant gains in the event that the prices of [Hut 8's] securities decline." *See* Short Report at 1. To realize that "significant gain," J Capital tries to convince the market of its opinion: that USBTC was near bankruptcy and that the King Mountain JV had energy and connectivity issues. But fatally to Plaintiff's claims, it does so by cherry-picking sections of disclosures made by the Company itself or other publicly available filings. *See* Short Report at 6 (citing to Hut 8's August 14, 2023 6-K, February 2023 S4, and November 2023 S4), Short Report at 22–23 (citing to publicly available bankruptcy filings).

The Short Report's opinion that USBTC "was teetering on bankruptcy," Short Report at 26, and that the King Mountain JV "lacked both reliable power and internet," *id.* at 21, is based on information that had *previously* been disclosed to the market. *See id.* at 22–24, 28–29, 32–34. The Short Report's speculative assessment that "the facility *now* uses a Starlink satellite network" is a statement about the facility's present internet source, not that the facility lacked broadband or experienced any issues when the alleged misstatements were made. *Id*. at 24 (emphasis added). J Capital's criticism of King Mountain JV, based on unspecified "diligence" and the opinion of one person who "managed a large data center" who dislikes Starlink, *id.* at 24, conveys nothing about the facility's energy and internet capabilities when the statements were made and could not have revealed anything new regarding whether Defendants' statements were true or accurate. *See Harris*, 135 F. Supp. 3d at 173 n.30 ("[A] particular disclosure constitutes a sufficient foundation for loss causation allegations *only if* it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate." (emphasis added)).

Indeed, "time has shown that" the Short Report "did not 'correct' public knowledge about the company" and Hut 8 "has not restated its financial statements." *Id.* In less than a month, by the close of February 14, 2024, the stock price recovered and has increased by roughly 300% since the Short Report was published. *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 103 (S.D.N.Y. 2011) (Plaintiff's failure to address a rebound in stock price after the alleged corrective disclosure rendered their loss causation allegation implausible.)

"Rather than injecting new information into the market that was absorbed into a corrected stock price, the [Short] Report caused a temporary price drop (which presumably resulted in a pecuniary gain for its author)." *Reed v. Amira Nature Foods Ltd.*, 2016 WL 6571281, at *12 (C.D. Cal. 2016). Unsurprisingly, this Court has repeatedly held that a short seller's report that fails to inform the market of undisclosed facts concerning the alleged misrepresentations cannot constitute a corrective disclosure. *See, e.g., id.*; *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 465–466 (S.D.N.Y. 2022) (short seller's report was not a corrective disclosure because "plaintiffs have failed to plausibly allege that the Report revealed an undisclosed fact possessing a sufficient nexus to the challenged statements[.]"); *Boluka Garment Co., Ltd. v Canaan Inc.*, 547 F.Supp.3d 439, 446 (S.D.N.Y. 2021) (short-seller's report that did not reveal "truth regarding the alleged fraud" cannot be a corrective disclosure), *see also Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019) (failure to plead loss causation where third party article "did not reveal any undisclosed information" and "relied on public information" to form an opinion about share value); *Reed*, 2016 WL 6571281, at *12 (short reports not "corrective" when passage of time shows that the report did not provide new information to the market). For the same reason, the Short Report cannot also serve as a basis for a materialization of risk. *See In re Xunlei Ltd. Sec.*

*Litig.*, 2019 WL 4276607, at \*12 (S.D.N.Y. Sept. 10, 2019) (statements that "fail to reveal any new facts not already known to the public" cannot be the basis for "materialization of risk.").

Because Plaintiff "failed to plausibly allege that the Report revealed an undisclosed fact possessing a sufficient nexus to the challenged statements, they have not pled loss causation." *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d at 466.

## B. Plaintiff Failed to Allege that Hut 8's Shares were Artificially Inflated by Fraudulent Misrepresentation.

In addition to failing to allege any corrective disclosure, nowhere does Plaintiff plead that the decline in Hut 8's share price is attributable to any such alleged misrepresentations—because they are unable to do so. Plaintiff must allege a direct "relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal citation omitted).

Plaintiff tries to conflate the Short Report with the alleged misstatements by arguing that "misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed" by the Short Report. ¶ 142. Critically, Plaintiff fails to disaggregate the price drop stemming from the negative spin on previously disclosed information from any purportedly undisclosed information with a sufficient nexus to the challenged statements. Plaintiff must "disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements." *Central States, Southeast and Southwest Areas Pension Fund v. Federal Home Loan Mortg. Corp.*, 543 Fed. App'x. 72, 76 (2d Cir. 2013) (quoting *In re Merrill Lynch & Co Research Reports Sec. Litig.*, 568 F.Supp.2d 349, 364 (S.D.N.Y. 2008)); *Gordon Partners v. Blumenthal*, 2007 WL 1438753, \*1 (S.D.N.Y. 2007), *aff'd*, 293 Fed. App'x. 815 (2d Cir. 2008) (A plaintiff must

27

"eliminat[e] … that portion of the price decline that is the result of forces unrelated to the wrong."). "[S]eek[ing] to draw inferences of general damage to shareholder value based on, essentially, anything negative that was associated" with the company is insufficient to demonstrate loss causation. *In re Mylan N.V. Sec. Litig.*, 666 F Supp 3d 266, 325 (S.D.N.Y. 2023). Plaintiff's failure to disaggregate the losses from the price drop on January 18, 2024, when the Short Report was published, compels dismissal of the Section 10(b) and 20(a) claims.

## IV. Individual Defendants Cannot Be Held Liable for Statements They Are Not Alleged to Have Personally "Made."

Plaintiff fails to allege that Visram or Leverton "made" any of the alleged misstatements, apart from a single statement from the Company's December 2023 10-Q, to which Leverton was a signatory. Ex. 6. The Section 10(b) claims against Leverton and Visram for the remaining alleged misstatements must be dismissed.

Rule 10b-5 prohibits "any person" from "mak[ing] any untrue statement of a material fact" in connection with a securities purchase or sale. 17 C.F.R. § 240.10b-5(b). To be held liable, a defendant must have "made" the alleged misstatements. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141(2011). The "maker" of a statement "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id*. And, as this Court has previously held, "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012).

Apart from the December 2023 10-Q, Plaintiff fails to plead that either Leverton or Visram had "ultimate authority" over the alleged misstatements. *See* ¶ 66; *id*. Plaintiff does not allege that either Leverton or Visram signed the Registration Statement. The only additional allegation put forth as to Leverton's control over the Registration Statement is that she is identified as a

28

prospective director of the Company.  ¶ 161.  But simply "consenting to being listed as director-nominee[]" is insufficient to establish the requisite authority under *Janus*.  *See City of Roseville Emps. Ret. System v. Energy Solutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (defendants listed as director-nominees who did not sign registration statement could not be held liable for alleged misstatements); *see also Smith Barney*, 884 F. Supp. 2d 152 at 165.  Plaintiff concedes that the "statements in the Registration Statement . . . were *made by Genoot and Ho*," but then suggests that these same statements can be attributed to other Individual Defendants.  ¶ 91 (emphasis added).  This position is at odds with the Supreme Court's holding that an Individual Defendant cannot be liable for statements that they did not "make."  *Janus*, 564 U.S. 135 at 138.  The 10(b) claim against Visram must be dismissed as to all statements, and must be dismissed against Leverton for all statements other than the single statement in the December 2023 10-Q.

## V.    Plaintiff Lacks Standing to Bring Section 10(b) Claims Based on Any Pre-Merger Statements About USBTC.

Plaintiff lacks statutory standing to bring claims under Section 10(b) and Rule 10b-5 based on statements made about USBTC prior to the Merger.  *See, e.g.*, ¶ 1 (identifying start of class period as February 13, 2023); Appendix A at A1-A6, B1-B4, C1-C2.  In *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, the Second Circuit explained that "[u]nder the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities about which a misstatement was made."  54 F.4th 82, 84 (2d Cir. 2022) (citations omitted).

Here, certain of the alleged misstatements discussing USBTC's financial condition or energy and internet capabilities were made on the Company's S-4, filed February 13, 2023, nine months before the Merger when Company shares first became available.  *See* ¶¶ 60-79 (USBTC); 86-100 (King Mountain), 102-103 (USBTC), 108 (USBTC).  The CAC is explicit that those statements are "about" USBTC, but Plaintiff does not allege that he bought shares in that entity.

29

Instead, his claims rest solely on his purchases of shares in the new entity, Hut 8.  *See* ¶ 16 ("Lead Plaintiff Abhishek Maheshwari purchased Hut 8 securities").  In addition, Plaintiff disclosed to the Court that he purchased Company stock from December 19, 2023 through January 9, 2024. Dkt. No. 28-1, Lead Pl.'s Damages Analysis and Holdings; *see also* ¶ 59 ("On November 30, 2023, the Merger between Legacy Hut and USBTC closed.").

Accordingly, all of Plaintiff's Exchange Act claims based on any pre-Merger statements must be dismissed.  *See In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at \*5 (S.D.N.Y. Mar. 29, 2024) (no standing where pre-merger statements were later incorporated into post-merger SEC filings, which was "precisely the argument that *Frutarom* foreclosed"); *see also In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 78 (S.D.N.Y. 2023) (rejecting that ownership of shares in post-merger entity was interchangeable with shares in pre-merger, privately held target company).[6]

### CONCLUSION

For the above reasons, the CAC should be dismissed in its entirety, with prejudice, together with such other, further, and different relief as the Court deems just and proper.

---

[6] The control-person claims must be dismissed because Plaintiff fails to state primary violations under either the Securities Act or the Exchange Act. *Rombach v. Chang,* 355 F.3d 164, 177–78 (2d Cir. 2004) (claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act are "necessarily predicated on a primary violation of securities law.").

Dated: December 2, 2024
     New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By:*/s/ Mary Beth Maloney*
    Mary Beth Maloney

Mary Beth Maloney
Monica K. Loseman
Kate Joo Hyun Lee
Raena Ferrer Calubaquib (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035
MMaloney@gibsondunn.com
MLoseman@gibsondunn.com
KLee@gibsondunn.com
RCalubaquib@gibsondunn.com

*Attorneys for Defendants*

31

**Appendix A**

Chart of Alleged Misstatements

| # | CAC ¶ | Statement and Source[1] | Defenses | Risk Disclosures/Relevant Additional Context[2] |
|---|---|---|---|---|
| **A. Financial Condition Statements** | | | | |
| A1. | 61 | "[USBTC] has experienced losses since inception. As of June 30, 2022, [USBTC] had cash of $21.1 million, positive operating cash flows of $1.4 million, working capital of ($63.1) million, total stockholders' equity of $87.6 million and an accumulated deficit of $40.9 million. Working capital of ($63.1) million is the result of [USBTC]'s current portion of notes payable, see Note 16 which addresses the extinguishment of $89.1 million of notes payable. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. **[USBTC] believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.**"<br><br>(Initial Registration Statement in Note 2 to USBTC's Consolidated Financial Statements.  Ex. 7.)<br><br>(The first, second, and third amendments to the registration statement contain identical statements regarding the "Liquidity and Financial Condition" of USBTC in Note 2 to USBTC's Consolidated Financial Statements.  Exs. 8, 9, 10.) | Not False<br><br>Opinion<br><br>Puffery<br><br>Forward-looking<br><br>Scienter<br><br>Loss Causation<br><br>Standing | ***USBTC is an early-stage company with limited operating history and may never become profitable.*** …. To date, USBTC has incurred losses as set forth below and may never become profitable. …. As of June 30, 2023, USBTC had an accumulated deficit of $106.5 million.….<br><br>Additionally, there can be no assurance that additional funding will be available to USBTC for the development of its business, which will require the commitment of substantial resources. … Accordingly, you should consider USBTC's prospects in light of the costs, uncertainties, delays and difficulties frequently encountered by companies in the early stages of development. Potential investors should carefully consider the risks and uncertainties that a company with a limited operating history will face. In particular, potential investors should consider that USBTC may be unable to:<br><br>• successfully implement or execute its business plan, or demonstrate that its business plan is sound;<br>• adjust to changing conditions or keep pace with increased demand; or<br>• attract and retain an experienced management team; or raise sufficient funds in the capital markets to effectuate its business plan. |

---

[1] Emphasis consistent with CAC.

[2] For ease of review, citations are to November 9, 2023 Registration Statement (the effective version), which reflects the Initial Registration Statement and all amendments thereto. Emphasis in original.

1

| # | CAC ¶ | Statement and Source[1] | Defenses | Risk Disclosures/Relevant Additional Context[2] |
|---|---|---|---|---|
| | | | | (November 9, 2023 Registration Statement (Ex. 2) at 41-42.) *USBTC faces certain risks associated with its current indebtedness, and failure to service debt under contracted terms may have a material adverse effect on the company's business, financial condition, and results of operations.* USBTC is subject to a number of risks associated with its indebtedness. USBTC must dedicate a portion of its cash flows from operations to pay debt service costs, and it therefore has less funds available for operations and other purposes. All else being equal, USBTC is more vulnerable to economic downturns and fluctuations in interest rates, less able to withstand competitive pressures and less flexible in reacting to changes in the industry and general economic conditions. If USBTC were to default under any of its existing credit facilities or if its creditors demand payment of a portion or all of its indebtedness, USBTC may not have sufficient funds to make such payments and/or it may result in the repossession of assets encumbered by its creditors . . . . (November 9, 2023 Registration Statement (Ex. 2) at 48.) USBTC has experienced significant negative cash flow from operations to date and may continue to experience significant negative cash flow in the future. While USBTC has experienced historical losses and liquidity issues, it had enough cash or cash equivalents to pay the one holder of Series A Shares. (November 9, 2023 Registration Statement (Ex. 2) at 53.) |

| # | CAC ¶ | Statement and Source[1] | Defenses | Risk Disclosures/Relevant Additional Context[2] |
|---|---|---|---|---|
| A2. | 63 | "[USBTC] has experienced losses since inception. As of September 30, 2022, [USBTC] had cash of $11.4 million, positive operating cash flows of $8.4 million, working capital of ($88.8) million, total stockholders' equity of $89.9 million and an accumulated deficit of $41.4 million. Working capital of ($88.8) million is the result of the [USBTC]'s current portion of notes payable, see Note 15 which addresses the extinguishment of $89.1 million of notes payable. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. [USBTC] believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued." <br><br> (Initial Registration Statement in Note 2 to USBTC's Unaudited Condensed Financial Statements.  Ex. 7.) | Not False<br><br>Opinion<br><br>Puffery<br><br>Forward-looking<br><br>Scienter<br><br>Loss Causation<br><br>Standing | See above at A1. |
| A3. | 64 | "**[USBTC] believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.**" <br><br> (The first, second, and third amendments to the registration statement contain similar statements regarding the "Liquidity and Financial Condition" of USBTC in Note 2 or 3 to USBTC's Unaudited Condensed Financial Statements.  Exs. 8, 9, 10.) | Not False<br><br>Opinion<br><br>Puffery<br><br>Forward-looking<br><br>Scienter<br><br>Loss Causation<br><br>Standing | See above at A1. |
| A4. | 65 | "[USBTC] has experienced losses since inception. As of June 30, 2023, [USBTC] had cash of $10.4 million, operating cash flows of ($29.3) million, total stockholders' equity of $27.4 million and an accumulated deficit of $106.5 million. To date, [USBTC] has, in large part, relied on equity and debt | Not False<br><br>Opinion<br><br>Puffery | See above at A1. |

3

| # | CAC ¶ | Statement and Source[1] | Defenses | Risk Disclosures/Relevant Additional Context[2] |
|---|---|---|---|---|
| | | financings to fund its operations. **[USBTC] believes its current cash on hand, proceeds from the sales of cryptocurrency and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these consolidated financial statements are issued.**"<br><br>(Fourth, fifth, sixth, and seventh amendments to the registration statement, and the Prospectus in Note 2 to USBTC's Consolidated Financial Statements.  Exs. 11, 12, 13, 2, 3.) | Forward-looking<br><br>Scienter<br><br>Loss Causation<br><br>Standing (for fourth, fifth, and sixth amendments) | |
| A5. | 66 | "[USBTC] has experienced losses since inception. As of September 30, 2023, [USBTC] had cash of $12.7 million, positive operating cash flows of $2.2 million, working capital of $11.2 million, total stockholders' equity of $23.3 million and an accumulated deficit of ($110.9) million. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. **[USBTC] believes its current cash on hand, proceeds from the sale of cryptocurrency, and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.**"<br><br>(December 19, 2023 10-Q in Note 2 to USBTC's Unaudited Condensed Financial Statements.  Ex. 6.) | Not False<br><br>Opinion<br><br>Puffery<br><br>Forward-looking<br><br>Scienter<br><br>Loss Causation | See above at A1. |
| A6. | 67 | "USBTC has incurred net losses since its inception **but does not anticipate it will continue to incur net losses for the foreseeable future**"<br><br>(Initial Registration Statement, all amendments thereto, and the Prospectus in "Liquidity and Capital Resources" section.  Exs. 7-13, 2, 3.) | Not False<br><br>Opinion<br><br>Puffery<br><br>Forward-looking<br><br>Scienter | See above at A1. |

4

| # | CAC ¶ | Statement and Source[1] | Defenses | Risk Disclosures/Relevant Additional Context[2] |
|---|---|---|---|---|
| | | | Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | |
| A7. | 68 | "[USBTC] has experienced losses since inception. As of June 30, 2023, [USBTC] had cash of $10.4 million, operating cash flows of ($29.3) million, total stockholders' equity of $27.4 million and an accumulated deficit of $106.5 million. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. **[USBTC] believes its current cash on hand, proceeds from the sales of cryptocurrency and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these consolidated financial statements are issued.**"<br><br>(Forms S-8, incorporating Prospectus by reference.  Ex. 14.)<br><br>"USBTC has incurred net losses since its inception **but does not anticipate it will continue to incur net losses for the foreseeable future**"<br><br>(Forms S-8, incorporating Prospectus by reference.  Ex. 14.) | Not False<br><br>Opinion<br><br>Puffery<br><br>Forward-looking<br><br>Scienter<br><br>Loss Causation | See above at A1. |

| B. Energy and Connectivity Statements | | | | |
|---|---|---|---|---|
| B1. | 88 | "The USBTC team will bring significant leadership in energy orientation, development, demand response, hedging, grid stabilization analytics to [the Company], which will enhance [the Company]'s ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets."<br><br>(Initial Registration Statement, all amendments thereto, and the Prospectus in "Questions and Answers about the Business Combination." Exs. 7-13, 2, 3.) | Not False<br><br>Puffery<br><br>Opinion<br><br>Scienter<br><br>Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | Key strategic advantages of the Business Combination include:<br><br>*A strengthened financial position and flexibility …*<br><br>*An accelerated diversification strategy for New Hut …*<br><br>*Maintaining commitment to advancing the high performance computing traditional data center business …*<br><br>*A strengthened, proven and trusted senior leadership team and board of directors with a track record of value creation …*<br><br>*A growing pipeline of opportunities …*<br><br>*Enhancing New Hut's position in one of the world's high-potential Bitcoin mining regions …*<br><br>*Advancing commitment to driving improvements across all ESG metrics …*<br><br>*Improving New Hut's energy expertise and hedging capabilities*<br>The USBTC team will bring significant leadership in energy origination, development, demand response, hedging, grid stabilization and analytics to New Hut, which will enhance New Hut's ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets.<br><br>(November 9, 2023 Registration Statement (Ex. 2) at 1-2.)<br><br>In reaching its decision to approve the Business Combination, the Hut 8 Board considered a variety of factors, including its knowledge of USBTC's |

6

| | | | | |
|---|---|---|---|---|
| | | | | business, operations, financial condition, results of operations and prospects, as well as the risks in achieving those prospects, including uncertainties associated with achieving financial forecasts. In making its determination, the Hut 8 Board considered a number of factors, including, but limited to, the following:<br><br>the Hut 8 Board's belief that the Business Combination would enhance Hut 8's competitive position by increasing its operating scale and scope, diversifying its business model, and strengthening its balance sheet; …<br><br>the Hut 8 Board's belief that the USBTC team brings significant leadership in energy origination, development, demand response, hedging, grid stabilization, and analytics significantly enhancing Hut 8's ability to mitigate fluctuating energy prices across markets; …<br><br>the Hut 8 Board's understanding of the business, assets and liabilities, results of operations, financial performance, strategic direction and prospects of each of USBTC and Hut 8; and<br><br>the result of Hut 8's commercial, financial, and legal due diligence of USBTC and the reputation, business practices, and experience of USBTC and its management.<br><br>(November 9, 2023 Registration Statement (Ex. 2) at 87-88.) |
| B2. | 89 | "The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sources from ERCOT . . . ." | Not False<br><br>Opinion<br><br>Puffery<br><br>Scienter | ***Although USBTC expects that the acquisition of the King Mountain JV interest will result in benefits to it, USBTC may not realize those benefits due to unforeseen difficulties.***<br>USBTC recently acquired its 50% interest in the King Mountain JV, including assuming an approximately $96.8 million promissory note in |

| | | |
|---|---|---|
| (Initial Registration Statement, all amendments thereto, and the Prospectus in "Commitment to ESG." Exs. 7-13, 2, 3.) | Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | connection with the acquisition. USBTC acquired this interest on an "as is" basis from a bankruptcy administrator or trustee with limited representations, which limits USBTC's recourse against the sellers of the interest after closing, which in turn may expose us to unexpected material losses or expenses after the closing. USBTC's diligence investigations with respect to the King Mountain JV were limited, which may also expose us to unexpected material losses or expenses after the closing.<br><br>(November 9, 2023 Registration Statement (Ex. 2) at 44.)<br><br>***USBTC faces certain risks associated with its current joint venture and may face similar risks in the future by entering into other joint ventures, and the materialization of any of these risks may have a material adverse effect on the company's business, financial condition, and results of operations.***<br>Joint ventures inherently involve a lesser degree of control over business strategy and operations, thereby potentially increasing the financial, legal, operational, regulatory, and/or compliance risks associated with them, and require the diversion of financial and management resources from existing operations or alternative opportunities. …<br><br>For example, USBTC owns a 50% membership interest in a joint venture with one of the world's largest renewable energy producers with respect to the Echo data center in King Mountain, Texas. …<br>If the member managers of USBTC and its joint venture partner are not aligned with respect to business interests, strategies, or goals, or if the member managers of USBTC and its joint venture partner cannot reach agreement in decision-making processes, there is a risk that USBTC may not be able to operate the King Mountain site optimally from a financial, legal, operational, regulatory, and/or compliance perspective. If this |

8

| | | | | |
|---|---|---|---|---|
| | | | | situation materializes, it may have a material adverse effect on the company's business, financial condition, and results of operations.<br><br>Business decisions or other actions or omissions of the partners, controlling shareholders, management, or other persons or entities who control them may adversely affect the value of USBTC's interest in the joint venture, result in litigation or regulatory action against USBTC, and may otherwise damage USBTC's reputation and brand.<br><br>(November 9, 2023 Registration Statement (Ex. 2) at 47-48.) |
| B3. | 90 | "The operation of the grids USBTC relies on, including the . . . [Electrical Reliability Counsel of Texas (ERCOT)] grid[] . . . subjects USBTC to a variety of risks, including the breakdown and failure of equipment . . . [and] outages affecting information technology systems."<br><br>(Initial Registration Statement, all amendments thereto, and the Prospectus in "USBTC's Power Generation-Related Risks." Exs. 7-13, 2, 3.) | Not False<br><br>Scienter<br><br>Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | ***The grids that USBTC relies on for energy may not be able to operate as planned, which may increase USBTC's expenses and decrease its revenues and have an adverse effect on USBTC's business, financial condition and results of operations.***<br>The operation of the grids USBTC relies on, including the NYISO and ERCOT grids, as well as USBTC's information technology systems and other assets and conduct of other activities subjects USBTC to a variety of risks, including the breakdown or failure of equipment, accidents, security breaches, viruses or outages affecting information technology systems … These events may impact USBTC's ability to conduct its businesses efficiently and lead to increased costs, expenses or losses. Planned and unplanned outages with respect to the power grids that USBTC relies on may require USBTC to purchase power at then-current market prices which could have a negative impact on the cost structure of USBTC's Bitcoin mining operations.<br><br>(November 9, 2023 Registration Statement (Ex. 2) at 64.) |

9

| | | | | |
|---|---|---|---|---|
| | | | | ***The properties included in USBTC's mining and hosting network may experience damages, including damages that are not covered by insurance.*** USBTC's current mining and hosting operations in New York, Nebraska and Texas are, and any future mines USBTC establishes will be, subject to a variety of risks relating to physical condition and operation…For example, a mine could be rendered inoperable, temporarily or permanently, as a result of a fire or other natural disaster … Additionally, a mine could be materially adversely affected by a power outage or loss of access to the electrical grid or loss by the grid of cost-effective sources of electrical power generating capacity. Given the power requirement, it would not be feasible to run miners on back-up power generators in the event of a power outage. USBTC's insurance may cover all or a portion of the replacement cost of any lost or damaged miners, but does not cover any interruption of its mining activities; … In the event of an uninsured loss, … such mines may not be adequately repaired in a timely manner or at all and USBTC may lose some or all of the future revenues anticipated to be derived from such mines.<br><br>(November 9, 2023 Registration Statement (Ex. 2) at 50.)<br><br>***The cost of obtaining new and replacement miners and parts has historically been capital-intensive and is likely to continue being capital-intensive, which could materially and adversely affect USBTC's business, financial condition, and results of operations.*** USBTC's mining operations can only be profitable if the costs, inclusive of hardware and electricity costs, associated with mining digital assets is lower than the price of the digital assets mined at the time of sale. … |

10

If USBTC is unable to obtain a sufficient unit volume of miners and equipment at scale, it may be unable to remain competitive in a highly competitive and evolving industry. If this happens, USBTC may not be able to mine digital assets as efficiently or at a comparable scale as competitors. As a result, the company's business, financial condition, and results of operations could suffer. This could, in turn, materially and adversely affect the trading price of the company's common stock and investors could lose part or all of their investment.

(November 9, 2023 Registration Statement (Ex. 2) at 42.)

***Failure of critical systems of the hosting facilities operated by USBTC and the services provided by USBTC could have a material adverse effect on its business, financial condition, and results of operations.***

The critical systems of the hosting facilities operated by USBTC and the services provided by USBTC are subject to failure. Any failure in the critical systems of any hosting facility operated by USBTC or services provided by USBTC, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, power supplies or network connectivity, whether or not within the company's control, could result in service interruptions to the company's customers and/or damage to equipment, which could significantly disrupt the normal business operations of the company's customers, harm the company's reputation, and reduce the company's revenue. Temporary downtime at any hosting facility operated by USBTC could reduce the amount of Bitcoin mined by the company and thereby reduce the profitability of its hosting customers. … Since the company's ability to attract and retain customers depends on its ability

11

|  |  |  | to provide a reliable service, even minor interruptions in service could harm the company's reputation and negatively impact its revenue and profitability. Any of these events may result in financial penalty, which could have a material adverse effect on its business, financial condition, and results of operations

The services provided by USBTC are subject to temporary or permanent interruption by factors that include but are not limited to:

- Power loss;
- Equipment failure; …
- Failure by USBTC or its suppliers to provide adequate service or maintain equipment;
- Network connectivity downtime and fiber cuts; …

(November 9, 2023 Registration Statement (Ex. 2) at 45.)

***USBTC's commercial success depends in large part on its ability to contribute computing power to pools that mine digital assets for the company and its hosting customers, attract and retain customers within the company's hosting and property management businesses, and sell mining equipment profitably. Increases in power costs or an inability to mine digital assets efficiently at favorable prices will reduce the company's operating margins, impact its ability to attract and retain customers, and harm its growth prospects and could have a material adverse effect on USBTC's business, financial condition and results of operations.***
USBTC's growth depends in large part on its ability to contribute computing power to pools that mine digital assets for the company and its hosting customers, attract and retain customers within the company's hosting and property management businesses, and sell mining |

| | | | | |
|---|---|---|---|---|
| | | | | equipment profitably. With respect to its hosting and property management businesses, USBTC may not be able to attract and retain customers for a number of reasons, including if:<br><br>…<br><ul><li>USBTC is unable to provide services that meet the needs of existing or potential customers; …</li><li>USBTC provides hosting or property management services that are deemed by existing and potential customers to be inferior to those of its competitors;</li><li>USBTC fails to meet customers' ongoing and evolving program qualification standards, based on a range of factors, including available power, preferred site design specifications, security considerations and connectivity; …</li></ul><br>(November 9, 2023 Registration Statement (Ex. 2) at 46-47.) |
| B4. | 92 | "***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin***.<br>A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin."<br><br>(Initial Registration Statement, all amendments thereto, and the Prospectus in "Risks Relating to USBTC's Business." Exs. 7-13, 2, 3.) | Forward-Looking Statement<br><br>Scienter<br><br>Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | See above at B3. |

13

| | | **C. Regulation S-K Statements** | | |
|---|---|---|---|---|
| C1. | 102 | "USBTC has incurred net losses since its inception but does not anticipate it will continue to incur net losses for the foreseeable future."<br><br>(Initial Registration Statement, all amendments thereto, and the Prospectus in "Liquidity and Capital Resources" section.  Exs. 7-13, 2, 3.) | Forward-Looking Statement<br><br>Opinion<br><br>Puffery<br><br>Scienter<br><br>Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | See above at A1. |
| C2. | 108 | *"USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.*<br>A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin."<br><br>(Initial Registration Statement, all amendments thereto, and the Prospectus in "Risks Relating to USBTC's Business."  Exs. 7-13, 2, 3.) | Forward-Looking Statement<br><br>Scienter<br><br>Loss Causation<br><br>Standing (for Initial Registration Statement and first through sixth amendments) | See above at B3. |

14