# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE HUT 8 CORP. SECURITIES LITIGATION | Case No. 1:24-cv-00904-VM

CLASS ACTION |
| THIS DOCUMENT RELATES TO:

ALL ACTIONS | CONSOLIDATED AMENDED COMPLAINT |

{00606969;7 }

# TABLE OF CONTENTS

NATURE OF THE ACTION AND OVERVIEW ........................................................... 1

JURISDICTION AND VENUE ................................................................................. 3

PARTIES ....................................................................................................... 3

BACKGROUND ............................................................................................... 5

    The Bitcoin Industry .................................................................................. 5

    The Parties to the Merger ........................................................................... 6

    The Merger ............................................................................................. 8

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...................................................................................................... 10

    A.    Failure to Disclose That USBTC Was on the Brink of Bankruptcy ..................... 10

    B.    Defendants Touted the Purported Benefits of the Merger with USBTC but Failed to Disclose the Energy and Internet Issues at the King Mountain JV .................. 16

    C.    The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K .................................................... 19

THE TRUTH EMERGES .................................................................................... 21

NO SAFE HARBOR ......................................................................................... 23

ADDITIONAL SCIENTER ALLEGATIONS .............................................................. 23

LOSS CAUSATION .......................................................................................... 26

CLASS ACTION ALLEGATIONS .......................................................................... 26

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .................................................................................................. 28

COUNT I ...................................................................................................... 30

COUNT II ..................................................................................................... 32

COUNT III .................................................................................................... 32

COUNT IV .................................................................................................... 35

PRAYER FOR RELIEF ...................................................................................... 36

JURY TRIAL DEMANDED ................................................................................. 37

Lead Plaintiff Abhishek Maheshwari ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon his personal knowledge as to the allegations concerning him and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based upon the investigation conducted by Lead Counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Hut 8 Corp. ("Hut 8" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Hut 8; (c) review of other publicly available information concerning Hut 8; and (d) interviews with a confidential witness ("CW") who was a former employee of the Company.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action, against Hut 8 and certain of its former and present officers and directors, on behalf of all persons and entities that purchased or otherwise acquired Hut 8 securities between February 13, 2023 and January 18, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Hut 8 is a large-scale energy infrastructure and one of North America's largest Bitcoin miners. Hut 8 acquires, designs, builds, manages, and operates data centers that power compute-intensive workloads such as Bitcoin mining, high performance computing, and artificial intelligence. It derives revenue from digital assets mining (self-mining), managed services, high performance computing, hosting, and equipment sales and repairs.

3. Hut 8 formed following the November 2023 merger of Hut 8 Mining Corp. ("Legacy Hut") and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC") (the "Merger").

4. Legacy Hut was a large, innovation-focused digital asset miner and high-performance computing infrastructure provider.

5. USBTC was a builder and strategic operator of Bitcoin mining sites.

6. In connection with the Merger, Defendants made materially false and/or misleading statements regarding USBTC's financial condition and cash flows. Specifically, Defendants misleadingly suggested that USBTC was financially sound enough to sustain operations for another year and had improving cash flows, but the Merger saved USBTC from imminent bankruptcy and USBTC's historical financial statements supported that it would continue to incur net losses.

7. In addition, despite touting the energy potential of the Merger, Defendants also failed to disclose the energy issues with one of USBTC's digital asset mining sites, the King Mountain joint venture.

8. Defendants also failed to disclose that the risks associated with the loss of internet connectivity had already materialized at the King Mountain joint venture, rendering their disclosure of that risk inadequate and misleading.

9. On January 18, 2024, J Capital Research published a report (the "Short Seller Report") which alleged, *inter alia*, that Legacy Hut's merger with USBTC was premised on a number of alleged misstatements, including that (1) without the Merger, USBTC would have undergone bankruptcy and (2) USBTC's King Mountain joint venture, "has historically failed to provide energy and high-speed internet."

10. On this news, Hut 8's stock price fell $2.16, or 23.3%, to close at $7.12 per share on January 18, 2024, on unusually heavy trading volume.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to § 22 of the Securities Act (15 U.S.C.§ 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15.     In connection with the acts alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Lead Plaintiff Abhishek Maheshwari purchased Hut 8 securities traceable to the Registration Statement or the Forms S-8 (as defined below) at artificially inflated prices during the Class Period and suffered as a result of Defendants' violations of the federal securities laws, as alleged herein.

17.     Defendant Hut 8 is incorporated under the laws of Delaware with a principal place of business in Miami, Florida. Hut 8's common stock trades on NASDAQ under the ticker symbol "HUT." Prior to the Merger, Legacy Hut's common stock also traded on NASDAQ under the symbol "HUT."

18.     Defendant Asher Genoot ("Genoot") was the Company's President at all relevant times. Prior to the Merger, Genoot was the President and a director of USBTC.

19.     Defendant Michael Ho ("Ho") was the Company's Chief Strategy Officer at all relevant times. Prior to the Merger, Ho was the Chief Executive Officer ("CEO") and chairman of the board of USBTC. Ho consented to being named as a prospective director of the Company in the initial registration statement filed with the SEC on February 13, 2023, and the exhibit containing his written consent was incorporated in all amendments thereto.

20.     Defendant Jaime Leverton ("Leverton") was the Company's CEO at all relevant times. Prior to the Merger, Leverton was the CEO of Legacy Hut. Leverton consented to being named as a prospective director of the Company in the initial registration statement filed with the SEC on February 13, 2023, and the exhibit containing her written consent was incorporated in all amendments thereto.

21.     Defendant Shenif Visram ("Visram") was the Company's Chief Financial Officer ("CFO") at all relevant times. Prior to the Merger, Visram was the CFO of Legacy Hut.

22.     Defendants Genoot, Ho, Leverton, and Visram (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings, press releases, and other market communications alleged herein to be misleading prior to,

{00606969;7 }                                                4

or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information – through their prior roles with Legacy Hut and USBTC, their roles with the Company following the Merger, and, upon information and belief, their access to the due diligence materials – the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## BACKGROUND

### The Bitcoin Industry

23. Bitcoin is a decentralized, peer-to-peer virtual currency that exists solely in electronic form and is the most utilized digital asset in the retail and commercial marketplace.

24. Bitcoin is used like money and can be exchanged for traditional currencies or used to purchase goods and services, typically online.

25. Bitcoin is stored in a digital wallet, which is secured by a unique private key that enables the Bitcoin owner to authorize transactions and prove ownership.

26. Bitcoin is built on a distributed digital record called a blockchain, and transactions are secured by a distributed network of participants.

27. The Bitcoin blockchain is a decentralized, peer-to-peer network of data made up of a chain of "blocks" that contain information about each Bitcoin transaction.

28. Blocks are strung together in chronological order, creating a digital chain of blocks, and once a block is added to the blockchain, anyone can view it.

29. However, before a block is added to the Bitcoin blockchain, it first must be verified through a process called mining.

30. Mining is the process by which specialized computer equipment solves complex math problems to verify and secure transactions and create new blocks in the Bitcoin blockchain.

31. Mining hardware provides computing power, which is measured in "hashrate" or "hashes per second." A "hash" is a single computation run by a miner to attempt to create a new block in the Bitcoin blockchain.

32. The more hashes per second a miner provides, the greater probability of the miner creating a new block.

33. Successfully adding a block to the blockchain results in a reward of Bitcoin.

34. The process of mining requires significant computing power, and therefore, vast amounts of electricity.

35. Most Bitcoin mining is conducted by mining pools, which coordinate groups of miners that work together to have a better chance of being rewarded Bitcoin. Mining pools share the payouts among participants.

## The Parties to the Merger

36. Legacy Hut was a Canada-based public company founded in 2017 that went public in 2018.

37. At the time of the merger, Legacy Hut had two digital asset mining sites in Alberta, Canada, five high performance computing data centers in British Columbia and Ontario, Canada, and one authorized repair center in Alberta, Canada, which was certified by MicroBT, a Bitcoin mining machine manufacturer.

38. Legacy Hut was the first Canadian digital asset miner to list on NASDAQ and it had one of the highest inventories of self-mined Bitcoin of any publicly traded company.

39. USBTC was a privately held Nevada company with a principal place of business in Miami, Florida.

40.     USBTC was an industrial-scale operator of Bitcoin mining sites, and its strategy was to design, build, and operate sites with access to low-cost and sustainable sources of electricity.

41.     As of September 30, 2023, USBTC operated a total of approximately 182,000 miners (including 30,200 owned miners) across four locations, with access to roughly 730 megawatts ("MW") of electricity, via USBTC's mining, hosting, equipment sales, and managed infrastructure operations.

42.     At the time of the merger, USBTC had four digital asset mining sites. It fully owned a site in Niagara Falls, New York, referred to as the "Alpha Site," which had access to approximately 50 MW of electricity. Pursuant to a joint venture agreement, it held a held a 50% interest in a site in King Mountain Texas (the "King Mountain JV"), referred to as the "Echo Site," which had access to approximately 280 MW of electricity. USBTC also managed, under property management agreements, sites in Kearney, Nebraska and Granbury, Texas, referred to, respectively, as the "Charlie Site" and the "Delta Site."  The Kearney and Granbury sites had access to approximately 100 MW and 300 MW of electricity, respectively.

43.     USBTC acquired its 50% interest in the King Mountain JV through a competitive auction process in connection with the Chapter 11 bankruptcy filing of Compute North Member LLC ("Compute North"). It acquired Compute North's 50% interest in TZRC LLC ("TZRC"), an early-stage operator of vertically integrated cryptocurrency mining and power facilities, and assumed a property management agreement with TZRC and a senior secured promissory note related to the King Mountain JV. NextEra Energy, Inc. held the other 50% interest in TZRC.

44.     USBTC's revenue streams included self-mining, hosting third-party machines at its sites for a fee, managed infrastructure, and equipment sales.

45. The only cryptocurrency that USBTC has mined is Bitcoin. UBSTC's goal was to increase the hashrate it operated and to deploy, host, and operate miners with profitable hashrate-to-power cost profiles.

46. Hosting services include the provision of mining equipment, energized spaces, and typically also monitoring, active troubleshooting, and various maintenance levels for the mining equipment.

47. Managed infrastructure services include providing day-to-day management, support, and administrative functions of operating Bitcoin mining datacenters owned or leased by third-party or related party customers, in exchange for management fees and reimbursement of certain operating costs.

### The Merger

48. On February 7, 2023, Legacy Hut and USBTC announced in a press release that their boards had unanimously approved a business combination agreement (the "Business Combination Agreement"), pursuant to which the companies would combine in an all-stock merger of equals and become wholly owned subsidiaries of Hut 8.

49. Under the Business Combination Agreement, Legacy Hut shareholders would receive 0.2 shares of Hut 8 stock for each Legacy Hut Share and USBTC shareholders would receive 0.6716 shares of Hut 8 stock for each share of USBTC capital stock, resulting in Legacy Hut and USBTC shareholders each effectively owning approximately fifty percent of Hut 8 stock.

50. Legacy Hut agreed to provide USBTC with secured bridge financing in the amount of $6-6.5 million in the interim period.

51. Following the Merger, the board of directors of Hut 8 would consist of 5 directors from Legacy Hut and 5 directors from USBTC, including Bill Tai (Legacy Hut) as the Chair of the Hut 8 board.

{00606969;7 }                                   8

52. The senior management team would also include former management of Legacy Hut and USBTC, including Jaime Leverton (Legacy Hut) as CEO, Asher Genoot (USBTC) as President, Michael Ho (USBTC) as Chief Strategy Officer, and Shenif Visram (Legacy Hut) as CFO.

53. On February 13, 2023, Hut 8 filed the initial registration statement on Form S-4 with the SEC announcing the proposed merger between Legacy Hut and USBTC. Genoot and Ho signed the Form S-4.

54. Ho and Leverton submitted their written consent to being named in the registration statement as prospective directors, which are attached as exhibits to the registration statement.

55. Hut 8 filed seven amendments to the registration statement on Forms S-4/A on or around April 18, 2023, June 13, 2023, July 17, 2023, August 24, 2023, September 18, 2023, November 6, 2023, and November 8, 2023. Genoot and Ho signed each amendment to the initial registration statement. Each of the amendments also incorporated the previously filed exhibits consisting of the written consents of Ho and Leverton to be named in the registration statement as prospective directors.

56. The SEC declared the registration statement, as amended, effective on November 9, 2023.

57. On that same day, the Company filed a final prospectus on Form 424(b)(3) (the "Prospectus"), which incorporates the registration statement. The Prospectus and the registration statement, as amended, are collectively referred to as the "Registration Statement."

58. On November 29, 2023, the Company filed three registration statements on Form S-8 (the "Forms S-8"), which registered shares related to employee benefit plans pursuant to and

subject to the terms of the Business Combination Agreement. Genoot and Ho signed each of the Forms S-8 and each of the Forms S-8 incorporated by reference the Prospectus.

59. On November 30, 2023, the Merger between Legacy Hut and USBTC closed.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Failure to Disclose That USBTC Was on the Brink of Bankruptcy

60. Throughout the Class Period, Defendants failed to disclose material details and misled investors about USBTC's financial condition prior to the Merger.

61. The initial registration statement describes the "Liquidity and Financial Condition" of USBTC in Note 2 to its Consolidated Financial Statements as follows:

> [USBTC] has experienced losses since inception. As of June 30, 2022, [USBTC] had cash of $21.1 million, positive operating cash flows of $1.4 million, working capital of ($63.1) million, total stockholders' equity of $87.6 million and an accumulated deficit of $40.9 million. Working capital of ($63.1) million is the result of [USBTC]'s current portion of notes payable, see Note 16 which addresses the extinguishment of $89.1 million of notes payable. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. **[USBTC] believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.**

(Emphasis added).[1]

62. Note 16 refers to USBTC's Master Equipment Finance Agreement ("MEFA") with Arctos Credit, LLC ("Arctos") and First Amendment to the MEFA (the "Amended MEFA"), pursuant to which, *inter alia*, NYDIG ABL LLC ("NYDIG") replaced Arctos as the "Lender" and "Secured Party." It describes:

---

[1] The first, second, and third amendments to the registration statement contain identical statements regarding the "Liquidity and Financial Condition" of USBTC in Note 2 to USBTC's Consolidated Financial Statements.

In February 2023, [USBTC] extinguished its MEFA and Amended MEFA with the financing company. The outstanding balance at the time of extinguishment was $89.1 million. [USBTC] exchanged all assets which the finance company financed, in addition to existing assets at one of our Texas locations and a portion of deposits on miners. On a provisional basis based upon un-impaired carrying values as of the date of these financial statements, [USBTC] anticipates a loss on extinguishment of approximately $19.2 million.

63.     The initial registration statement contains similar information regarding the "Liquidity and Financial Condition" of USBTC, but as of September 30, 2022, in Note 2 to USBTC's Unaudited Condensed Financial Statements.

64.     The first amendment to the registration statement, as well as the second and third amendments, contain similar information regarding the "Liquidity and Financial Condition" of USBTC in Note 2 to USBTC's Unaudited Condensed Financial Statements (in the first and second amendments) or Note 3 to USBTC's Unaudited Condensed Financial Statements (in the third amendment), as of December 31, 2022; June 22, 2022; and March 31, 2023, respectively. They each contain the identical statement that "**[USBTC] believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.**"

65.     The fourth, fifth, sixth, and seventh amendments to the registration statement, and the Prospectus each contain the following statement regarding the "Liquidity and Financial Condition" of USBTC as Note 2 to USBTC's Consolidated Financial Statements:

> [USBTC] has experienced losses since inception. As of June 30, 2023, [USBTC] had cash of $10.4 million, operating cash flows of ($29.3) million, total stockholders' equity of $27.4 million and an accumulated deficit of $106.5 million. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. **[USBTC] believes its current cash on hand, proceeds from the sales of cryptocurrency and ongoing operations will be sufficient to meet its operating and capital**

**requirements for at least the next twelve months from the date these consolidated financial statements are issued**.

(Emphasis added).

66.     In addition, a similar statement appears in the Company's 10-Q filed on December 19, 2023 (the "December 2023 10-Q), which Jamie Leverton signed, in Note 2 to USBTC's Unaudited Condensed Financial Statements for the three-month period ending on September 30, 2023, prior to the Merger:

> [USBTC] has experienced losses since inception. As of September 30, 2023, [USBTC] had cash of $12.7 million, positive operating cash flows of $2.2 million, working capital of $11.2 million, total stockholders' equity of $23.3 million and an accumulated deficit of ($110.9) million. To date, [USBTC] has, in large part, relied on equity and debt financings to fund its operations. **[USBTC] believes its current cash on hand, proceeds from the sale of cryptocurrency, and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.**

(Emphasis added).

67.     The liquidity and capital resources section of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") of USBTC in the Registration Statement[2] also describes USBTC's cash flows as follows: "USBTC has incurred net losses since its inception **but does not anticipate it will continue to incur net losses for the foreseeable future**" (emphasis added).

68.     Because the Forms S-8 incorporate the Prospectus by reference, they also incorporate by reference the same misleading statements set forth in ¶¶ 65 & 67.

---

[2] Each of the statements attributed herein and in the following sections to the "Registration Statement" appears in the initial registration statement, as well as all amendments thereto and the Prospectus.

69.     Each of the foregoing statements in the Registration Statement and December 2023 10-Q that USBTC, which are incorporated in the Forms S-8 by reference, (1) would be able to meet its operating and capital requirements for at least the next twelve months, and (2) did not anticipate incurring net losses for the foreseeable future – which were made by Genoot, Ho, and/or Leverton, and are attributable to the Company and its senior executives, including the Individual Defendants, who were involved in its day-to-day affairs and, upon information and belief, the due diligence leading up to the Merger – were materially false and/or misleading because they misled investors that USBTC (1) was financially sound enough to sustain operations for at least twelve more months and, (2) its cash flows were improving. In reality, without the Merger, USBTC faced imminent bankruptcy and USBTC's historical financial statements support that USBTC would have continued to incur net losses.

70.     With respect to the assertion that USBTC would be able to sustain operations for twelve more months based on its current cash on hand, proceeds from the sale of cryptocurrency, and ongoing operations, USBTC's historical financial statements included in the Registration Statement support otherwise.

71.     According to the Prospectus, as of June 30, 2023, USTBC's current assets (*i.e.*, assets readily convertible to cash), totaled about $19.4 million, including roughly $10.4 million in cash and $851,000 in cryptocurrency. Yet, USBTC's current liabilities (*i.e.*, obligations reasonably expected to be due within an operating cycle, typically one year) were roughly $10.3 million. Thus, when considering the ratio of current assets to current liabilities, USBTC had only about $9 million available in net current assets.

72. Yet, the annual cost of USBTC's ongoing operations far exceeded $9 million. As reflected in the statement of cash flows, USBTC was not generating money from operating activities.

73. According to the Prospectus, USBTC's cash flows used in operations was about ($42.9) million for the fiscal year ended June 30, 2022, and about ($29.3) million for the fiscal year ended June 30, 2023, an average loss of $36.1 million.

74. Thus, the roughly $9 million of net current assets USBTC had available as of June 30, 2023 would have only sustained operations for about one third of the year, rather than twelve more months.[3]

75. Further, to the extent USBTC's misleading statements about its viability for twelve more months and improving cash flows were based on its future projections, their reliance on such projections was flawed.

76. As set forth above, according to the Prospectus, USBTC's cash flows used in operations for fiscal 2023 (the year ended June 30, 2023) was ($29.3) million, but the Prospectus projected, as of January 28, 2023, that USBTC would have positive free cash flows of about $62.7 million in calendar year 2023.[4]

77. There is a six month overlap between the actual cash flows used in operations and the projections for calendar year 2023. Given the disparity between USBTC's actual cash flows

---

[3] It is likely that the period during which USBTC would be able to sustain its operations would be even shorter because USBTC's cash flows include distributions of earnings from the King Mountain JV, but those distributions are swept to pay down the King Mountain JV Senior Note. (Prospectus at pages 167, F-6). Removing the roughly $11.8 million in distributions from operating cash flows for the fiscal year ended June 30, 2023 increases the net cash used in operating activities from ($29.3) to ($41.1).

[4] "The most comparable GAAP measure to free cash flow is net cash provided by operating activities." Prospectus at page 103.

used in operations for the fiscal year ended June 30, 2023 – about ($29.3) million – and the projections for calendar year 2023 – $62.7 million – USBTC's cash flows from operations would need to significantly improve for the remaining six months of calendar year 2023 to even come close to the $62.7 million projection.

78.     Similarly, the seventh amendment to the registration statement and the Prospectus projected, as of January 28, 2023, that USBTC's EBITDA (about $62.7 million) and EBITDA Margin (about 65%) for the calendar year 2023 were at least 50% higher than what it actually achieved during fiscal year 2023, which ended June 30, 2023 (EBITDA of about $35.9 million and EBITDA Margin of 44%).[5]

79.     Thus, USBTC's projections were overoptimistic in light of USBTC's actual performance, further supporting the falsity of the statements concerning USBTC's financial condition and cash flows.

80.     Leverton expressly acknowledged her awareness of USBTC's financial condition.

81.     According to CW 1, at a company retreat held at the Miraval Berkshire Resort in Lennox, Massachusetts between January 14-17, 2024, Leverton told all the attendees that the Merger saved USBTC from bankruptcy.

82.     Nevertheless, after the Short Seller Report was released on January 18, 2024, Leverton took a conflicting position to the public, denying the veracity of the Short Seller Report.

83.     Specifically, the Company issued a press release on January 24, 2024 stating that "the report is filled with inaccuracies, misrepresented data, speculative claims, and unfounded

---

[5] "Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenue." Prospectus at page 103.

character attacks" and the statements "expose an inadequate, distorted understanding of the Company, its operations, and its key executives."

84. Leverton is quoted in the January 24, 2024 press release as saying: "The short report is riddled with speculative accusations and misinformation."

85. Thus, despite acknowledging privately to Company employees that USBTC faced bankruptcy but for the Merger, Leverton and the Company categorically denied the Short Seller Report's assertions that USBTC would have been bankrupt within week if not for the Merger.

**B. Defendants Touted the Purported Benefits of the Merger with USBTC but Failed to Disclose the Energy and Internet Issues at the King Mountain JV**

86. A February 7, 2023 Hut 8 Presentation for investors titled "Strategic Merger of [Legacy Hut] and [USBTC]" with a subheading, "Creating a leading energy and infrastructure platform of the future," represented that USBTC was expected to strengthen the Company's "energy strategy and commitment to leveraging low-cost renewable energy sources," including with, *inter alia*, "[a] diversified mix of hydro, wind, and nuclear energy sources powering the expanded site portfolio."

87. An analyst and investor call held at 8:30 a.m. E.T. on that same date similarly emphasized the energy potential of the Merger, with Leverton stating: USBTC "brings outstanding energy-sourcing management and hedging capabilities to [the Company], significantly enhancing our ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets."

88. The Registration Statement echoes this characterization of the Merger as an opportunity for the Company to improve its energy expertise, stating: "The USBTC team will bring significant leadership in energy orientation, development, demand response, hedging, grid

stabilization analytics to [the Company], which will enhance [the Company]'s ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets."

89. The Registration Statement also touts the renewable energy sources powering USBTC's sites, stating that, "[t]he Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sources from ERCOT . . . ."

90. It acknowledges certain power generation-related risks, including that disruptions of the energy grids on which USBTC relies could have adverse effects on USBTC's operations: "The operation of the grids USBTC relies on, including the . . . [Electrical Reliability Counsel of Texas (ERCOT)] grid[] . . . subjects USBTC to a variety of risks, including the breakdown and failure of equipment . . . [and] outages affecting information technology systems."

91. However, the above statements in the Registration Statement[6] – which were made by Genoot and Ho, and are attributable to the Company and its senior executives, including the Individual Defendants, who were involved in its day-to-day affairs and, upon information and belief, the due diligence leading up to the Merger – are materially misleading because they failed to disclose the energy issues that had already materialized at the King Mountain JV by the time the statements were made.

92. Defendants' positive statements about the Merger were also misleading because they failed to disclose known internet disruptions at the King Mountain JV. Although the

---

[6] These statements are also incorporated by reference in the Forms S-8 insofar as the Forms S-8 incorporate by reference the Prospectus.

Registration Statement[7] purported to warn of the risks of a loss of internet connectivity, it did not disclose that those risks had already materialized:

> ***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.***
>
> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

93.     Indeed, CW 1 – who worked as a data analyst for the Company in the months leading up to the Merger and thereafter – had daily discussions with the Director of Infrastructure before the Merger about the ongoing energy issues with the King Mountain JV.

94.     According to CW 1, Genoot also complained about the efficiency of the King Mountain JV during general meetings.

95.     CW 1's job responsibilities included analyzing mining data to attempt to maximize operational capacity of the miners, which involved tracking miner outages on a daily basis, and managing miner counts and total miner operations.

96.     In that capacity, CW 1 saw evidence of the energy issues in the Hashrate failure and energy usage reports he received.  According to CW 1, the King Mountain JV had the most inefficient miners, and this inefficiency impeded the ability to properly mine.

97.     In addition, during CW 1's tenure with the Company, there were often dips in the network service with several outages and network failures.

---

[7] The Forms S-8 incorporate the same misleading risk disclosure by reference insofar as they incorporate the Prospectus by reference.

98. The outages, which were reported in daily outage reports, were often significant and caused by broken miners or offline miners.

99. CW 1 stated that senior management in Operations directed data analysts to classify the outages in a manner that masked their true nature, such as characterizing the miners as overheated and not offline, rather than an outage. Over half, or more, outages were falsely reclassified as overheated.

100. Thus, the above risk disclosure – which was made by Genoot and Ho, and is attributable to the Company and its senior executives, including the Individual Defendants, who were involved in its day-to-day affairs and, upon information and belief, the due diligence leading up to the Merger – was materially misleading because Defendants failed to disclose that the risk of internet disruptions had already materialized by the time the statement was made and Defendants failed to disclose the energy issues at the King Mountain JV.

**C.     The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K**

101. Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material or unfavorable impact on net sales or revenues or income from continuing operations."

102. Although within the liquidity and capital resources section of the MD&A of USBTC, the Registration Statement discloses the trend that "UBSTC has incurred net losses since its inception," it misleadingly states that USBTC "does not anticipate it will continue to incur net losses for the foreseeable future."

{00606969;7 }                                    19

103. As described above and assuming "the foreseeable future" consists of the next twelve months, USBTC's historical financial statements included in the Registration Statement support otherwise.

104. Specifically, as of June 30, 2023, USBTC had only about $9 million available in net current assets, yet the annual cost of its ongoing operations far exceeded that amount and as reflected in the statement of cash flows, USBTC was not generating money from operating activities.

105. Further, for the fiscal years ended June 30, 2022 and June 30, 2023, USBTC's cash flows used in operations was an average loss of $36.1 million. Thus, the roughly $9 million of net current assets USTBC had available as of June 30, 2023 would have only sustained operations for roughly a third of the year and USBTC's trend of incurring net losses would have continued.[8]

106. Accordingly, in violation of Item 303, the Registration Statement misleadingly suggested that USBTC's trend of incurring net losses would not continue, when in reality, USBTC's historical financial statements supported that it *would* continue, and, in fact, the Company was in imminent danger of going bankrupt. These undisclosed facts were known trends and were likely to have an unfavorable impact on the Company's revenues and income from operations.

107. In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

---

[8] As set forth above, the average loss increases when excluding distributions on earnings from the King Mountain JV, which are swept to pay down the King Mountain JV Senior Note.

{00606969;7 }                    20

108. As set forth above, the Risk Factors section of the Registration Statement discloses the following:

> ***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.***
>
> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

109. However, this disclosure was inadequate and violated Item 105 insofar as it misleadingly and inaccurately suggested that it was a potential risk, when in fact, the risk had already materialized at the King Mountain JV.

110. As discussed herein, reliable internet connectivity is critical for bitcoin mining, a major component of both USBTC's and the Company's business.

111. Indeed, Hut 8 derives the bulk of its revenue from self-mining.

112. Thus, internet disruptions at one of the Company's bitcoin mining sites is a material factor that made investment in the Company speculative or risky.

## THE TRUTH EMERGES

113. On January 18, 2024, at approximately 10:30 AM EST, J Capital Research published the Short Seller Report, titled "The Coming HUT Pump and Dump: Management hiding stock ownership through undisclosed related party, a stock-promotor cabal, and a host of left-for-dead assets."

114. The Short Seller Report alleged that "[o]ne person highly familiar with USBTC told us, 'without the merger, [USBTC] would have done a structured bankruptcy.'"

{00606969;7 }

21

115. It quoted "someone deeply involved with the company" as saying "[t]he merger was a complete godsend for USBTC" and without it, "USBTC would have been bankrupt within weeks."

116. The Short Seller Report also alleged that USBTC's core asset, King Mountain JV "has historically failed to provide energy and high-spend internet" and at the time of the Merger, "lacked both reliable power and internet."

117. The Short Seller Report quotes a proof of claim filed on November 23, 2022 by Marathon Digital Holdings, Inc. ("Marathon") against Compute North, the entity from which USBTC acquired a 50% interest in the King Mountain JV. Marathon was the largest customer at the King Mountain Facility.

118. In the proof of claim, Marathon alleges Compute North "fail[ed] to energize thousands of miners" and "also repeatedly failed to provide an adequate high-speed network to allow Marathon's miners to mine Bitcoin at full capacity."

119. Further, Marathon's 2023 Annual Report identifies that it "experienced significant production downtime in the second and third quarters as a result of . . . delays in energization at King Mountain."

120. The Short Seller Report indicates that the King Mountain facility "uses a Starlink satellite network instead of a broadband connection to access the Internet," which is "**unheard of in the Bitcoin mining industry**" because Starlink "is an expensive and unreliable choice for mining at scale."

121. Following the release of the Short Seller Report, Hut 8's stock price fell $2.16, or 23.3%, to close at $7.12 per share on January 18, 2024, on unusually heavy trading volume.

**NO SAFE HARBOR**

122. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged misstatements pled in this Complaint. The statements alleged to be false and/or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Hut 8 who knew that the statement was false when made.

**ADDITIONAL SCIENTER ALLEGATIONS**

123. When the Merger was announced, Genoot was the President and a director of USBTC, Ho was the CEO and chairman of the board of USBTC, Leverton was the CEO of Legacy Hut, and Visram was the CFO of Legacy Hut.

124. They were slated to assume, and eventually did assume, other senior roles in the Company when the Merger closed: Genoot as President and director, Ho as Chief Strategy Officer and director, Leverton as CEO and director, and Visram as CFO.

125. Given their senior roles within USBTC or Legacy Hut and their senior positions with the Company, as well as, upon information and belief, their access to the information exchanged during the due diligence period before the Merger, the Individual Defendants were

privy to confidential, proprietary information concerning USBTC, and its business, operations, and financial condition, including: (1) the information that USBTC faced imminent bankruptcy without the merger, (2) information concerning its cash flows; and (2) the information that USBTC had energy and internet issues at the King Mountain JV.

126. Thus, they knew, or recklessly disregarded, that USBTC was on the brink of bankruptcy and its cash flows were not improving, and that the King Mountain JV experienced energy and internet issues.

127. The Individual Defendants, therefore, knew that the Company's documents and statements identified herein that were issued or disseminated to the public were materially false and/or misleading.

128. Leverton also expressly acknowledged her awareness of USBTC's dire financial condition.

129. According to CW1, at a company retreat held at the Miraval Berkshire Resort in Lennox, Massachusetts between January 14-17, 2024, Leverton told all the attendees that the Merger saved USBTC from bankruptcy.

130. Despite privately acknowledging that USBTC was on the brink of bankruptcy, Leverton then publicly denied it when the truth of USBTC's dire financial position emerged with the release of the Short Seller Report.

131. In response to the Short Seller Report, the Company issued a press release on January 24, 2024, stating that "the report is filled with inaccuracies, misrepresented data, speculative claims, and unfounded character attacks" and the statements "expose an inadequate, distorted understanding of the Company, its operations, and its key executives."

{00606969;7 }                                               24

132.    Leverton is quoted in the January 24, 2024 press release as similarly saying: "The short report is riddled with speculative accusations and misinformation."

133.    Thus, publicly, Leverton and the Company categorically denied the veracity of the Short Seller Report – which stated that USBTC would have been bankrupt within weeks if not for the Merger – despite Leverton's contemporaneous conflicting private acknowledgement to Company employees that USBTC faced bankruptcy if not for the Merger.

134.    In addition, Genoot was aware of the energy and internet issues with the King Mountain site, because, according to CW 1, he complained about the efficiency of the King Mountain site during general meetings.

135.    The other Individual Defendants similarly were aware of, or recklessly disregarded, the energy and internet issues at the King Mountain site.

136.    A major component of USBTC's business consisted of self-mining Bitcoin at its digital asset mining sites, including at the King Mountain JV. Thus, reliable energy sources and internet access were critical to the operations of such sites.

137.    The importance of reliable energy and internet connectivity is highlighted by the fact that, according to CW 1: (1) the Company tracked mining data (*i.e.*, miner outages, miner counts, and miner operations) on a daily basis, and tracked other energy issues, such as Hashrate failure and energy usage reports, and (2) data analysts, such as CW 1, monitored this information to attempt to maximize operational capacity.

138.    Energy and internet issues have adverse financial effects for the Company, including increased costs, expenses, or losses.

139.    Thus, each of the Individual Defendants – by virtue of their former roles with Legacy Hut or USBTC and their roles within the Company, and, upon information and belief, their

access to the due diligence materials – were aware of, or recklessly disregarded the energy and internet issues at the King Mountain JV.

140. Because the Company acts through its employees, the scienter of the Individual Defendants is imputable to the Company.

## LOSS CAUSATION

141. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

142. During the Class Period, Lead Plaintiff and the Class purchased Hut 8's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## CLASS ACTION ALLEGATIONS

143. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Hut 8 securities between February 13, 2023 and January 18, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

144. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hut 8's shares were actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class. Millions of Hut 8 shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Hut 8 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

145. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

146. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

147. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether Defendants' statements were materially false and misleading or omitted material facts; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

148. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

149. The market for Hut 8's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or omissions, Hut 8's securities traded at artificially inflated prices during the Class Period. On December 27, 2023, the Company's share price closed at a Class Period high of $18.13 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Hut 8's securities and market information relating to Hut 8, and have been damaged thereby.

150. During the Class Period, the artificial inflation of Hut 8's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about USBTC's business, financial condition, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of USBTC and Hut 8 and their business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

{00606969;7 }                                        28

151. At all relevant times, the market for Hut 8's securities was an efficient market for the following reasons, among others:

(a) Hut 8 shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Hut 8 filed periodic public reports with the SEC and/or NASDAQ;

(c) Hut 8 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Hut 8 was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

152. As a result of the foregoing, the market for Hut 8's securities promptly digested current information regarding Hut 8 from all publicly available sources and reflected such information in Hut 8's share price. Under these circumstances, all purchasers of Hut 8's securities during the Class Period suffered similar injury through their purchase of Hut 8's securities at artificially inflated prices and a presumption of reliance applies.

153. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse

information regarding UBSTC's and the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### COUNT I

### Violation of Section 11 of The Securities Act Against the Company, Ho, Genoot, and Leverton

154. Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct. This Count is based on negligence and strict liability.

155. This Count is asserted against the Company, Ho, Genoot, and Leverton for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Lead Plaintiff and all members of the Class.

156. The Registration Statement for the Merger was inaccurate and misleading, contained untrue statements of material fact, and omitted other facts necessary to make the statements made not misleading.

157. The Forms S-8 suffered from the same deficiencies insofar as they incorporated by reference the Prospectus, which contained the misleading statements described herein.

158. Hut 8 is the registrant for the Merger and the Individual Defendants were responsible for the contents and dissemination of the Registration Statement and the Forms S-8.

159. As the issuer of the shares, Hut 8 is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions in the Registration Statement and Forms S-8.

160.    Ho is liable insofar as he signed the Registration Statement and the Forms S-8 and is identified, with his consent, in the Registration Statement as a prospective director of the Company.

161.    Leverton is liable insofar as she is identified, with her consent, in the Registration Statement as a prospective director of the Company.

162.    Genoot is liable insofar as he signed the Registration Statement and the Forms S-8.

163.    Ho, Leverton, and Genoot had a duty to make a reasonable investigation into the statements contained in the Registration Statement to ensure that they were true and did not omit any material facts necessary to make certain statements not false or misleading. None of them made a reasonable investigation because in the exercise of reasonable care, they should have known that the Registration Statement contained material misstatements and omissions.

164.    By reason of the conduct alleged herein, the Company, Ho, Leverton, and Genoot violated Section 11 of the Securities Act.

165.    Lead Plaintiff and the Class purchased or acquired Hut 8 shares without knowledge of the misstatements or omissions alleged herein and were thereby damaged by Defendants' material misstatements and omissions.

166.    Because Hut 8 was newly formed upon completion of the Merger, the only Hut 8 shares available in the market at that time when Lead Plaintiff and the Class acquired their shares (*i.e.*, during the Class Period after the Merger closed on November 30, 2023) were shares issued pursuant to the Registration Statement or the Forms S-8.

167.    Thus, Lead Plaintiff and similarly situated Class members acquired shares pursuant to, or traceable to the Registration Statement or the Forms S-8.

## COUNT II

**Violation of Section 15 of The Securities Act Against the Individual Defendants**

168.    Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

169.    This Count is asserted against the Individual Defendants based on Section 15 of the Securities Act, 15 U.S.C. §77o.

170.    Each of the Individual Defendants, by virtue of their executive and/or director positions were involved in the day-to-day activities of Legacy Hut and USBTC prior to the Merger and Hut 8 following the Merger, including, upon information and belief, the due diligence related to the Merger, press releases, presentations, and other public statements related to the Merger, and preparing and reviewing the Registration Statement and the Forms S-8, the contents of which the Individual Defendants had the ability to control.

171.    The Individual Defendants had the power to direct the actions of the Company and exercised the same to cause Hut 8 to engage in the unlawful acts described herein.

172.    The Individual Defendants' positions made them privy to the material facts concealed from Lead Plaintiff and the Class.

173.    By virtue of the conduct alleged herein, the Individual Defendants are liable to Lead Plaintiff and the Class for damages suffered due to the primary violations of the Company.

## COUNT III

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

174.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in the acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the members of the Class; made untrue statements of material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

176. Such scheme was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Hut 8's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

177. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings and other public statements and documents described above. Such filings and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth.

178. By virtue of their positions at the Company – and their prior positions at USBTC and Legacy Hut – the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.

179. Because the Company acts through its employees, the Individual Defendants' scienter is imputable to the Company.

180. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

181. Defendants were privy to USBTC's financial condition and business operations by virtue of their roles as senior officers and directors of Legacy Hut or USBTC and the Company, as well as, upon information and belief, their access to the information exchanged during the due diligence period. Thus, Defendants had knowledge of the information misrepresented and/or not disclosed, as alleged herein.

182. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, they were able to and did, directly and indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition, and future prospects (including that of USBTC). As a result of the dissemination of the aforementioned false and misleading reports, filings, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning USBTC's business and financial condition, which was concealed by Defendants, Lead Plaintiff and the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price

of the securities, the integrity of the market for the securities, and/or upon the statements disseminated by Defendants, and were damaged thereby.

183. During the Class Period, the Company's securities were traded on an active and efficient market. Lead Plaintiff and the Class, relying on the materially false and misleading statements described herein – which the Defendants made, issued, or caused to be disseminated – or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions of Lead Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the Class.

184. By virtue of the foregoing, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

185. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misstatements and omissions to the investing public.

## <u>COUNT IV</u>

### <u>Violation of Section 20(a) of The Exchange Act Against The Individual Defendants</u>

186. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

187. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions – both at the Company and formerly at USBTC or Legacy Hut – they knew the adverse non-public information about the Company's false statements.

188. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

189. Because of their positions of control and authority as senior officers and directors of the Company, the Individual Defendants were able to and did control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein, which comprise the primary violations about which Plaintiff and the Class complain. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

190. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

(a) Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiff as the class representative;

(b)     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts, omissions, and transactions alleged herein;

(c)     Awarding Lead Plaintiff and the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

(d)     Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: June 14, 2024
New York, New York

Respectfully submitted,

POMERANTZ LLP

*/s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman
Murielle J. Steven Walsh
Emily C. Finestone
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjsteven@pomlaw.com
efinestone@pomlaw.com

*Counsel for Abhishek Maheshwari and*
*Proposed Lead Counsel for the Class*

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Abhishek Maheshwari*