# EXHIBIT 2

S-4/A 1 tm235928-38_s4a.htm S-4/A
TABLE OF CONTENTS

**As filed with the Securities and Exchange Commission on November 7, 2023**

**Registration No. 333-269738**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

**AMENDMENT NO. 7**
**TO**

# FORM S-4

**REGISTRATION STATEMENT**
**Under**
**The Securities Act of 1933**

# HUT 8 CORP.

| **Delaware** | **7374** | **92-2056803** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification No.) |

**c/o U.S Data Mining Group, Inc.**
**1101 Brickell Avenue, Suite 1500**
**Miami, Florida 33131**
**Phone: (305) 224-6427**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Corporation Service Company**
**251 Little Falls Drive**
**Wilmington, Delaware 19808**
**Phone: (650) 560-4753**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | | | | |
|---|---|---|---|---|
| **Ryan J. Dzierniejko** **June S. Dipchand** **Skadden, Arps, Slate,** **Meagher & Flom LLP** **One Manhattan West** **New York, NY 10001** **(212) 735-3000** | **Curtis Cusinato** **Matthew Hunt** **Bennett Jones LLP** **3400 One First Canadian Place** **Toronto, ON M5X 1A4** **(416) 863-1200** | **Aniss Amdiss** **Chief Legal Officer and** **Corporate Secretary,** **Hut 8 Mining Corp.** **24 Duncan Street, Suite 500** **Toronto, ON M5V 2B8** **(647) 256-1992** | **Daniella G. Silberstein** **Raffael M. Fiumara** **Greenberg Traurig, P.A.** **333 S.E. 2nd Avenue, Suite 4400** **Miami, FL 33131** **(305) 579-0500** | **Amanda Linett** **Stikeman Elliott LLP** **5300 Commerce Court West** **199 Bay Street** **Toronto, ON, M5L 1B9** **(416) 869-5500** |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this registration statement becomes effective and upon consummation of the merger described in the enclosed prospectus.

If the securities being registered on this Form are to be offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated file" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☒

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule I3e-4(i) (Cross-Border Issuer Tender Offer)    ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer)    ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with section 8(a) of the Securities Act of 1933 or until this registration statement shall become effective on such date as the SEC, acting pursuant to said section 8(a), may determine.**

## QUESTIONS AND ANSWERS ABOUT THE BUSINESS COMBINATION

*The following questions and answers briefly address some questions that you, as a securityholder of USBTC, may have regarding the Business Combination. These questions and answers, as well as the summary section that follows, are not meant to be a substitute for the information contained in the remainder of this prospectus, and this information is qualified in its entirety by the more detailed descriptions and explanations contained elsewhere in this prospectus. You are urged to read this prospectus in its entirety. Additional important information is also contained in the documents incorporated by reference in and the exhibits to the Registration Statement of which this prospectus forms a part. You should pay special attention to the "Cautionary Statement Regarding Forward-Looking Statements" beginning on page 23 of this prospectus and to the "Risk Factors" beginning on page 25 of this prospectus.*

### *Why am I receiving this prospectus?*

New Hut is providing this prospectus to the USBTC stockholders (the "**USBTC stockholders**") because New Hut has entered into the Business Combination Agreement, pursuant to which Merger Sub will merge with and into USBTC, with each share of Series A Preferred, Series B Preferred, Series B-1 Preferred and USBTC common stock being exchanged for 0.6716 of a share of New Hut common stock in a merger executed in accordance with the relevant provisions of the NRS. As a result of the Merger, USBTC will become a wholly-owned subsidiary of New Hut. Pursuant to the Registration Statement of which this prospectus forms a part, New Hut is registering shares of New Hut common stock issuable to USBTC stockholders upon the consummation of the Business Combination (the "**Closing**"), in accordance with the Business Combination Agreement. Applicable requirements of the federal securities laws require New Hut to provide you with information regarding the Business Combination. This prospectus contains important information about the Business Combination, the Business Combination Agreement, and certain related matters, and you should read this prospectus carefully. However, please be aware that this prospectus is not a proxy statement or notice of meeting and that we are not asking you for a proxy and you are requested not to send us a proxy.

The Merger must be approved by at least (i) a majority of the voting power of the outstanding USBTC capital stock, voting together as a single class on an as-converted basis, and (ii) separately, the holders of a majority of the outstanding shares of the Series A Preferred (voting together as a single and separate class on an as-converted basis) including the affirmative vote of JHS Bitcoin Mining LLC ("**JHS**") (the "**USBTC Stockholder Approval**"). Following the effectiveness of the Registration Statement of which this prospectus forms a part, USBTC intends to solicit the USBTC Stockholder Approval by way of a written consent of the USBTC stockholders (the "**USBTC Consent**").

The Arrangement will require the approval of at least 66⅔% of the votes cast by the Hut 8 shareholders present in person or represented by proxy at a special meeting of Hut 8 shareholders held for the purpose of approving the Business Combination and the transactions contemplated thereby (the "**Hut 8 Meeting**"). Hut 8 shareholders approved the Arrangement on September 12, 2023. Securityholders of USBTC will not be required to vote on or approve the Arrangement.

### *Why are the two companies proposing the Business Combination?*

The Business Combination is expected to create a strengthened player in the digital asset mining, hosting, managed infrastructure operations, and high performance computing infrastructure space with strong financial and operating metrics. New Hut will be led by a combined board of directors and management team of Bitcoin miners, energy experts, and business leaders, bringing together the powerful cultures, strengths, and capabilities of both Hut 8 and USBTC.

Key strategic advantages of the Business Combination include:

*A strengthened financial position and flexibility*

New Hut aims to benefit from a combined balance sheet with greater financial stability, which is expected to strengthen New Hut's ability to navigate market cycles and increases New Hut's flexibility to grow and invest in new opportunities. New Hut anticipates being included in new stock indexes and improved access to capital given its increased scale and new U.S. headquarters.

New Hut is expected to benefit from a combined installed self-mining capacity of 7.5 exahashes per second ("**EH/s**") and 253 megawatts ("**MW**") of total energy currently available from six sites with current self-mining operations: Medicine Hat, Alberta; Drumheller, Alberta; Niagara Falls, New York; Kearney, Nebraska; Granbury, Texas; and King Mountain, Texas. The 1.7 EH/s installed self-mining capacity at the King Mountain, Texas site is owned by TZRC LLC ("**TZRC LLC**"), the joint venture entity in which USBTC has a 50% membership interest alongside NextEra Energy, Inc. ("**NextEra**"). USBTC refers to its joint venture with NextEra throughout this prospectus as the "**King Mountain JV**" given the mining operations are located in King Mountain, Texas.

*An accelerated diversification strategy for New Hut*

New Hut is expected to have an enhanced revenue profile from distinct business lines, including from hardware equipment sales to customers, and the MicroBT-certified repair center business serving customers across North America and Northern Europe. New Hut is expected to generate monthly recurring revenue from hosting services denominated in fiat from existing long-term clients and managed infrastructure operations for Bitcoin mining sites looking to maximize the potential of their facilities.

*Maintaining commitment to advancing the high performance computing traditional data center business*

New Hut will be committed to the continued advancement of the high performance computing business, which continues to be a key focus of New Hut's diversified strategy and is expected to generate monthly recurring revenue from approximately 330 North American customers.

*A strengthened, proven and trusted senior leadership team and board of directors with a track record of value creation*

The combined New Hut executive team will lead approximately 210 team members to deliver on the existing and proven strategy of growing long-term sustainable operations.

*A growing pipeline of opportunities*

New Hut will benefit from a strong pipeline of growth opportunities at existing, greenfield and brownfield sites.

*Enhancing New Hut's position in one of the world's high-potential Bitcoin mining regions*

The Business Combination looks to solidify New Hut as a Bitcoin mining entity with operating capacity at high-quality sites in Alberta, Canada, and Texas, Nebraska, and New York in the United States.

*Advancing commitment to driving improvements across all ESG metrics*

The Business Combination will improve New Hut's overall energy mix to include wind, hydro and nuclear sources solidifying the Hut 8 and USBTC team's commitment and focus on ESG goals.

*Improving New Hut's energy expertise and hedging capabilities*

The USBTC team will bring significant leadership in energy origination, development, demand response, hedging, grid stabilization and analytics to New Hut, which will enhance New Hut's ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets.

To review the reasons for the Business Combination in greater detail, see the sections titled "*The Business Combination — The Hut 8 Board's Reasons for the Business Combination*" and "*The Business Combination — The USBTC Board's Reasons for the Business Combination*" beginning on pages 87 and 88, respectively, of this prospectus.

**What will USBTC stockholders and Hut 8 securityholders receive in the Business Combination?**

Pursuant to the terms of the Business Combination Agreement, each share of Series A Preferred, Series B Preferred, Series B-1 Preferred and USBTC common stock will be exchanged for 0.6716 of a share of New

2

**RISK FACTORS**

*Investing in New Hut and New Hut common stock involves a high degree of risk. In addition to the other information included in this prospectus, including the matters addressed in the section entitled "Cautionary Note Concerning Forward-Looking Statements" beginning on page 23, you should carefully consider the risks described below before deciding whether to invest in New Hut and New Hut common stock, including the risk factors associated with each of the businesses of Hut 8 and USBTC, because these risk factors may affect the operations and financial results of New Hut. In addition, you should read and consider Hut 8's risk factors that may be found in its Annual Information Form for the year ended December 31, 2022, included as Exhibit 99.1 to Hut 8's Annual Report on Form 40-F for the year ended December 31, 2022; in its Management's Discussion and Analysis for the year ended December 31, 2022, included as Exhibit 99.3 to Hut 8's Annual Report on Form 40-F for the year ended December 31, 2022; and in its Management's Discussion and Analysis for the three and six months ended June 30, 2023, included as Exhibit 99.3 to its Form 6-K dated August 14, 2023. Furthermore, you should read and consider the other information in this prospectus and the other documents incorporated by reference herein. See the section entitled "Where You Can Find More Information" beginning on page 241 for the location of information incorporated by reference into this prospectus. Additional risks and uncertainties not presently known to Hut 8 or USBTC or that are not currently believed to be important also may adversely affect the Business Combination and New Hut following the Business Combination.*

**Risks Related to the Business Combination**

***Hut 8 shareholders and USBTC stockholders cannot be sure of the value of the Business Combination consideration they will receive.***

Hut 8 shareholders and USBTC stockholders will receive a fixed number of shares of New Hut common stock in the Business Combination, rather than a number of shares of New Hut common stock with a particular fixed market value. The values of Hut 8 common shares and USBTC common stock at the effective time may vary significantly from their prices on the date prior to the date the Business Combination Agreement was executed, the date of this prospectus or the date on which Hut 8 shareholders and USBTC stockholders approve the Business Combination. Because the respective Hut 8 and USBTC exchange ratios are fixed and will not be adjusted to reflect any changes in the prices of Hut 8 common shares or USBTC common stock, the market value of the New Hut common stock issued as part of the Business Combination, and the Hut 8 common shares and USBTC common stock surrendered as part of the Business Combination, may be higher or lower than the values of these shares on earlier dates. All of the consideration to be received by Hut 8 shareholders and USBTC stockholders will be New Hut common stock. At the time of approval, Hut 8 shareholders and USBTC stockholders will not know or be able to determine the value of the New Hut common stock they may receive upon completion of the Business Combination. Changes in the prices of Hut 8 common shares and USBTC common stock may result from a variety of factors that are beyond the control of Hut 8 or USBTC, including changes in their respective businesses, operations and prospects, regulatory considerations, governmental actions, and legal proceedings and other developments.

Neither Hut 8 nor USBTC is permitted to terminate the Business Combination Agreement solely because of changes in the prices of either party's common stock. There is no assurance that the Business Combination will be completed, that there will not be a delay in the completion of the Business Combination, or that all or any of the anticipated benefits of the Business Combination will be obtained.

***The Business Combination Agreement may be terminated in accordance with its terms and the Business Combination may not be consummated.***

The completion of the Business Combination is subject to the satisfaction or waiver of a number of conditions. Those conditions include, but are not limited to: (i) obtaining the Interim Order and Final Order of the Court on terms consistent with the Business Combination Agreement; (ii) the receipt of requisite approvals by the requisite shareholders of Hut 8 and USBTC; (iii) the absence of certain governmental restraints or prohibitions preventing completion of the Business Combination; (iv) no order, legal prohibition, or injunction preventing or restricting the consummation of the Business Combination; (v) the effectiveness of the registration statement of which this prospectus forms a part and the absence of any threatened or initiated stop order or proceedings by the SEC; (vi) the approval of New Hut's listing applications with Nasdaq and the TSX on terms satisfactory to each of the parties; (vii) the execution and delivery of executive employment agreements

TABLE OF CONTENTS

state legislatures and regulatory agencies are expected to introduce and enact new laws and regulations to regulate digital asset intermediaries, such as digital asset exchanges and custodians. The U.S. regulatory regime — namely the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., the SEC, the CFTC, the Financial Crimes Enforcement Network of the U.S. Treasury Department ("**FinCEN**"), the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation ("**FDIC**"), and the Federal Bureau of Investigation) as well as the White House have issued reports and releases concerning digital assets, including Bitcoin and digital asset markets. However, the extent and content of any forthcoming laws and regulations are not yet ascertainable with certainty, and it may not be ascertainable in the near future. It is possible that new laws and increased regulation and regulatory scrutiny may require Hut 8 to comply with certain regulatory regimes, which could result in new costs for Hut 8. Hut 8 may have to devote increased time and attention to regulatory matters, which could increase costs. New laws, regulations, and regulatory actions could significantly restrict or eliminate the market for, or uses of, digital assets including Bitcoin, which could have a negative effect on the value of Bitcoin, which in turn would have a negative effect on the value of Hut 8's common shares.

***Adverse developments affecting the financial services industry, such as actual events or concerns involving liquidity, defaults or nonperformance by financial institutions or transactional counterparties, could adversely affect Hut 8's current and projected business operations and Hut 8's financial condition and results of operations.***

Actual events involving limited liquidity, defaults, non-performance or other adverse developments that affect financial institutions, transactional counterparties or other companies in the financial services industry or the financial services industry generally, or concerns or rumors about any events of these kinds or other similar risks, have in the past and may in the future lead to market-wide liquidity problems.

For example, Hut 8's cash is held in accounts at Canadian banking institutions. Cash held in non-interest-bearing and interest-bearing operating accounts may exceed the Canada Deposit Insurance Corporation ("**CDIC**") insurance limits in Canada. If such banking institutions were to fail, Hut 8 could lose all or a portion of those amounts held in excess of such insurance limitations. As the FDIC continues to address the situation with Silicon Valley Bank ("**SVB**"), Signature Bank ("**Signature Bank**") and other banking institutions, the risk of loss in excess of insurance limitations and otherwise has increased across financial institutions. There is no guarantee that the CDIC, U.S. Department of Treasury, FDIC and Federal Reserve Board will provide access to uninsured funds in the future in the event of the closure of other banks or financial institutions, or that they would do so in a timely fashion. Any loss that Hut 8 may experience in the future could have a material and adverse effect on Hut 8's ability to pay its operational expenses or make other payments and may require Hut 8 to move its accounts to other banks, which could cause delays in making payments to its vendors and employees, among other counterparties, and cause other business and operational disruptions.

**Risks Relating to USBTC's Business**

***If USBTC fails to effectively manage its growth, its business, financial condition and results of operations would be harmed.***

USBTC is a development stage company with a small management team and is subject to the strains of ongoing development and growth, which will place significant demands on management and operational and financial infrastructure. Although USBTC may not grow as expected, if USBTC fails to manage its growth effectively or to develop and expand its managerial, operational and financial resources and systems, USBTC's business and financial results would be materially harmed.

USBTC may not be able to manage growth effectively, which could damage its reputation, limit growth and negatively affect USBTC's operating results. Further, USBTC cannot provide any assurance that it will successfully identify all emerging trends and growth opportunities in its business sector and USBTC may lose out on those opportunities. Such circumstances could have a material adverse effect on USBTC's business, prospects or operations.

***USBTC is an early-stage company with limited operating history and may never become profitable.***

USBTC is an early-stage company currently focused on developing Bitcoin mining operations and investing in blockchain-focused technologies, newly formed in December 2020, and has a limited operating history. To

date, USBTC has incurred losses as set forth below and may never become profitable. USBTC has built a Bitcoin mining operation, operating specialized computers manufactured by Bitmain, Canaan and MicroBT (also known as "**miners**") that generate Bitcoin. USBTC had a net loss of $65.6 million for the fiscal year ended June 30, 2023 and $31.8 million for the fiscal year ended June 30, 2022. As of June 30, 2023, USBTC had an accumulated deficit of $106.5 million.

Additionally, there can be no assurance that additional funding will be available to USBTC for the development of its business, which will require the commitment of substantial resources. USBTC may be required to liquidate its digital assets (including Bitcoin assets) if other capital is not available to it on commercially reasonable terms. Accordingly, you should consider USBTC's prospects in light of the costs, uncertainties, delays and difficulties frequently encountered by companies in the early stages of development. Potential investors should carefully consider the risks and uncertainties that a company with a limited operating history will face. In particular, potential investors should consider that USBTC may be unable to:

- successfully implement or execute its business plan, or demonstrate that its business plan is sound;

- adjust to changing conditions or keep pace with increased demand; or

- attract and retain an experienced management team; or raise sufficient funds in the capital markets to effectuate its business plan.

### *USBTC operates in an industry subject to various regulatory and technological uncertainties.*

USBTC operates Bitcoin mining operations in New York, Texas, and Nebraska. As Bitcoin, other digital assets, and blockchain technologies evolve and become more widely available, the services and products associated with them may evolve. Future regulations may require USBTC to change its business model to comply fully with federal and state laws regulating power generation, Bitcoin mining, or provision of Bitcoin mining services to third parties.

To remain competitive with peers, USBTC may need to modify aspects of its business model from time to time. USBTC cannot offer any assurance that these or any other changes will be successful or will not result in harm to its business. USBTC may not be able to manage its growth effectively, which could damage its reputation, limit its growth, and negatively affect its operating results. Furthermore, USBTC cannot provide any assurance that it will successfully identify all emerging trends and growth opportunities in the market. As a result, USBTC may not capture those opportunities. Such circumstances could have a material adverse effect on the USBTC's business, prospects or operations.

### *The cost of obtaining new and replacement miners and parts has historically been capital-intensive and is likely to continue being capital-intensive, which could materially and adversely affect USBTC's business, financial condition, and results of operations.*

USBTC's mining operations can only be profitable if the costs, inclusive of hardware and electricity costs, associated with mining digital assets is lower than the price of the digital assets mined at the time of sale. Miners experience ordinary wear and tear from operation and may also face more significant malfunctions caused by factors which may be beyond the company's control. Additionally, as technology evolves, the company may acquire newer models of miners to remain competitive in the market.

For example, the miners and other equipment purchased by USBTC since the company's inception will eventually degrade due to ordinary wear and tear from usage and may also be lost or damaged due to factors outside of the USBTC's control. When this happens, these miners and equipment need to be repaired or replaced. The process of upgrading mines and equipment requires substantial capital investment, and USBTC may face challenges in executing upgrades on a timely and cost-effective basis based on availability of new miners and the company's access to adequate capital. If USBTC is unable to obtain a sufficient unit volume of miners and equipment at scale, it may be unable to remain competitive in a highly competitive and evolving industry. If this happens, USBTC may not be able to mine digital assets as efficiently or at a comparable scale as competitors. As a result, the company's business, financial condition, and results of operations could suffer. This could, in turn, materially and adversely affect the trading price of the company's common stock and investors could lose part or all of their investment.

***The price of new miners may be linked to the price of Bitcoin and other digital assets, and the cost of obtaining new and replacement miners may increase if the price of Bitcoin rises, which could materially and adversely affect USBTC's business, financial condition and results of operations.***

There are reports indicating that miner manufacturers adjust miner prices based on the price of Bitcoin. As a result, the USBTC's cost of obtaining new miners can be unpredictable and significantly higher than USBTC's historical cost of obtaining new miners. USBTC's business, financial condition, and results of operations are dependent on its ability to sell the Bitcoin it mines at a price greater than its cost to produce Bitcoin. As the cost of obtaining new miners increases, the cost of producing Bitcoin also increases. This requires a corresponding increase in the price of Bitcoin for USBTC to maintain profitability.

USBTC observed a significant increase in market demand for miners when Bitcoin prices rose into the end of the calendar year 2021. Concurrently, USBTC observed a significant increase in the unit price of new model miners in the market. While USBTC cannot know definitively if these two phenomena are linked, it has observed a measurable increase in the price of new miners offered by manufacturers coinciding with a rise in the price of Bitcoin. If this phenomena exists in the future, USBTC may obtain new miners and other hardware from manufacturers or from other third parties at a cost higher than its historical cost.

USBTC incurs a significant upfront capital cost each time it acquires new miners, and the company may not realize the benefit of these capital expenditures. If this occurs, the company's business, financial condition, and results of operations could be materially and adversely affected should the future price of Bitcoin not be sufficiently high.

***USBTC may be unable to purchase miners at scale or face delays or difficulty in obtaining new miners at scale, which could materially and adversely affect its business, financial condition, and results of operations.***

In the past, USBTC has observed periods of shortage in new miners available for purchase and a delay in delivery schedules for new miner purchases. There is no assurance that miner manufacturers or any other equipment manufacturers will be able to keep pace with potential surges in demand for mining equipment. It is uncertain how manufacturers will respond to increased global demand and whether they fulfill purchase orders fully and in a timely manner.

In the event that miner manufacturers or other suppliers are not able to keep pace with, or fail to satisfy, demand, USBTC may not be able to purchase miners or other equipment in sufficient quantities or on the delivery schedules required to meet its business needs. Additionally, should any suppliers default on purchase agreements with USBTC, the company may need to pursue recourse under international jurisdictions, which could be costly and time-consuming. Furthermore, there is no guarantee that USBTC would succeed in recovering any of the deposits paid for such purchases, which could materially and adversely affect its business, financial condition, and results of operations.

***Miner manufacturers may continue requiring significant advance deposits before orders are fulfilled and delivered.***

In the past, miner manufacturers have required advance deposits for miner purchases. If this continues in the future, USBTC may need to tie up significant amounts of cash several months before it receives and is able to deploy purchased miners to generate revenue. These advance deposits further drive the financial burden of operating a capital-intensive business. Miner manufacturers holding a deposit from USBTC may go out of business before delivering purchased miners, or for other reasons fail to deliver the miners associated with the deposit. There is no certainty that, in such circumstances, USBTC would succeed in recovering any of its deposit, which could materially and adversely affect its business, financial condition, and results of operations.

***USBTC may acquire other businesses and/or assets or form strategic alliances or joint ventures that could negatively affect its operating results, dilute shareholder ownership, increase debt, or cause it to incur significant expenses; notwithstanding the foregoing, USBTC's growth may depend on its success in identifying and completing such transactions.***

USBTC may seek to pursue additional acquisitions of businesses and/or assets and/or enter into strategic alliances or joint ventures. However, it cannot offer any assurance that any such acquisition or partnership will be successful. USBTC may not be able to identify suitable partners or acquisition candidates and may not be

43

TABLE OF CONTENTS

able to complete such transactions on favorable terms, if at all. If USBTC completes any acquisitions, it may not be able to integrate these acquisitions successfully into its existing business. In addition, in the event that USBTC acquires any existing businesses, it may assume unknown or contingent liabilities.

Any future acquisitions also could result in the issuance of stock, incurrence of debt, contingent liabilities or future write-offs of intangible assets or goodwill, any of which could have a negative impact on the company's business, financial condition, and results of operations. Integration of an acquired company may also disrupt ongoing operations and require management resources that would otherwise be focused on developing and expanding the company's existing business. USBTC may experience losses related to potential investments in other companies, which could materially and adversely affect its business, financial condition, and results of operations. Furthermore, USBTC may not realize the anticipated benefits of any acquisition, strategic alliance or joint venture if those benefits do not materialize.

***Although USBTC expects that the acquisition of the King Mountain JV interest will result in benefits to it, USBTC may not realize those benefits due to unforeseen difficulties.***

USBTC recently acquired its 50% interest in the King Mountain JV, including assuming an approximately $96.8 million promissory note in connection with the acquisition. USBTC acquired this interest on an "as is" basis from a bankruptcy administrator or trustee with limited representations, which limits USBTC's recourse against the sellers of the interest after closing, which in turn may expose us to unexpected material losses or expenses after the closing. USBTC's diligence investigations with respect to the King Mountain JV were limited, which may also expose us to unexpected material losses or expenses after the closing.

***USBTC may be unable to raise the additional capital needed to grow its business.***

If the price of Bitcoin declines, and as the company expects to need to raise additional capital to expand its operations and pursue its growth strategy, and to respond to competitive pressures or unanticipated working capital requirements, USBTC may but fail to obtain additional debt or equity financing on favorable terms, if at all, which could impair its growth and adversely affect its existing operations. If USBTC were to raise additional equity financing, its shareholders may experience significant dilution of their ownership interest, and the value of their investment could decline. Furthermore, if USBTC were to raise additional debt financing, the company's debtors would likely have priority over holders of equity with respect to order of payment preference. USBTC may be required to accept terms that restrict its ability to incur additional indebtedness or take other actions, including terms that require it to maintain a specified level of liquidity or other balance sheet ratios that may not be in the interests of other shareholders.

***If there are significant changes to the method of validating blockchain transactions, such changes could reduce demand for USBTC's blockchain hosting services or for USBTC's miner equipment.***

New digital asset transaction protocols are continuously being deployed, and existing and new protocols are in a state of constant change and development. While certain validation protocols currently employ a "proof of work" consensus algorithm, whereby transaction processors are required to expend significant amounts of electrical and computing power to solve complex mathematical problems in order to validate transactions and create new blocks in a blockchain, there may be a shift towards adopting alternative validating protocols. These protocols may include a "proof of stake" algorithm or an algorithm based on a protocol other than proof of work, which may decrease the reliance on computing power as an advantage to validating blocks. USBTC's transaction processing operations, and, to USBTC's knowledge, the operations of its potential hosting customers, are currently designed to primarily support a proof of work consensus algorithm. Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate (for example, from lower priced electricity, processing, real estate or hosting) less competitive. As a result of USBTC's efforts to optimize and improve the efficiency of its digital asset mining operations, USBTC may be exposed to the risk in the future of losing the benefit of its capital investments and the competitive advantage USBTC hopes to gain from this as a result, and may be negatively impacted if a switch to proof of stake validation were to occur. Any such change to transaction validating protocols could have a material adverse effect on USBTC's business, financial condition and results of operations.

44

TABLE OF CONTENTS

***Failure to price hosting contracts correctly may lead USBTC to operate these contracts at a loss, which could have a material adverse effect on its business, financial condition, and results of operations.***

USBTC hosting contracts may be structured with margin-based or cost-plus pricing that considers the estimated power consumption of hosting client miners and other costs of service. USBTC's ability to generate a profit on contracts with such pricing structures requires that it accurately forecast these costs over the contracted time period. Failure to do so could have a material adverse effect on the business, financial condition, and results of operations.

***Failure of critical systems of the hosting facilities operated by USBTC and the services provided by USBTC could have a material adverse effect on its business, financial condition, and results of operations.***

The critical systems of the hosting facilities operated by USBTC and the services provided by USBTC are subject to failure. Any failure in the critical systems of any hosting facility operated by USBTC or services provided by USBTC, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, power supplies or network connectivity, whether or not within the company's control, could result in service interruptions to the company's customers and/or damage to equipment, which could significantly disrupt the normal business operations of the company's customers, harm the company's reputation, and reduce the company's revenue. Temporary downtime at any hosting facility operated by USBTC could reduce the amount of Bitcoin mined by the company and thereby reduce the profitability of its hosting customers. The destruction or severe impairment of any of the hosting facilities operated by USBTC could result in significant downtime and loss of customer data. Since the company's ability to attract and retain customers depends on its ability to provide a reliable service, even minor interruptions in service could harm the company's reputation and negatively impact its revenue and profitability. Any of these events may result in financial penalty, which could have a material adverse effect on its business, financial condition, and results of operations.

The services provided by USBTC are subject to temporary or permanent interruption by factors that include but are not limited to:

- Power loss;
- Equipment failure;
- Human error and accidents;
- Theft, sabotage, and vandalism;
- Failure by USBTC or its suppliers to provide adequate service or maintain equipment;
- Network connectivity downtime and fiber cuts;
- Service interruptions resulting from server relocation;
- Security breaches of infrastructure;
- Improper or inadequate building maintenance by the company;
- Physical, electronic, and cybersecurity breaches;
- Animal incursions;
- Fire, earthquake, hurricane, tornado, flood and other natural disasters;
- Extreme temperatures;
- Water damage;
- Public health emergencies; and
- Terrorism.

Moreover, service interruptions and equipment failures may expose USBTC to potential legal liability. As the services provided by USBTC may be critical to its customers' business operations, any disruption in services could result in lost profit or other indirect or consequential damages to its customers. Although customer

45

TABLE OF CONTENTS

contracts typically contain provisions limiting the company's liability, there can be no assurance that a court would enforce any contractual limitations on the company's liability in the event that one of its customers brings a lawsuit against it as the result of a service interruption that they ascribe to the company. The outcome of any such lawsuit would depend on the specific facts of the case and any legal and policy considerations that the company may not be able to mitigate. In such cases, USBTC may be liable for substantial damage awards, which could have a material adverse effect on its business, financial condition, and results of operations.

***USBTC may not be able to obtain new hosting and transaction processing hardware or purchase such hardware at competitive prices during times of high demand, which could have a material adverse effect on its business, financial condition and results of operations.***

Historically, an increase in interest and demand for digital assets has led to a shortage of hosting and transaction processing hardware and increased prices. USBTC and its customers and potential customers have experienced, and may in the future experience, difficulty in obtaining new equipment or replacement components for USBTC's and its customers' existing equipment, including graphics processing units and application-specific integrated circuit chipsets and computer servers, which has had, and in the future may have, a material impact on the demand for USBTC's services and associated revenue. Currently, restrictions on digital asset mining in China have increased availability of used mining equipment and decreased prices of new mining equipment. In addition, these restrictions have decreased available mining facilities in China and increased demand for hosting in countries outside of China including the United States. To the extent miners view this used equipment as a viable alternative to purchasing new miners from USBTC, USBTC's equipment sales may suffer, which could have a material adverse effect on USBTC's business, financial condition and results of operations.

***USBTC's commercial success depends in large part on its ability to contribute computing power to pools that mine digital assets for the company and its hosting customers, attract and retain customers within the company's hosting and property management businesses, and sell mining equipment profitably. Increases in power costs or an inability to mine digital assets efficiently at favorable prices will reduce the company's operating margins, impact its ability to attract and retain customers, and harm its growth prospects and could have a material adverse effect on USBTC's business, financial condition and results of operations.***

USBTC's growth depends in large part on its ability to contribute computing power to pools that mine digital assets for the company and its hosting customers, attract and retain customers within the company's hosting and property management businesses, and sell mining equipment profitably. With respect to its hosting and property management businesses, USBTC may not be able to attract and retain customers for a number of reasons, including if:

- there is a reduction in the demand for USBTC's services due to macroeconomic factors;
- there is a reduction in demand for USBTC's services due to a broader secular reduction in demand for such services in the underlying digital asset mining sector;
- USBTC is unable to provide services that meet the needs of existing or potential customers;
- USBTC fails to effectively market the company and its services to potential customers;
- USBTC fails to price its hosting or property management services attractively;
- USBTC provides hosting or property management services that are deemed by existing and potential customers to be inferior to those of its competitors;
- USBTC fails to meet customers' ongoing and evolving program qualification standards, based on a range of factors, including available power, preferred site design specifications, security considerations and connectivity;
- businesses decide to host or manage sites internally as an alternative to the use of USBTC's services;
- USBTC fails to successfully communicate the benefits of its services to potential customers;
- USBTC is unable to strengthen awareness of its brand; and
- potential customers are unable to secure the digital asset mining equipment required to engage USBTC in the capacity of a third party hosting provider or property manager.

TABLE OF CONTENTS

If USBTC is unable to obtain hosting or property management customers at favorable terms or at all, it could have a material adverse effect on its business, financial condition and results of operations.

***USBTC generates a meaningful share of its hosting revenue from a small number of customers, and the loss of, or a significant decrease in business from, a number of these customers and/or a failure to attract new customers could have a material adverse effect on the company's business, financial condition, and results of operations.***

To date, USBTC has generated a significant share of its hosting revenue from a small number of customers. Any failure to meet customer expectations could result in the cancellation or non-renewal of hosting contracts and loss of associated revenue. Any event leading to the early termination of a hosting contract, including, but not limited to, customer bankruptcy or force majeure events that disrupt facility operations or damage customer miners, could result in the loss of revenue associated with those contracts. If USBTC were unable to offset lost revenue by refilling vacant capacity with other miners in the case of customer churn or by repossessing miners in the case of customer default, it could have a material adverse effect on the company's business, financial condition, and results of operations.

***If USBTC does not accurately predict its hosting facility requirements, it could have a material adverse effect on its business, financial condition and results of operations.***

The costs of building out, leasing and maintaining USBTC's hosting facilities may constitute a significant portion of USBTC's capital and operating expenses. In order to manage growth and ensure adequate capacity for USBTC's digital mining operations and new and existing hosting customers while minimizing unnecessary excess capacity costs, USBTC continuously evaluates its short- and long-term data center capacity requirements. If USBTC overestimates its business' capacity requirements or the demand for its services and therefore secure excess data center capacity, USBTC's operating margins could be materially reduced. If USBTC underestimates its data center capacity requirements, USBTC may not be able to service the expanding needs of its existing customers and may be required to limit new customer acquisition, which could have a material adverse effect on its business, financial condition and results of operations.

***USBTC operates a number of data centers for third party owners under the USMIO brand and cannot execute changes to strategy and operations without owner consent, which could result in suboptimal financial performance and may have a material adverse effect on the company's business, financial condition, and results of operations.***

USBTC has entered into property management agreements ("**PMAs**") with the owners of Charlie, Delta, and Echo. Under these agreements, USBTC is paid a fixed fee to operate each data center and partakes in an incentive structure that compensates USBTC for introducing and executing initiatives that increase revenue and decrease costs. At times, USBTC may recommend certain changes to a data center's strategy or operations, including, but not limited to, modification of the data center's energy curtailment approach, repricing or cancellation or existing customer hosting contracts, or hiring new personnel, to increase revenue, decrease costs, and/or strengthen data center operations.

As the given data center owner must consent to certain changes recommended by USBTC, and as the given owner may not consent to such changes, USBTC will not always have ultimate control over key decisions that drive the financial and operating performance of these data centers. If USBTC is unable to implement decisions required to operate these data centers profitably and effectively, it could negatively impact the revenue and profitability of its partners and harm the reputation of both its partners and USBTC. This could have a material adverse effect on USBTC's business, financial condition, and results of operations.

Furthermore, if USBTC were to fail to meet the expectations of third party data owners for any reason within or beyond its control, its partners could cancel or decline to renew its contracts with USBTC. If USBTC were unable to offset lost revenue by securing new PMAs, it could have a material adverse effect on the company's business, financial condition, and results of operations.

***USBTC faces certain risks associated with its current joint venture and may face similar risks in the future by entering into other joint ventures, and the materialization of any of these risks may have a material adverse effect on the company's business, financial condition, and results of operations.***

Joint ventures inherently involve a lesser degree of control over business strategy and operations, thereby potentially increasing the financial, legal, operational, regulatory, and/or compliance risks associated with

them, and require the diversion of financial and management resources from existing operations or alternative opportunities. USBTC may be dependent on partners, controlling shareholders, management, or other persons or entities who control the joint venture and who may have business interests, strategies, or goals that are inconsistent or competitive with those of USBTC. Furthermore, joint venture partners receive access to USBTC's intellectual property and other resources, which introduces the risk of theft and/or exploitation.

For example, USBTC owns a 50% membership interest in a joint venture with one of the world's largest renewable energy producers with respect to the Echo data center in King Mountain, Texas. Decision making control over the joint venture's actions rests in a committee of four member managers, two from each Member of the joint venture (USBTC and its partner). If the member managers of USBTC and its joint venture partner are not aligned with respect to business interests, strategies, or goals, or if the member managers of USBTC and its joint venture partner cannot reach agreement in decision-making processes, there is a risk that USBTC may not be able to operate the King Mountain site optimally from a financial, legal, operational, regulatory, and/or compliance perspective. If this situation materializes, it may have a material adverse effect on the company's business, financial condition, and results of operations.

Business decisions or other actions or omissions of the partners, controlling shareholders, management, or other persons or entities who control them may adversely affect the value of USBTC's interest in the joint venture, result in litigation or regulatory action against USBTC, and may otherwise damage USBTC's reputation and brand. USBTC's ability to realize value from its joint ventures may be limited by applicable securities laws and regulations. If USBTC fails to address the foregoing risks or other problems encountered in connection with past or future joint ventures, new technologies, services, and other assets, it could have a material adverse effect on the company's business, financial condition, and results of operations.

***USBTC faces certain risks associated with its current indebtedness, and failure to service debt under contracted terms may have a material adverse effect on the company's business, financial condition, and results of operations.***

USBTC is subject to a number of risks associated with its indebtedness. USBTC must dedicate a portion of its cash flows from operations to pay debt service costs, and it therefore has less funds available for operations and other purposes. All else being equal, USBTC is more vulnerable to economic downturns and fluctuations in interest rates, less able to withstand competitive pressures and less flexible in reacting to changes in the industry and general economic conditions. If USBTC were to default under any of its existing credit facilities or if its creditors demand payment of a portion or all of its indebtedness, USBTC may not have sufficient funds to make such payments and/or it may result in the repossession of assets encumbered by its creditors.

For example, pursuant to USBTC's loan agreement with Anchorage Lending CA, LLC ("**Anchorage**"), USBTC and certain of its subsidiaries are obligated to repay the amount borrowed from Anchorage of approximately $49.0 million. In addition, pursuant to the loan agreement, the outstanding loan amount is secured by certain assets of USBTC and certain of its subsidiaries. In the event that USBTC and/or certain of its subsidiaries fail to pay the outstanding loan amounts or otherwise default under the loan agreement, Anchorage will be entitled to, amongst other remedies, (i) declare the outstanding loan amount immediately due and payable and/or (ii) enforce the rights granted to it pursuant to its security interests, including foreclosing upon the assets subject to the security interest. In addition, USBTC assumed a $96.8 member loan at a subsidiary level in connection with its King Mountain JV acquisition. While USBTC, as a parent entity, is not a guarantor under the loan, in the event that USBTC and/or its subsidiaries fail to pay the outstanding loan amounts or otherwise defaults under the loan, it may have a material adverse effect on USBTC's business, financial condition and results of operations.

***If USBTC is unable to increase the operating scale of its Alpha and Echo data centers as planned, the company will be required to find alternative options to increase the operating scale of its data center portfolio. If this scenario were to materialize and if USBTC was unsuccessful in its effort to expand its operating scale by other means, it may adversely affect your investment.***

USBTC plans to increase the operating scale of its Alpha and Echo data centers by energizing additional miners at each site. The company faces several risks as it executes this plan, including, but not limited to, the risk that USBTC fails to secure regulatory approval and the risk that it is not prepared, for reasons within or beyond its control, to energize miners in a timely manner or at all upon their delivery. If USBTC is unable to

TABLE OF CONTENTS

successfully increase the operating scale of its Alpha and Echo data centers, and if the company were unsuccessful in its effort to expand its operating scale by other means, it may adversely affect your investment.

***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.***

A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

***USBTC may become dependent on third-party brokers and direct suppliers to source some or all of its miners, and failure to properly manage these relationships, or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on USBTC's business, prospects or operations.***

While USBTC has historically purchased miners directly from miner manufacturers, it may in the future rely on third-party brokers or other suppliers to source some or all of its miners. USBTC cannot ensure that business interruptions will not occur as a result of the potential failure of these brokers or suppliers to perform as expected, for reasons including, but not limited to, the failure to secure acceptable or a sufficient number of miners for USBTC.

Like USBTC, many of USBTC's industry peers have purchased mining equipment at scale in the past, which has at times resulted in a worldwide shortage of mining equipment and extended delivery schedules for new miner purchases. USBTC cannot ensure that miner manufacturers will be able to keep pace with potential increases in demand for mining equipment in the future. Furthermore, resource constraints or regulatory barriers could affect USBTC's ability to purchase and secure miners. For example, China has experienced power shortages in the past, which at times led to business disruptions to certain of USBTC's miner manufacturer suppliers. There is a possibility that certain miner manufacturers may relocate their manufacturing activities from China to other countries following the September 2021 regulatory blanket ban on digital asset mining and transactions in China. Such factors, including power outages and the relocation of manufacturing activities, could result in cancellations or delays and may negatively impact USBTC's ability to receive mining equipment on a timely basis or at all.

In the past, increased demand for miners has also limited the supply of miners that brokers can source. USBTC cannot ensure that brokers, if engaged, or suppliers will continue to perform to USBTC's satisfaction or under commercially attractive terms. Brokers or suppliers may also decline USBTC's orders to fulfill orders from a competitor, which could harm USBTC's competitive position. If USBTC's brokers or suppliers were to not provide services according to USBTC's needs or to become unable to produce and deliver the volume of miners required by USBTC, USBTC may not be able to find alternative means of purchasing and securing miners in a timely manner. Any delays, interruptions, or increased costs resulting from these dynamics could have a material adverse effect on USBTC's business, prospects or operations.

***USBTC may become involved in legal proceedings from time to time, which could adversely affect USBTC. USBTC cannot predict the outcome of any legal proceedings with respect to its current and past business activities.***

From time to time, USBTC may be a party to legal and regulatory proceedings, including matters involving governmental agencies or regulators, entities with whom it does business and other proceedings, whether arising in the ordinary course of business or otherwise. USBTC evaluates its exposure to legal and regulatory proceedings and establishes reserves, if required, for the estimated liabilities in accordance with generally accepted accounting principles. Assessing and predicting the outcome of these matters involves substantial uncertainties and contingencies. Such matters can be time-consuming, divert management's attention and resources, cause us to incur significant expenses or liabilities, or require USBTC to change its business practices. In addition, the expenses and liabilities of litigation and other proceedings, and the timing of these expenses from period to period, are difficult to estimate, subject to change, and could adversely affect USBTC's business, financial condition and results of operations.

TABLE OF CONTENTS

For example, USBTC, and its wholly-owned subsidiary, U.S. Data Technologies Ltd. were defendants in a lawsuit filed by the City of Niagara Falls and the Director of the Department of Code Enforcement of the City of Niagara Falls on November 17, 2022 (*City of Niagara Falls, et al. v. U.S. Data Technologies Group Ltd., et al., index no. E178623/2022, Niagara County Supreme Court*), pursuant to which the plaintiffs were seeking to enjoin USBTC's digital asset mining operations in Niagara Falls on the basis of alleged non-compliance with, and absence of required permits under, Niagara Falls' recently amended zoning ordinance (the "**Niagara Falls Litigation**"). On December 1, 2022, the Niagara County Supreme Court issued a temporary restraining order directing USBTC to restrain from violating the law, continuing to mine digital assets, and engaging in business on the property. USBTC believed that the enactment of the recent amendment to the zoning ordinance was procedurally invalid and constitutionally unsound. In connection with the Niagara Falls Litigation, on April 7, 2023, USBTC entered into a settlement with the City of Niagara Falls (the "**Niagara Falls Settlement**"), which settled all such claims underlying the Niagara Falls Litigation and terminated the temporary restraining order against USBTC. In connection with the Niagara Falls Settlement, USBTC was required to pay the City of Niagara Falls a $100,000 compliance fee as well as $180,000 of the city's attorney's fees incurred with the Niagara Falls Litigation. In addition, USBTC is subject to ongoing noise level restrictions, which if not complied with, could result in fines under the terms of the Niagara Falls Settlement. For more information regarding the Niagara Falls Settlement, see "*Information about USBTC—Legal Proceedings*." Any violation of the noise restraints under the Niagara Falls Settlement may result in the accumulation of fines or the voluntary shutdown of the site's operations, both of which would have a material adverse effect on USBTC's business and results of operations.

In addition, responding to lawsuits brought against USBTC and governmental inquiries or legal actions that USBTC may initiate, can often be expensive and time-consuming and disruptive to normal business operations. Moreover, the results of complex legal proceedings and governmental inquiries could adversely affect USBTC's business, results of operations or financial condition, and USBTC could incur substantial monetary liability and/or be required to change its business practices.

***The properties included in USBTC's mining and hosting network may experience damages, including damages that are not covered by insurance.***

USBTC's current mining and hosting operations in New York, Nebraska and Texas are, and any future mines USBTC establishes will be, subject to a variety of risks relating to physical condition and operation, including:

- the presence of construction or repair defects or other structural or building damage;

- any noncompliance with or liabilities under applicable environmental, health or safety regulations or requirements or building permit requirements;

- any damage resulting from natural disasters, such as hurricanes, earthquakes, fires, floods and windstorms; and

- and claims by employees and others for injuries sustained at USBTC properties.

For example, a mine could be rendered inoperable, temporarily or permanently, as a result of a fire or other natural disaster or by a terrorist or other attack on the mine. The security and other measures USBTC takes to protect against these risks may not be sufficient. Additionally, a mine could be materially adversely affected by a power outage or loss of access to the electrical grid or loss by the grid of cost-effective sources of electrical power generating capacity. Given the power requirement, it would not be feasible to run miners on back-up power generators in the event of a power outage. USBTC's insurance may cover all or a portion of the replacement cost of any lost or damaged miners, but does not cover any interruption of its mining activities; USBTC's insurance therefore may not be adequate to cover the losses it suffers as a result of any of these events. In the event of an uninsured loss, including a loss in excess of insured limits, at any of the mines in its network, such mines may not be adequately repaired in a timely manner or at all and USBTC may lose some or all of the future revenues anticipated to be derived from such mines.

***USBTC has previously identified material weaknesses in its internal control over financial reporting. These material weaknesses could continue to adversely affect USBTC's ability to report its results of operations and financial condition accurately and in a timely manner.***

In connection with the preparation of USBTC's consolidated financial statements as of June 30, 2022 and for the fiscal year ended June 30, 2022, management and its independent registered public accounting firm

TABLE OF CONTENTS

impact on the effectiveness of USBTC's internal control system. Failure to successfully manage these risks in the development and implementation of new lines of business or new services could have a material adverse effect on USBTC's business, results of operations and financial condition.

***USBTC has completed a rescission offer of privately issued securities, with one offeree choosing to accept USBTC's rescission offer to date (the "Rescission Offer").***

In July 2021, USBTC offered to repurchase 31,422 shares of Series A Preferred Stock of USBTC (the "**Series A Shares**"), 62,431 shares of common stock of USBTC sold during the USBTC's "founder" round (the "**Founder Common Shares**"), 37,510 shares of common stock of USBTC sold during the USBTC's "seed" round (the "**Seed Common Shares**," and together with the Founder Common Shares, the "**Rescission Offer Common Shares**," and the Series A Shares, the "**Rescission Shares**") and up to an aggregate principal amount of $5.87 million promissory notes outstanding plus applicable accrued interest outstanding (the "**Promissory Notes**," and together with the Rescission Shares, the "**Rescission Securities**"). The Rescission Securities were originally purchased in private transactions by certain persons who are or were residents of California, Florida, Illinois, Maryland, Massachusetts, Pennsylvania, Nevada, New Jersey, New York, Texas, Virginia, Washington, Puerto Rico, Canada, the Cayman Islands, Hong Kong and the United Arab Emirates at the time such Rescission Securities were purchased.

Management of USBTC became aware that (i) court orders (the "**SEC Orders**") against two of USBTC's now-former stockholders, John Stetson and Mark Groussman, which, among other things, restrain and enjoin such stockholders from violating certain federal securities laws, may have precluded USBTC from relying on certain federal and state securities exemptions for the offerings since such stockholders may have been deemed "promoters" based on certain of their activities in one or more of the offerings, (ii) it is possible that payments made to certain persons may be deemed as a commission or finder's fee in connection with one or more of the offerings and (iii) given the fact that proper notification and/or other provisions for an exemption may not have been complied with, the sale of certain Rescission Securities may not have been in compliance with state securities, "blue sky" or other applicable laws. Additionally, a current beneficial owner of securities of USBTC is a family member of a third defendant implicated in the SEC Order. It is possible the USBTC stockholder relationship with such individual could be subject to regulatory scrutiny and alleged by regulators as USBTC acting in concert with the bad actor defendants. Because of the aforementioned items, it is possible that the disclosure provided to subscribers in the aforementioned offerings was incomplete. As a result, USBTC elected to conduct the Rescission Offer. All equity previously held by Messrs. Stetson and Groussman and any of their family members and/or affiliates has been sold to other equity holders of USBTC, and USBTC has taken all other actions necessary as of August 2021 so that Messrs. Stetson and Groussman no longer have any involvement with USBTC.

The Rescission Offer remained open until the earlier of (i) the date on which USBTC received written responses from all offerees and (ii) 30 days after delivery of the Rescission Offer. As of the date of this prospectus, the Rescission Offer has closed and only one holder of 126 Series A Shares elected to have USBTC redeem his investment and rescind his purchase of the Series A Shares. If all securityholders were to have accepted the Rescission Offer, USBTC would have been required to pay approximately $41.2 million in the aggregate. As of the date of this prospectus, USBTC has voluntarily paid off the $5.87 million in Promissory Notes. USBTC has experienced significant negative cash flow from operations to date and may continue to experience significant negative cash flow in the future. While USBTC has experienced historical losses and liquidity issues, it had enough cash or cash equivalents to pay the one holder of Series A Shares. However, in the future, should additional holders of Rescission Securities seek to rescind their prior purchases or should the validity of the Rescission Offer be contested for any reason, USBTC may not have enough cash or cash equivalents to pay any holders of Rescission Securities who may claim they continue to have a right to rescind their purchase of Rescission Securities.

***USBTC is subject to orders in three states, Massachusetts, Maryland and Virginia, and its failure to comply with federal and state securities laws and regulations in connection with the Rescission Offer could subject USBTC to additional enforcement actions, monetary fines and penalties, disqualifications under federal securities laws, and impair its ability to raise capital in the future.***

USBTC is relying upon exemptions from the securities registration provisions of the federal and state securities laws and regulations in connection with the Rescission Offer. In relying upon such exemptions, USBTC has

TABLE OF CONTENTS

with respect to its power source or a transmission outage due to natural or manmade events, USBTC's supply of electricity could materially decrease. USBTC may also incur significant repair and clean-up costs associated with these events. The effect of the failure of established power sources to operate as planned as described above could have a material adverse effect on USBTC's business, financial condition and results of operations.

***The grids that USBTC relies on for energy may not be able to operate as planned, which may increase USBTC's expenses and decrease its revenues and have an adverse effect on USBTC's business, financial condition and results of operations.***

The operation of the grids USBTC relies on, including the NYISO and ERCOT grids, as well as USBTC's information technology systems and other assets and conduct of other activities subjects USBTC to a variety of risks, including the breakdown or failure of equipment, accidents, security breaches, viruses or outages affecting information technology systems, labor disputes, obsolescence, delivery/ transportation problems and disruptions of fuel supply and performance below expected levels. These events may impact USBTC's ability to conduct its businesses efficiently and lead to increased costs, expenses or losses. Planned and unplanned outages with respect to the power grids that USBTC relies on may require USBTC to purchase power at then-current market prices which could have a negative impact on the cost structure of USBTC's Bitcoin mining operations.

***USBTC may be required to obtain, and to comply with, government permits and approvals.***

USBTC may be required to obtain, and to comply with, numerous permits and licenses from federal, state and local governmental agencies. The process of obtaining and renewing necessary permits and licenses can be lengthy and complex and can sometimes result in the establishment of conditions that make the project or activity for which the permit or license was sought unprofitable or otherwise unattractive. In addition, such permits or licenses may be subject to denial, revocation or modification under various circumstances. Failure to obtain or comply with the conditions of permits or licenses, or failure to comply with applicable laws or regulations, may result in the delay or temporary suspension of USBTC's operations.

USBTC's inability to procure and comply with the permits and licenses that may be required for its operations, or the cost to us of such procurement or compliance, could have a material adverse effect on USBTC. In addition, new environmental legislation or regulations, if enacted, or changed interpretations of existing laws, may cause activities at USBTC's facilities to need to be changed to avoid violating applicable laws and regulations or elicit claims that historical activities at USBTC's facilities violated applicable laws and regulations. In addition to the possible imposition of fines in the case of any such violations, USBTC may be required to undertake significant capital investments and obtain additional operating permits or licenses, which could have a material adverse effect on USBTC. For example, USBTC entered into the Niagara Falls Settlement, which requires compliance with certain conditions in connection with its operations at its Alpha Site. Any noncompliance could result in fines under the Niagara Falls Settlement or other adverse consequences, such as further litigation or the shutdown of the site's operations, which would have a material adverse effect on USBTC's business, financial position and results of operations. See "Risks Relating to USBTC's Business — USBTC may become involved in legal proceedings from time to time, which could adversely affect USBTC. USBTC cannot predict the outcome of any legal proceedings with respect to its current and past business activities."

In addition, natural risks such as earthquake, flood, lightning, hurricane and wind, other human-made hazards, such as nuclear accidents, dam failure, gas or other explosions, mine area collapses, fire, structural collapse, machinery failure and other dangerous incidents are inherent risks in its operations. These and other hazards can cause significant personal injury or loss of life, severe damage to and destruction of property, plant, equipment, and transmission lines, contamination of, or damage to, the environment and suspension of operations. Further, USBTC's employees and contractors work in, and the general public may be exposed to, potentially dangerous environments at or near USBTC's operations. As a result, employees, contractors, customers and the general public are at risk for serious injury, including loss of life.

TABLE OF CONTENTS

## THE BUSINESS COMBINATION

*The following is a description of the material aspects of the Business Combination. While we believe that the following description covers the material aspects of the Business Combination, the description may not contain all of the information that is important to you. We encourage you to carefully read this entire prospectus, including the Business Combination Agreement attached as an exhibit to the Registration Statement of which this prospectus forms a part, for a more complete understanding of the Business Combination.*

### Structure of the Business Combination

The Business Combination will be effected by way of the Arrangement and Merger. Pursuant to the Arrangement, (i) Hut 8 and its wholly-owned subsidiary, Hut 8 Holdings, will be amalgamated by way of a short-form vertical amalgamation, with Hut Amalco having the same capital as the capital of Hut 8 immediately prior to the amalgamation, and (ii) following the amalgamation, the common shares in the capital of Hut Amalco (other than any shares in respect of which a registered Hut 8 shareholder has validly exercised dissent rights) will be exchanged for shares of New Hut common stock based on the Hut 8 Exchange Ratio. Following the completion of the Arrangement, pursuant to the Merger, Merger Sub will be merged with and into USBTC, with USBTC surviving the Merger as a subsidiary of New Hut. Pursuant to the Merger, holders of USBTC capital stock will receive shares of New Hut common stock based on the USBTC Exchange Ratio. As a result of the Business Combination, among other things, New Hut will become the ultimate parent of Hut 8, USBTC, and their respective subsidiaries.

Subject to the terms and conditions set forth in the Business Combination Agreement, Hut 8 shareholders (other than registered Hut 8 shareholders who validly exercise dissent rights) will have the right to receive, for each Hut 8 common share they hold immediately prior to the effective time of the Arrangement, that number of shares of New Hut common stock equal to the Hut 8 Exchange Ratio, and USBTC stockholders will have the right to receive, with respect to each share of Series A Preferred, Series B Preferred, Series B-1 Preferred and USBTC common stock they hold at the effective time of the Merger, that number of shares of New Hut common stock equal to the USBTC Exchange Ratio. Where the aggregate number of shares of New Hut common stock that a Hut 8 shareholder or USBTC stockholder would otherwise be entitled to receive under the Business Combination includes a fractional share of New Hut common stock, the number of shares of New Hut common stock to be received by such Hut 8 shareholder or USBTC stockholder, as applicable, will be rounded down to the nearest whole number and no cash will be paid in lieu of such fractional share of New Hut common stock.

The Business Combination does not contain any provision that would adjust the Hut 8 Exchange Ratio or USBTC Exchange Ratio based on fluctuations in the market value of either company's capital stock. Because of this, the implied value of the stock consideration to Hut 8 shareholders and USBTC stockholders will fluctuate between now and the completion of the Business Combination and will depend on the market value of New Hut common stock at the time the Business Combination is completed.

In order to be effective, the Business Combination must be approved by the affirmative vote of not less than $66\frac{2}{3}$% of the votes cast by Hut 8 shareholders present or represented by proxy and entitled to vote at the Hut 8 Meeting. For the purposes of implementing the Business Combination, USBTC will seek to obtain the USBTC Consent.

### Background of the Business Combination

Each of the Hut 8 Board and the USBTC Board and their respective senior management regularly review and discuss their company's performance, business strategy and competitive position in the digital asset mining industry. In addition, such boards and senior management regularly review and evaluate various strategic alternatives, including acquisitions, dispositions, capital raising, and other strategic transactions, as part of ongoing efforts to strengthen their respective overall business and enhance shareholder value. In particular, the USBTC Board previously considered pursuing an initial public offering in the United States but determined not to proceed, primarily due to market conditions.

As part of this ongoing evaluation, each of the Hut 8 Board and USBTC Board, together with their senior management teams, have from time to time considered various strategic options to accelerate growth and

TABLE OF CONTENTS

drive value for shareholders, including the possibility of a strategic combination with other companies in the digital asset industry. A number of factors are considered, including the potential for industry consolidation, the highly competitive digital asset mining industry, the large number of existing and new competitors in the industry, and the significant scaling obstacles that are hindering wide spread acceptance of digital assets as a means of payment.

In addition, in the course of each of Hut 8 and USBTC conducting their own strategic reviews and planning, representatives of Hut 8 and USBTC have, from time to time, discussed with various companies in the digital asset mining industry potential business combination transactions that might expand their respective businesses, improve their respective paths to scale, and enhance stockholder value.

On May 9, 2022, Stifel GMP prepared a presentation for Hut 8's management that highlighted a number of potential acquisition and merger partners. Following the meeting, Hut 8 management continued to evaluate options.

Over the course of the summer in 2022, Jaime Leverton, Chief Executive Officer of Hut 8, and Stifel GMP continued to discuss various strategic alternatives for Hut 8, exploring organic growth and inorganic growth by reviewing the universe of various potential partners for a business combination transaction, as Hut 8 had received a number of inbounds indicating a preliminary high level of interest for a discussion between parties. Stifel GMP continued to evaluate potential options for the company.

Over the course of the summer in 2022, USBTC management undertook a comprehensive strategic planning process for the company. USBTC explored various models to scale the business, including greenfield site expansion, partnerships and joint ventures, and M&A. Michael Ho, co-founder and Chief Executive Officer of USBTC, and Asher Genoot, co-founder and President of USBTC, commenced exploratory conversations with industry peers.

On June 15, 2022, Mr. Ho, USBTC's Chief Executive Officer, and Joel Block, USBTC's Chief Financial Officer, had an introductory meeting with the CEO and CFO of another industry participant ("**Company A**") to discuss the industry in which their respective companies operated. Each of the parties concluded that there may be future interest in a potential strategic transaction.

On July 18, 2022, Stifel GMP connected Ms. Leverton with Mr. Ho and Mr. Genoot, and the parties discussed the industry in which their respective companies operated. Each of the parties concluded that there was interest in a potential strategic transaction, and following the meeting the parties continued to have further discussions.

On August 13, 2022, Ms. Leverton received an inbound request from a third-party industry participant ("**Company B**") to discuss the potential benefits of a business combination between Hut 8 and Company B. Stifel GMP prepared initial views on the potential transaction to members of Hut 8's management which was shared with the Hut 8 Board.

On August 18, 2022, Stifel GMP prepared a presentation for Hut 8 in regards to a potential business combination with another industry participant ("**Company C**"). Hut 8 held preliminary discussions with Company C and such discussions did not progress as Company C was determined not to be an attractive option by Hut 8 management.

During the balance of August 2022, Hut 8 explored potential joint venture initiatives with a third industry participant ("**Company D**"). During this period, Hut 8 management and representatives of Stifel GMP were in contact with Company D and exchanged additional documentation with Company D's management and representatives. Discussions with Company D did not progress past a preliminary stage.

During August and September 2022, USBTC explored potential strategic transactions with another industry participant ("**Company E**"). Discussions with Company E did not progress past a preliminary stage.

On September 5, 2022, representatives of Stifel GMP delivered an updated presentation to Ms. Leverton, which presentation was shared with the Hut 8 Board, and provided a broad analysis of various potential partners for a potential acquisition or business combination.

On September 9, 2022 representatives of Stifel GMP verbally explored the idea of a potential business combination of USBTC and Hut 8 with USBTC management. USBTC management expressed interest and the parties continued to have further discussions.

TABLE OF CONTENTS

On September 15, 2022, Mr. Ho and Mr. Block had a follow-up meeting with the CEO and CFO of Company A, and the parties discussed potential strategic transactions, including a partnership and a business combination transaction. Discussions with Company A did not progress past a preliminary stage.

On September 20, 2022, Hut 8 management and representatives of Stifel GMP delivered a presentation to the Hut 8 Board wherein identifying Company B as a strategic fit to Hut 8's existing and future operations. The Hut 8 Board supported continuing to pursue advanced discussions with respect to a potential business combination transaction with Company B.

On October 3, 2022, USBTC engaged NYDIG ABL LLC ("**NYDIG**") via videoconference to discuss its current financial position and debt obligations with NYDIG and to propose a restructuring of its debt obligations with NYDIG. The parties continued to have further discussions in subsequent months to reach a resolution.

On October 6, 2022, USBTC engaged Anchorage via videoconference to discuss its current financial position and debt obligations with Anchorage and to propose a restructuring of its debt obligations with Anchorage. The parties continued to have further discussions in subsequent months to reach a resolution.

On October 6, 2022, Mr. Genoot and Mr. Block met in-person with the CEO of another industry participant ("**Company F**") to discuss a potential strategic transaction. Discussions with Company F did not progress past a preliminary stage.

On October 18, 2022, USBTC was selected by an institutional investor focused on renewable energy assets to operate two digital asset mining sites in Kearney, Nebraska and Granbury, Texas formerly owned and operated by a third party industry participant. USBTC management recognized an opportunity to build a standalone business unit focused on managed infrastructure operations and formed the USMIO business upon being selected as the strategic operator of these sites. USBTC entered into these agreements following a formal request for proposal (RFP)-driven process in connection with the Chapter 11 bankruptcy filing of Compute North, through which the institutional investor became the owner of two digital asset mining sites.

On November 3, 2022, Hut 8 determined they were not going to come to an acceptable agreement with Company B and instructed representatives of Stifel GMP to inform representatives of Company B of the decision and to suspend further discussions with Company B.

On November 4, 2022, USBTC entered into PMAs at the Kearney, Nebraska and Granbury, Texas sites under two USBTC subsidiaries, formalizing USMIO as a revenue-generating business.

On November 15, 2022, USBTC won a bid to acquire from Compute North, via their Chapter 11 bankruptcy process, a 50% membership interest in a joint venture with one of the world's largest renewable energy producers at the King Mountain, Texas digital asset mining site and assume a senior note in the amount of $96.8 million pursuant to the acquisition. The transaction closed on December 6, 2022 as noted below.

During November 2022, USBTC emerged to Hut 8 as a potential strategic partner after USBTC was selected to operate significant data center assets in Kearney, Nebraska and Granbury, Texas under its USMIO and shortly thereafter won a bid to acquire significant data center assets in King Mountain, Texas from a third party industry participant.

Over the course of several days in November 2022, representatives of Stifel GMP updated the previous presentations for Ms. Leverton, which alternatives were shared with the Hut 8 Board. Further discussions did not materialize with parties other than USBTC as the potential transactions with these various partners were determined to not be suitable either from a strategic or financial perspective.

On November 10, 2022, a mutual non-disclosure agreement was signed between Hut 8 and USBTC to discuss options of a working relationship between the parties.

Between November 18, 2022 and November 20, 2022, Ms. Leverton, Mr. Ho, and representatives of Stifel GMP held a series of in-person meetings to explore and further discuss the benefits and considerations and mechanics of a potential business combination. During the meetings the individuals noted the potential strategic fit between Hut 8 and USBTC as a critical element of a successful integration, highlighting that the operational scale of USBTC and balance sheet of Hut 8 could achieve operational and capital efficiencies.

TABLE OF CONTENTS

During the meetings, the individuals noted that the businesses presented similar corporate cultures and a complementary geographic presence. The parties further discussed, at a high-level, certain contributions that each company could bring to a potential business combination. With preliminary financial input being provided by Stifel GMP to Hut 8, the parties agreed, subject to further financial diligence, to further consider and explore a potential business combination that could result in a possible merger of relative equals for the shareholders of Hut 8 and the stockholders of USBTC in a combined company. The parties also discussed certain management and governance matters recognizing the minimal overlap in management and the importance of the continued leadership of Bill Tai, Chairman of Hut 8, in any combined company.

On November 19, 2022, Ms. Leverton and Sue Ennis, Vice President of Corporate Development of Hut 8, met with Mr. Ho and the parties reaffirmed interest in engaging in discussions regarding a strategic transaction.

On November 21, 2022, USBTC's management and the USBTC Board convened for the company's monthly board meeting. Mr. Ho and Mr. Genoot updated the USBTC Board on a potential business combination with Hut 8, and a discussion ensued regarding the merits of the potential transaction.

On November 23, 2022, representatives of Stifel GMP and representatives of Bennett Jones LLP, Canadian legal counsel to Hut 8 ("**Bennett Jones**") and Skadden, Arps, Slate, Meagher & Flom LLP, U.S. legal counsel to Hut 8 ("**Skadden**") held a meeting via videoconference to discuss a potential business combination between Hut 8 and USBTC. The parties discussed a number of matters relating to a potential transaction, including valuation considerations, related tax and structuring considerations, and regulatory review.

On November 23, 2022, Mr. Ho, Mr Genoot, and representatives of Stifel GMP held a meeting via videoconference during which Mr. Genoot reaffirmed interest in continuing to pursue a possible business combination involving merger of relative equals, noting the relative contributions of each entity.

On November 23, 2022, Hut 8 and USBTC provided each other's representatives access to a mutual electronic data room containing due diligence information for each company. This data room was updated regularly throughout the due diligence period.

On November 24, 2022, Ms. Leverton, Mr. Ho, and Mr. Genoot began the first of a series of standing meetings to discuss the status of effecting the proposed transaction.

On December 1, 2022, representatives of Stifel GMP and representatives of USBTC convened an update call via videoconference to discuss matters relating to the legal due diligence for the potential transaction, including the type of diligence materials that would be requested.

On December 5, 2022, Ms. Leverton, Mr. Ho, Mr. Genoot, and representatives from Stifel GMP held a meeting via videoconference to further discuss their interest in pursuing a potential transaction. The parties noted that initial results from their respective business, financial and legal due diligence investigations were positive and generally supported a business combination involving a possible merger of relative equals. At this meeting, representatives of USBTC indicated they would be pursuing financing for shipment of additional miners and raised the possibility of Hut 8 providing a bridge loan for such financing.

On December 6, 2022, USBTC closed its acquisition of a 50% membership interest in a joint venture and assumed a senior note in the amount of $96.8 million pursuant to the acquisition. For further details, see *Management's Discussion and Analysis of Financial Condition and Results of Operations of USBTC — Business Updates — King Mountain JV*.

On December 15, 2022, representatives of Stifel GMP held a video conference call with the Hut 8 Board and discussed the mutual indications of interest between Hut 8 and USBTC and provided their initial views on a possible transaction involving the companies based on discussions and communications between the parties to date and other commercial considerations.

On December 20, 2022, Stifel GMP delivered an initial non-binding written letter of intent for a proposed strategic transaction between Hut 8 and USBTC (the "**Letter of Intent**").

Between December 20, 2022 and December 30, 2022, representatives of Hut 8, USBTC, and Stifel GMP convened a series of meetings via video conference to discuss and negotiate the terms of the Letter of Intent.

85

TABLE OF CONTENTS

On December 21, 2022, USBTC's senior management and the USBTC Board convened for the USBTC's monthly board meeting via videoconference. Mr. Ho and Mr. Genoot updated the USBTC Board on the status of the potential transaction.

On December 30, 2022, USBTC engaged Needham & Company, LLC ("**Needham**") to act as its financial advisor.

On December 30, 2022, Hut 8 and USBTC signed the Letter of Intent setting out the major commercial terms of the transaction.

Starting on January 3, 2023, standing meetings were held via videoconference on a regular basis to generally discuss the progress of the proposed transaction. In addition to the attendees from senior management of each of Hut 8 and USBTC and representatives from Stifel GMP and Needham, representatives of Canadian and U.S. legal counsel to Hut 8 and USBTC attended the majority of these meetings.

During the balance of January 2023, representatives of Hut 8 and USBTC participated in various business and legal due diligence sessions, along with numerous in person site visits across both companies' various operating locations. Representatives of Hut 8 visited USBTC sites in New York, Texas, and Nebraska. Representatives of USBTC visited Hut 8 sites in Mississauga, Vaughan, North Bay, Medicine Hat, Drumheller, Kelowna, and Vancouver.

Between January 6, 2023 and January 8, 2023, representatives of Hut 8, USBTC, Bennett Jones, Skadden, Greenberg Traurig, LLP, U.S. legal counsel to USBTC ("**Greenberg**"), Stikeman Elliott LLP, Canadian legal counsel to USBTC ("**Stikeman**"), Stifel GMP, and Needham, held a series of meetings via videoconference to discuss tax matters relating to the transaction, including different structuring approaches and the tax implications of different types of consideration.

On January 9, 2023, Hut 8 signed an engagement letter with Stifel GMP to govern the relationship between the parties in respect of a potential transaction between Hut 8 and USBTC.

On January 12, 2023, Hut 8's legal counsel delivered an initial draft of a Business Combination Agreement to USBTC's legal counsel.

On January 16, 2023, representatives of Hut 8, USBTC, and their respective legal and financial advisors, held a meeting via videoconference to continue discussions regarding the terms of the transaction.

On January 17, 2023, USBTC's legal counsel delivered a revised draft of a Business Combination Agreement to Hut 8's legal counsel. Over the following days, legal counsel for Hut 8 and USBTC continued discussions of the Business Combination Agreement and the other transaction agreements.

On January 22, 2023, the USBTC Board, senior management of USBTC, and representatives of Needham held a meeting via videoconference to provide the USBTC Board with an update regarding Needham's diligence on the potential synergies, competitive positioning, and pro forma financials of the combined company.

On January 23, 2023, the Hut 8 Board held a meeting via videoconference to discuss the status of the potential transaction.

On January 23, 2023, the USBTC Board and senior management of USBTC convened for the company's monthly board meeting via videoconference. Mr. Ho and Mr. Genoot updated the USBTC Board on the status of the transaction.

On January 24, 2023, Hut 8 signed an engagement letter with Kroll to govern the relationship between the parties in respect of a potential transaction between Hut 8 and USBTC.

On January 28, 2023, the USBTC Board and senior management held a meeting via videoconference to discuss the status of the potential transaction.

On January 30, 2023, Ms. Leverton, the USBTC Board, and senior management of USBTC held a meeting via videoconference to introduce Ms. Leverton to the USBTC Board and to discuss the status of the potential transaction.

TABLE OF CONTENTS

On February 3, 2023, USBTC entered into a Loan, Guaranty and Security Agreement with Anchorage in connection with a restructuring of its debt obligations with Anchorage. On the same day, USBTC entered into an Asset Purchase Agreement with NYDIG, pursuant to which USBTC transferred certain of its assets, including certain of its equipment, real estate, and contracts to NYDIG in full satisfaction of the master equipment financing debt owed by USBTC to NYDIG.

On February 4, 2023, representatives from Hut 8, USBTC, and their respective advisors held a meeting via videoconference to conduct a final discussion on the progress of the potential transaction and its documentation.

On February 6, 2023, the Hut 8 Board, senior management of Hut 8, representatives of Stifel GMP, Kroll, Bennett Jones, and Skadden held a meeting via videoconference to provide the Hut 8 Board with an update regarding the key terms of the potential transaction and to discuss various transactional matters. Legal counsel to Hut 8 also presented an overview on the current draft of the Business Combination Agreement and discussed the transaction agreement and other transaction issues. During this meeting, following a review of the process and methodologies considered by Stifel GMP in evaluating the financial terms of the Business Combination, the Hut Board received oral opinions from Stifel GMP and Kroll that, as of the date of such opinions and subject to the scope of review, assumptions and limitations contained therein, the USBTC Exchange Ratio was fair, from a financial point of view, to Hut 8. Following discussion and consideration of the alternatives available to Hut 8, the Hut 8 Board determined that the transaction with USBTC was in the best interest of Hut 8 as well as Hut 8's shareholders and approved the Business Combination Agreement and Hut 8's entry into the agreements related to the transaction.

On February 6, 2023, the USBTC Board held a meeting to consider the proposed transaction, which was attended by members of USBTC senior management, and representatives of Needham, Greenberg, and Stikeman. Following a review of the terms of the Business Combination Agreement and other material terms of the transaction, the USBTC Board approved USBTC's entry into the agreements related to the transaction, as well as the Merger Consent Approval Transfer (as defined herein).

On February 6, 2023, representatives from each of Hut 8 and USBTC signed the Business Combination Agreement and other transaction documentation.

For more information regarding the Merger Consent Approval Transfer, see "*Certain Relationships and Related Party and Other Transactions of USBTC — The Merger Consent Approval Transfer*."

**The Hut 8 Board's Reasons for the Business Combination**

In evaluating the Business Combination, the Hut 8 Board, in consultation with Hut 8's management and financial and legal advisors, engaged in numerous discussions regarding the Business Combination and received various materials for review and consideration.

In reaching its decision to approve the Business Combination, the Hut 8 Board considered a variety of factors, including its knowledge of USBTC's business, operations, financial condition, results of operations and prospects, as well as the risks in achieving those prospects, including uncertainties associated with achieving financial forecasts. In making its determination, the Hut 8 Board considered a number of factors, including, but limited to, the following:

- the Hut 8 Board's belief that the Business Combination would enhance Hut 8's competitive position by increasing its operating scale and scope, diversifying its business model, and strengthening its balance sheet;

- the Hut 8 Board's belief that the Business Combination creates greater financial stability through market cycles and allows Hut 8 to grow and invest in new opportunities, including managed infrastructure operations;

- the Hut 8 Board's belief that through increased scale and U.S. headquarters, Hut 8 would be included in additional stock indices and enjoy improved access to capital;

- the Hut 8 Board's belief that the Business Combination would optimize data center and self-mining operations;

87

TABLE OF CONTENTS

- the Hut 8 Board's belief that USBTC's purpose-built energy and site management software would provide additional opportunities for efficiencies, especially at Hut 8's Canadian sites;

- the Hut 8 Board's belief that the combined organization would be led by members of the current management teams of both Hut 8 and USBTC, each of whom would bring distinct and complementary experience and expertise to the management of the combined company;

- the Hut 8 Board's belief that the USBTC team brings significant leadership in energy origination, development, demand response, hedging, grid stabilization, and analytics significantly enhancing Hut 8's ability to mitigate fluctuating energy prices across markets;

- the Hut 8 Board's belief that Hut 8 and USBTC have complementary environmental, social and governance ("**ESG**") strategies, are both dedicated to accelerating the global transition to renewable energy, and that the Business Combination would introduce additional renewable and zero carbon emission energy sources to New Hut's energy portfolio;

- the Hut 8 Board's expectation that, upon completion of the Business Combination, current Hut 8 shareholders will own approximately 50% of New Hut common stock on a fully-diluted in-the-money basis;

- the Hut 8 Board's understanding of the business, assets and liabilities, results of operations, financial performance, strategic direction and prospects of each of USBTC and Hut 8; and

- the result of Hut 8's commercial, financial, and legal due diligence of USBTC and the reputation, business practices, and experience of USBTC and its management.

The Hut 8 Board also considered a number of uncertainties and risks in its deliberations concerning the Business Combination, including the following:

- the expenses incurred and to be incurred in connection with the Business Combination;

- the possible volatility, at least in the short term, of the trading price of the Hut 8 common shares resulting from the announcement of the Business Combination;

- the risk that the Business Combination might not be consummated in a timely manner or at all and the potential adverse effect of the public announcement of the Business Combination or on the delay or failure to complete the Business Combination on the reputation of Hut 8;

- the risk to the business of Hut 8, operations, and financial results in the event that any of the Business Combination is not consummated as planned;

- the Business Combination Consideration which is in the form of equity and not cash;

- the risk in connection with obtaining the Hut 8 Shareholder Approval; and

- various other risks associated with the combined organization and the Business Combination, including those described in the section entitled "*Risk Factors*" in this prospectus.

**The USBTC Board's Reasons for the Business Combination**

In evaluating the Business Combination, the USBTC Board, in consultation with USBTC's management and financial and legal advisors, engaged in numerous discussions regarding the Business Combination and received various materials for review and consideration.

In reaching its decision to approve the Business Combination, the USBTC Board considered a variety of factors, including its knowledge of Hut 8's business, operations, financial condition, results of operations and prospects, as well as the risks in achieving those prospects, including uncertainties associated with achieving financial forecasts. In making its determination, the USBTC Board considered a number of factors, including, but limited to, the following:

- the USBTC Board's belief that the Business Combination would enhance USBTC's competitive position by increasing its operating scale and scope, diversifying its business model, and strengthening its balance sheet;

- the USBTC Board's belief that the Business Combination would accelerate USBTC's ability to execute on strategic opportunities in USBTC's pipeline to scale and optimize its data center operations;

- the USBTC Board's belief that the Business Combination would support USBTC's ability to continue investing in the development of the purpose-built technology and intellectual property underlying its operations;

- the USBTC Board's belief that the Business Combination would strengthen USBTC's resilience to market downturns by further diversifying its revenue streams;

- the USBTC Board's assessment of the complementary businesses of USBTC and Hut 8 and the potential strategic and financial benefits, including potential synergies, to be realized from the combination of the two companies;

- the USBTC Board's belief that the combined organization would be led by members of the current management teams of both USBTC and Hut 8, each of whom would bring distinct and complementary experience and expertise to the management of the combined company;

- the USBTC Board's belief that USBTC and Hut 8 have complementary ESG strategies and are both dedicated to accelerating the global transition to renewable energy;

- the USBTC Board's belief that the Business Combination will provide existing USBTC shareholders an opportunity to benefit from the increase in liquidity of their ownership positions driven by the dual-listing of the combined organization on Nasdaq and the TSX;

- the USBTC Board's expectation that, upon completion of the Business Combination, current USBTC stockholders will own approximately 50% of New Hut common stock on a fully-diluted in-the-money basis;

- the USBTC Board's understanding of the business, assets and liabilities, results of operations, financial performance, strategic direction and prospects of each of USBTC and Hut 8; and

- the result of USBTC's commercial, financial, and legal due diligence of Hut 8 and the reputation, business practices, and experience of Hut 8 and its management.

The USBTC Board also considered a number of uncertainties and risks in its deliberations concerning the Business Combination, including the following:

- the expenses incurred and to be incurred in connection with the Business Combination;

- the possible volatility, at least in the short term, of the trading price of the Hut 8 common shares resulting from the announcement of the Business Combination;

- the risk that the Business Combination might not be consummated in a timely manner or at all and the potential adverse effect of the public announcement of the Business Combination or on the delay or failure to complete the Business Combination on the reputation of USBTC;

- the risk to the business of USBTC, operations, and financial results in the event that any of the Business Combination is not consummated as planned;

- the Business Combination Consideration which is in the form of equity and not cash;

- the risk in connection with obtaining the USBTC Stockholder Approval;

- the indebtedness of USBTC and its impact on the New Hut's ability to raise capital as a stand-alone entity;

- the current balance sheet position of USBTC and difficulties to be faced as a standalone company; and

- various other risks associated with the combined organization and the Business Combination, including those described in the section entitled "Risk Factors" in this prospectus.

**Fairness Opinion of Stifel GMP**

*Engagement of Stifel GMP*

Pursuant to an engagement letter (the "**Stifel GMP Engagement Letter**") dated as of January 9, 2023 between Hut 8 and Stifel GMP, Stifel GMP was retained to act as financial advisor to Hut 8 and to prepare and deliver

89

TABLE OF CONTENTS

to the Hut 8 Board its opinion as to whether the USBTC Exchange Ratio is fair, from a financial point of view, to Hut 8 (the "**Stifel GMP Opinion**").

At the meeting of the Hut 8 Board held on February 6, 2023, Stifel GMP presented its opinion stating that, as of the date of the opinion, and based upon and subject to the assumptions, limitations and qualifications set forth therein, the USBTC Exchange Ratio is fair, from a financial point of view, to Hut 8. The Stifel GMP Opinion was provided to the Hut 8 Board in connection with their evaluation of the fairness of the USBTC Exchange Ratio to Hut 8 pursuant to the Business Combination, and does not address any other aspect of the Business Combination and does not constitute a recommendation as to how the Hut 8 Board, or Hut 8 shareholders or USBTC stockholders, should vote or act with respect to the Business Combination.

Stifel GMP has not been engaged to prepare, and has not prepared, a formal valuation or appraisal of Hut 8 or USBTC, or any of their respective assets, securities or liabilities (whether on a standalone basis or as a combined entity), and the Stifel GMP Opinion should not be construed as such. Further, the Stifel GMP Opinion only considers the USBTC Exchange Ratio as applied to USBTC Options (as defined in the Business Combination Agreement) that have vested and are in-the-money as of the date of the opinion. Any USBTC Options that remain either unvested or out-the-money as of such date are specifically excluded from the conclusions reached in the opinion.

Stifel GMP is not an insider, associate or affiliate (as such terms are defined in the Securities Act (Ontario)) of Hut 8, USBTC or New Hut or any of their respective associates or affiliates. Stifel GMP has in the past provided certain financial advisory services and participated in financings for Hut 8 and USBTC, as applicable, as further described in the Stifel GMP Opinion. There are no understandings, agreements or commitments between Stifel GMP and either Hut 8, USBTC or New Hut with respect to any future business dealings. Stifel GMP may, however, in the future in the ordinary course of business seek to perform financial advisory services for any one or more of them from time to time. In the ordinary course of its business, Stifel GMP acts as a trader and dealer, both as principal and agent, in major financial markets and, as such, may have, today, or in the future, positions in the securities of Hut 8, USBTC or New Hut and, from time to time, may have executed or may execute transactions on behalf of Hut 8, USBTC or New Hut or other clients for which it received or may receive compensation. In addition, as an investment dealer, Stifel GMP conducts research on securities and may, in the ordinary course of its business, provide research reports and investment advice to its clients on investment matters, including research with respect to Hut 8, USBTC or New Hut and/or their respective affiliates or associates.

The Stifel GMP Engagement Letter provides, among other things, that Stifel GMP will be paid by Hut 8 for the services provided thereunder, including (i) a success fee of C$5,250,000 if, during the term of the Stifel GMP Engagement Letter, or within 12 months thereafter, a merger, business combination, carve out, amalgamation, arrangement, reorganization or similar transaction involving Hut 8 and USBTC is completed or announced and subsequently completed (the "**Transaction Fee**"), (ii) a monthly work fee of C$50,000 lasting for three months, which amount shall be credited against the Transaction Fee, and (iii) an opinion fee of C$250,000 payable upon delivery of the Stifel GMP Opinion, which amount shall be credited against the Transaction Fee. In the event the Business Combination is not completed and Hut 8 receives a termination fee, Stifel GMP shall be entitled to 10% of such fee up to a maximum of C$1,000,000. Hut 8 shall also reimburse Stifel GMP for all its reasonable out-of-pocket expenses, subject to certain notice and consent requirements. In addition, Stifel GMP and its affiliates and their respective directors, officers, employees, shareholders, partners and duly authorized agents are to be indemnified by Hut 8 under certain circumstances from and against certain liabilities arising out of the performance of professional services rendered to Hut 8.

### Scope of Review

In connection with rendering the Stifel GMP Opinion, Stifel GMP reviewed and relied upon, or carried out, among other things, the following:

1.  a draft of the Business Combination Agreement dated February 2, 2023;

2.  a draft of the Plan of Arrangement dated February 2, 2023;

TABLE OF CONTENTS

3.  certain publicly available information relating to the business, operations, financial condition and security trading history of Hut 8, USBTC and New Hut, as applicable, and other selected companies Stifel GMP considered relevant;

4.  certain internal financial, operating, corporate and other information prepared or provided by or on behalf of Hut 8, USBTC and New Hut, as applicable, relating to the business, operations and financial condition of Hut, USBTC and New Hut, as applicable;

5.  internal management forecasts, projections, estimates and budgets prepared or provided by or on behalf of management of Hut 8 and USBTC;

6.  discussions with management of Hut 8 relating to Hut 8, USBTC and New Hut's current business, plan, financial condition and prospects;

7.  public information with respect to selected precedent transactions Stifel GMP considered relevant;

8.  various reports published by equity research analysts and industry sources Stifel GMP considered relevant;

9.  a certificate with respect to certain factual matters and the completeness and accuracy of certain information upon which the Stifel GMP Opinion is based, addressed to Stifel GMP and dated as of the date of the Stifel GMP Opinion, provided by senior officers of Hut 8 (the "**Hut 8 Certificate**"); and

10. such other information, investigations, analyses and discussions as Stifel GMP considered necessary or appropriate in the circumstances.

Stifel GMP did not meet with the auditors of Hut 8 or USBTC and, as stipulated below, has assumed, without independent investigation, the accuracy and fair presentation of the audited financial statements of Hut 8 and USBTC and the reports of the auditors thereon, and of the unaudited interim financial statements of Hut 8 and USBTC.

### *Approach to Financial Fairness*

In support of the Stifel GMP Opinion, Stifel GMP performed a variety of financial and comparative analyses. The following is a summary of the material financial analyses performed by Stifel GMP in connection with the preparation of its opinion. It is not a complete description of all analyses underlying such opinion. The preparation of an opinion is a complex process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances. As a consequence, neither Stifel GMP's opinion nor the respective analyses underlying its opinion is readily susceptible to partial analysis or summary description. In arriving at its opinion, Stifel GMP assessed as a whole the results of all analyses undertaken by it with respect to the opinion. While it took into account the results of each analysis in reaching its overall conclusions, Stifel GMP did not make separate or quantifiable judgments regarding individual analyses and did not draw, in isolation, conclusions from or with regard to any individual analysis or factor. Stifel GMP has not attributed any particular weight to any specific analysis or factor but rather based the opinion on a number of qualitative and quantitative factors deemed appropriate by Stifel GMP based on Stifel GMP's experience in rendering such opinions. Therefore, Stifel GMP believes that the analyses underlying the opinion must be considered as a whole and that selecting portions of its analyses or the factors it considered, without considering all analyses and factors underlying the opinion collectively, could create a misleading or incomplete view of the analyses performed by Stifel GMP in preparing the opinion.

### *Discounted Cash Flow Analysis*

A discounted cash flow analysis uses projected future free cash flows discounted back to the present value using a risk-adjusted rate in order to determine the value of an asset. Hut 8 and USBTC provided Stifel GMP with internally prepared financial projections. These projections formed the basis for Stifel GMP's discounted cash flow analysis and are subject to the assumptions and risks set forth therein.

TABLE OF CONTENTS

*Selected Companies Analysis*

Stifel GMP considered certain financial data for Hut 8, USBTC and New Hut and selected companies with publicly traded equity securities Stifel GMP deemed relevant.

*Selected Transactions Analysis*

Stifel GMP considered the financial terms of business transactions Stifel GMP deemed relevant. None of the target companies or transactions in the selected transactions have characteristics identical to the proposed Business Combination. Accordingly, an analysis of selected business combinations is not exact; rather it involves complex considerations and judgments concerning differences in financial and operating characteristics of the target companies in the selected transactions and other factors that could affect the respective acquisition values of the transactions reviewed.

*Equity Contribution Analysis*

Stifel GMP reviewed and compared the expected financial contribution of Hut 8 to the pro forma company against Hut 8's expected ownership percentage of the pro forma company implied by the USBTC Exchange Ratio.

*Qualitative Rationale*

Stifel GMP considered certain other qualitative factors with respect to the Business Combination, including but not limited to, the expected diversification of Hut 8's business lines and the expertise of the combined board and management teams.

***Assumptions and Limitations***

With Hut 8's approval and as provided for in the Stifel GMP Engagement Letter, Stifel GMP has relied upon and has assumed, without independent investigation, the completeness, accuracy and fair presentation of all financial, technical and other information, data, documents, advice, opinions, budgets, projections, estimates, forecasts, representations and other materials obtained by Stifel GMP from public sources, including information relating to Hut 8, USBTC, New Hut and the Business Combination, or provided to Stifel GMP by Hut 8, USBTC and their respective affiliates or advisors or otherwise pursuant to the engagement (collectively, the "**Information**") and the Stifel GMP Opinion is conditional upon such completeness, accuracy and fair presentation. Subject to the exercise of professional judgment and except as expressly described herein, Stifel GMP has not attempted to verify independently the accuracy or completeness of any such Information. Furthermore, Stifel GMP has not assumed any obligation to conduct, and has conducted only very limited, physical inspections of the properties or facilities of Hut 8 or USBTC.

The Hut 8 Certificate includes, among other things, representations that: (i) the Information provided to Stifel GMP orally by, or in the presence of, an officer or employee of Hut 8 or any of its subsidiaries or in writing by Hut 8 or any of its subsidiaries or any of its or their representatives in connection with the engagement was, at the date the Information was provided, and is, as of the date of this opinion, complete, true and correct in all material respects, and did not and does not contain a misrepresentation (as defined in the *Securities Act* (Ontario)); and (ii) since the dates on which such Information was provided to Stifel GMP, except as disclosed in writing to Stifel GMP, there has been no material change, financial or otherwise, in the financial condition, assets, liabilities (contingent or otherwise), business, operations or prospects of Hut 8 or any of its subsidiaries, and no change has occurred in such Information or any part thereof which would have or which could reasonably be expected to have a material effect on the Stifel GMP Opinion.

The Stifel GMP Opinion is rendered as of February 6, 2023 on the basis of securities markets, economic, financial and general business conditions prevailing as at such date, and the condition and prospects, financial and otherwise, of Hut 8 and USBTC as they were reflected in the Information and as they were represented to Stifel GMP in discussions with the management of Hut 8 and USBTC. In rendering the opinion, Stifel GMP has assumed that there are no material changes or material facts relating to Hut 8 or USBTC, or their respective businesses, operations, capital or future prospects which have not been generally disclosed. Any changes therein may affect the opinion and, although Stifel GMP reserves the right to change or withdraw the opinion in such

92

TABLE OF CONTENTS

event, Stifel GMP disclaims any obligation to advise any person of any change that may come to its attention or to update the opinion after the date of this opinion. Stifel GMP has also assumed that the executed Business Combination Agreement, along with any ancillary documents to be entered into by Hut 8, USBTC or New Hut in connection with the Business Combination, will not differ in any material respect from the drafts of such documents that Stifel GMP has reviewed.

Stifel GMP is not a legal, tax, accounting or regulatory advisor or expert. Stifel GMP is a financial advisor only and has relied upon, without independent verification, the assessment of Hut 8 and USBTC and their respective legal, tax, accounting and regulatory advisors with respect to legal, tax, accounting and regulatory matters. Stifel GMP has not made any independent valuation or appraisal of the assets or liabilities of Hut 8 or USBTC, nor has Stifel GMP been furnished with any such appraisals. As such, Stifel GMP was not engaged to review any legal, tax, accounting or regulatory aspects of the Business Combination and accordingly expresses no view thereon. The Business Combination is subject to a number of conditions outside the control of Hut 8 and USBTC, and Stifel GMP has assumed that all conditions precedent to the completion of the Business Combination can and will be satisfied in due course and all consents, permissions, exemptions or orders of relevant regulatory authorities will be obtained, without adverse conditions or qualification and that the Business Combination can and will be completed as currently planned without additional material costs or liabilities to Hut 8 or USBTC. Stifel GMP has also assumed that the Business Combination will be completed in accordance with the terms and conditions of the Business Combination Agreement without waiver of, or amendment to, any term or condition that is any way material to the analyses or the opinion, that the Business Combination will be completed in compliance with applicable laws and that the disclosure relating to Hut 8, USBTC and the Business Combination in any disclosure documents will be accurate and will comply with the requirements of applicable laws. In rendering the opinion, Stifel GMP expresses no view as to the likelihood that the conditions respecting the Business Combination will be satisfied or waived or that the Business Combination will be implemented on a timely basis or at all. The Stifel GMP Opinion does not address the relative merits of the Business Combination as compared to other transaction or business strategies that might be available to Hut 8 or Hut 8's underlying business decision to effect the Business Combination.

In the analyses and in connection with the preparation of the opinion, Stifel GMP made numerous assumptions with respect to industry performance, general business, market and economic conditions and other matters, many of which are beyond the control of any party involved in the Business Combination. While, in the professional opinion of Stifel GMP, the assumptions used in preparing the opinion are reasonable in the current circumstances, some or all of these assumptions may prove to be incorrect.

The summary of the Stifel GMP Opinion described above is qualified in its entirety by the full text of the Stifel GMP Opinion, which sets forth, among other things, the assumptions made, information reviewed, matters considered and limitations on the scope of the review undertaken by Stifel GMP in rendering its opinion.

Stifel GMP has consented to the inclusion of this summary in this prospectus and the inclusion of its opinion as an exhibit to the Registration Statement of which this prospectus forms a part.

**Fairness Opinion of Kroll**

On February 6, 2023, Kroll, operating through its Duff & Phelps Opinions Practice, rendered its oral opinion to the Hut 8 Board (which was subsequently confirmed in writing by delivery of its written opinion dated the same date) to the effect that, subject to the assumptions, qualifications, limitations and other matters considered by Duff & Phelps in connection with the preparation of its opinion, as of such date, the USBTC Exchange Ratio in the proposed Business Combination was fair, from a financial point of view, to Hut 8.

**The full text of Duff & Phelps' opinion is included as an exhibit to the Registration Statement of which this prospectus forms a part and describes the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Duff & Phelps. The summary of Duff & Phelps' opinion in this prospectus is qualified in its entirety by reference to the full text of the opinion. Neither Duff & Phelps' opinion nor the summary of its opinion and the related analyses set forth in this prospectus is intended to be or constitutes a recommendation to any shareholder of Hut 8 as to how such holder should act with respect to the proposed Business Combination.**

Duff & Phelps' opinion (i) did not address the merits of the underlying business decision to enter into the proposed Business Combination versus any alternative strategy or transaction; (ii) did not address any

transaction related to the proposed Business Combination; (iii) was not a recommendation as to how the Hut 8 Board or any shareholder should vote or act with respect to any matters relating to the proposed Business Combination, or whether to proceed with the proposed Business Combination or any related transaction, and (iv) did not indicate that the USBTC Exchange Ratio was the best possibly attainable under any circumstances; instead, it merely stated whether the USBTC Exchange Ratio in the proposed Business Combination was within a range suggested by certain financial analyses. The decision as to whether to proceed with the proposed Business Combination or any related transaction may depend on an assessment of factors unrelated to the financial analysis on which Duff & Phelps' opinion was based. Duff & Phelps' opinion should not be construed as creating any fiduciary or other duty on the part of Duff & Phelps to any party.

*Scope of Analysis*

In connection with its opinion, Duff & Phelps made such reviews, analyses and inquiries as it deemed necessary and appropriate under the circumstances. Duff & Phelps also took into account its assessment of general economic, market and financial conditions, as well as its experience in securities and business valuation, in general, and with respect to similar transactions, in particular. Duff & Phelps' procedures, investigations, and financial analysis with respect to the preparation of its opinion included, but were not limited to, the items summarized below:

- Reviewed the following documents:
    - Hut 8's annual reports and audited financial statements included in Hut 8's Form 40-F filed with the SEC for the year ended December 31, 2021 and Hut 8's unaudited interim financial statements for the quarter ended September 30, 2022 included in the Company's Form 6-K filed with the SEC;
    - Unaudited internal financial information for Hut 8 for the twelve months ended December 31, 2022, which Hut 8 management identified as being the most current financial statements available;
    - USBTC's audited financial statements for the period from December 4, 2020 (inception) through June 30, 2021 included in USBTC's draft registration statement on Form S-1 as amended and filed with the SEC on August 12, 2022, and USBTC's internal unaudited financial statements for the fiscal year ended June 30, 2022 and for the three months ended September 30, 2022;
    - USBTC's internal unaudited balance sheet as of December 31, 2022 and pro forma balance sheet as of January 31, 2023, which USBTC management identified as being the most current financial statements available;
    - Financial projections for Hut 8 for the years ending December 31, 2023 through 2025 as shown in the file named "Hut 8 Operating Model vF," prepared and provided to Duff & Phelps by management of Hut 8 (the "**Management Projections — Hut 8**");
    - Financial projections for USBTC for the years ending December 31, 2023 through 2025 as shown in the file named "USBTC Operating Model — vF," prepared by management of USBTC and provided to Duff & Phelps and approved by management of Hut 8 (the "**Management Projections — USBTC**");
    - Financial projections for New Hut after giving effect to the proposed Business Combination for the years ending December 31, 2023 through 2025 as shown in the file named "CombineCo Model VF," provided to Duff & Phelps by management of Hut 8 and prepared and approved by the managements of Hut 8 and USBTC (the "**Management Projections — New Hut**," and together with the Management Projections — Hut 8 and the Management Projections — USBTC, the "**Management Projections**");
    - Information regarding the equity capitalization of Hut 8 and USBTC prepared by the managements of Hut 8 and USBTC;
    - Other internal documents relating to the history, current operations, and probable future outlook of Hut 8 and USBTC provided to Duff & Phelps by the management of Hut 8;
    - A letter dated the date of Duff & Phelps' opinion, from the management of Hut 8 addressed to Duff & Phelps which made certain representations as to historical financial statements, financial

94

TABLE OF CONTENTS

projections and the underlying assumptions, and a pro forma schedule of assets and liabilities (including identified contingent liabilities) for Hut 8, USBTC and New Hut (on a post-transaction basis);

- The Confidential Non-Binding Letter of Intent by and between Hut 8 and USBTC dated December 30, 2022; and

- A draft dated February 2, 2023 of the Business Combination Agreement, including the plan of arrangement;

• Discussed the information referred to above and the background and other elements of the proposed Business Combination with the management of Hut 8;

• Discussed with the management of Hut 8 the plans and intentions with respect to the management and operation of Hut 8 and USBTC;

• Reviewed the historical trading price and trading volume of the common shares of Hut 8, and the publicly traded securities of certain other companies that Duff & Phelps deemed relevant;

• Performed certain valuation and comparative analyses using generally accepted valuation and analytical techniques including a discounted cash flow analysis and an analysis of selected public companies that Duff & Phelps deemed relevant; and

• Conducted such other analyses and considered such other factors as Duff & Phelps deemed appropriate.

### Assumptions, Qualifications and Limiting Conditions

In performing its analyses and rendering its opinion with respect to the proposed Business Combination, Duff & Phelps, with Hut 8's consent:

• Relied upon the accuracy, completeness, and fair presentation of all information, data, advice, opinions and representations obtained from public sources or provided to it from private sources, including the managements of Hut 8 and USBTC, and did not independently verify such information;

• Relied upon the fact that the Hut 8 Board and Hut 8 were advised by counsel as to all legal matters with respect to the proposed Business Combination, including whether all procedures required by law to be taken in connection with the proposed Business Combination were duly, validly and timely taken;

• Assumed that any estimates, evaluations, forecasts and projections furnished to Duff & Phelps by or on behalf of Hut 8 or USBTC, including without limitation, projections, forward looking statements and underlying assumptions, were reasonably prepared and based upon the best currently available information and good faith judgment of the person furnishing the same, and Duff & Phelps expressed no opinion with respect to such projections or the underlying assumptions;

• Assumed that information supplied and representations made by the managements of Hut 8 and USBTC were substantially accurate regarding Hut 8, USBTC, and the proposed Business Combination;

• Assumed that the representations and warranties made in the Business Combination Agreement were accurate;

• Assumed that the final versions of all documents reviewed by Duff & Phelps in draft form conformed in all material respects to the drafts reviewed;

• Assumed that there had been no material change in the assets, liabilities, financial condition, results of operations, business, or prospects of Hut 8 or USBTC since the date of the most recent financial statements and other information made available to Duff & Phelps, and that there was no information or facts that would make the information reviewed by Duff & Phelps incomplete or misleading;

• Assumed that all of the conditions required to implement the proposed Business Combination would be satisfied and that the proposed Business Combination would be completed in accordance with the Business Combination Agreement without any amendments thereto or any waivers of any terms or conditions thereof; and

95

TABLE OF CONTENTS

- Assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the proposed Business Combination would be obtained without any adverse effect on Hut 8, USBTC or New Hut.

To the extent that any of the foregoing assumptions or any of the facts on which Duff & Phelps' opinion is based prove to be untrue in any material respect, its opinion cannot and should not be relied upon. Furthermore, in Duff & Phelps' analysis and in connection with the preparation of its opinion, Duff & Phelps made numerous assumptions with respect to industry performance, general business, market and economic conditions and other matters, many of which are beyond the control of any party involved in the proposed Business Combination.

Duff & Phelps prepared its opinion effective as of the date thereof. Duff & Phelps' opinion was necessarily based upon market, economic, financial and other conditions as they existed and could be evaluated as of the date of the opinion, and Duff & Phelps disclaimed any undertaking or obligation to advise any person of any change in any fact or matter affecting its opinion which may come or be brought to the attention of Duff & Phelps after the date of Duff & Phelps' opinion. In particular, volatility in the price of Bitcoin on any date after the date of Duff & Phelps' opinion could affect the outcome of the opinion were it given on such date. As Hut 8 was aware, the credit, financial and stock markets had been experiencing unusual volatility and Duff & Phelps expressed no opinion or view as to any potential effects of such volatility on Hut 8, USBTC, or the proposed Business Combination.

Duff & Phelps did not evaluate Hut 8's or USBTC's solvency or conduct an independent appraisal or physical inspection of any specific assets or liabilities (contingent or otherwise). Duff & Phelps was not requested to, and did not, (i) initiate any discussions with, or solicit any indications of interest from, third parties with respect to the proposed Business Combination, the assets, businesses or operations of Hut 8 or USBTC, or any alternatives to the proposed Business Combination, (ii) negotiate the terms of the proposed Business Combination, and therefore, Duff & Phelps assumed that such terms were the most beneficial terms, from Hut 8's perspective, that could, under the circumstances, be negotiated among the parties to the Business Combination Agreement and the proposed Business Combination, or (iii) advise Hut 8, the Hut 8 Board or any other party with respect to alternatives to the proposed Business Combination.

Duff & Phelps did not express any opinion as to the market price or value of Hut 8's common shares, USBTC's common stock or preferred stock or New Hut's common stock (or anything else), including after the announcement or the consummation of the proposed Business Combination. Duff & Phelps' opinion should not be construed as a valuation opinion, credit rating, solvency opinion, an analysis of the creditworthiness of Hut 8 or USBTC, as tax advice, or as accounting advice. Duff & Phelps expressed no opinion as to projections, forward-looking statements or underlying assumptions provided in connection with its opinion. Without limiting the generality of the foregoing, Duff & Phelps further did not express an opinion as to the reasonableness or attainability of any projection, forward-looking statement or underlying assumption provided or prepared by or on behalf of Hut 8's management or USBTC's management. Duff & Phelps did not make, and assumed no responsibility to make, any representation, or render any opinion, as to any legal matter.

In rendering its opinion, Duff & Phelps did not express any opinion with respect to the amount or nature of any compensation to any of Hut 8's, USBTC's or New Hut's officers, directors, or employees, or any class of such persons, relative to the consideration to be received by the public shareholders of the Company in the proposed Business Combination, or with respect to the fairness of any such compensation.

Duff & Phelps' opinion was furnished solely for the use and benefit of the Hut 8 Board in connection with its consideration of the proposed Business Combination and was not intended to, and did not, confer any rights or remedies upon any other person, and was not intended to be used, and may not be used, by any other person or for any other purpose, without Duff & Phelps' express consent. However, Duff & Phelps has consented to the inclusion of this summary in this prospectus and the inclusion of its opinion as an exhibit to the Registration Statement of which this prospectus forms a part.

### *Summary of Material Financial Analyses by Duff & Phelps*

Set forth below is a summary of the material financial analyses performed by Duff & Phelps in connection with providing its opinion to the Hut 8 Board. While this summary describes the analyses and factors that

96

TABLE OF CONTENTS

Duff & Phelps deemed material in its presentation to the Hut 8 Board, it is not a comprehensive description of all analyses and factors considered by Duff & Phelps. The preparation of a fairness opinion is a complex process that involves various determinations as to appropriate and relevant methods of financial analysis and the application of these methods to the particular circumstances. Therefore, neither its opinion nor Duff & Phelps' underlying analysis is susceptible to partial analysis or summary description. In arriving at its opinion, Duff & Phelps did not attribute any particular weight to any analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of each analysis and factor. Accordingly, Duff & Phelps' analyses must be considered as a whole and selecting portions of its analyses and of the factors considered by it in rendering its opinion, without considering all analyses and factors, could create a misleading or incomplete view of the evaluation process underlying its opinion. The conclusion reached by Duff & Phelps was based on all analyses and factors taken as a whole, and also on the application of Duff & Phelps' own experience and judgment.

The financial analyses summarized below include information presented in tabular format. In order for Duff & Phelps' financial analyses to be fully understood, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses undertaken by Duff & Phelps. Considering the data below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Duff & Phelps' financial analyses.

*Discounted Cash Flow Analysis of Hut 8.*   Duff & Phelps performed a discounted cash flow analysis of Hut 8 by calculating the estimated net present value of the projected unlevered free cash flows of Hut 8. For purposes of this analysis, Duff & Phelps took into account the Management Projections — Hut 8, which were approved for use in Duff & Phelps' analyses by Hut 8. In addition, for purposes of this analysis, Duff & Phelps applied a range of terminal value multiples of 85.0x to 95.0x to Hut 8's terminal year hashrate and discount rates ranging from 20.0% to 25.0%. The discounted cash flow analysis indicated an implied aggregate enterprise value reference range for Hut 8 of approximately $212,000,000 to $273,000,000.

*Discounted Cash Flow Analysis of USBTC.*   Duff & Phelps performed a discounted cash flow analysis of USBTC on a sum-of-the parts basis by calculating the estimated net present value of the projected unlevered free cash flows of USBTC's mining operations and the estimated net present value of the projected unlevered free cash flows of USBTC's non-mining operations. For purposes of this analysis, Duff & Phelps took into account the Management Projections — USBTC, which were approved for use in Duff & Phelps' analyses by Hut 8. With respect to USBTC's mining operations, Duff & Phelps applied a range of terminal value multiples of 85.0x to 95.0x to USBTC's terminal year hashrate and discount rates ranging from 20.0% to 25.0%. With respect to USBTC's non-mining operations, Duff & Phelps applied a perpetuity growth rate of 3.0% for purposes of calculating a terminal value and discount rates ranging from 18.0% to 22.0%. The discounted cash flow analysis indicated an implied aggregate enterprise value reference range of approximately $242,000,000 to $302,000,000 for USBTC's mining operations, $227,000,000 to $282,000,000 for USBTC's non-mining operations and $469,000,000 to $584,000,000 for USBTC.

*Selected Public Companies Analysis.*   Duff & Phelps reviewed certain financial data for selected companies with publicly traded equity securities that Duff & Phelps deemed relevant. Share prices used in the selected public companies analysis were based on the closing price of the common stock of the selected companies listed below as of February 2, 2023, and the current hashrates for the selected companies listed below were

TABLE OF CONTENTS

based on the hashrates most recently reported publicly by such companies. The selected companies and corresponding financial data were:

| | Enterprise Value/ Hashrate (in exahashes per second) |
|---|---|
| Argo Blockchain plc | 88.0× |
| Bit Digital, Inc. | 28.5× |
| Bitfarms Ltd. | 64.5× |
| Cipher Mining Inc. | 98.9× |
| CleanSpark, Inc. | 39.9× |
| Coinbase Global, Inc. | — |
| DMG Blockchain Solutions Inc. | 37.1× |
| HIVE Blockchain Technologies Ltd. | 153.4× |
| Iris Energy Limited | 64.8× |
| Marathon Digital Holdings, Inc. | 147.9× |
| Northern Data AG | 36.8× |
| Riot Platforms, Inc. | 90.6× |
| **Mean** | 77.3× |
| **Median** | 64.8× |

*Hut 8*.   Taking into account the results of the selected companies analysis, Duff & Phelps applied a selected range of 65.0x to 85.0x to Hut 8's current hashrate (assuming Hut 8's North Bay site was back online). The selected companies analysis indicated an implied aggregate enterprise value reference range for Hut 8 of approximately $212,000,000 to $277,000,000.

*USBTC*.    Taking into account the results of the selected companies analysis, Duff & Phelps applied a selected range of 70.0x to 90.0x to the current hashrate of USBTC's mining operations (including USBTC's 50% share of the Echo Site). The selected companies analysis indicated an implied aggregate enterprise value reference range for USBTC's mining operations of approximately $257,000,000 to $330,000,000. Adding the implied value reference range for USBTC's non-mining operations indicated by the discounted cash flow analysis of USBTC's non-mining operations resulted in an implied aggregate enterprise value reference range for USBTC of approximately $484,000,000 to $612,000,000.

*New Hut*.    Taking into account the results of the selected companies analysis, Duff & Phelps applied a selected range of 75.0x to 95.0x to the proforma hashrate of New Hut's mining operations (assuming Hut 8's North Bay site was back online). The selected companies analysis indicated an implied aggregate enterprise value reference range for New Hut's mining operations of approximately $520,000,000 to $658,000,000. Adding the implied value reference range for USBTC's non-mining operations indicated by the discounted cash flow analysis of USBTC's non-mining operations resulted in an implied aggregate enterprise value reference range for New Hut of approximately $747,000,000 to $940,000,000.

None of the selected public companies are identical to Hut 8, USBTC or New Hut, and Duff & Phelps does not have access to non-public information regarding these companies. Accordingly, a complete analysis cannot be limited to a quantitative review of the selected public companies and involves complex considerations and judgments concerning differences in financial and operating characteristics of such companies, as well as other factors that could affect their value relative to Hut 8, USBTC and New Hut.

*Implied Aggregate Equity and Per Share Value Reference Ranges.*   Taking into account the results of its discounted cash flow and selected companies analyses of Hut 8 and USBTC, Duff & Phelps calculated implied aggregate equity value reference ranges of approximately $428,407,000 to $491,407,000 for Hut 8 and $387,607,000 to $508,607,000 for USBTC and implied per share value reference ranges of approximately $9.69 to $11.11 for Hut 8 and $5.89 to $7.72 for USBTC.

*Implied Relative Equity Value Contribution.*   Comparing (i) the low end of the implied aggregate equity value reference range of USBTC to the low end of the implied aggregate equity value reference range of Hut 8 and

(ii) the high end of the implied aggregate equity value reference range of USBTC to the high end of the implied aggregate equity value reference range of Hut 8 resulted in an implied relative aggregate equity value contribution of approximately 52.5% to 49.1% for Hut 8 and 47.5% to 50.9% for USBTC, as compared to the aggregate equity ownership percentage resulting from the proposed Business Combination of 50.0% for former Hut 8 shareholders and 50.0% for former USBTC shareholders on a fully-diluted in-the-money basis.

*Implied Exchange Ratio Reference Range.*    Dividing (i) the low end of the implied per share value reference range of USBTC by the low end of the implied per share value reference range of Hut 8 and (ii) the high end of the implied per share value reference range of USBTC by the high end of the implied per share value reference range of Hut 8 resulted in an implied exchange ratio reference range of approximately 0.6077 to 0.6951, as compared to the USBTC Exchange Ratio in the proposed Business Combination of 0.6716.

*Implied Equity Value of Hut 8 and New Hut.*    Taking into account the aggregate equity ownership percentage resulting from the proposed Business Combination, Duff & Phelps multiplied the implied aggregate equity value reference range of New Hut indicated by its financial analysis of New Hut by 50.0% and compared the resulting range of approximately $437,007,000 to $533,507,000 to the aggregate implied equity value reference range for Hut 8 of approximately $428,407,000 to $491,407,000.

### Other Matters

Duff & Phelps is the premier global valuation and corporate finance advisor with expertise in complex valuation, dispute and legal management consulting, M&A, restructuring, and compliance and regulatory consulting. Since 2005, Duff & Phelps has rendered over 1,100 fairness opinions in transactions aggregating more than $560 billion and is regularly engaged in the valuation of businesses and securities in the preparation of fairness opinions in connection with mergers, acquisitions and other strategic transactions.

Duff & Phelps was retained by Hut 8 to provide an opinion to the Hut 8 Board as to the fairness, from a financial point of view, to Hut 8 of the USBTC Exchange Ratio in the proposed Business Combination. Pursuant to the terms of its engagement, Duff & Phelps became entitled to a fee of $350,000 for its services, half of which became payable in connection with its engagement and the remainder of which became payable upon Duff & Phelps informing the Hut 8 Board that it was prepared to deliver its opinion. No portion of Duff & Phelps' fee is contingent upon either the conclusion expressed in its opinion or whether the proposed Business Combination is successfully consummated. Furthermore, Duff & Phelps is entitled to be paid additional fees at Duff & Phelps' standard hourly rates for any time incurred should Duff & Phelps be called upon to support its findings subsequent to the delivery of its opinion. Hut 8 has also agreed to reimburse Duff & Phelps for its out-of-pocket expenses and reasonable fees and expenses of counsel, consultants and advisors retained by Duff & Phelps in connection with the engagement. Hut 8 has also agreed to indemnify Duff & Phelps for certain liabilities arising out of its engagement.

Other than this engagement, during the two years preceding the date of its opinion, Duff & Phelps provided compliance consulting services to an affiliate of USBTC, for which Duff & Phelps received aggregate compensation of less than $50,000, and valuation services to Hut 8, for which Duff & Phelps received aggregate compensation of less than $50,000.

### Certain Projected Financial Information Utilized by Hut 8's Financial Advisors

#### *Certain Financial Projections Related to Hut 8*

Hut 8 does not, as a matter of course, publicly disclose long-term forecasts or internal projections as to future performance, earnings or other results given, among other reasons, the uncertainty of the underlying assumptions and estimates. In connection with the Hut 8 Board's consideration of the Business Combination, Hut 8's management prepared or approved certain financial projections regarding Hut 8's future performance for the years December 31, 2023 through 2025 on a standalone basis without giving effect to the Business Combination, which are referred to above as the "Management Projections — Hut 8," and provided these management projections to the Hut 8 Board and to Hut's financial advisors for their use and reliance in connection with their respective financial analyses and opinions. See the sections described above in this prospectus entitled "*The Business Combination — Fairness Opinion of Stifel GMP*" beginning on page <u>89</u> of this prospectus and "*The Business Combination — Fairness Opinion of Kroll*" beginning on page <u>93</u> of this

prospectus. The projected financial information of Hut 8 was prepared by the management of Hut 8 in January 2023 based on assumptions that management believed were reasonable and that, at the time, reflected management's best available estimates of the future financial performance of Hut 8.

The inclusion of this projected financial information should not be regarded as an indication that any of Hut 8, the Hut 8 Board, the financial advisors or any other recipient of this information considered, or now considers, such projected financial information to be necessarily predictive of actual future results, and this projected financial information should not be relied upon as such.

The projected financial information was based on numerous variables, qualitative estimates and assumptions, including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors. Such estimates and assumptions are inherently uncertain and may be beyond the control of Hut 8. The projected financial information constitutes forward-looking statements, and important factors that may affect actual results and cause these financial forecasts to not be achieved include, but are not limited to, Hut 8's ability to obtain power at each of its operational sites at favorable rates, Hut 8's ability to maintain operations at its existing operational sites and restart operations at its North Bay site, volatility in the price of Bitcoin, increases in Bitcoin network difficulty, the effect of any halving, including the halving expected to occur in 2024, the potential future regulation of the digital asset industry, the state of the market for digital assets generally, and other factors described under the captions "*Cautionary Note Concerning Forward-Looking Statements*" and "*Risk Factors*" in this prospectus. You are encouraged to review the risks and uncertainties described under these captions in this prospectus. The projected results may not be realized and the actual results may be significantly higher or lower than estimated. Since the projected financial information covers multiple years, that information by its nature becomes less predictive with each successive year. In addition, the projected financial information is subjective in many respects and thus is susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

On January 28, 2023, Hut 8 provided Stifel GMP and Kroll with certain projected financial information relating to Hut 8's revenue, year-over-year revenue growth, Adjusted EBITDA and Adjusted EBITDA Margin. This projected financial information is summarized in the table below and does not take into account any circumstances or events occurring after the date it was provided. See "*Cautionary Note Concerning Forward-Looking Statements*."

| $ (in thousands of U.S. dollars) | 2023E | 2024E | 2025E |
|---|---|---|---|
| Revenue | 82,623 | 127,610 | 131,171 |
| Year-over-Year Revenue Growth | — | 54% | 3% |
| Adjusted EBITDA[1] | 723 | 25,349 | 24,823 |
| Adjusted EBITDA Margin[2] | 1% | 20% | 19% |

(1)  Adjusted EBITDA is a non-IFRS measure and is calculated as net income (loss) before interest, taxes, depreciation and amortization, further adjusted by the removal of one-time transaction costs, the impairment of long-lived assets and stock-based compensation expense in the period presented.

(2)  Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenue.

In addition, the following table shows the estimated amounts of free cash flow of Hut 8, which management of Hut 8 provided to its financial advisors to use in connection with their analyses summarized above in the sections entitled "*The Business Combination — Fairness Opinion of Stifel GMP*," beginning on page 89 of this prospectus and "*The Business Combination — Fairness Opinion of Kroll*," beginning on page 93 of this prospectus. The information below was based on the projected financial information provided by Hut 8 and set forth above.

| $ (in thousands of U.S. dollars) | 2023E | 2024E | 2025E |
|---|---|---|---|
| Free Cash Flow[1] | (37,017) | 8,682 | 24,823 |

(1)  Free cash flow is a non-IFRS financial measure and is determined based on the forecasted net income (loss) adjusted for interest, taxes, depreciation and amortization, and capital expenditures. The most comparable IFRS measure to free cash flow is net cash provided by operating activities. Free cash flow should be considered in addition to, rather than as a substitute for, net cash provided by operating activities as a measure of Hut 8's liquidity, which is an IFRS financial measure. Hut 8 believes the use of free cash flow

100

provides an additional tool for investors and potential investors to use in evaluating its ongoing liquidity results and trends, but caution that free cash flow should not be considered in isolation from, or as a substitute for, financial information presented in compliance with IFRS.

The following material assumptions were made in arriving at Hut 8's projected financial information:

- Hut 8's North Bay site would come back online in April 2023, all other Hut 8 mining sites would be operating, and $50.0 million of expansion capital expenditures would be incurred over the course of the first two years;

- Expansion capital expenditures would be used primarily to acquire new miners, which would be deployed at a hosted site in order to mine Bitcoin, and expected to add 2 EH/s to Hut 8's hashrate once fully deployed;

- Average Bitcoin price assumptions of $22,722 per Bitcoin in 2023, $39,764 per Bitcoin in 2024, and $45,444 per Bitcoin in 2025, with the increase in average Bitcoin price attributed to the next halving event forecasted to occur in April 2024;

- Bitcoin total network hashrate assumptions of 275 EH/s in the initial month of the projection period, increasing to 327 EH/s in the last month, representing an approximate 0.50% sequential increase month over month, reflecting the trend of rising ASIC production;

- Total Hut 8 installed mining hashrate of 2.5 EH/s in the initial month of the projection period, increasing to 5.3 EH/s in the second half of 2024, representing the impact of the full deployment of expansion capital expenditures and Hut 8's North Bay site coming back online;

- Assumed additional growth in Hut 8's high performance computing business due to the impact of web 3.0 and blockchain projects expected to be launched in 2023, contributing approximately $600,000 of Adjusted EBITDA per year in 2024 and 2025;

- Cost of power assumptions at each site based on regionally available historic information, each site's individual specifications and ability to manage load, as well as the gradual normalization of costs assumptions to the respective long term expectation over the projection period;

- An assumption that Hut 8 will restart its yield enhancement program in the second half of 2023, putting 2,000 Bitcoin on loan at a 3.0% yield to generate additional income; and

- Assumptions that in the normal course of business, Hut 8 will manage its liquidity and cash flow position to ensure it is able to meet all of its ongoing obligations. Options available to Hut 8 to fund its operations may include, but are not limited to, selling a portion of its Bitcoin mined, selling a portion of its Bitcoin holdings, or capital raised through debt or equity.

Hut 8 believes that the material assumptions described above were reasonable at the time the projected financial information was prepared. The assumptions that management of Hut 8 made in preparing the foregoing projected financial information may not reflect actual future conditions. The estimates and assumptions underlying the projected financial information involve judgments with respect to, among other things, risks and uncertainties relating to Hut 8's business, industry performance, digital asset market conditions, the competitive environment, changes in technology, and general business and economic conditions. Various assumptions underlying the foregoing projected financial information may prove to not have been, or may no longer be, accurate. Specifically, the projected financial information did not take into account the remediation efforts at Hut 8's Drumheller site, the continued shut down of Hut 8's North Bay site and Hut 8's attempt to relocate and re-energize the miners from Hut 8's North Bay site at a different location, delays in Hut 8's expansion capital expenditures, and the deferral of the restart of Hut 8's yield enhancement program.

The projected financial information did not take into account remediation efforts at Hut 8's Drumheller site. Hut 8 has encountered issues at the Drumheller site since the time the projections were prepared, primarily stemming from high energy input levels that have been causing miners to fail. Remediation began in March 2023 and has continued throughout June 2023. Repair staff have remained focused on re-installation and energization of repaired miners while continuing to complete repairs on the remaining affected miners. This has materially reduced operations and has resulted in more miners being offline at the site than projected. The impact on Hut 8 is expected to be lower EBITDA and revenue in 2023 and into 2024.

101

TABLE OF CONTENTS

The projected financial information assumed that the North Bay site would be operational on April 1, 2023. The expectation of Hut 8 was that a commercial resolution to Hut 8's dispute with Validus Power Corp. and its subsidiary, Bay Power Corp. (collectively, "**Validus**"), would be reached, however the litigation is ongoing. For more information on the Validus dispute, see the sections of this prospectus titled "*Information About Hut 8 — The Validus Litigation*" beginning on page 140 of this prospectus. Hut 8 is currently looking to move the disabled miners to a third-party hosted site, however the economics of a hosted site operation are less favorable than the economics at the North Bay site as anticipated when the projections were prepared. The result of the ongoing dispute is that Hut 8 will generate less revenue due to lost revenue from April 1, 2023 until the date that the miners are running again; EBITDA will also be negatively affected, once the miners are running again given that the economics of a third-party hosted site operation compare unfavorably to projected operations at the North Bay site.

The projected financial information did not take into account delays in Hut 8's expansion capital expenditures, which have yet to occur. The length of delay regarding such expenditures will be determined by the timing of the closing of the Business Combination.

The projected financial information assumed that a yield enhancement program, whereby Hut 8 may loan digital assets to a borrower for a specific period of time in exchange for a fee, would begin to generate yield in the middle of the 2023 calendar year. The restarting of the yield enhancement program was assumed to coincide with the consummation of the Business Combination, allowing New Hut to decide how best to leverage its Bitcoin stack. With delays to the consummation of the Business Combination, Hut 8 has not implemented any yield enhancement strategies at this time. Any future implementation of a yield enhancement strategy would be decided upon with reference to the timing of the consummation of the Business Combination.

In addition, the average price of Bitcoin and the Bitcoin total network hash rate have increased to levels higher than what was assumed when the projected financial information was prepared in January 2023. The projections are also subject to significant uncertainty given (i) the passage of time since they were first formulated, and (ii) broad market volatility in the digital asset markets. Therefore, Hut 8's management does not believe that the projected financial information included herein represents a reliable current forecast of the near-term results that Hut 8 may achieve. Except as may be required in order to comply with applicable securities laws, none of Hut 8 or any of its representatives intend to update, or otherwise revise, the above projected financial information, or the specific portions presented, to reflect circumstances existing after the date when they were made or to reflect the occurrence of future events, even in the event that any or all of the assumptions are shown to be in error or change. In addition, the above projected financial information does not reflect the impact of the Business Combination, nor does it take into account the effect of any failure of the Business Combination to occur.

### Certain Financial Projections Related to USBTC

USBTC does not, as a matter of course, publicly disclose long-term forecasts or internal projections as to future performance, earnings or other results given, among other reasons, the uncertainty of the underlying assumptions and estimates. In connection with USBTC's consideration of the Business Combination, USBTC's management prepared or approved certain financial projections regarding USBTC's future performance for the years December 31, 2023 through 2025 on a standalone basis without giving effect to the Business Combination, which are referred to above as the "Management Projections — USBTC," and provided these management projections to Hut 8 for Hut 8's financial advisors use and reliance in connection with their respective financial analyses and opinions. See the sections described above in this prospectus entitled "*The Business Combination — Fairness Opinion of Stifel GMP*" beginning on page 89 of this prospectus and "*The Business Combination — Fairness Opinion of Kroll*" beginning on page 93 of this prospectus. The projected financial information of USBTC was prepared by the management of USBTC in January 2023 based on assumptions that management believed were reasonable and that, at the time, reflected management's best available estimates of the future financial performance of USBTC.

The inclusion of this projected financial information should not be regarded as an indication that any of USBTC, Hut 8, the financial advisors or any other recipient of this information considered, or now considers, such projected financial information to be necessarily predictive of actual future results, and this projected financial information should not be relied upon as such.

The projected financial information was based on numerous variables, qualitative estimates and assumptions, including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors. Such estimates and assumptions are inherently uncertain and may be beyond the control of USBTC. The projected financial information constitutes forward-looking statements, and important factors that may affect actual results and cause these financial forecasts to not be achieved include, but are not limited to, USBTC's ability to obtain power at each of its operational sites at favorable rates, USBTC's ability to maintain operations at its existing operational sites, volatility in the price of Bitcoin, increases in Bitcoin network difficulty, the effect of any halving, including the halving expected to occur in 2024, the potential future regulation of the digital asset industry and the state of the market for digital assets generally and other factors described under the captions "*Cautionary Note Concerning Forward-Looking Statements*" and "*Risk Factors*" in this prospectus. You are encouraged to review the risks and uncertainties described under these captions in this prospectus. The projected results may not be realized and the actual results may be significantly higher or lower than estimated. Since the projected financial information covers multiple years, that information by its nature becomes less predictive with each successive year. In addition, the projected financial information is subjective in many respects and thus is susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

On January 28, 2023, USBTC provided Hut 8 with certain projected financial information relating to USBTC's revenue, year-over-year revenue growth, Adjusted EBITDA and Adjusted EBITDA Margin, which was provided to Stifel GMP and Kroll. This projected financial information is summarized in the table below and does not take into account any circumstances or events occurring after the date it was provided. See "*Cautionary Note Concerning Forward-Looking Statements*."

| $ (in thousands of U.S. dollars) | 2023E | 2024E | 2025E |
|---|---|---|---|
| Revenue | 95,793 | 110,333 | 127,121 |
| Year-over-Year Revenue Growth | — | 15% | 15% |
| Adjusted EBITDA[1] | 62,667 | 67,226 | 71,863 |
| Adjusted EBITDA Margin[2] | 65% | 61% | 57% |

(1)   Adjusted EBITDA is a non-GAAP measure and is calculated as net income (loss) before interest, taxes, depreciation and amortization, further adjusted by depreciation and amortization embedded in the equity in earnings (losses) from USBTC's unconsolidated joint venture, the removal of one-time transaction costs, the impairment of long-lived assets and stock-based compensation expense in the period presented.

(2)   Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenue.

In addition, the following table shows the estimated amounts of free cash flow of USBTC provided to Hut 8 by USBTC, which amounts management of Hut 8 provided to its financial advisors to use in connection with their analyses summarized above in the sections entitled "*The Business Combination — Fairness Opinion of Stifel GMP*," beginning on page 89 of this prospectus and "*The Business Combination — Fairness Opinion of Kroll*," beginning on page 93 of this prospectus. The information below was based on the projected financial information provided by USBTC and set forth above.

| $ (in thousands of U.S. dollars) | 2023E | 2024E | 2025E |
|---|---|---|---|
| Free Cash Flow[1] | 62,667 | 32,851 | 68,738 |

(1)   Free cash flow is a non-GAAP financial measure and is determined based on the forecasted net income (loss) adjusted for interest, taxes, depreciation and amortization, USBTC's share of depreciation and amortization embedded in the equity in earnings (losses) from USBTC's unconsolidated joint venture, and capital expenditures. The most comparable GAAP measure to free cash flow is net cash provided by operating activities. Free cash flow should be considered in addition to, rather than as a substitute for, net cash provided by operating activities as a measure of USBTC's liquidity, which is a GAAP financial measure. USBTC believes the use of free cash flow provides an additional tool for investors and potential investors to use in evaluating its ongoing liquidity results and trends, but caution that free cash flow should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP.

The following material assumptions were made in arriving at USBTC's projected financial information:

- Approximately 35,000 miners operating at the beginning of January 2023, with the remaining 10,000 mining machines being delivered and energized at a third-party hosting facility at the beginning of

TABLE OF CONTENTS

February, no new mining sites built and $37.5 million of expansion capital expenditures incurred over the course of the first two years;

- Expansion capital expenditures would be used primarily to acquire new miners, which would be deployed at third-party hosting facilities in order to mine Bitcoin, and expected to add 1.5 EH/s to USBTC's hashrate once fully deployed;

- Average Bitcoin price assumptions of $22,722 per Bitcoin in 2023, $39,764 per Bitcoin in 2024, and $45,444 per Bitcoin in 2025, with the increase in average Bitcoin price attributed to the next halving event forecasted to occur in April 2024;

- Bitcoin total network hashrate assumptions of 275 EH/s in the initial month of the projection period, increasing to 327 EH/s in the last month, representing an approximate 0.50% sequential increase month over month, reflecting the trend of rising ASIC production;

- Total USBTC installed mining hashrate of 4.6 EH/s in the second month of the projection period after full deployment of the remaining approximately 10,000 mining machines, increasing to 6.1 EH/s by February 2025, representing the impact of the full deployment of expansion capital expenditures;

- Revenues generated from USBTC's USMIO business were based on USBTC's contracts as of January 2023 and were projected to be approximately $17.0 million annually, consisting of a mixture of fixed fees and variable incentives related to onboarding new hosting clients and energy management;

- USBTC generated approximately $7.0 million in annual revenue related to the resale of mining equipment and infrastructure assets;

- Approximately 23,000 mining machines are hosted at a third-party facility for $60/MWh, increasing to approximately 34,000 mining machines by February 2025, representing the impact of the full deployment of expansion capital expenditures;

- Cost of power assumptions at USBTC's Alpha and Echo sites based on publicly available forward curves produced by third parties and national trading exchanges; and

- Assumptions that in the normal course of business, USBTC will manage its liquidity and cash flow position to ensure it is able to meet all of its ongoing obligations. Options available to USBTC to fund its operations may include, but are not limited to, selling a portion of its Bitcoin mined, selling a portion of its Bitcoin holdings, or capital raised through debt or equity.

USBTC believes that the material assumptions described above were reasonable at the time the projected financial information was prepared. The assumptions that management of USBTC made in preparing the foregoing projected financial information may not reflect actual future conditions. The estimates and assumptions underlying the projected financial information involve judgments with respect to, among other things, risks and uncertainties relating to USBTC's business, industry performance, digital asset market conditions, the competitive environment, changes in technology, and general business and economic conditions. Various assumptions underlying the foregoing projected financial information may prove to not have been, or may no longer be, accurate. Specifically, the projected financial information did not take into account the average price of Bitcoin and the Bitcoin total network hash rate having increased to levels higher than what was assumed when the projected financial information was prepared. The projections are also subject to significant uncertainty given (i) the passage of time since they were first formulated, and (ii) broad market volatility in the digital asset markets. Therefore, USBTC's management does not believe that the projected financial information included herein should be relied upon as a current forecast of the near-term results that USBTC may achieve. Except as may be required in order to comply with applicable securities laws, none of USBTC or any of its representatives intend to update, or otherwise revise, the above projected financial information, or the specific portions presented, to reflect circumstances existing after the date when they were made or to reflect the occurrence of future events, even in the event that any or all of the assumptions are shown to be in error or change. In addition, the above projected financial information does not reflect the impact of the Business Combination, nor does it take into account the effect of any failure of the Business Combination to occur.

***Certain Financial Projections Related to the Combined Company, New Hut***

Using the Management Projections — Hut 8 and the Management Projections — USBTC, Hut 8, USBTC, and their respective managements prepared financial projections for the combined company, New Hut, after

104

TABLE OF CONTENTS

completion of the Business Combination for the fiscal years ending December 31, 2023 through 2025, referred to above as the "Management Projections — New Hut." The Hut 8 Board utilized these financial projections in connection with its review and evaluation of the Business Combination, and Hut 8's financial advisors were provided these projections for their use and reliance in connection with their respective financial analyses and opinions. See the sections described above in this prospectus entitled "*The Business Combination — Fairness Opinion of Stifel GMP*" beginning on page 89 of this prospectus and "*The Business Combination — Fairness Opinion of Kroll*" beginning on page 93 of this prospectus. The projected financial information relating to New Hut was prepared by Hut 8 and USBTC management in January 2023 based on assumptions believed to be reasonable and that, at the time, reflected the best available estimates of the future financial performance of New Hut.

The forecasted financial information contained in this section was not prepared for public disclosure. The inclusion of this projected financial information should not be regarded as an indication that any of New Hut, Hut 8, the Hut 8 Board or Hut 8's financial advisors or any other recipient of this information considered, or now considers, such projected financial information to be necessarily predictive of actual future results, and this projected financial information should not be relied upon as such.

The projected financial information was based on numerous variables, qualitative estimates and assumptions, including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors. Such estimates and assumptions are inherently uncertain and may be beyond the control of Hut 8, USBTC and New Hut. The projected financial information constitutes forward-looking statements, and important factors that may affect actual results and cause these financial forecasts to not be achieved include, but are not limited to, closing of the Business Combination and the timing thereof, the ability to successfully integrate Hut 8 and USBTC, New Hut's ability to obtain power at each of its operational sites at favorable rates and ability to maintain operations at its existing operational sites and restart operations at Hut 8's existing North Bay site, volatility in the price of Bitcoin and the state of the market for digital assets generally, increases in Bitcoin network difficulty, the effect of any halving, including the halving expected to occur in 2024, and other factors described under the captions "*Cautionary Note Concerning Forward-Looking Statements*" and "*Risk Factors*" in this prospectus. You are encouraged to review the risks and uncertainties described under these captions in this prospectus. The projected results may not be realized and the actual results may be significantly higher or lower than estimated. Since the projected financial information covers multiple years, that information by its nature becomes less predictive with each successive year. In addition, the projected financial information is subjective in many respects and thus is susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

On January 28, 2023, Hut 8 provided Stifel GMP and Kroll with certain projected financial information relating to New Hut's revenue, year-over-year revenue growth, Adjusted EBITDA and Adjusted EBITDA margin. This projected financial information is summarized in the table below and does not take into account any circumstances or events occurring after the date it was provided. See "*Cautionary Note Concerning Forward-Looking Statements*."

| $ (in thousands of U.S. dollars) | 2023E | 2024E | 2025E |
|---|---|---|---|
| Revenue | 176,959 | 220,771 | 222,953 |
| Year-over-Year Revenue Growth | — | 25% | 1% |
| Adjusted EBITDA[1] | 62,647 | 84,184 | 79,671 |
| Adjusted EBITDA Margin[2] | 35% | 38% | 36% |

(1)   Adjusted EBITDA is a non-IFRS measure and is calculated as net income (loss) before interest, taxes, depreciation and amortization, further adjusted by depreciation and amortization embedded in the equity in earnings (losses) from New Hut's unconsolidated joint venture, the removal of one-time transaction costs, the impairment of long-lived assets and stock-based compensation expense in the period presented.

(2)   Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenue.

The financial projections include Adjusted EBITDA and Adjusted EBITDA Margin, both of which are non-GAAP financial measures. These measures were included in the financial projections because they were believed to be useful in evaluating, on a prospective basis, the potential operating performance of New Hut's business. These non-GAAP measures should not be considered in isolation from, or as a substitute for,

TABLE OF CONTENTS

financial information presented in compliance with GAAP, and non-GAAP financial measures such as those used in the financial projections may not be comparable to similarly titled amounts used by other companies.

The following material assumptions were made in arriving at New Hut's projected financial information:

- The Business Combination was assumed to close in June 2023;

- Hut 8's North Bay site would come back online in April 2023, all other mining sites of Hut 8 and USBTC are operating, no new mining sites are built and $50.0 million of expansion capital expenditures would be incurred over the course of the first two years;

- Expansion capital expenditures would be used primarily to acquire new miners, which would be deployed at Hut 8 and USBTC's existing sites' available capacity in order to mine Bitcoin, and are expected to add 2 EH/s to New Hut's hashrate once fully deployed;

- Average Bitcoin price assumptions of $22,722 per Bitcoin in 2023, $39,764 per Bitcoin in 2024, and $45,444 per Bitcoin in 2025, with the increase in average Bitcoin price attributed to the next halving event forecasted to occur in April 2024;

- Bitcoin total network hashrate assumptions of 275 EH/s in the initial month of the projection period, increasing to 327 EH/s in the last month, representing an approximate 0.50% sequential increase month over month, reflecting the trend of rising ASIC production;

- Revenues generated from USBTC's USMIO business were based on USBTC's contracts as of January 2023 and were projected to be approximately $17.0 million annually, consisting of a mixture of fixed fees and variable incentives related to onboarding new hosting clients and energy management;

- USBTC generated approximately $7.0 million in annual revenue related to the resale of mining equipment and infrastructure assets;

- Total New Hut installed mining hashrate of 5.6 EH/s in the initial month of the projection period, increasing to 9.0 EH/s in the second half of 2024, representing the impact of the full deployment of expansion capital expenditures, delivery of existing miner orders, and Hut 8's existing North Bay site coming back online;

- Assumed additional growth in Hut 8's high performance computing business due to the impact of web 3.0 and blockchain projects expected to be launched in 2023, contributing approximately $600,000 of Adjusted EBITDA per year in 2024 and 2025;

- An assumption that Hut 8 will restart its yield enhancement program in the second half of 2023, putting 2,000 Bitcoin on loan at a 3.0% yield to generate additional income;

- Cost of power assumptions at each site based on regionally available historic information, publicly available forward curves produced by third parties, each site's individual specifications and ability to manage load, as well as the gradual normalization of costs assumptions to the respective long term expectation over the projection period; and

- Assumptions that in the normal course of business, New Hut will manage its liquidity and cash flow position to ensure it is able to meet all of its ongoing obligations. Options available to New Hut to fund its operations may include, but are not limited to, selling a portion of its Bitcoin mined, selling a portion of its Bitcoin holdings, or capital raised through debt or equity.

Each of Hut 8, USBTC and New Hut management believes that the material assumptions described above were reasonable at the time the prospective financial information was prepared. The assumptions made in preparing the foregoing projected financial information may not reflect actual future conditions. The estimates and assumptions underlying the projected financial information involve judgments with respect to, among other things, risks and uncertainties relating to closing of the Business Combination and timing thereof, New Hut, Hut 8 and USBTC's businesses, industry performance, digital asset market conditions, the competitive environment, changes in technology, and general business, economic and regulatory conditions. Various assumptions underlying the foregoing projected financial information may prove to not have been, or may no longer be, accurate. Specifically, the projected financial information did not take into account the remediation efforts at Hut 8's Drumheller site, the continued shut down of Hut 8's North Bay site and Hut 8's attempt to relocate and re-energize the miners from Hut 8's North Bay site at a different location, delay's in Hut 8's

TABLE OF CONTENTS

technology platforms to build a services business for third-party data center owners. Finally, as a participant in each of these sectors, USBTC may, from time to time, sell mining or infrastructure equipment to third parties to capture additional economic upside.

To enable its strategy of diversification across infrastructure, mining, and property management, USBTC actively explores and pursues opportunities to develop joint ventures and partnerships with peers across the Bitcoin mining and energy sectors. These partnerships and joint ventures present an opportunity for USBTC to design innovative models to scale and accelerate the growth of the business by tapping into new pools of resources and capabilities.

As the Bitcoin mining industry continues to mature, USBTC believes it can leverage its operating strength and technology to position itself as a leading partner to institutional investors, energy companies, real estate owners, and other stakeholders across the Bitcoin mining value chain. In such partnerships, USBTC can bring its specialized operating experience and expertise while benefiting from its counterparty's complementary expertise in other areas, such as capital raising and energy asset development. In such cases, USBTC focuses on identifying differentiated opportunities that provide equity positions in new companies, new revenue models (e.g., profit share), and management fees as additional economic upside.

### *Commitment to ESG*

USBTC pursues site portfolio growth with the goal that the agile load infrastructure it builds is a grid-stabilizing asset that drives the advancement of non-baseload renewable assets such as wind and solar. USBTC aims to address transmission constraints and support the development of clean energy sources. It does this by building sites in energy supply congested areas and balancing oversupply with an increase in demand, which in turn helps to increase the price of electricity at the resource node and create an environment that is more favorable for clean energy generation.

With respect to front-of-the-meter energy and storage systems ("**loads**"), which are directly connected to the grid and pull energy exclusively from the market, USBTC's sites stabilize fluctuations in the grid in areas where growth in renewable loads such as wind and solar is driving natural unpredictability and volatile supply dynamics by curtailing when energy prices are high and demand outpaces supply. USBTC focuses on differentiated opportunities in both regulated and deregulated markets, partnering with cities, states, and utilities and leveraging economic development incentives to build grid-stabilizing assets and monetize grid scale inefficiencies. Some examples of this are large transmission nodes with extra capacity where flexible loads are valuable, rural areas with built up infrastructure that is underutilized or where industry has departed, and joint ventures with large power partners to arbitrage structural gaps in power trading markets.

With respect to behind-the-meter-loads, which are co-located with an energy source and share a meter into the grid, USBTC sites act as a consumer of last resort. Wind and solar projects face the critical challenge of undesired curtailment due to node congestion caused by limited transmission systems. The growing supply of renewable generation facilities has created an imbalance where existing transmission infrastructure cannot support the volume of load generation in periods of high production. USBTC focuses on building sites in such areas, typically with low population density and an abundance of renewable development, such as West Texas. By doing so, it enables generation and consumption of power that would otherwise have been curtailed.

Renewable energy sources powering USBTC's owned and operated sites include renewable energy and zero carbon emission energy from wind, hydro, and nuclear sources. As of June 30, 2023:

- Alpha Site at Niagara Falls is fueled by a minimum of approximately 91% zero carbon emission energy sources;

- Charlie Site in Nebraska is powered by more than 56% zero carbon emission sources, including 42.3% nuclear, 7.4% wind and 6.4% hydro; and

- The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sourced from ERCOT which includes more than 40% zero carbon emission sources.

TABLE OF CONTENTS

*Equipment sales*

USBTC began equipment sales in March 2022. Equipment sales revenue was $3.6 million for the fiscal year ended June 30, 2023 compared to $0 for the fiscal year ended June 30, 2022.

*King Mountain JV*

On December 6, 2022, one of USBTC's subsidiaries acquired a 50% membership interest in a joint venture and assumed the King Mountain JV Senior Note. USBTC acquired the 50% membership interest through a competitive auction process in connection with the Chapter 11 bankruptcy filing of Compute North. For additional information on the King Mountain JV Senior Note, see below.

Self-mining revenue, hosting services revenue and cost reimbursement revenues for the King Mountain JV was $18.5 million, $26.5 million and $20.4 million, respectively, for the six months ended June 30, 2023, which represented 100% of the King Mountain JV's revenue during the period. USBTC has provisionally concluded that the King Mountain JV will be accounted for with the equity method of accounting. USBTC's 50% portion of monthly distributions from the King Mountain JV will be swept to pay down the King Mountain JV Senior Note. For additional information on the King Mountain JV Senior Note, see below.

*King Mountain JV Senior Note*

One of USBTC's subsidiaries assumed the King Mountain JV Senior Note with a provisional fair value estimate of approximately $95.1 million as part of the consideration paid to acquire an equity membership interest in the King Mountain JV on December 6, 2022. The estimated fair value represents a discount of approximately $1.7 million from the carryover basis of the King Mountain JV Senior Note. The discount is being amortized over the term of the King Mountain JV Senior Note into interest expense. The assumed balance includes assumed accrued but unpaid interest of approximately $8.7 million.

The stated interest on the King Mountain JV Senior Note accrues at a rate per annum equal to the lesser of (a) a varying rate per annum equal to the sum of (i) the prime rate as published in The Wall Street Journal, plus (ii) 12.0% per annum, (b) 15.25% per annum and (c) the maximum rate of non-usurious interest permitted by Law. USBTC has the option to defer the interest until maturity of the King Mountain JV Senior Note under a paid-in-kind ("**PIK**") payments option. USBTC has elected to apply the PIK payment option. Accordingly, the interest increases the principal amount of the King Mountain JV Senior Note. PIK interest is payable upon maturity in April 2027, unless or until any portion or all of the King Mountain JV Senior is prepaid under the prepayment option discussed below. USBTC is also subject to post-default interest of an additional 2% upon occurrence of an event of default. The higher interest rate applies from the date of non-payment until such amount is paid in full. As of June 30, 2023, the interest rate on the King Mountain JV Senior Note was 15.25%.

USBTC has the option to prepay the King Mountain JV Senior Note in whole or in part without premium or penalty. Any prepayment would be accompanied by all accrued and unpaid interest on the principal amount prepaid. The King Mountain JV Senior Note is secured by a first priority security interest in the USBTC subsidiary's membership interest in the King Mountain JV.

As of June 30, 2023, approximately $92.1 million in principal and PIK interest, net of a $1.5 million discount, was outstanding under the King Mountain JV Senior Note, with payment of principal and PIK interest due upon the first to occur of (a) the date that is five years from origination on April 8, 2022, (b) the date of any event of dissolution of the King Mountain JV and (c) the date of the closing of certain events specified in the King Mountain JV's governing documents.

**Managed Infrastructure Operations**

Two USBTC subsidiaries entered into PMAs in November 2022 with an institutional investor focused on renewable energy assets. Two USBTC subsidiaries entered into PMAs in November 2022 with an institutional investor focused on renewable energy assets. USBTC entered into these agreements following a formal request for proposal (RFP)-driven process in connection with the Chapter 11 bankruptcy filing of Compute North, through which the institutional investor became the owner of two digital asset mining sites.

167

*Gain on debt extinguishment*

Gain on debt extinguishment was $23.7 million and $0 for the year ended June 30, 2023 and 2022, respectively. In February 2023, USBTC settled its MEFA Debt of approximately $96.7 million. As part of the settlement and extinguishment, USBTC exchanged assets from its location in Pecos, Texas and recorded a gain on extinguishment of debt of approximately $23.7 million.

**Income Tax**

For the year ended June 30, 2023, USBTC recognized income tax benefit of $1.2 million. USBTC's effective income tax rate was 1.8% for the year ended June 30, 2023. The difference between the effective tax rate and the expected statutory rate was a result of stock-based compensation and related changes in the valuation allowance.

USBTC's effective tax rate for the fiscal year ended June 30, 2022 was (18.6%), which differs from the U.S. Federal income tax rate of 21.0% primarily due to a change in valuation allowance and adjustments to tax accounts.

**Net Operating Loss Carryforwards**

As of June 30, 2023, USBTC had federal net operating loss carryforwards of approximately $77.4 million. The federal net operating losses can be carried forward indefinitely, but utilization is subject to an 80% taxable income limitation.

**Liquidity and Capital Resources**

USBTC's earnings, cash flows and ability to meet any debt obligations will depend on the cash flows resulting from its operations. USBTC's cash needs historically were primarily for growth through acquisitions and working capital to support equipment financing and the purchase of additional miners. Cash needs for operations have historically been financed with cash generated from operations, sales of USBTC's mined Bitcoin or financings. Although USBTC's strategy is primarily to hold Bitcoin on its balance sheet, it will from time to time sell Bitcoin it mines through Coinbase or other exchanges for fiat currency based on its internal cash management policy. USBTC intends to hold enough fiat currency or hedge enough of its Bitcoin exposure to fund its projected near-term fiat currency expenses, including liabilities, operating expenses, and capital expenditures.

*Cash Flows*

USBTC has incurred net losses since its inception but does not anticipate it will continue to incur net losses for the foreseeable future. As of June 30, 2023 and 2022, USBTC had cash and cash equivalents of approximately $10.4 million and $21.1 million, respectively. The following table summarizes USBTC's cash flows for the periods indicated:

| | Year Ended June 30, 2023 | Year Ended June 30, 2022 |
|---|---|---|
| **Net cash provided by (used in):** | | |
| Cash flows used in operating activities | $(29,337) | $ (42,915) |
| Cash flows provided by (used in) investing activities | 25,248 | (134,365) |
| Cash flows (used in) provided by financing activities | (6,599) | 191,629 |
| **Net change in cash** | **$(10,688)** | **$   14,349** |

*Operating Activities*

Net cash used in operating activities was ($29.3) million and ($42.9) million for the year ended June 30, 2023 and 2022, respectively.

Net cash used in operating activities for the year ended June 30, 2023 resulted from a net loss and related adjustments of ($24.4) million in addition to changes in working capital of ($4.9) million. Net cash used in

185

**Unaudited Pro Forma Combined Statement of Financial Position**
**As at June 30, 2023**
**(in thousands of US dollars)**

| | New Hut | Historical – As at June 30, 2023 USBTC | Hut 8 (Note 4) | Acquisition Transaction Adjustments (Note 2) | | Subtotal | Joint Venture Investment (Note 3) | New Hut Pro Forma |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| **Current assets** | | | | | | | | |
| Cash | — | 10,379 | 20,156 | (15,176) | (c) | 15,359 | | 15,359 |
| Accounts receivable, net | — | 636 | 1,598 | | | 2,234 | | 2,234 |
| Cryptocurrency, net | — | 851 | 978 | 748 | (a) | 2,577 | | 2,577 |
| Prepaid expenses and other current assets | — | 7,504 | 4,193 | | | 11,697 | | 11,697 |
| **Total current assets** | — | **19,370** | **26,925** | **(14,428)** | | **31,867** | — | **31,867** |
| **Non-current assets** | | | | | | | | |
| Property and equipment, net | — | 70,719 | 85,542 | | | 156,261 | | 156,261 |
| Cryptocurrency, net | | | 124,442 | 126,553 | (a) | 250,995 | | 250,995 |
| Cryptocurrency, pledged as collateral | | | 12,794 | 13,010 | (a) | 25,804 | | 25,804 |
| Right-of-use assets | — | 536 | — | | | 536 | | 536 |
| Other deposits | — | 254 | 19,798 | | | 20,052 | | 20,052 |
| Investment in unconsolidated joint venture | — | 93,583 | — | | | 93,583 | | 93,583 |
| Intangible assets, net | — | 5,535 | 2,446 | | | 7,981 | | 7,981 |
| Goodwill | — | — | 8,718 | 118,014 | (a) | 126,732 | | 126,732 |
| **Total non-current assets** | — | **170,627** | **253,740** | **257,577** | | **681,944** | — | **681,944** |
| **Total assets** | — | **189,997** | **280,665** | **243,149** | | **713,811** | — | **713,811** |
| **LIABILITIES** | | | | | | | | |
| **Current liabilities** | | | | | | | | |
| Accounts payable | — | 3,605 | 6,146 | (1,647) | (c) | 8,104 | | 8,104 |
| Accrued expenses | — | 3,415 | 10,682 | (9,438) | (c) | 4,659 | | 4,659 |
| Other current liabilities | — | 591 | — | | | 591 | | 591 |
| Deferred revenue | — | 1,031 | — | | | 1,031 | | 1,031 |
| Loans payable | — | — | 23,937 | | | 23,937 | | 23,937 |
| Lease liability, current portion | — | 395 | 3,029 | | | 3,424 | | 3,424 |
| Notes payable, current portion | — | 1,299 | — | | | 1,299 | | 1,299 |
| **Total current liabilities** | — | **10,336** | **43,794** | **(11,085)** | | **43,045** | — | **43,045** |
| **Non-current liabilities** | | | | | | | | |
| Notes payable, less current portion | — | 149,891 | — | | | 149,891 | | 149,891 |
| Lease liability, less current portion | — | 943 | 15,871 | | | 16,814 | | 16,814 |
| Deposit liability | — | — | — | | | — | | — |
| Deferred tax liability | — | 1,454 | — | | | 1,454 | | 1,454 |
| Long- term debt | — | — | 5,579 | | | 5,579 | | 5,579 |
| Warrants liability | — | — | 11 | (11) | (g) | — | | — |
| **Total non-current liabilities** | — | **152,288** | **21,461** | **(11)** | | **173,738** | — | **173,738** |
| **Total Liabilities** | — | **162,624** | **65,255** | **(11,096)** | | **216,783** | — | **216,783** |

**U.S. Data Mining Group, Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**

**Stock Split**

On September 1, 2022, the Company's Board of Directors authorized a stock split of its common stock, par value $0.00001 per share, and its preferred stock, par value $0.00001, at a ratio of 250-for-1 (the "**2022 Stock Split**"). As a result of the 2022 Stock Split, (i) every 1 share of the issued and outstanding common stock and preferred stock were automatically converted into 250 newly issued and outstanding shares of common stock and preferred stock, respectively, without any change in the par value per share, and (ii) the number of authorized shares of common stock and preferred stock outstanding was proportionally increased. Shares of common stock underlying outstanding stock options and other equity instruments convertible into common stock were proportionately increased and the respective exercise prices, if applicable, were proportionately decreased in accordance with the terms of the agreements governing such securities. Fractional shares, if any, resulting from the 2022 Stock Split were rounded up to the nearest whole share, and all shares of common stock and preferred stock (including fractions thereof) issuable upon the 2022 Stock Split to a given stockholder were aggregated for the purpose of determining whether the Stock Split would result in the issuance of a fractional share. Conversion terms on the Company's preferred stock were not changed. Preferred stock continues to convert on a one to one basis for common stock.

All of the Company's historical share and per share information related to issued and outstanding common stock, issued and outstanding preferred stock and outstanding options exercisable for common stock in these consolidated financial statements have been adjusted, on a retroactive basis, to reflect the 2022 Stock Split. See Note 13.

*Investment in Fahrenheit LLC and Celsius Bankruptcy Bid*

On April 10, 2023, a USBTC subsidiary invested in Fahrenheit LLC ("**Fahrenheit**"), a joint venture formed for the purposes of bidding on the management rights of NewCo Celsius Network LLC ("**Celsius**") in connection with Celsius' bankruptcy auction. On May 25, 2023, Fahrenheit won the auction and was awarded the right to manage and operate the assets of Celsius in exchange for a management fee of $20.0 million per year as part of a five-year agreement with Celsius, subject to the approval of the bankruptcy court. In addition, USBTC, acting separately through its USMIO business, won the right to enter into one or more operating and services agreements with the restructured company, in exchange for a fee of $15.0 million per year net of certain operating expenses, which is also subject to the approval of the bankruptcy court.

On May 26, 2023, the USBTC subsidiary contributed $3.3 million of the initial $10.0 million cash deposit required in the Fahrenheit bid. Upon obtaining the necessary approvals, Fahrenheit will be obligated to the restructuring of Celsius and to contribute an additional $40.0 million for its bid. All investments are currently held in escrow in connection with the bankruptcy proceeding, and in the instance where the bid is not approved, the USBTC subsidiary is expected to have its invested money returned. The $3.3 million deposit in included in the Company's consolidated balance sheets in prepaid expenses and other current assets.

No other economic or operating activities have occurred between Fahrenheit and Celsius, and the Company is waiting for the bankruptcy court before it moves forward.

**Note 2.   Liquidity and Financial Condition**

The Company has experienced losses since inception. As of June 30, 2023, the Company had cash of $10.4 million, operating cash flows of ($29.3) million, total stockholders' equity of $27.4 million and an accumulated deficit of $106.5 million. To date, the Company has, in large part, relied on equity and debt financings to fund its operations. The Company believes its current cash on hand, proceeds from sales of cryptocurrency and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these consolidated financial statements are issued.

During the fiscal year ended June 30, 2022, the Company received net proceeds of approximately $61.1 million from sales of 10,000,000 shares of its Series B preferred stock, $0.00001 par value.

TABLE OF CONTENTS

**SIGNATURES**

Pursuant to the requirements of the Securities Act, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-4 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Miami, State of Florida, on the 7th day of November, 2023.

**Hut 8 Corp.**

By: /s/ Asher Genoot

　　Name:　Asher Genoot
　　Title:　President

TABLE OF CONTENTS

II-6

TABLE OF CONTENTS

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed below by the following persons on behalf of the registrant and in the capacities indicated below on November 7, 2023:

| Signature | Title |
|---|---|
| /s/ Asher Genoot<br>Asher Genoot | President and Sole Director (Principal Executive Officer) |
| /s/ Michael Ho<br>Michael Ho | Vice President, Secretary and Treasurer (Principal Financial and Accounting Officers) |

II-7