# EXHIBIT 7

S-4 1 tm235928-1_s4.htm S-4

TABLE OF CONTENTS

As filed with the Securities and Exchange Commission on February 13, 2023

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form S-4

**REGISTRATION STATEMENT**
Under
**The Securities Act of 1933**

# HUT 8 CORP.

| **Delaware** | **7374** | **92-2056803** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification No.) |

**c/o U.S Data Mining Group, Inc.**
**1221 Brickell Avenue, Suite 900**
**Miami, Florida 33131**
**Phone: (305) 224-6427**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Corporation Service Company**
**251 Little Falls Drive**
**Wilmington, Delaware 19808**
**Phone: (650) 560-4753**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| Ryan J. Dzierniejko | Curtis Cusinato | Aniss Amdiss | Daniella G. Silberstein | Amanda Linett |
|---|---|---|---|---|
| June S. Dipchand | Matthew Hunt | Chief Legal Officer and | Raffael M. Fiumara | Stikeman Elliott LLP |
| Skadden, Arps, Slate, | Bennett Jones LLP | Corporate Secretary, | Greenberg Traurig, P.A. | 5300 Commerce Court West |
| Meagher & Flom LLP | 3400 One First Canadian Place | Hut 8 Mining Corp. | 333 S.E. 2nd Avenue, Suite 4400 | 199 Bay Street |
| One Manhattan West | Toronto, ON M5X 1A4 | 24 Duncan Street, Suite 500 | Miami, FL 33131 | Toronto, ON, M5L 1B9 |
| New York, NY 10001 | (416) 863-1200 | Toronto, ON M5V 2B8 | (305) 579-0500 | (416) 869-5500 |
| (212) 735-3000 | | (647) 256-1992 | | |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this registration statement becomes effective and upon consummation of the merger described in the enclosed prospectus.

If the securities being registered on this Form are to be offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated file" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☒

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule I3e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with section 8(a) of the Securities Act of 1933 or until this registration statement shall become effective on such date as the SEC, acting pursuant to said section 8(a), may determine.**

## QUESTIONS AND ANSWERS ABOUT THE BUSINESS COMBINATION

*The following questions and answers briefly address some questions that you, as a securityholder of USBTC, may have regarding the Business Combination. These questions and answers, as well as the summary section that follows, are not meant to be a substitute for the information contained in the remainder of this prospectus, and this information is qualified in its entirety by the more detailed descriptions and explanations contained elsewhere in this prospectus. You are urged to read this prospectus in its entirety. Additional important information is also contained in the documents incorporated by reference in and the exhibits to the Registration Statement of which this prospectus forms a part. You should pay special attention to the "Cautionary Statement Regarding Forward-Looking Statements" beginning on page 25 of this prospectus and to the "Risk Factors" beginning on page 27 of this prospectus.*

### Why am I receiving this prospectus?

New Hut is providing this prospectus to the USBTC stockholders (the "**USBTC stockholders**") because New Hut has entered into the Business Combination Agreement, pursuant to which Merger Sub will merge with and into USBTC, with each share of Series A Preferred, Series B Preferred, Series B-1 Preferred and USBTC common stock being exchanged for 0.6716 of a share of New Hut common stock in a merger executed in accordance with the relevant provisions of the NRS. As a result of the Merger, USBTC will become a wholly-owned subsidiary of New Hut. Pursuant to the Registration Statement of which this prospectus forms a part, New Hut is registering shares of New Hut common stock issuable to USBTC stockholders upon the consummation of the Business Combination (the "**Closing**"), in accordance with the Business Combination Agreement. Applicable requirements of the federal securities laws require New Hut to provide you with information regarding the Business Combination. This prospectus contains important information about the Business Combination, the Business Combination Agreement, and certain related matters, and you should read this prospectus carefully. However, please be aware that this prospectus is not a proxy statement or notice of meeting and that we are not asking you for a proxy and you are requested not to send us a proxy.

The Merger must be approved by at least (i) a majority of the voting power of the outstanding USBTC capital stock, voting together as a single class on an as-converted basis, and (ii) separately, the holders of a majority of the outstanding shares of the Series A Preferred (voting together as a single and separate class on an as-converted basis) including the affirmative vote of JHS Bitcoin Mining LLC ("**JHS**") (the "**USBTC Stockholder Approval**"). Following the effectiveness of the Registration Statement of which this prospectus forms a part, USBTC intends to solicit the USBTC Stockholder Approval by way of a written consent of the USBTC stockholders (the "**USBTC Consent**").

The Arrangement will require the approval of at least 66⅔% of the votes cast by the Hut 8 shareholders present in person or represented by proxy at a special meeting of Hut 8 shareholders held for the purpose of approving the Business Combination and the transactions contemplated thereby (the "**Hut 8 Meeting**"). Securityholders of USBTC will not be required to vote on or approve the Arrangement.

### Why are the two companies proposing the Business Combination?

The Business Combination is expected to create a strengthened player in the digital asset mining, hosting, managed infrastructure operations, and high performance computing space with strong financial and operating metrics. New Hut will be led by a combined board of directors and management team of Bitcoin miners, energy experts, and business leaders, bringing together the powerful cultures, strengths, and capabilities of both Hut 8 and USBTC.

Key strategic advantages of the Business Combination include:

*A strengthened financial position and flexibility*

New Hut aims to benefit from a combined balance sheet with greater financial stability, which is expected to strengthen New Hut's ability to navigate market cycles and increases New Hut's flexibility to grow and invest in new opportunities. New Hut anticipates being included in new stock indexes and improved access to capital given its increased scale and new U.S. headquarters.

*An accelerated diversification strategy for New Hut*

New Hut is expected to have an enhanced revenue profile from distinct business lines. New Hut is expected to generate monthly recurring revenue from: hosting services denominated in fiat from existing long-term clients, managed infrastructure operations for Bitcoin mining sites looking to maximize the potential of their facilities, hardware equipment sales to customers, and the MicroBT-certified repair center business serving customers across North America and Northern Europe.

*Maintaining commitment to advancing the high performance computing traditional data center business*

New Hut will be committed to the continued advancement of the high performance computing business, which continues to be a key focus of New Hut's diversified strategy and is expected to generate monthly recurring revenue from approximately 370 North American customers.

*A strengthened, proven and trusted senior leadership team and board of directors with a track record of value creation*

The combined New Hut executive team will lead approximately 210 team members to deliver on the existing and proven strategy of growing long-term sustainable operations.

*A growing pipeline of opportunities*

New Hut will benefit from a strong pipeline of growth opportunities at existing, greenfield and brownfield sites.

*Enhancing New Hut's position in one of the world's high-potential Bitcoin mining regions*

The Business Combination looks to solidify New Hut as a Bitcoin mining entity with operating capacity at high-quality sites in Alberta, Canada, and Texas, Nebraska, and New York in the United States.

*Advancing commitment to driving improvements across all ESG metrics*

The Business Combination will improve New Hut's overall energy mix to include wind, hydro and nuclear sources solidifying the Hut 8 and USBTC team's commitment and focus on ESG goals.

*Improving New Hut's energy expertise and hedging capabilities*

The USBTC team will bring significant leadership in energy origination, development, demand response, hedging, grid stabilization and analytics to New Hut, which will enhance New Hut's ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets.

To review the reasons for the Business Combination in greater detail, see the sections titled "*The Business Combination — The Hut 8 Board's Reasons for the Business Combination*" and "*The Business Combination — The USBTC Board's Reasons for the Business Combination*" beginning on pages 80 and 81, respectively, of this prospectus.

**What will USBTC stockholders and Hut 8 securityholders receive in the Business Combination?**

Pursuant to the terms of the Business Combination Agreement, each share of Series A Preferred, Series B Preferred, Series B-1 Preferred and USBTC common stock will be exchanged for 0.6716 of a share of New Hut common stock (the "**USBTC Exchange Ratio**"). In addition, each option to purchase USBTC common stock (a "**USBTC Option**") outstanding immediately prior to Closing shall automatically be exchanged for an option (each, a "**USBTC Replacement Option**") entitling the holder to purchase that number of shares of New Hut common stock equal to the product obtained when the number of shares of USBTC common stock subject to such USBTC Option immediately prior to the Closing is multiplied by the USBTC Exchange Ratio (rounded down to the nearest whole share), at an exercise price for each share of New Hut common stock that may be purchased under such USBTC Replacement Option equal to the quotient obtained when the exercise price per share of USBTC common stock, as of immediately prior to the Closing, under such exchanged

2

***The combined company may be exposed to increased litigation, which could have an adverse effect on the combined company's business and operations.***

New Hut may be exposed to increased litigation from shareholders, customers, suppliers, consumers and other third parties due to the combination of Hut 8's business and USBTC's business following the Business Combination. Such litigation may have an adverse impact on New Hut's business and results of operations or may cause disruptions to the New Hut's operations.

***If New Hut fails to develop or maintain an effective system of internal controls in the future, it may not be able to accurately report its financial condition or results of operations, which may adversely affect investor confidence in New Hut and, as a result, the value of the New Hut common stock.***

Effective internal controls are necessary for New Hut to provide reliable financial reports, prevent fraud and operate successfully as a public company. If New Hut cannot provide reliable financial reports or prevent fraud, its reputation and operating results would be harmed. If USBTC fails to remediate the material weakness in its internal control over financial reporting or identify any new material weaknesses in the future, it could limit its ability to prevent or detect a misstatement of our accounts or disclosures that could result in a material misstatement of New Hut's annual or interim consolidated financial statements. In such case, New Hut may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable stock exchange listing requirements, investors may lose confidence in its financial reporting and the prices of its securities may decline as a result. New Hut cannot assure you that any measures it may take in the future will be sufficient to avoid potential future material weaknesses.

As a result of being a public company, New Hut will be required, under Section 404 of the Sarbanes-Oxley Act, to furnish a report by management on, among other things, the effectiveness of its internal control over financial reporting beginning in the year following its first annual report required to be filed with the SEC. This assessment will need to include disclosure of any material weaknesses identified by New Hut management in its internal control over financial reporting. Additionally, when New Hut ceases to be an "emerging growth company" under the federal securities laws, New Hut's independent registered public accounting firm may be required to express an opinion on the effectiveness of New Hut's internal controls. If New Hut is unable to confirm that New Hut's internal control over financial reporting is effective, or if its independent registered public accounting firm is unable to express an unqualified opinion on the effectiveness of New Hut's internal controls, New Hut could lose investor confidence in the accuracy and completeness of its financial reports, which could cause the price of New Hut common stock to decline.

**Risks Relating to USBTC's Business**

***If USBTC fails to effectively manage its growth, its business, financial condition and results of operations would be harmed.***

USBTC is a development stage company with a small management team and is subject to the strains of ongoing development and growth, which will place significant demands on management and operational and financial infrastructure. Although USBTC may not grow as expected, if USBTC fails to manage its growth effectively or to develop and expand its managerial, operational and financial resources and systems, USBTC's business and financial results would be materially harmed.

USBTC may not be able to manage growth effectively, which could damage its reputation, limit growth and negatively affect USBTC's operating results. Further, USBTC cannot provide any assurance that it will successfully identify all emerging trends and growth opportunities in its business sector and USBTC may lose out on those opportunities. Such circumstances could have a material adverse effect on USBTC's business, prospects or operations.

***USBTC is an early-stage company with limited operating history and may never become profitable.***

USBTC is an early-stage company currently focused on developing Bitcoin mining operations and investing in blockchain-focused technologies, newly formed in December 2020, and has a limited operating history. To date, USBTC has incurred losses as set forth below and may never become profitable. USBTC has built a Bitcoin mining operation, operating specialized computers manufactured by Bitmain, Canaan and MicroBT

38

(also known as "**miners**") that generate Bitcoin. USBTC had a net loss of $31.8 million and $9.1 million for the fiscal year ended June 30, 2022 and the period from December 4, 2020 (inception) through June 30, 2021 (audited), respectively. In addition, USBTC had a net loss of $0.6 million and $0.6 million for the three months ended September 30, 2022 and 2021 (unaudited), respectively. As of September 30, 2022, USBTC had an accumulated deficit of $41.4 million.

Additionally, there can be no assurance that additional funding will be available to USBTC for the development of its business, which will require the commitment of substantial resources. USBTC may be required to liquidate its digital assets (including Bitcoin assets) if other capital is not available to it on commercially reasonable terms. Accordingly, you should consider USBTC's prospects in light of the costs, uncertainties, delays and difficulties frequently encountered by companies in the early stages of development. Potential investors should carefully consider the risks and uncertainties that a company with a limited operating history will face. In particular, potential investors should consider that USBTC may be unable to:

- successfully implement or execute its business plan, or demonstrate that its business plan is sound;

- adjust to changing conditions or keep pace with increased demand; or

- attract and retain an experienced management team; or raise sufficient funds in the capital markets to effectuate its business plan.

### *USBTC operates in an industry subject to various regulatory and technological uncertainties.*

USBTC operates Bitcoin mining operations in New York, Texas, and Nebraska. As Bitcoin, other digital assets, and blockchain technologies evolve and become more widely available, the services and products associated with them may evolve. Future regulations may require USBTC to change its business model to comply fully with federal and state laws regulating power generation, Bitcoin mining, or provision of Bitcoin mining services to third parties.

To remain competitive with peers, USBTC may need to modify aspects of its business model from time to time. USBTC cannot offer any assurance that these or any other changes will be successful or will not result in harm to its business. USBTC may not be able to manage its growth effectively, which could damage its reputation, limit its growth, and negatively affect its operating results. Furthermore, USBTC cannot provide any assurance that it will successfully identify all emerging trends and growth opportunities in the market. As a result, USBTC may not capture those opportunities. Such circumstances could have a material adverse effect on the USBTC's business, prospects or operations.

### *The cost of obtaining new and replacement miners and parts has historically been capital-intensive and is likely to continue being capital-intensive, which could materially and adversely affect USBTC's business, financial condition, and results of operations.*

USBTC's mining operations can only be profitable if the costs, inclusive of hardware and electricity costs, associated with mining digital assets is lower than the price of the digital assets mined at the time of sale. Miners experience ordinary wear and tear from operation and may also face more significant malfunctions caused by factors which may be beyond the company's control. Additionally, as technology evolves, the company may acquire newer models of miners to remain competitive in the market.

For example, the miners and other equipment purchased by USBTC since the company's inception will eventually degrade due to ordinary wear and tear from usage and may also be lost or damaged due to factors outside of the USBTC's control. When this happens, these miners and equipment need to be repaired or replaced. The process of upgrading mines and equipment requires substantial capital investment, and USBTC may face challenges in executing upgrades on a timely and cost-effective basis based on availability of new miners and the company's access to adequate capital. If USBTC is unable to obtain a sufficient unit volume of miners and equipment at scale, it may be unable to remain competitive in a highly competitive and evolving industry. If this happens, USBTC may not be able to mine digital assets as efficiently or at a comparable scale as competitors. As a result, the company's business, financial condition, and results of operations could suffer. This could, in turn, materially and adversely affect the trading price of the company's common stock and investors could lose part or all of their investment.

39

able to complete such transactions on favorable terms, if at all. If USBTC completes any acquisitions, it may not be able to integrate these acquisitions successfully into its existing business. In addition, in the event that USBTC acquires any existing businesses, it may assume unknown or contingent liabilities.

Any future acquisitions also could result in the issuance of stock, incurrence of debt, contingent liabilities or future write-offs of intangible assets or goodwill, any of which could have a negative impact on the company's business, financial condition, and results of operations. Integration of an acquired company may also disrupt ongoing operations and require management resources that would otherwise be focused on developing and expanding the company's existing business. USBTC may experience losses related to potential investments in other companies, which could materially and adversely affect its business, financial condition, and results of operations. Furthermore, USBTC may not realize the anticipated benefits of any acquisition, strategic alliance or joint venture if those benefits do not materialize.

***Although USBTC expects that the acquisition of the King Mountain JV interest will result in benefits to it, USBTC may not realize those benefits due to unforeseen difficulties.***

USBTC recently acquired its 50% interest in the King Mountain JV, including assuming an approximately $96.8 million promissory note in connection with the acquisition. USBTC acquired this interest on an "as is" basis from a bankruptcy administrator or trustee with limited representations, which limits USBTC's recourse against the sellers of the interest after closing, which in turn may expose us to unexpected material losses or expenses after the closing. USBTC's diligence investigations with respect to the King Mountain JV were limited, which may also expose us to unexpected material losses or expenses after the closing.

***USBTC may be unable to raise the additional capital needed to grow its business.***

If the price of Bitcoin declines, and as the company expects to need to raise additional capital to expand its operations and pursue its growth strategy, and to respond to competitive pressures or unanticipated working capital requirements, USBTC may seek but fail to obtain additional debt or equity financing on favorable terms, if at all, which could impair its growth and adversely affect its existing operations. If USBTC were to raise additional equity financing, its shareholders may experience significant dilution of their ownership interest, and the value of their investment could decline. Furthermore, if USBTC were to raise additional debt financing, the company's debtors would likely have priority over holders of equity with respect to order of payment preference. USBTC may be required to accept terms that restrict its ability to incur additional indebtedness or take other actions, including terms that require it to maintain a specified level of liquidity or other balance sheet ratios that may not be in the interests of other shareholders.

***If there are significant changes to the method of validating blockchain transactions, such changes could reduce demand for USBTC's blockchain hosting services or for USBTC's miner equipment.***

New digital asset transaction protocols are continuously being deployed, and existing and new protocols are in a state of constant change and development. While certain validation protocols currently employ a "proof of work" consensus algorithm, whereby transaction processors are required to expend significant amounts of electrical and computing power to solve complex mathematical problems in order to validate transactions and create new blocks in a blockchain, there may be a shift towards adopting alternative validating protocols. These protocols may include a "proof of stake" algorithm or an algorithm based on a protocol other than proof of work, which may decrease the reliance on computing power as an advantage to validating blocks. USBTC's transaction processing operations, and, to USBTC's knowledge, the operations of its potential hosting customers, are currently designed to primarily support a proof of work consensus algorithm. Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate (for example, from lower priced electricity, processing, real estate or hosting) less competitive. As a result of USBTC's efforts to optimize and improve the efficiency of its digital asset mining operations, USBTC may be exposed to the risk in the future of losing the benefit of its capital investments and the competitive advantage USBTC hopes to gain from this as a result, and may be negatively impacted if a switch to proof of stake validation were to occur. Any such change to transaction validating protocols could have a material adverse effect on USBTC's business, financial condition and results of operations.

41

***Failure to price hosting contracts correctly may lead USBTC to operate these contracts at a loss, which could have a material adverse effect on its business, financial condition, and results of operations.***

USBTC hosting contracts may be structured with margin-based or cost-plus pricing that considers the estimated power consumption of hosting client miners and other costs of service. USBTC's ability to generate a profit on contracts with such pricing structures requires that it accurately forecast these costs over the contracted time period. Failure to do so could have a material adverse effect on the business, financial condition, and results of operations.

***Failure of critical systems of the hosting facilities operated by USBTC and the services provided by USBTC could have a material adverse effect on its business, financial condition, and results of operations.***

The critical systems of the hosting facilities operated by USBTC and the services provided by USBTC are subject to failure. Any failure in the critical systems of any hosting facility operated by USBTC or services provided by USBTC, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, power supplies or network connectivity, whether or not within the company's control, could result in service interruptions to the company's customers and/or damage to equipment, which could significantly disrupt the normal business operations of the company's customers, harm the company's reputation, and reduce the company's revenue. Temporary downtime at any hosting facility operated by USBTC could reduce the amount of Bitcoin mined by the company and thereby reduce the profitability of its hosting customers. The destruction or severe impairment of any of the hosting facilities operated by USBTC could result in significant downtime and loss of customer data. Since the company's ability to attract and retain customers depends on its ability to provide a reliable service, even minor interruptions in service could harm the company's reputation and negatively impact its revenue and profitability. Any of these events may result in financial penalty, which could have a material adverse effect on its business, financial condition, and results of operations.

The services provided by USBTC are subject to temporary or permanent interruption by factors that include but are not limited to:

- Power loss;
- Equipment failure;
- Human error and accidents;
- Theft, sabotage, and vandalism;
- Failure by USBTC or its suppliers to provide adequate service or maintain equipment;
- Network connectivity downtime and fiber cuts;
- Service interruptions resulting from server relocation;
- Security breaches of infrastructure;
- Improper or inadequate building maintenance by the company;
- Physical, electronic, and cybersecurity breaches;
- Animal incursions;
- Fire, earthquake, hurricane, tornado, flood and other natural disasters;
- Extreme temperatures;
- Water damage;
- Public health emergencies; and
- Terrorism.

Moreover, service interruptions and equipment failures may expose USBTC to potential legal liability. As the services provided by USBTC may be critical to its customers' business operations, any disruption in services could result in lost profit or other indirect or consequential damages to its customers. Although customer

42

TABLE OF CONTENTS

contracts typically contain provisions limiting the company's liability, there can be no assurance that a court would enforce any contractual limitations on the company's liability in the event that one of its customers brings a lawsuit against it as the result of a service interruption that they ascribe to the company. The outcome of any such lawsuit would depend on the specific facts of the case and any legal and policy considerations that the company may not be able to mitigate. In such cases, USBTC may be liable for substantial damage awards, which could have a material adverse effect on its business, financial condition, and results of operations.

***USBTC may not be able to obtain new hosting and transaction processing hardware or purchase such hardware at competitive prices during times of high demand, which could have a material adverse effect on its business, financial condition and results of operations.***

Historically, an increase in interest and demand for digital assets has led to a shortage of hosting and transaction processing hardware and increased prices. USBTC and its customers and potential customers have experienced, and may in the future experience, difficulty in obtaining new equipment or replacement components for USBTC's and its customers' existing equipment, including graphics processing units and application-specific integrated circuit chipsets and computer servers, which has had, and in the future may have, a material impact on the demand for USBTC's services and associated revenue. Currently, restrictions on digital asset mining in China have increased availability of used mining equipment and decreased prices of new mining equipment. In addition, these restrictions have decreased available mining facilities in China and increased demand for hosting in countries outside of China including the United States. To the extent miners view this used equipment as a viable alternative to purchasing new miners from USBTC, USBTC's equipment sales may suffer, which could have a material adverse effect on USBTC's business, financial condition and results of operations.

***USBTC's commercial success depends in large part on its ability to contribute computing power to pools that mine digital assets for the company and its hosting customers, attract and retain customers within the company's hosting and property management businesses, and sell mining equipment profitably. Increases in power costs or an inability to mine digital assets efficiently at favorable prices will reduce the company's operating margins, impact its ability to attract and retain customers, and harm its growth prospects and could have a material adverse effect on USBTC's business, financial condition and results of operations.***

USBTC's growth depends in large part on its ability to contribute computing power to pools that mine digital assets for the company and its hosting customers, attract and retain customers within the company's hosting and property management businesses, and sell mining equipment profitably. With respect to its hosting and property management businesses, USBTC may not be able to attract and retain customers for a number of reasons, including if:

- there is a reduction in the demand for USBTC's services due to macroeconomic factors;
- there is a reduction in demand for USBTC's services due to a broader secular reduction in demand for such services in the underlying digital asset mining sector;
- USBTC is unable to provide services that meet the needs of existing or potential customers;
- USBTC fails to effectively market the company and its services to potential customers;
- USBTC fails to price its hosting or property management services attractively;
- USBTC provides hosting or property management services that are deemed by existing and potential customers to be inferior to those of its competitors;
- USBTC fails to meet customers' ongoing and evolving program qualification standards, based on a range of factors, including available power, preferred site design specifications, security considerations and connectivity;
- businesses decide to host or manage sites internally as an alternative to the use of USBTC's services;
- USBTC fails to successfully communicate the benefits of its services to potential customers;
- USBTC is unable to strengthen awareness of its brand; and
- potential customers are unable to secure the digital asset mining equipment required to engage USBTC in the capacity of a third party hosting provider or property manager.

43

TABLE OF CONTENTS

If USBTC is unable to obtain hosting or property management customers at favorable terms or at all, it could have a material adverse effect on its business, financial condition and results of operations.

***USBTC generates a meaningful share of its hosting revenue from a small number of customers, and the loss of, or a significant decrease in business from, a number of these customers and/or a failure to attract new customers could have a material adverse effect on the company's business, financial condition, and results of operations.***

To date, USBTC has generated a significant share of its hosting revenue from a small number of customers. Any failure to meet customer expectations could result in the cancellation or non-renewal of hosting contracts and loss of associated revenue. Any event leading to the early termination of a hosting contract, including, but not limited to, customer bankruptcy or force majeure events that disrupt facility operations or damage customer miners, could result in the loss of revenue associated with those contracts. If USBTC were unable to offset lost revenue by refilling vacant capacity with other miners in the case of customer churn or by repossessing miners in the case of customer default, it could have a material adverse effect on the company's business, financial condition, and results of operations.

***If USBTC does not accurately predict its hosting facility requirements, it could have a material adverse effect on its business, financial condition and results of operations.***

The costs of building out, leasing and maintaining USBTC's hosting facilities may constitute a significant portion of USBTC's capital and operating expenses. In order to manage growth and ensure adequate capacity for USBTC's digital mining operations and new and existing hosting customers while minimizing unnecessary excess capacity costs, USBTC continuously evaluates its short- and long-term data center capacity requirements. If USBTC overestimates its business' capacity requirements or the demand for its services and therefore secure excess data center capacity, USBTC's operating margins could be materially reduced. If USBTC underestimates its data center capacity requirements, USBTC may not be able to service the expanding needs of its existing customers and may be required to limit new customer acquisition, which could have a material adverse effect on its business, financial condition and results of operations.

***USBTC operates a number of data centers for third party owners under the USMIO brand and cannot execute changes to strategy and operations without owner consent, which could result in suboptimal financial performance and may have a material adverse effect on the company's business, financial condition, and results of operations.***

USBTC has entered into property management agreements ("**PMAs**") with the owners of Charlie, Delta, and Echo. Under these agreements, USBTC is paid a fixed fee to operate each data center and partakes in an incentive structure that compensates USBTC for introducing and executing initiatives that increase revenue and decrease costs. At times, USBTC may recommend certain changes to a data center's strategy or operations, including, but not limited to, modification of the data center's energy curtailment approach, repricing or cancellation or existing customer hosting contracts, or hiring new personnel, to increase revenue, decrease costs, and/or strengthen data center operations.

As the given data center owner must consent to certain changes recommended by USBTC, and as the given owner may not consent to such changes, USBTC will not always have ultimate control over key decisions that drive the financial and operating performance of these data centers. If USBTC is unable to implement decisions required to operate these data centers profitably and effectively, it could negatively impact the revenue and profitability of its partners and harm the reputation of both its partners and USBTC. This could have a material adverse effect on USBTC's business, financial condition, and results of operations.

Furthermore, if USBTC were to fail to meet the expectations of third party data owners for any reason within or beyond its control, its partners could cancel or decline to renew its contracts with USBTC. If USBTC were unable to offset lost revenue by securing new PMAs, it could have a material adverse effect on the company's business, financial condition, and results of operations.

***USBTC faces certain risks associated with its current joint venture and may face similar risks in the future by entering into other joint ventures, and the materialization of any of these risks may have a material adverse effect on the company's business, financial condition, and results of operations.***

Joint ventures inherently involve a lesser degree of control over business strategy and operations, thereby potentially increasing the financial, legal, operational, regulatory, and/or compliance risks associated with

44

TABLE OF CONTENTS

them, and require the diversion of financial and management resources from existing operations or alternative opportunities. USBTC may be dependent on partners, controlling shareholders, management, or other persons or entities who control the joint venture and who may have business interests, strategies, or goals that are inconsistent or competitive with those of USBTC. Furthermore, joint venture partners receive access to USBTC's intellectual property and other resources, which introduces the risk of theft and/or exploitation.

For example, USBTC owns a 50% membership interest in a joint venture with one of the world's largest renewable energy producers with respect to the Echo data center in King Mountain, Texas. Decision making control over the joint venture's actions rests in a committee of four member managers, two from each Member of the joint venture (USBTC and its partner). If the member managers of USBTC and its joint venture partner are not aligned with respect to business interests, strategies, or goals, or if the member managers of USBTC and its joint venture partner cannot reach agreement in decision-making processes, there is a risk that USBTC may not be able to operate the King Mountain site optimally from a financial, legal, operational, regulatory, and/or compliance perspective. If this situation materializes, it may have a material adverse effect on the company's business, financial condition, and results of operations.

Business decisions or other actions or omissions of the partners, controlling shareholders, management, or other persons or entities who control them may adversely affect the value of USBTC's interest in the joint venture, result in litigation or regulatory action against USBTC, and may otherwise damage USBTC's reputation and brand. USBTC's ability to realize value from its joint ventures may be limited by applicable securities laws and regulations. If USBTC fails to address the foregoing risks or other problems encountered in connection with past or future joint ventures, new technologies, services, and other assets, it could have a material adverse effect on the company's business, financial condition, and results of operations.

***USBTC faces certain risks associated with its current indebtedness, and failure to service debt under contracted terms may have a material adverse effect on the company's business, financial condition, and results of operations.***

USBTC is subject to a number of risks associated with its indebtedness. USBTC must dedicate a portion of its cash flows from operations to pay debt service costs, and it therefore has less funds available for operations and other purposes. All else being equal, USBTC is more vulnerable to economic downturns and fluctuations in interest rates, less able to withstand competitive pressures and less flexible in reacting to changes in the industry and general economic conditions. If USBTC were to default under any of its existing credit facilities or if its creditors demand payment of a portion or all of its indebtedness, USBTC may not have sufficient funds to make such payments and/or it may result in the repossession of assets encumbered by its creditors.

For example, pursuant to USBTC's loan agreement with Anchorage Lending CA, LLC ("**Anchorage**"), USBTC and certain of its subsidiaries are obligated to repay the amount borrowed from Anchorage of approximately $49.0 million. In addition, pursuant to the loan agreement, the outstanding loan amount is secured by certain assets of USBTC and certain of its subsidiaries. In the event that USBTC and/or certain of its subsidiaries fail to pay the outstanding loan amounts or otherwise default under the loan agreement, Anchorage will be entitled to, amongst other remedies, (i) declare the outstanding loan amount immediately due and payable and/or (ii) enforce the rights granted to it pursuant to its security interests, including foreclosing upon the assets subject to the security interest. In addition, USBTC assumed a $96.8 member loan at a subsidiary level in connection with its King Mountain JV acquisition. While USBTC, as a parent entity, is not a guarantor under the loan, in the event that USBTC and/or its subsidiaries fail to pay the outstanding loan amounts or otherwise defaults under the loan, it may have a material adverse effect on USBTC's business, financial condition and results of operations.

***If USBTC is unable to increase the operating scale of its Alpha and Echo data centers as planned, the company will be required to find alternative options to increase the operating scale of its data center portfolio. If this scenario were to materialize and if USBTC was unsuccessful in its effort to expand its operating scale by other means, it may adversely affect your investment.***

USBTC plans to increase the operating scale of its Alpha and Echo data centers by energizing additional miners at each site. The company faces several risks as it executes this plan, including, but not limited to, the risk that USBTC fails to secure regulatory approval and the risk that it is not prepared, for reasons within or beyond its control, to energize miners in a timely manner or at all upon their delivery. If USBTC is unable to

45

successfully increase the operating scale of its Alpha and Echo data centers, and if the company were unsuccessful in its effort to expand its operating scale by other means, it may adversely affect your investment.

### *USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.*

A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

### *USBTC may become dependent on third-party brokers and direct suppliers to source some or all of its miners, and failure to properly manage these relationships, or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on USBTC's business, prospects or operations.*

While USBTC has historically purchased miners directly from miner manufacturers, it may in the future rely on third-party brokers or other suppliers to source some or all of its miners. USBTC cannot ensure that business interruptions will not occur as a result of the potential failure of these brokers or suppliers to perform as expected, for reasons including, but not limited to, the failure to secure acceptable or a sufficient number of miners for USBTC.

Like USBTC, many of USBTC's industry peers have purchased mining equipment at scale in the past, which has at times resulted in a worldwide shortage of mining equipment and extended delivery schedules for new miner purchases. USBTC cannot ensure that miner manufacturers will be able to keep pace with potential increases in demand for mining equipment in the future. Furthermore, resource constraints or regulatory barriers could affect USBTC's ability to purchase and secure miners. For example, China has experienced power shortages in the past, which at times led to business disruptions to certain of USBTC's miner manufacturer suppliers. There is a possibility that certain miner manufacturers may relocate their manufacturing activities from China to other countries following the September 2021 regulatory blanket ban on digital asset mining and transactions in China. Such factors, including power outages and the relocation of manufacturing activities, could result in cancellations or delays and may negatively impact USBTC's ability to receive mining equipment on a timely basis or at all.

In the past, increased demand for miners has also limited the supply of miners that brokers can source. USBTC cannot ensure that brokers, if engaged, or suppliers will continue to perform to USBTC's satisfaction or under commercially attractive terms. Brokers or suppliers may also decline USBTC's orders to fulfill orders from a competitor, which could harm USBTC's competitive position. If USBTC's brokers or suppliers were to not provide services according to USBTC's needs or to become unable to produce and deliver the volume of miners required by USBTC, USBTC may not be able to find alternative means of purchasing and securing miners in a timely manner. Any delays, interruptions, or increased costs resulting from these dynamics could have a material adverse effect on USBTC's business, prospects or operations.

### *USBTC is currently subject to Niagara Falls Litigation. USBTC cannot predict the outcome of the Niagara Falls Litigation or any other legal proceedings with respect to its current and past business activities.*

USBTC, and its wholly-owned subsidiary, U.S. Data Technologies Ltd. are defendants in a lawsuit filed by the City of Niagara Falls and the Director of the Department of Code Enforcement of the City of Niagara Falls on November 17, 2022 (*City of Niagara Falls, et al. v. U.S. Data Technologies Group Ltd., et al., index no. E178623/2022, Niagara County Supreme Court*), pursuant to which the plaintiffs are seeking to enjoin USBTC's digital asset mining operations in Niagara Falls on the basis of alleged non-compliance with, and absence of required permits under, Niagara Falls' recently amended zoning ordinance (the "**Niagara Falls Litigation**"). On December 1, 2022, the Niagara County Supreme Court issued a temporary restraining order directing USBTC to restrain from violating the law, continuing to mine digital assets, and engaging in business on the property. On January 25, 2023, the Niagara County Supreme Court issued its initial determination in which it found that USBTC was in violation of the amended zoning ordinance and the temporary restraining order. The court granted the City of Niagara Fall's motion for contempt for the USBTC's violations of the temporary restraining order and imposed a fine of $540,000 due February 1, 2023 if USBTC's operations were not shut down by January 31, 2023. The court also ruled that if the operation is not shut down by

46

TABLE OF CONTENTS

January 31, 2023, and the temporary restraining order continues to be violated, then the fine will increase to $25,000 a day beginning February 1, 2023. The court also denied USBTC's motion to dismiss and denied USBTC's motion to vacate the temporary restraining order. On January 31, 2023, USBTC filed motions for leave to: (1) reargue the City of Niagara Falls' motion for contempt, and (2) reargue USBTC's motion to vacate the temporary restraining order. A three-day hearing on the City of Niagara Fall's motion for a preliminary injunction is currently scheduled for March 9, 2023. USBTC believes that the enactment of the recent amendment to the zoning ordinance was procedurally invalid and constitutionally unsound and intends to use all appropriate legal and administrative means in their defense in the Niagara Falls Litigation, including a request for a rehearing as well as an appeal of the initial determination. An adverse outcome of the Niagara Falls Litigation may affect U.S. Data Technologies Group Ltd.'s permits and operations with respect to its Niagara Falls data site.

In addition, responding to lawsuits brought against USBTC and governmental inquiries or legal actions that USBTC may initiate, can often be expensive and time-consuming and disruptive to normal business operations. Moreover, the results of complex legal proceedings and governmental inquiries could adversely affect USBTC's business, results of operations or financial condition, and USBTC could incur substantial monetary liability and/or be required to change its business practices.

***The properties included in USBTC's mining and hosting network may experience damages, including damages that are not covered by insurance.***

USBTC's current mining and hosting operations in New York, Nebraska and Texas are, and any future mines USBTC establishes will be, subject to a variety of risks relating to physical condition and operation, including:

- the presence of construction or repair defects or other structural or building damage;

- any noncompliance with or liabilities under applicable environmental, health or safety regulations or requirements or building permit requirements;

- any damage resulting from natural disasters, such as hurricanes, earthquakes, fires, floods and windstorms; and

- and claims by employees and others for injuries sustained at USBTC properties.

For example, a mine could be rendered inoperable, temporarily or permanently, as a result of a fire or other natural disaster or by a terrorist or other attack on the mine. The security and other measures USBTC takes to protect against these risks may not be sufficient. Additionally, a mine could be materially adversely affected by a power outage or loss of access to the electrical grid or loss by the grid of cost-effective sources of electrical power generating capacity. Given the power requirement, it would not be feasible to run miners on back-up power generators in the event of a power outage. USBTC's insurance may cover all or a portion of the replacement cost of any lost or damaged miners, but does not cover any interruption of its mining activities; USBTC's insurance therefore may not be adequate to cover the losses it suffers as a result of any of these events. In the event of an uninsured loss, including a loss in excess of insured limits, at any of the mines in its network, such mines may not be adequately repaired in a timely manner or at all and USBTC may lose some or all of the future revenues anticipated to be derived from such mines.

***USBTC has previously identified material weaknesses in its internal control over financial reporting. These material weaknesses could continue to adversely affect USBTC's ability to report its results of operations and financial condition accurately and in a timely manner.***

In connection with the preparation of USBTC's consolidated financial statements as of June 30, 2022 and for the fiscal year ended June 30, 2022, management and its independent registered public accounting firm identified material weaknesses in internal controls over accounting for revenue related transactions, accounting for income taxes, accounting for equity transactions and accounting for complex transactions. A material weakness is a deficiency, or a combination of control deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. USBTC's management is responsible for the internal control over financial reporting of USBTC and is taking steps to address the material weaknesses, including:

47

relationship with such individual could be subject to regulatory scrutiny and alleged by regulators as USBTC acting in concert with the bad actor defendants. Because of the aforementioned items, it is possible that the disclosure provided to subscribers in the aforementioned offerings was incomplete. As a result, USBTC elected to conduct the Rescission Offer. All equity previously held by Messrs. Stetson and Groussman and any of their family members and/or affiliates has been sold to other equity holders of USBTC, and USBTC has taken all other actions necessary as of August 2021 so that Messrs. Stetson and Groussman no longer have any involvement with USBTC.

The Rescission Offer remained open until the earlier of (i) the date on which USBTC received written responses from all offerees and (ii) 30 days after delivery of the Rescission Offer. As of the date of this prospectus, the Rescission Offer has closed and only one holder of 126 Series A Shares elected to have USBTC redeem his investment and rescind his purchase of the Series A Shares. If all securityholders were to have accepted the Rescission Offer, USBTC would have been required to pay approximately $41.2 million in the aggregate. As of the date of this prospectus, USBTC has voluntarily paid off the $5.87 million in Promissory Notes. USBTC has experienced significant negative cash flow from operations to date and may continue to experience significant negative cash flow in the future. While USBTC has experienced historical losses and liquidity issues, it had enough cash or cash equivalents to pay the one holder of Series A Shares. However, in the future, should additional holders of Rescission Securities seek to rescind their prior purchases or should the validity of the Rescission Offer be contested for any reason, USBTC may not have enough cash or cash equivalents to pay any holders of Rescission Securities who may claim they continue to have a right to rescind their purchase of Rescission Securities.

***USBTC is subject to orders in three states, Massachusetts, Maryland and Virginia, and its failure to comply with federal and state securities laws and regulations in connection with the Rescission Offer could subject USBTC to additional enforcement actions, monetary fines and penalties, disqualifications under federal securities laws, and impair its ability to raise capital in the future.***

USBTC is relying upon exemptions from the securities registration provisions of the federal and state securities laws and regulations in connection with the Rescission Offer. In relying upon such exemptions, USBTC has the burden of ensuring compliance with such laws for the Rescission Offer, including the applicable state anti-fraud provisions. As of the date of this prospectus, USBTC has voluntarily disclosed the Rescission Offer and corresponded with the state securities regulators in the states of California, Maryland, New Jersey, Pennsylvania, Virginia, Massachusetts and Washington regarding the Rescission Offer and has been advised by all such states that no further actions are necessary. Given that USBTC believes that the Rescission Securities were exempt from registration under Section 4(a)(2) of the Securities Act, USBTC does not believe there were any violations of federal securities laws, and as such, has not notified any federal regulators regarding the Rescission Offer.

In connection with the Rescission Offer, the Commonwealth of Massachusetts, Office of the Secretary of the Commonwealth, Securities Division (the "**Massachusetts Division**") issued a Consent Order, Docket No. E-2022-0011, on March 22, 2022 (the "**Massachusetts Order**") in lieu of a hearing. The Massachusetts Order recited that the Massachusetts Division had conducted an investigation of USBTC pursuant to the Massachusetts Uniform Act, Mass. Gen. Laws c. 110A the ("**Massachusetts Securities Act**") and the regulations promulgated thereunder (the "**Massachusetts Regulations**"), and reviewed self-reported allegations of alleged sales of unregistered securities of USBTC in the State of Massachusetts in potential violation of the Massachusetts Securities Act and Massachusetts Regulations which securities had not been determined to be exempt from registration requirements. As had been agreed by and consented to by USBTC, the Massachusetts Order, in summary, required USBTC to (i) permanently cease and desist from committing violations of the Massachusetts Securities Act; (ii) offer to rescind securities purchase transactions with five Massachusetts residents; (iii) submit the necessary paperwork and pay the necessary fees in order to register the sales to the Massachusetts residents with the Massachusetts Division; and (iv) pay an administrative fine in the amount of $1.0 million. With respect to the requirement to offer rescission, USBTC resent the Rescission Offer provided in July 2021, with additional Massachusetts-specific disclaimers, to the five Massachusetts residents, who collectively held 4,335 Series A Shares, in April 2022. The Massachusetts investors reconfirmed their declination of the offer to rescind. In April 2022, USBTC paid the $1.0 million administrative fine.

In connection with the Rescission Offer, USBTC entered into a Stipulation for Consent Order, Case No. 2021-0127, on November 5, 2021 (the "**Maryland Order**") in lieu of a hearing, following receipt of a Consent Order

49

increasing tensions between the United States and Russia and the other effects of the ongoing conflict in Ukraine have resulted in many broader economic impacts such as the United States imposing sanctions and bans against Russia and Russian products imported into the United States. Such sanctions and bans have impacted and may continue to impact commodity pricing such as fuel and energy costs, making it more expensive for USBTC to conduct its mining operations. Further sanctions, bans or other economic actions in response to the ongoing conflict in Ukraine or in response to any other global conflict could result in an increase in costs, further disruptions to USBTC's supply chain, and/or a lack of consumer confidence resulting in reduced demand. While the extent of such items is not presently known, any of them could negatively impact USBTC's business, results of operations, and financial condition.

***Maintenance, expansion and refurbishment of power generation facilities involve significant risks that could result in unplanned power outages or reduced output and could have a material adverse effect on USBTC's Bitcoin mining activities, results of operations, cash flows and financial condition.***

USBTC is subject to liability risks relating to the competitive power generation business and its operations. USBTC currently draws power from various power sources, which include the NYISO grid and the ERCOT grid. Those grids and any power plants or facilities that USBTC may acquire in the future require periodic maintenance and repair. Any unexpected failure, including failure associated with breakdowns, forced outages or any unanticipated capital expenditures could result in reduced profitability.

USBTC cannot be certain of the level of capital expenditures that will be required due to changing environmental and safety laws (including changes in the interpretation or enforcement thereof), needed facility repairs and unexpected events (such as natural disasters or terrorist attacks). The unexpected requirement of large capital expenditures could have a material adverse effect on USBTC's business, liquidity, financial condition and results of operations. If USBTC significantly modifies a unit, USBTC may be required to install the best available control technology or to achieve the lowest achievable emission rates as such terms are defined under the new source review provisions of the federal Clean Air Act, as amended from time to time, which would likely result in substantial additional capital expenditures.

The conduct of USBTC's physical and commercial operations subjects USBTC to many risks, including risks of potential physical injury, property damage or other financial liability, caused to, or by, employees, customers, contractors, vendors, contractual or financial counterparties and other third parties.

***Natural or manmade events may cause the production of power to fall below USBTC's expectations.***

USBTC's electricity demand depends upon its various power grids' ability to maintain the working order of their power generation facilities. A natural or manmade disaster, severe weather such as snow and ice storms, or accident could adversely affect the ability of energy source and miners to operate or require USBTC to shut down its facilities, miners or related operations. To the extent USBTC experiences a prolonged interruption with respect to its power source or a transmission outage due to natural or manmade events, USBTC's supply of electricity could materially decrease. USBTC may also incur significant repair and clean-up costs associated with these events. The effect of the failure of established power sources to operate as planned as described above could have a material adverse effect on USBTC's business, financial condition and results of operations.

***The grids that USBTC relies on for energy may not be able to operate as planned, which may increase USBTC's expenses and decrease its revenues and have an adverse effect on USBTC's business, financial condition and results of operations.***

The operation of the grids USBTC relies on, including the NYISO and ERCOT grids, as well as USBTC's information technology systems and other assets and conduct of other activities subjects USBTC to a variety of risks, including the breakdown or failure of equipment, accidents, security breaches, viruses or outages affecting information technology systems, labor disputes, obsolescence, delivery/ transportation problems and disruptions of fuel supply and performance below expected levels. These events may impact USBTC's ability to conduct its businesses efficiently and lead to increased costs, expenses or losses. Planned and unplanned outages with respect to the power grids that USBTC relies on may require USBTC to purchase power at then-current market prices which could have a negative impact on the cost structure of USBTC's Bitcoin mining operations.

58

On February 3, 2023, USBTC entered into a Loan, Guaranty and Security Agreement with Anchorage in connection with a restructuring of its debt obligations with Anchorage. On the same day, USBTC entered into an Asset Purchase Agreement with NYDIG, pursuant to which USBTC transferred certain of its assets, including certain of its equipment, real estate, and contracts to NYDIG in full satisfaction of the master equipment financing debt owed by USBTC to NYDIG.

On February 4, 2023, representatives from Hut 8, USBTC, and their respective advisors held a meeting via videoconference to conduct a final discussion on the progress of the potential transaction and its documentation.

On February 6, 2023, the Hut 8 Board, senior management of Hut 8, representatives of Stifel GMP, Kroll, Bennett Jones, and Skadden held a meeting via videoconference to provide the Hut 8 Board with an update regarding the key terms of the potential transaction and to discuss various transactional matters. Legal counsel to Hut 8 also presented an overview on the current draft of the Business Combination Agreement and discussed the transaction agreement and other transaction issues. During this meeting, following a review of the process and methodologies considered by Stifel GMP in evaluating the financial terms of the Business Combination, the Hut Board received oral opinions from Stifel GMP and Kroll that, as of the date of such opinions and subject to the scope of review, assumptions and limitations contained therein, the USBTC Exchange Ratio was fair, from a financial point of view, to Hut 8. Following discussion and consideration of the alternatives available to Hut 8, the Hut 8 Board determined that the transaction with USBTC was in the best interest of Hut 8 as well as Hut 8's shareholders and approved the Business Combination Agreement and Hut 8's entry into the agreements related to the transaction.

On February 6, 2023, the USBTC Board held a meeting to consider the proposed transaction, which was attended by members of USBTC senior management, and representatives of Needham, Greenberg, and Stikeman. Following a review of the terms of the Business Combination Agreement and other material terms of the transaction, the USBTC Board approved USBTC's entry into the agreements related to the transaction, as well as the Merger Consent Approval Transfer (as defined herein).

On February 6, 2023, representatives from each of Hut 8 and USBTC signed the Business Combination Agreement and other transaction documentation.

For more information regarding the Merger Consent Approval Transfer, see "*Certain Relationships and Related Party and Other Transactions of USBTC — The Merger Consent Approval Transfer*."

**The Hut 8 Board's Reasons for the Business Combination**

In evaluating the Business Combination, the Hut 8 Board, in consultation with Hut 8's management and financial and legal advisors, engaged in numerous discussions regarding the Business Combination and received various materials for review and consideration.

In reaching its decision to approve the Business Combination, the Hut 8 Board considered a variety of factors, including its knowledge of USBTC's business, operations, financial condition, results of operations and prospects, as well as the risks in achieving those prospects, including uncertainties associated with achieving financial forecasts. In making its determination, the Hut 8 Board considered a number of factors, including, but limited to, the following:

- the Hut 8 Board's belief that the Business Combination would enhance Hut 8's competitive position by increasing its operating scale and scope, diversifying its business model, and strengthening its balance sheet;

- the Hut 8 Board's belief that the Business Combination creates greater financial stability through market cycles and allows Hut 8 to grow and invest in new opportunities, including managed infrastructure operations;

- the Hut 8 Board's belief that through increased scale and U.S. headquarters, Hut 8 would be included in additional stock indices and enjoy improved access to capital;

- the Hut 8 Board's belief that the Business Combination would optimize data center and self-mining operations;

80

- the Hut 8 Board's belief that USBTC's purpose-built energy and site management software would provide additional opportunities for efficiencies, especially at Hut 8's Canadian sites;

- the Hut 8 Board's belief that the combined organization would be led by members of the current management teams of both Hut 8 and USBTC, each of whom would bring distinct and complementary experience and expertise to the management of the combined company;

- the Hut 8 Board's belief that the USBTC team brings significant leadership in energy origination, development, demand response, hedging, grid stabilization, and analytics significantly enhancing Hut 8's ability to mitigate fluctuating energy prices across markets;

- the Hut 8 Board's belief that Hut 8 and USBTC have complementary environmental, social and governance ("**ESG**") strategies, are both dedicated to accelerating the global transition to renewable energy, and that the Business Combination would introduce additional renewable and zero carbon emission energy sources to New Hut's energy portfolio;

- the Hut 8 Board's expectation that, upon completion of the Business Combination, current Hut 8 shareholders will own approximately 50% of New Hut common stock on a fully-diluted in-the-money basis;

- the Hut 8 Board's understanding of the business, assets and liabilities, results of operations, financial performance, strategic direction and prospects of each of USBTC and Hut 8; and

- the result of Hut 8's commercial, financial, and legal due diligence of USBTC and the reputation, business practices, and experience of USBTC and its management.

The Hut 8 Board also considered a number of uncertainties and risks in its deliberations concerning the Business Combination, including the following:

- the expenses incurred and to be incurred in connection with the Business Combination;

- the possible volatility, at least in the short term, of the trading price of the Hut 8 common shares resulting from the announcement of the Business Combination;

- the risk that the Business Combination might not be consummated in a timely manner or at all and the potential adverse effect of the public announcement of the Business Combination or on the delay or failure to complete the Business Combination on the reputation of Hut 8;

- the risk to the business of Hut 8, operations, and financial results in the event that any of the Business Combination is not consummated as planned;

- the Business Combination Consideration which is in the form of equity and not cash;

- the risk in connection with obtaining the Hut 8 Shareholder Approval; and

- various other risks associated with the combined organization and the Business Combination, including those described in the section entitled "*Risk Factors*" in this prospectus.

**The USBTC Board's Reasons for the Business Combination**

In evaluating the Business Combination, the USBTC Board, in consultation with USBTC's management and financial and legal advisors, engaged in numerous discussions regarding the Business Combination and received various materials for review and consideration.

In reaching its decision to approve the Business Combination, the USBTC Board considered a variety of factors, including its knowledge of Hut 8's business, operations, financial condition, results of operations and prospects, as well as the risks in achieving those prospects, including uncertainties associated with achieving financial forecasts. In making its determination, the USBTC Board considered a number of factors, including, but limited to, the following:

- the USBTC Board's belief that the Business Combination would enhance USBTC's competitive position by increasing its operating scale and scope, diversifying its business model, and strengthening its balance sheet;

81

its specialized operating experience and expertise while benefiting from its counterparty's complementary expertise in other areas, such as capital raising and energy asset development. In such cases, USBTC focuses on identifying differentiated opportunities that provide equity positions in new companies, new revenue models (e.g., profit share), and management fees as additional economic upside.

*Commitment to ESG*

USBTC pursues site portfolio growth with the goal that the agile load infrastructure it builds is a grid-stabilizing asset that drives the advancement of non-baseload renewable assets such as wind and solar. USBTC aims to address transmission constraints and support the development of clean energy sources. It does this by building sites in energy supply congested areas and balancing oversupply with an increase in demand, which in turn helps to increase the price of electricity at the resource node and create an environment that is more favorable for clean energy generation.

With respect to front-of-the-meter energy and storage systems ("**loads**"), which are directly connected to the grid and pull energy exclusively from the market, USBTC's sites stabilize fluctuations in the grid in areas where growth in renewable loads such as wind and solar is driving natural unpredictability and volatile supply dynamics by curtailing when energy prices are high and demand outpaces supply. USBTC focuses on differentiated opportunities in both regulated and deregulated markets, partnering with cities, states, and utilities and leveraging economic development incentives to build grid-stabilizing assets and monetize grid scale inefficiencies. Some examples of this are large transmission nodes with extra capacity where flexible loads are valuable, rural areas with built up infrastructure that is underutilized or where industry has departed, and joint ventures with large power partners to arbitrage structural gaps in power trading markets.

With respect to behind-the-meter-loads, which are co-located with an energy source and share a meter into the grid, USBTC sites act as a consumer of last resort. Wind and solar projects face the critical challenge of undesired curtailment due to node congestion caused by limited transmission systems. The growing supply of renewable generation facilities has created an imbalance where existing transmission infrastructure cannot support the volume of load generation in periods of high production. USBTC focuses on building sites in such areas, typically with low population density and an abundance of renewable development, such as West Texas. By doing so, it enables generation and consumption of power that would otherwise have been curtailed.

Renewable energy sources powering USBTC's owned and operated sites include renewable energy and zero carbon emission energy from wind, hydro, and nuclear sources. As of January 31, 2023:

- Alpha Site at Niagara Falls is fueled by a minimum of approximately 94% zero carbon emission energy sources;

- Charlie Site in Nebraska is powered by 62% zero carbon emission sources, including 46.9% nuclear, 7.9% wind and 7.6% hydro; and

- The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sourced from ERCOT which includes more than 40% zero carbon emission sources.

*Custody Policy*

USBTC uses third-party custody solutions from Coinbase, Inc. ("**Coinbase**"), NYDIG Trust Company LLC, and Fidelity to safeguard its Bitcoin. USBTC's custody policy and procedures are detailed below and have not been changed in light of the current digital asset market disruption. USBTC does not currently hold any bitcoin for third parties.

Each third-party custody solution used by USBTC to safeguard its Bitcoin offers both online storage, or "hot storage," and offline storage, or "cold storage."

The majority of USBTC's Bitcoin balance is held by Coinbase and accessed via the Coinbase Prime platform. Coinbase Prime offers online "hot storage" via its trading account system and offline "cold storage" via its vault account system. As of the data of this prospectus, USBTC stores substantially all of its Bitcoin in a Coinbase Prime trading account.

132

*Impairments of digital assets*

Impairments of digital assets was $30.3 million and $1.3 million, or 32.4% and 8.2% of total costs and expenses, for the year ended June 30, 2022 and for the period from December 4, 2020 (inception) through June 30, 2021, respectively. Impairment results from declines in the market value of Bitcoin during the period it is held.

*Interest Expense*

Interest expense was $6.9 million and $0.2 million for the year ended June 30, 2022 and for the period from December 4, 2020 (inception) through June 30, 2021, respectively. The increase in interest expense is related to the addition of equipment financing loans from NYDIG in July 2021 and December 2021 and Anchorage in March and April 2022, as described in the "Liquidity and Capital Resources" section below.

**Income Tax**

For the three months ended September 30, 2022, USBTC recognized income tax expense of $0.3 million. USBTC's effective income tax rate was (128.6%) for the three months ended September 30, 2022. The difference between the effective tax rate and the expected statutory rate was a result of stock compensation shortfalls and the related change to the valuation allowance.

USBTC's effective tax rate for the fiscal year ended June 30, 2022 was (18.6%), which differs from the U.S. Federal income tax rate of 21% primarily due to a change in valuation allowance and adjustments to tax accounts.

**Net Operating Loss Carryforwards**

As of June 30, 2022, USBTC had federal and state net operating loss carryforwards of approximately $105.6 million and $31.0 million, respectively. The federal net operating losses can be carried forward indefinitely and the state net operating loss expires in tax year 2040.

**Liquidity and Capital Resources**

USBTC's earnings, cash flows and ability to meet any debt obligations will depend on the cash flows resulting from its operations. USBTC's cash needs historically were primarily for growth through acquisitions and working capital to support equipment financing and the purchase of additional miners. Cash needs for operations have historically been financed with cash generated from operations, sales of USBTC's mined Bitcoin or financings. Although USBTC's strategy is primarily to hold Bitcoin on its balance sheet, it will from time to time sell Bitcoin it mines through Coinbase or other exchanges for fiat currency based on its internal cash management policy. USBTC intends to hold enough fiat currency or hedge enough of its Bitcoin exposure to fund its projected near-term fiat currency expenses, including liabilities, operating expenses, and capital expenditures.

*Cash Flows*

USBTC has incurred net losses since its inception but does not anticipate it will continue to incur net losses for the foreseeable future. As of September 30, 2022 and 2021, USBTC had cash and cash equivalents of $21.4 million and $31.9 million, respectively. The following table summarizes USBTC's cash flows for the periods indicated:

| | Three Months Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Net cash provided by (used in):** | | |
| Cash flows provided by (used in) operating activities | $ 8,364 | $ (3,558) |
| Cash flows used in activities | (9,791) | (39,904) |
| Cash flows provided by financing activities | 1,761 | 68,669 |
| **Net change in cash** | **$    334** | **$ 25,207** |

158

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

issuance of a fractional share. Conversion terms on the Company's preferred stock were not changed. Preferred stock continues to convert on a one to one basis for common stock.

All of the Company's historical share and per share information related to issued and outstanding common stock, issued and outstanding preferred stock and outstanding options exercisable for common stock in these unaudited condensed consolidated financial statements have been adjusted, on a retroactive basis, to reflect the 2022 Stock Split. See Note 12.

**Note 2.    Liquidity and Financial Condition**

The Company has experienced losses since inception. As of September 30, 2022, the Company had cash of $11.4 million, positive operating cash flows of $8.4 million, working capital of ($88.8) million, total stockholders' equity of $89.9 million and an accumulated deficit of $41.4 million. Working capital of ($88.8) million is the result of the Company's current portion of notes payable, see Note 15 which addresses the extinguishment of $89.1 million of notes payable. To date, the Company has, in large part, relied on equity and debt financings to fund its operations. The Company believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued.

During the fiscal year ended June 30, 2022, the Company received net proceeds of approximately $61.1 million from sales of 10,000,000 shares of its Series B preferred stock, $0.00001 par value.

During the fiscal year ended June 30, 2022, the Company received net proceeds of approximately $12.5 million from sales of 793,250 shares of its Series B-1 preferred stock, $0.00001 par value.

On December 27, 2021, the Company amended the Master Equipment Financing Agreement ("Amended MEFA") it entered into on July 17, 2021 which now includes approximately $84.3 million of additional funding to be used to purchase additional miners. As of June 30, 2022, approximately $66.8 million of the Amended MEFA was received by the Company, net of approximately $1.7 million in closing costs. The $66.8 million included multiple tranches, which mature on June 25, 2023 or December 25, 2023. The Amended MEFA bears interest at 12% per annum with twelve monthly interest-only payments due beginning in January 2022. The financing is secured by a first priority security interest in substantially all of the Company's assets and includes financial reporting covenants on a quarterly and annual basis. Once the miners are delivered and installed, the first priority security interest in substantially all of the Company assets will be terminated, and the first priority security interest reverts to the miners only. For the fiscal year ended June 30, 2022, approximately $86.1 million of gross proceeds were received from the MEFA and Amended MEFA. See Note 10 and Note 15.

On March 31, 2022, the Company entered into an equipment loan and security agreement ("ELSA") with a financing company in the amount of approximately $25.0 million which the Company used to fund the acquisition of additional miners. The ELSA bears interest at 12% per annum with six monthly interest-only payments due beginning in April 2022. The financing is secured by a first priority security interest in approximately 5,900 miners which will be purchased from Acme. See Note 10 and Note 15.

On April 26, 2022, the Company entered into an equipment loan and security agreement ("ELSA") with a financing company in the amount of approximately $25.0 million which the Company used to fund the acquisition of additional miners. The ELSA bears interest at 12% per annum with six monthly interest-only payments due beginning in April 2022. See Note 10 and Note 15. The financing is secured by a first priority security interest in approximately 5,800 miners which will be purchased from Acme as part of the purchase commitments mentioned below.

During the quarter ended September 30, 2022, the Company paid approximately $2.5 million against its notes payable.

During the fiscal year ended June 30, 2022, the Company paid approximately $1.3 million against its related party notes payable and approximately $9.3 million against its notes payable.

F-7

**U.S. Data Mining Group, Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**

issuance of a fractional share. Conversion terms on the Company's preferred stock were not changed. Preferred stock continues to convert on a one to one basis for common stock.

All of the Company's historical share and per share information related to issued and outstanding common stock, issued and outstanding preferred stock and outstanding options exercisable for common stock in these consolidated financial statements have been adjusted, on a retroactive basis, to reflect the 2022 Stock Split. See Notes 12 and 15.

**Note 2.   Liquidity and Financial Condition**

The Company has experienced losses since inception. As of June 30, 2022, the Company had cash of $21.1 million, positive operating cash flows of $1.4 million, working capital of ($63.1) million, total stockholders' equity of $87.6 million and an accumulated deficit of $40.9 million. Working capital of ($63.1) million is the result of the Company's current portion of notes payable, see Note 16 which addresses the extinguishment of $89.1 million of notes payable. To date, the Company has, in large part, relied on equity and debt financings to fund its operations. The Company believes its current cash on hand and subsequent equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these consolidated financial statements are issued.

During the fiscal year ended June 30, 2022, the Company received net proceeds of approximately $61.1 million from sales of 10,000,000 shares of its Series B preferred stock, $0.00001 par value.

During the fiscal year ended June 30, 2022, the Company received net proceeds of approximately $12.5 million from sales of 793,250 shares of its Series B-1 preferred stock, $0.00001 par value.

On December 27, 2021, the Company amended the Master Equipment Financing Agreement ("Amended MEFA") it entered into on July 17, 2021 which now includes approximately $84.3 million of additional funding to be used to purchase additional miners. As of June 30, 2022, approximately $66.8 million of the Amended MEFA was received by the Company, net of approximately $1.7 million in closing costs. The $66.8 million included multiple tranches, which mature on June 25, 2023 or December 25, 2023. The Amended MEFA bears interest at 12% per annum with twelve monthly interest-only payments due beginning in January 2022. The financing is secured by a first priority security interest in substantially all of the Company's assets and includes financial reporting covenants on a quarterly and annual basis. Once the miners are delivered and installed, the first priority security interest in substantially all of the Company assets will be terminated, and the first priority security interest reverts to the miners only. For the fiscal year ended June 30, 2022, approximately $86.1 million of gross proceeds were received from the MEFA and Amended MEFA. See Note 11 and Note 16.

On March 31, 2022, the Company entered into an equipment loan and security agreement ("ELSA") with a financing company in the amount of approximately $25.0 million which the Company used to fund the acquisition of additional miners. The ELSA bears interest at 12% per annum with six monthly interest-only payments due beginning in April 2022. The financing is secured by a first priority security interest in approximately 5,900 miners which will be purchased from Acme. See Note 11 and Note 16.

On April 26, 2022, the Company entered into an equipment loan and security agreement ("ELSA") with a financing company in the amount of approximately $25.0 million which the Company used to fund the acquisition of additional miners. The ELSA bears interest at 12% per annum with six monthly interest-only payments due beginning in April 2022. See Note 11 and Note 16. The financing is secured by a first priority security interest in approximately 5,800 miners which will be purchased from Acme as part of the purchase commitments mentioned below.

During the fiscal year ended June 30, 2022, the Company paid approximately $1.3 million against its related party notes payable and approximately $9.3 million against its notes payable.

F-29

**U.S. Data Mining Group, Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**

loss, if any, will result from any claims, lawsuits and proceedings to which the Company is subject to either individually, or in the aggregate.

*City of Niagara Falls, New York Lawsuit*

On November 18, 2022, the City of Niagara Falls, New York ("the City"), filed a lawsuit claiming the Company violated one of its newly enacted laws. The City also applied for a preliminary injunction to shut down the Company's operation and also applied for and received a temporary restraining order which ordered the shutdown of the Company's Niagara Falls operation, pending a hearing on its application. On January 25, 2023 the Company was additionally assessed a fine by the City. Management believes the City's law is unenforceable and has taken the necessary legal steps to counter the lawsuit.

**Note 16.  Subsequent Events**

The Company has completed an evaluation of all subsequent events after the balance sheet date up to January 29, 2023, the date that the consolidated financial statements were available to be issued. Except as described above and below, the Company has concluded no other subsequent events have occurred that requires disclosure.

*Equity*

In September 2022, the Company's Board of Directors authorized 16,557,000 shares of Series C Preferred Stock. As further discussed in Note 1 and Note 13, the Company's Board of Directors authorized a stock split and increases to certain share classes.

*Acquisition*

On December 6, 2022, one of the Company's subsidiaries acquired a 50% membership interest in a joint venture ("JV"). In addition, the Company's subsidiary also assumed a property management agreement ("PMA"), a senior note and other agreements related to the JV.

*Strategic Operator Agreements*

In addition to the PMA related to the acquisition noted above, two of the Company's subsidiaries entered into Strategic Operator Agreements ("SOA") in November 2022. Each of these SOA's have five year terms whereby each subsidiary charges a monthly fixed fee, and also has the ability to pass-thru certain additional costs, for the management, support and administrative functions of operating a bitcoin mining datacenter for a third party customer.

*Debt*

In December 2022, the Company entered into a $10.0 million term-loan with a third party. The maturity date is December 5, 2027 and the interest rate is 6% per annum. Interest is payable in kind as an addition to, and capitalization on, the outstanding principal. The term-loan is secured by certain assets of the Company and does not have financial covenants.

*Finance Agreements*

In February 2023, the Company extinguished its MEFA and Amended MEFA with the financing company. The outstanding balance at the time of extinguishment was approximately $89.1 million. The Company exchanged all assets which the finance company financed, in addition to existing assets at one of our Texas locations and a portion of deposits on miners. On a provisional basis based upon un-impaired carrying values as of the date of these financial statements, the Company anticipates a loss on extinguishment of approximately $19.2 million.

F-49

TABLE OF CONTENTS

**U.S. Data Mining Group, Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**

In February 2023, the Company restructured both of its ELSA's with the financing company. The terms of the ELSA's have been extended five years and will be repaid via a monthly cash flow sweep from Company miners being hosted at a third party facility.

***Leases***

In November 2022, the Company terminated its Second Niagara Lease. In accordance with the lease terms, no early payment penalties applied.

F-50

TABLE OF CONTENTS

**SIGNATURES**

Pursuant to the requirements of the Securities Act, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-4 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Miami, State of Florida, on the 13th day of February, 2023.

**Hut 8 Corp.**

By: /s/ Asher Genoot
_____

Name:    Asher Genoot
Title:    President

II-6

TABLE OF CONTENTS

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Asher Genoot and Michael Ho and each of them, as attorneys-in-fact, each with the power of substitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement, and to sign any registration statement for the same offering covered by this Registration Statement that is to be effective upon filing pursuant to Rule 462(b) promulgated under the Securities Act of 1933, as amended, and all post-effective amendments thereto, and to file the same, with all exhibits thereto and all documents in connection therewith, with the SEC, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that such attorneys-in-fact and agents or any of them, or her or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed below by the following persons on behalf of the registrant and in the capacities indicated below on February 13, 2023:

| Signature | Title |
| --- | --- |
| /s/ Asher Genoot<br>Asher Genoot | President and Sole Director (Principal Executive Officer) |
| /s/ Michael Ho<br>Michael Ho | Vice President, Secretary and Treasurer (Principal Financial and Accounting Officers) |

II-7