USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __9/12/24____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE HUT 8 CORP. SECURITIES
LITIGATION

---

THIS DOCUMENT RELATES TO ALL ACTIONS

---

24 Civ. 904 (VM)

<u>**DECISION AND ORDER**</u>

**VICTOR MARRERO, United States District Judge.**

Lead plaintiff Abhishek Maheshwari ("Maheshwari" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, brings this action against defendants Hut 8 Corp. ("Hut 8" or the "Company"), and Asher Genoot ("Genoot"), Michael Ho ("Ho"), Jaime Leverton ("Leverton"), and Shenif Visram ("Visram", and collectively, the "Individual Defendants", and together with Hut 8, the "Defendants"). Lead Plaintiff alleges violations of the securities laws. (<u>See</u> "Consolidated Amended Complaint" or "CAC", Dkt. No. 39.) Maheshwari claims that Defendants made materially false and misleading statements in connection with the November 2023 merger (the "Merger") of two data mining companies, which formed Hut 8. Before the Court is Defendants' motion to dismiss the Consolidated Amended Complaint, ("Motion to Dismiss" or "MTD", Dkt. No. 52), pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the

reasons below, the Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND[1]

Lead Plaintiff brings this securities class action on behalf of all persons and entities that purchased or otherwise acquired Hut 8 securities (the "Securities") between February 13, 2023, and January 18, 2024, inclusive (the "Class Period"). (See CAC ¶¶ 1, 9, 53.) Lead Plaintiff alleges that Defendants made materially false and/or misleading statements in filings with the United States Securities and Exchange Commission (the "SEC") surrounding the Merger of Hut 8 Mining Corp. ("Legacy Hut") and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC"), which formed Hut 8. (See id. ¶¶ 3, 6.)

### A.    THE PARTIES

Lead Plaintiff is an individual who purchased Hut 8 securities during the Class Period. (See id. ¶ 16.)

Hut 8 is a large-scale energy infrastructure company and one of North America's largest Bitcoin miners. (See id. ¶ 2.) Legacy Hut was a Canada-based public company that mined digital assets and provided high-performance computing

---

[1] Except as otherwise noted, the following background derives from the CAC. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to the Lead Plaintiff, as required under the standard set forth in Section III below.

infrastructure. (See id. ¶¶ 4, 36.) USBTC was a privately held Nevada company with a principal place of business in Miami, Florida, and a builder and strategic operator of Bitcoin mining sites. (See id. ¶¶ 5, 39.) At the time of the Merger, USBTC held a fifty percent interest in a digital asset mining site in King Mountain, Texas (the "King Mountain Joint Venture" or "King Mountain JV"). (See id. ¶¶ 42-43.)

The Individual Defendants were officers of Hut 8 and previously were former officers of USBTC or Legacy Hut. At all relevant times, Genoot was Hut 8's President, Ho was Hut 8's Chief Strategy Officer, Leverton was Hut 8's Chief Executive Officer ("CEO"), and Visram was Hut 8's Chief Financial Officer ("CFO"). (See id. ¶¶ 18-21.) Prior to the Merger, Genoot was USBTC's President and a director, Ho was USBTC's CEO and Chairman of the Board, Leverton was Legacy Hut's CEO, and Visram was Legacy Hut's CFO. (See id.)

B.    THE MERGER

On February 7, 2023, Legacy Hut and USBTC announced that the companies would combine in an all-stock merger of equals and become wholly owned subsidiaries of Hut 8 pursuant to a business combination agreement (the "Business Combination Agreement"). (See id. ¶ 48.) On February 13, 2023 – the date the Class Period begins - Hut 8 filed the initial registration statement on Form S-4 (the "Initial Registration

Statement") with the SEC, announcing the proposed Merger.[2] (See id. ¶ 53.) Ho and Leverton submitted their written consent to being named in the Initial Registration Statement as prospective directors. (See id. ¶ 54.) Hut 8 filed seven amendments to the Initial Registration Statement on Forms S-4/A on April 18 ("First Amendment" or "1st Amend."), June 12 ("Second Amendment" or "2d Amend."), July 17 ("Third Amendment" or "3d Amend."), August 24 ("Fourth Amendment" or "4th Amend."), September 18 ("Fifth Amendment" or "5th Amend."), November 6 ("Sixth Amendment" or "6th Amend."), and November 7, 2023 ("Seventh Amendment" or "7th Amend.").[3] (See id. ¶ 55.) Genoot and Ho signed each Amendment, which incorporated Ho's and Leverton's consent to be named as prospective directors. (See id. ¶ 55.) On November 9, 2023,

---

[2] See Hut 8 Corp., Registration Statement (Form S-4) (Feb. 13, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923019807/tm235928-1_s4.htm.

[3] See Hut 8 Corp., Amendment No. 1 (Form S-4) (Apr. 17, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923046342/tm235928-4_s4.htm; Hut 8 Corp., Amendment No. 2 (Form S-4) (June 12, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923070494/tm235928-8_s4a.htm; Hut 8 Corp., Amendment No. 3 (Form S-4) (July 14, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923081328/tm235928-13_s4a.htm; Hut 8 Corp., Amendment No. 4 (Form S-4) (Aug. 24, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923094950/tm235928-21_s4a.htm; Hut 8 Corp., Amendment No. 5 (Form S-4) (Sept. 18, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923101668/tm235928-27_s4a.htm; Hut 8 Corp., Amendment No. 6 (Form S-4) (Nov. 6, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923114442/tm235928-30_s4a.htm; Hut 8 Corp., Amendment No. 7 (Form S-4) (Nov. 7, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923115414/tm235928-38_s4a.htm.

the SEC declared the amended Registration Statement (the "Amended Registration Statement") effective. (See id. ¶ 56.) That day, Hut 8 filed the final prospectus on Form 424(b)(3) (the "Prospectus", and with the Initial Registration Statement and Amendments, the "Registration Statement"), incorporating the Amended Registration Statement.[4] (See id. ¶ 57.) On November 29, 2023, Hut 8 filed three registration statements on Form S-8 (the "Forms S-8"), which registered shares related to employee benefit plans.[5] (See id. ¶ 58.) Genoot and Ho signed each of the Forms S-8, which incorporated the Prospectus by reference. (See id. ¶ 58.)

On November 30, 2023, the Merger closed. (See id. ¶ 59.) On December 19, 2023, Hut 8 filed a 10-Q Form (the "December 2023 10-Q" or "Dec. 2023 10-Q").[6] (See id. ¶ 66.) On January 18, 2024 – the date the Class Period ends - J Capital

---

[4] See Hut 8 Corp., Prospectus (Form 424(b)(3)) (Nov. 9, 2023), https://www.sec.gov/Archives/edgar/data/1964789/000110465923116384/tm235928-42_424b3.htm.

[5] See Hut 8 Corp., Registration Statement (Form S-8) (Nov. 29, 2023) (registering up to 6,065,682 shares of common stock), https://www.sec.gov/Archives/edgar/data/1964789/000110465923122084/tm2331643d1_s8.htm; Hut 8 Corp., Registration Statement (Form S-8) (Nov. 29, 2023) (registering up to 4,490,400 shares of common stock), https://www.sec.gov/Archives/edgar/data/1964789/000110465923122086/tm2331643d2_s8.htm; Hut 8 Corp., Registration Statement (Form S-8) (Nov. 29, 2023) (registering up to 1,553,254 shares of common stock), https://www.sec.gov/Archives/edgar/data/1964789/000110465923122087/tm2331643d3_s8.htm.

[6] See Hut 8 Corp., Quarterly Report (Form 10-K) (Dec. 19, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001964789/000110465923127101/hut-20230930x10q.htm.

Research published a report (the "Short Seller Report"), alleging that Hut 8's stock was overvalued because USBTC would have declared bankruptcy without the Merger and the King Mountain JV had experienced persistent energy and internet problems.[7] (See id. ¶¶ 9, 114, 116.) That day, upon publication of the Short Seller Report, Hut 8's stock price fell $2.16, or 23.3 percent, to close at $7.12 per share. (See id. ¶ 10.) On January 24, 2024, Hut 8 issued a press release denying the Report's veracity. (See id. ¶¶ 82-84.)

Lead Plaintiff alleges that Defendants made materially false and misleading statements and omissions during the Class Period in the above SEC filings, as detailed below.

C.    STATEMENTS REGARDING USBTC'S FINANCIAL CONDITION

First, Lead Plaintiff alleges that Defendants suggested that USBTC was financially strong enough to sustain operations for another year when in fact the Merger saved USBTC from bankruptcy. (See CAC ¶¶ 6, 70.) Lead Plaintiff alleges that the following statements in Hut 8's SEC filings were false or misleading. First, the Initial Registration Statement and the First, Second, and Third Amendments stated that USBTC "believes its current cash on hand and subsequent

---

[7] See J Capital Research, "The Coming HUT Pump and Dump" (Jan. 18, 2024), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.jcapitalresearch.com/uploads/2/0/0/3/20032477/2024_01_18_hut.pdf.

equity and debt financings will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued" ("Financial Statement No. 1" or "Fin. Statement No. 1"). (Id. ¶ 61; see also id. ¶ 64.) Second, the Fourth, Fifth, Sixth, and Seventh Amendments, and the Prospectus stated that USBTC "believes its current cash on hand, proceeds from the sales of cryptocurrency and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these consolidated financial statements are issued" ("Financial Statement No. 2" or "Fin. Statement No. 2"). (Id. ¶ 65.) Third, the December 2023 10-Q stated that USBTC "believes its current cash on hand, proceeds from the sale of cryptocurrency, and ongoing operations will be sufficient to meet its operating and capital requirements for at least the next twelve months from the date these unaudited condensed consolidated financial statements are issued" ("Financial Statement No. 3" or "Fin. Statement No. 3"). (Id. ¶ 66.) Fourth, the Registration Statement stated that "USBTC has incurred net losses since its inception but does not anticipate it will continue to incur net losses for the foreseeable future" ("Financial Statement No. 4" or "Fin. Statement No. 4"). (Id. ¶ 67.) Forms S-8 also contained

Financial Statements Nos. 2 and 4, insofar as Forms S-8 incorporated the Prospectus. (See id. ¶ 68.)

Lead Plaintiff contends that USBTC's historical financial statements in the Registration Statement show that USBTC could not have sustained operations for another year. (See id. ¶ 70.) Per the Prospectus, USTBC had approximately $9 million available in net current assets as of June 30, 2023. (See id. ¶ 71.) Also, USBTC's cash flows showed an average loss of $36.1 million the fiscal year ending June 30, 2022 ("Fiscal 2022") and the fiscal year ending June 30, 2023 ("Fiscal 2023"). (See id. ¶ 73.) Hence, Lead Plaintiff asserts, the $9 million available would have sustained operations for about four months, not twelve months. (See id. ¶¶ 73-74.)

Moreover, Lead Plaintiff argues that to the extent the Financial Statements were based on projections, those projections were overly optimistic. (See id. ¶ 75.) Per the Prospectus, USBTC's cash flows used in operations for Fiscal 2023 were approximately negative $29.3 million. As of January 8, 2023, the Prospectus projected that USBTC would have positive cash flows of about $62.7 million in calendar year 2023. (See id. ¶ 76.) Given that Fiscal 2023 ended on June 30, 2023, USBTC's cash flows from operations would have needed to "significantly improve" in the remaining six months of

8

2023 "to even come close" to the $62.7 million projection. (Id. ¶ 77.) Likewise, the Seventh Amendment and the Prospectus projected that, as of January 28, 2023, USBTC's earnings before interest, taxes, depreciation, and amortization ("EBITDA") and EBITDA margin for calendar year 2023 would be at least 50 percent higher than what was achieved in Fiscal 2023. (See id. ¶ 75.)

Further, Lead Plaintiff contends that a confidential witness ("CW 1"), a data analyst for Hut 8 in the months before the Merger and thereafter, asserts that Leverton told the attendees of a Hut 8 retreat held from January 14-17, 2024, that the Merger saved USBTC from bankruptcy. (See id. ¶¶ 81, 93.)

Lead Plaintiff also asserts that Financial Statement No. 4 failed to disclose required information under Item 303 of SEC Regulation S-K ("Item 303"), which requires registrants to describe any "known trends" that are "reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Accordingly, although Financial Statement No. 4 disclosed that "USBTC has incurred net losses since its inception," it misleadingly stated that USBTC "does not anticipate it will

continue to incur net losses for the foreseeable future."
(CAC ¶ 102.)

### D.    STATEMENTS REGARDING THE KING MOUNTAIN JV

Second, Lead Plaintiff alleges that Defendants failed to disclose the energy and internet issues that had already materialized at the King Mountain JV.

Regarding the energy-related issues, CW 1 "had daily discussions with the Director of Infrastructure before the Meger" about the "ongoing energy issues" at the King Mountain JV. (Id. ¶ 93.) Also, CW 1 "saw evidence of the energy issues in the Hashrate failure and energy usage reports he received." (Id. ¶ 96.) Per CW 1, the King Mountain JV had the most inefficient miners. (See id.) Accordingly, Lead Plaintiff alleges that the following statements in Hut 8's Registration Statement were materially misleading, as they did not disclose the known energy problems. First, that "[t]he USBTC team will bring significant leadership in energy orientation, development, demand response, hedging, grid stabilization analytics to [Hut 8], which will enhance [Hut 8's] ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets" ("King Mountain Statement No. 1"). (Id. ¶ 88.) Second, that:

> The Echo facility at King Mountain is co-located
> behind the meter at a wind farm, and at peak wind
> generation periods can draw up to 100% of the energy

the wind project produces to power mining and
hosting; the rest of the time, the energy is
source[d] from [the Electrical Reliability Counsel
of Texas ("ERCOT") grid] ("King Mountain Statement
No. 2").

(Id. ¶ 89.)

Third, that "[t]he operation of the grids USBTC relies

on, including the . . . [ERCOT grid] . . . subjects USBTC to

a variety of risks, including the breakdown and failure of

equipment . . . [and] outages affecting information

technology systems" ("King Mountain Statement No. 3"). (Id.

¶ 90.)

Regarding the internet-related issues, according to CW

1, there were often "dips" in the network service and several

outages and network failures during his time with the Company,

which were reported in daily outage reports. (See id. ¶¶ 97-

98.) CW 1 claims that senior management directed data analysts

to conceal the outages' true cause by characterizing the

miners as overheated and not offline. Hence, at least half of

internet outages were falsely classified as overheating

incidents. (See id. ¶ 99.) Accordingly, Lead Plaintiff

alleges that the following statement in Hut 8's Registration

Statement was materially misleading, insofar as it did not

disclose the above known internet problems: "USBTC may face

risks of Internet disruptions, which could have an adverse

effect on the price of Bitcoin" ("King Mountain Statement
No. 4"). (Id. ¶ 92.)

Also, Lead Plaintiff claims the Short Seller Report
corroborated CW 1's allegations with the following
information. First, King Mountain JV's largest customer filed
a proof of claim on November 23, 2022, against the entity
from whom USBTC acquired its fifty percent interest in the
site, alleging that the former co-owner failed to energize
thousands of miners and provide an "adequate high-speed
network." (Id. ¶¶ 117-18.) Second, that customer stated in
its 2023 Annual Report that it experienced significant
production downtime because of "delays in energization at
King Mountain." (Id. ¶ 119.) Second, the Short Seller Report
alleges that the King Mountain JV uses a "Starlink satellite
network" for internet access, which is "unheard of in the
Bitcoin mining industry" because Starlink is an unreliable
choice for mining at scale. (Id. ¶ 120.)

Additionally, Lead Plaintiff contends that King Mountain
Statement No. 4 failed to disclose required information under
Item 105 of Regulation S-K ("Item 105"), which requires that
under the "Risk Factors" section, the registrant include "a
discussion of the material factors that make an investment in
the registrant or offering speculative or risky" and
"adequately describe[] the risk." 17 C.R.F. § 229.105(a).

Thus, King Mountain Statement No. 4's warning that "USBTC may face risks of Internet disruptions" was inadequate, insofar as the disclosure suggested internet disruptions were a potential risk, rather than a risk that had already materialized. (CAC ¶¶ 108-09.)

## II. <u>PROCEDURAL HISTORY</u>

On February 7, 2024 – approximately three weeks after the Short Seller Report was published – plaintiff Ryan Mayiras initiated this class action against Hut 8, Leverton, and Visram. (<u>See</u> "Mayiras Complaint", Dkt. No. 1.) On March 4, 2024, plaintiff Mark Latino initiated a parallel class action against the same defendants. (<u>See</u> "Latino Complaint", Case No. 24 Civ. 01636, Dkt. No. 1.) On March 15, 2024, this Court consolidated the two actions pursuant to Rule 42 because the Complaints described the same or substantially similar underlying events arising out of the same or substantially similar operative facts and asserted the same or substantially similar claims against the same defendants. (<u>See</u> "Consolidation Order", Dkt. No. 9.)

On April 19, 2024, the Court appointed Maheshwari as Lead Plaintiff pursuant to Section 21D(a)(3)(B)(iii) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), finding that Maheshwari had the largest financial interest in the outcome

of the action and satisfied the requirements of Rule 23. (<u>See</u> "Lead Plaintiff Order", Dkt. No. 34.)

On June 14, 2024, Lead Plaintiff filed the CAC, naming Hut 8, Ho, Genoot, Leverton, and Visram as Defendants. (<u>See</u> CAC.) Lead Plaintiff alleged violation of Section 11 of the Securities Act ("Section 11"), 15 U.S.C. § 77k, as to Hut 8, Ho, Genoot, and Leverton ("Count I"); violation of Section 15 of the Securities Act ("Section 15"), 15 U.S.C. § 77o, as to the Individual Defendants ("Count II"); violation of Section 10(b) of the Exchange Act ("Section 10(b)"), 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R § 240.10b-5, as to all Defendants ("Count III"); and violation of Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t, as to the Individual Defendants ("Count IV"). (<u>See</u> CAC ¶¶ 154-90.)

After completion of the pre-motion letter exchange outlined in this Court's Individual Practice II.B, Defendants filed their Motion to Dismiss on December 2, 2024 (<u>see</u> MTD), supported by a memorandum of law ("Memorandum" or "Mem.", Dkt. No. 53) and a declaration of Mary Beth Maloney ("Maloney Declaration" or "Maloney Decl.", Dkt. No. 54). On January 16, 2025, Plaintiffs filed a memorandum of law in opposition to the Motion to Dismiss ("Opposition" or "Opp'n.", Dkt.

No. 55). On February 18, 2025, Defendants filed a reply memorandum of law ("Reply", Dkt. No. 56).

### III. <u>LEGAL STANDARDS</u>

A.    <u>RULE 12(b)(6)</u>

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal conduct" — there is not "a probability requirement at the pleading stage." <u>Lynch v. City of New York</u>, 952 F.3d 67, 75 (2d Cir. 2020) (quoting <u>Twombly</u>, 550 U.S. at 556(quotations omitted)); <u>see</u> <u>Iqbal</u>, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" <u>Liboy v. Russ</u>, No. 22 Civ. 10334, 2023 WL 6386889, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting <u>Twombly</u>, 550 U.S. at 555). In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally,

accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation marks omitted).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents on which the plaintiffs relied in bringing suit and that are either in the plaintiffs' possession or about which the plaintiffs knew, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). When adjudicating a motion to dismiss a securities action based on alleged misrepresentations, the Court may also take judicial notice of the contents of "public disclosure documents required to be filed with the SEC," as well "related documents that bear on the adequacy of the disclosure." Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

   B.   SECURITIES ACT

Section 11 of the Securities Act ("Section 11") "impose[s] liability on certain participants in a registered securities offering" when the registration statements "contain material misstatements or omissions." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010); see 15 U.S.C. § 77k. To state a claim under Section

11, the plaintiff must allege that: (1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." In re Morgan Stanley, 592 F.3d at 359-60 (quoting 15 U.S.C. § 77k(a) (internal quotation marks omitted)).

Section 15 of the Securities Act ("Section 15") creates liability for individuals or entities that "control[] any person liable" under Sections 11 or 12 of the Securities Act. 15 U.S.C. § 77o(a). To state a claim under Section 15, the plaintiff must allege (1) "a primary violation by a controlled person" and (2) "control by the defendant of the primary violator." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007). If the plaintiff has not adequately alleged a primary violation – i.e. a viable claim under another provision of the Securities Act – the Section 15 claim must be dismissed. (See id.)

C.    EXCHANGE ACT

Section 10(b) of the Exchange Act ("Section 10(b)") provides that "in connection with the purchase or sale of any

security," it is unlawful to use "any manipulative or deceptive device or contrivance in contravention of" SEC rules and regulations. 15 U.S.C. § 78j(b). Rule 10b-5, in turn, prohibits making "any untrue statement of a material fact" or omitting "a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). To state a private securities-fraud claim under Section 10(b) and Rule 10b-5, the plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." In Re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417 (2d Cir. 2023) (quoting Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S. 148, 157 (2008) (internal quotation marks omitted)).

Section 20(a) of the Exchange Act imposes liability on any "person who . . . controls any person liable" under Section 10(b). 15 U.S.C. § 78t(a). To state a claim under Section 20(a), the plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud." <u>Carpenters Pension Tr. Fund of</u> <u>St. Louis v. Barclays PLC</u>, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). As with Section 15 claims under the Securities Act, if the plaintiff has not adequately alleged a primary violation under another provision of the Exchange Act, the Section 20(a) claim must be dismissed. <u>See</u> <u>id.</u>

Further, Exchange Act plaintiffs must satisfy the heightened pleading requirements of Rule 9(b) by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "In short, a plaintiff must set forth the who, what, when, where and how of the alleged fraud." <u>Telenor E. Inv. AS v. Altimo Holdings & Invs. Ltd.</u>, 567 F. Supp. 2d 432, 441–42 (S.D.N.Y. 2008) (internal quotation marks omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." <u>ATSI</u> <u>Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007).

The PSLRA additionally imposes heightened pleading standards for plaintiffs alleging securities fraud under the Exchange Act, instructing that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information

and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004). Further, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (*i.e.* scienter). 15 U.S.C. § 78u-4(b)(2)(A); see also ATSI Commc'ns, 493 F.3d at 99. A court shall grant a motion to dismiss a Section 10(b) claim if these requirements are not met.

## IV.  DISCUSSION

Lead Plaintiff brings Counts I and II under Sections 11 and 15 of the Securities Act, respectively (the "Securities Act Claims"), and Counts III and IV under Section 10(b) and 20(a) of the Exchange Act, respectively (the "Exchange Act Claims"). (See CAC ¶¶ 154-90.) The CAC brings the Securities Act Claims as to Financial Statements Nos. 1-2 and 4, and King Mountain Statements Nos. 1-4, as all are contained in the Registration Statement.[8] (See CAC ¶¶ 156, 170.) See 15

---

[8] Financial Statement No. 3, contained in the December 2023 10-K, is the only alleged misstatement not contained in the Registration Statement and thus is inactionable under Sections 11 or 15 of the Securities Act. See 15 U.S.C. § 77k.

U.S.C. §§ 77b(a)(8), 77f. The CAC brings the Exchange Act
Claims as to Financial Statements Nos. 1-4 and King Mountain
Statements Nos. 1-4. (See CAC ¶¶ 178, 188.)

Defendants argue that (1) Lead Plaintiff does not have
statutory standing to bring a claim under Section 10(b) of
the Exchange Act; (2) Lead Plaintiff's Securities Act Claims
are subject to Rule 9(b)'s heightened pleading standard
because those claims sound in fraud; and (3) Lead Plaintiff
has failed to state a claim under the Securities Act or the
Exchange Act because none of the challenged Statements are
materially false or misleading. (See Mem. at 9, 29.)

The Court addresses Section 10(b) standing first. Then,
the Court turns to whether Rule 8(a)'s "short plain statement"
standard or Rule 9(b)'s "particularity" standard applies to
the Securities Act Claims. Next, the Court evaluates whether
Lead Plaintiff alleged any material untrue statements or
omissions before analyzing the remaining elements of the
claims.

A.    STANDING UNDER SECTION 10(b)

To sue under Section 10(b) of the Exchange Act,
plaintiffs must have "at least dealt in the security to which
the prospectus, representation, or omission relates." Blue
Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 747 (1975);
see also Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463

(2d Cir. 1952). "Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities about which a misstatement was made." Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 54 F.4th 82, 84 (2d Cir. 2022). "Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp., 369 F.3d 27, 34 (2d Cir. 2004). "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold the securities about which the misstatements were made." Frutarom, 54 F.4th at 88.

Defendants contend that Lead Plaintiff does not have statutory standing to challenge Financial Statements Nos. 1-2 and 4 and King Mountain Statements Nos. 1-4 under Section 10(b) and Rule 10b-5 because (1) those Statements were made before the Merger when Hut 8 shares were not yet available, (2) those Statements are about USBTC, and (3) Lead Plaintiff bought shares in Hut 8, not USBTC.[9] (See Mem. at 29-30; CAC

---

[9] Defendants do not dispute that Lead Plaintiff has Section 10(b) standing to challenge Financial Statement No. 3 because it was made in the December 19, 2023, 10-Q – after the November 30, 2023, Merger and the same day

¶¶ 1, 16.) Hence, the Court must determine whether Lead Plaintiff "bought or sold the securities about which the misstatements were made." Frutarom, 54 F.4th at 88. For the reasons below, the Court concludes that Lead Plaintiff does not have Section 10(b) standing to challenge Financial Statements Nos. 1-2 and 4 or King Mountain Statements Nos. 2-4, but that Lead Plaintiff has Section 10(b) standing to challenge King Mountain Statement No. 1.

Defendants rely on Menora Mivtachim Insurance Ltd. v. Frutarom Industry Ltd., in which purchasers of a post-acquisition company's securities sued the target company under Section 10(b) based on pre-merger statements made by the target company about itself. See 54 F.4th at 84. The Second Circuit held that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger" because those misstatements were not "about" the company in which plaintiffs owned shares. Id. at 88. District courts applying Frutarom have likewise held that plaintiffs lacked Section

---

that Lead Plaintiff began purchasing Hut 8 stocks. (See Mem. at 30; CAC ¶¶ 59, 66; Dkt. No. 28-1 (Lead Plaintiff's Damages Analysis and Holdings); Dec. 2023 10-Q.) See, e.g., In re CarLotz, Inc. Sec. Litig., No. 21 Civ. 5906, 2024 WL 1348749, at *4-7 (S.D.N.Y. Mar. 29, 2024) (plaintiff lacked Section 10(b) standing to challenge pre-merger, but not post-merger, statements).

10(b) standing to challenge pre-merger statements about a target company made by the special purpose acquisition company ("SPAC") that took the target company public when the plaintiffs owned securities in and sued the SPAC. See In re CarLotz, 2024 WL 1348749, at *4, 6 (rejecting plaintiffs' argument that statements about the target company pertained to the post-merger entity because the statements were incorporated into the SPAC's SEC filings "in respect of the proposed merger").

Lead Plaintiff argues that because the Merger was a merger of equals, not an acquisition like the mergers in Frutarom or CarLotz, the pre-Merger misstatements about USBTC are necessarily misstatements about Hut 8. (See Opp'n. at 27-28.) Further, Lead Plaintiff acquired Hut 8 shares and is suing Hut 8 (whereas in Frutarom plaintiffs bought shares in the acquiring company and sued the target subsidiary), and Hut 8 and the Individual Defendants acting on Hut 8's behalf published the misstatements (whereas in Frutarom the target company made the alleged misstatements about itself). (See id. at 27-29.) Because the CarLotz plaintiffs owned shares in and sued the entity that made the alleged misstatements (the SPAC), Lead Plaintiff argues that CarLotz's holding goes beyond Frutarom's ruling by suggesting that "who made the

statement is inconsequential to the standing analysis." (Id. at 29.)

The parties have not cited any cases, and the Court is not aware of any, where a court applied Frutarom's reasoning to an action where plaintiffs purchased shares in a post-merger-of-equals entity and challenged pre-merger statements about a pre-merger entity. Moreover, Lead Plaintiff has not cited any cases, and the Court is not aware of any, where a court considered who made the alleged misstatement within Frutarom's framework. Indeed, Frutarom reiterated the Supreme Court's warning against "an 'endless case-by-case erosion' of the purchaser-seller rule by creating exceptions" and undertaking a "'shifting and highly fact-oriented' inquiry." 54 F.4th at 86-87 (quoting Blue Chip Stamps, 421 U.S. at 755). Accordingly, the Court rejects Lead Plaintiff's argument that the Court should consider that the Registration Statement containing the Statements was published by Hut 8 and the Individual Defendants acting on Hut 8's behalf. (See Opp'n. at 28.)

At least one court applying Frutarom has held that purchasers of a post-acquisition company's securities had standing to challenge pre-merger statements when it was "plausible that some of the pre-merger statements concerned [the] post-merger [company]." Point12 Diversified Fund, LP

25

v. TMC The Metals Co., No. 21 Civ. 5991, 2025 WL 1920340, at
*11 (E.D.N.Y. July 11, 2025). In so holding, the Point12 court
relied upon allegations that the challenged press release was
a joint statement in which defendants "described the
valuation of the 'combined company;'" stated that the "merger
'transaction'" included $330 million in funding; and stated
that the post-merger company was "the ultimate answer to [the
SPAC's] thorough search for meaningful ESG impacts combined
with tremendous financial upside." Id. The court, conversely,
found that plaintiffs lacked Section 10(b) statutory standing
to challenge pre-merger statements that "plainly concerned"
the target company, which "were about the assets and
expenditures of [the] pre-merger [target company]" and "never
mentioned" the post-merger company." Id. The court held that
it was irrelevant for the standing analysis that the SPAC
made those statements in its SEC filing, since "[w]hat matters
is that the alleged misstatements were *about* [the target
company]." Id. (emphasis in original).

Here, the Court finds that Financial Statements Nos. 1-
2 and 4 and King Mountain Statements Nos. 2-4 were about
USBTC, not Hut 8, but that King Mountain Statement No. 1
plausibly concerned Hut 8. See id.

Financial Statements Nos. 1-2 are within the section on
USBTC's Consolidated Financial Statements and pertain solely

to USBTC's past financial performance and USBTC's "belie[f]"
that it would have enough funding to meet operating and
capital requirements for at least twelve months. (See Initial
Registration Statement at F-7; 1st Amend. at F-7; 2d Amend.
at F-12; 3d Amend. at F-12; 4th Amend. at F-8; 5th Amend. at
F-8; 6th Amend. at F-8; 7th Amend. at F-8; Prospectus at F-
8.) Similarly, Financial Statement No. 4 is within the
section on "Management's Discussion and Analysis of Financial
Condition and Results of Operations of USBTC" and concerns
only USBTC's past financial performance and its
"anticipat[ion]" that it would not continue to incur net
losses for the foreseeable future. (Initial Registration
Statement at 158; 1st Amend. at 172; 2d Amend. at 183; 3d
Amend. at 184; 4th Amend. at 182; 5th Amend. at 183; 6th
Amend. at 185; 7th Amend. at 185; Prospectus at 185.)

Likewise, King Mountain Statements Nos. 2-4 concern only
USBTC and not post-merger Hut 8. King Mountain Statement No. 2
appears in the "Information About USBTC" section and touts
King Mountain's Echo facility's ability to "draw up to 100%
of the energy" that the neighboring wind farm generates. (See
Initial Registration Statement at 132; 1st Amend. at 141; 2d
Amend. at 151; 3d Amend. at 153; 4th Amend. at 153; 5th Amend.
at 154; 6th Amend. at 155; 7th Amend. at 155; Prospectus at
155.) King Mountain Statements Nos. 3-4 appear in the "Risks

Relating to USBTC's Business" section. King Mountain Statement No. 3 discloses risk factors related to the electrical grids on which USBTC relies, and King Mountain Statement No. 4 discloses the risk of internet disruptions at USBTC. (See Initial Registration Statement at 46, 58; 1st Amend. at 47, 61; 2d Amend. at 49, 63; 3d Amend. at 49, 63; 4th Amend. at 48, 62; 5th Amend. at 49, 63; 6th Amend. at 49, 64; 7th Amend. at 49, 64; Prospectus at 49, 64.) Therefore, Lead Plaintiff does not have Section 10(b) statutory standing to challenge Financial Statements Nos. 1-2 and 4 or King Mountain Statements Nos. 2-4, as those pre-Merger Statements are about USBTC.

King Mountain Statement No. 1, however, is within the section on "Questions and Answers About the Business Combination," and specifically answers the question "[w]hy are the two companies proposing the Business Combination" under the header "[i]mproving [Hut 8's] energy expertise and hedging capabilities." That Statement discusses the attributes USBTC "will bring . . . to [Hut 8], which will enhance [Hut 8's] ability to better plan around stable and predictable energy usage and mitigate fluctuating prices across markets." (Registration Statement at 1-2.) Therefore, the Court finds that Lead Plaintiff "bought . . . the

securities about which [King Mountain Statement No. 1] [was] made." <u>Frutarom</u>, 54 F.4th at 88.

In sum, Lead Plaintiff has Section 10(b) statutory standing to challenge King Mountain Statement No. 1 because it was about Hut 8. Further, Lead Plaintiff has Section 10(b) statutory standing to challenge Financial Statement No. 3 because it was made after the Merger. Lead Plaintiff, however, does not have Section 10(b) statutory standing to challenge the other Statements because they were about USBTC and made before the Merger. Accordingly, the Court **GRANTS** the Motion to Dismiss Count III as it pertains to Financial Statements Nos. 1-2 and 4 and King Mountain Statements Nos. 2-4. Because Lead Plaintiff does not have standing to allege a primary violation under Section 10(b), the Court also **GRANTS** the Motion to Dismiss Count IV as it pertains to Financial Statements Nos. 1-2 and 4 and King Mountain Statements Nos. 2-4.

B.  <u>APPLICABILITY OF RULE 9(b) TO SECURITIES ACT CLAIMS</u>

Unlike Exchange Act Section 10(b) claims, Securities Act Section 11 claims need not allege scienter, and thus need not sound in fraud. <u>See</u> <u>In re Morgan Stanley</u>, 592 F.3d at 359 ("Issuers are subject to 'virtually absolute' liability under [S]ection 11, while the remaining potential defendants under

[S]ections 11 and 12(a)(2) [*e.g.*, underwriters and statutory sellers] may be held liable for mere negligence."). This rule obtains because Section 10(b) imposes liability, through Rule 10b-5, for *making* a material untrue statement or omission, whereas Section 11 imposes liability when registration statements *contain* a material untrue statement or omission. Compare 17 C.F.R. § 240.10b-5(b), with 15 U.S.C. § 77k.

Lead Plaintiff asserts that the Securities Act Claims are based on negligence and strict liability, such that the heightened pleading standard for fraud under Rule 9(b) does not apply. (See CAC ¶¶ 154, 168; Opp'n. at 6.) See Pappas v. Qutoutiao Inc., No. 23 Civ. 1233, 2024 WL 4588491, at *1 (2d Cir. Oct. 28, 2024) ("[T]he Rule 8 notice pleading standard applies where the plaintiff alleges negligent preparation of the registration statement and prospectus, rather than fraudulent preparation, . . . or where the complaint explicitly does not allege fraud." (internal quotation marks omitted)). Defendants state, without further explanation, that the Securities Act Claims must comply with Rule 9(b) because all Lead Plaintiff's claims sound in fraud. (See Mem. at 9.)

A Securities Act plaintiff "cannot avoid the strictures of Rule 9(b) by the mere expedient of disclaiming that its claims sound in fraud." Pappas, 2024 WL 4588491, at *2. Hence,

a Section 11 claim is subject to Rule 9(b) despite assertions
that it sounds in negligence or strict liability when "the
gravamen of the complaint is plainly fraud and no effort is
made to show any other basis for the claims." Rombach, 355
F.3d at 172 (quoting In re Stac Elecs. Sec. Litig., 89 F.3d
1399, 1405 n.2 (9th Cir. 1996) (quotation marks omitted))
(Section 11 claim sounded in fraud because "the wording and
imputations of the complaint are classically associated with
fraud"). Conversely, plaintiffs "may retain the application
of the Rule 8 notice pleading standard by expressly pleading
negligence, disclaiming fraud, eschewing language in its
Section 11 . . . claim[] implying fraud or the elements
thereof, and separating allegations supporting fraud claims
from allegations supporting negligence claims." Pappas, 2024
WL 4588491, at *2 (when allegations "would be evaluated under
Rule 8 if contained in a stand-alone complaint alleging
violations only of the Securities Act," they "will not be
held to a higher standard because Plaintiff also exercised
his right to sue Defendants for securities fraud under the
Exchange Act").

Here, the Court finds that the Lead Plaintiff's
Securities Act Claims do not sound in fraud. Counts I and II
"are framed in the classic language of negligence and strict
liability." Id. Lead Plaintiff alleges that Ho, Leverton, and

Genoot "had a duty to make a reasonable investigation" to ensure that the statements in the Registration Statement were truthful and did not omit material facts to make the statements "not false or misleading," and that those Defendants failed their duty. (CAC ¶ 163.) Further, the CAC "expressly disclaims fraud, scienter, and the intent of Defendants to defraud investors and painstakingly segregates the fraud and negligence claims." Pappas, 2024 WL 4588491, at *2 (Securities Act claims sounded in negligence where each "claim is set forth under its own heading and incorporates only certain factual allegations such that . . . the Securities Act claims expressly do not incorporate the allegations supposedly supporting a finding of scienter and reliance"); see also In re iQIYI, Inc. Sec. Litig., No. 20 Civ. 01830, 2024 WL 4362509, at *22 (E.D.N.Y. Sept. 30, 2024) ("Although the Exchange Act claims and Securities Act claims share common factual allegations, the allegations contained in the Securities Act section of the [complaint] provide an alternative basis of liability – namely, negligence . . . ."). Accordingly, the Court will analyze Counts I and II under Rule 8's pleading standard. See Pappas, 2024 WL 4588491, at *1 ("Nothing in Rule 9 or in this Court's prior decision in Rombach forecloses pleading Section 10(b) fraud and Section 11 negligence as alternatives with the

former claim to be governed by Rule 9(b) and the latter by
Rule 8.").

### C. MATERIAL MISREPRESENTATION OR OMISSION

A plaintiff must allege a material untrue statement or
omission to state a claim under Securities Act Section 11 and
Exchange Act Section 10(b). See City of Westland Police &
Fire Ret. Sys. v. MetLife, Inc., 129 F. Supp. 3d 48, 88
(S.D.N.Y. 2015) (alleged misstatements "fail under Section 11
for the same principal reason that they fail under Section
10(b) — [plaintiff] has not alleged adequately that
[defendant] made a material misrepresentation or omission").

Here, the Section 11 claim challenges Financial
Statements Nos. 1-2 and 4 and King Mountain Statements
Nos. 1-4. Although not subject to Rule 9(b)'s heightened
pleading standard, "the complaint must still allege a false
or misleading statement or omission in more than conclusory
terms." Harris v. AmTrust Fin. Servs., Inc., 135 F. Supp. 3d
155, 170 (S.D.N.Y. 2015), aff'd, 649 F. App'x 7 (2d Cir.
2016); see also Omnicare, Inc. v. Laborers Dist. Council
Const. Indus. Pension Fund, 575 U.S. 175, 194 (2015) (to state
a Section 11 claim, the complaint "must identify particular
(and material) facts going to the basis for the issuer's
opinion . . . whose omission makes the opinion statement at
issue misleading to a reasonable person reading the statement

fairly and in context"). Lead Plaintiff has Section 10(b) standing to challenge King Mountain Statement No. 1 and Financial Statement No. 3. In accordance with Rule 9(b) and the PSLRA, the CAC "must specify the false or misleading statement about which it complains and must allege the reason or reasons why the statement is false or misleading." Harris, 135 F. Supp. 3d at 170.

The Court first outlines the legal principles it will use to analyze whether the CAC pleaded a material misstatement or omission under Section 11 or Section 10(b). See In re Scot. Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007) ("For the same reasons the Complaint adequately pleads falsity under 10(b) and 10b-5, the Complaint adequately alleges material misstatements under [S]ection 11 and [S]ection 12(a)(2).").

         1.   <u>Legal Standards</u>

         a)   <u>Falsity</u>

To allege a misstatement, the plaintiff "must allege adequately that the statement is untrue." City of Westland Police, 129 F. Supp. 3d at 67 (internal quotation marks omitted). To allege an omission, the plaintiff must allege that the omitted fact was material and necessary to render another statement not misleading or that the defendant had a duty to disclose. See Basic Inc. v. Levinson, 485 U.S. 224,

239 n.17 (1988). To be actionably misleading, there must be a "sufficiently close nexus" between the statement and the allegedly omitted material information. _In re Omega Healthcare Invs., Inc. Sec. Litig._, 563 F. Supp. 3d 259, 272 (S.D.N.Y. 2021). Further, a defendant cannot be liable when the "allegedly undisclosed material information is in fact readily accessible in the public domain." _In re KeySpan Corp. Sec. Litig._, 383 F.Supp.2d 358, 377 (E.D.N.Y.2003). Finally, an actionable misstatement is one that "was false _at the time it was made_." _In re Lululemon Sec. Litig._, 14 F.Supp.3d 553, 571 (S.D.N.Y.2014) (emphasis in original).

        b)    <u>Materiality</u>

A misstatement or omission is material if "there is a substantial likelihood that a reasonable person would consider [the stated or omitted facts] important in deciding whether to buy or sell shares of stock." <u>Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC</u>, 595 F.3d 86, 92-93 (2d Cir. 2010) (internal quotation marks omitted); <u>see also</u> <u>In re Morgan Stanley</u>, 592 F.3d at 360 ("The definition of materiality is the same for [Section 11] as it is under [S]ection 10(b) . . . ."). Hence, materiality is a mixed question of law and fact, such that a complaint may not be dismissed on a Rule 12(b)(6) motion based on immateriality unless the challenged statements "are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." City of Westland Police, 129 F. Supp. 3d at 66-67.

####        c)    Statements Categorically Not False or Material

"Certain types of statements are categorically incapable of being 'false' or 'misleading'" because "no reasonable investor would rely on them." Hawes v. Argo Blockchain plc, No. 23 Civ. 7305, 2024 WL 4451967, at *3 (S.D.N.Y. Oct. 9, 2024).

First, forward-looking statements accompanied by risk-disclosing language are generally not misleading or material. The PSLRA creates a "safe harbor" for forward-looking statements for Exchange Act and Securities Act claims. See 15 U.S.C. § 77z-2(c) (Securities Act); id. § 78u-5(c) (Exchange Act). As relevant here, both rules provide that a forward-looking statement is inactionable when it is identified as forward-looking and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 77z-2(c)(1); id. § 78u-5(c)(1); see also Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010). Generally, a statement is identified as forward-looking through the "use of linguistic cues like 'we expect' or 'we believe,' when combined with an

explanatory description of the company's intention to thereby designate a statement as forward-looking." Id. at 769 (internal quotation marks omitted). Moreover, meaningful cautionary language is "not boilerplate" and "convey[s] substantive information." Id. at 722. Similarly, courts have adopted a "bespeaks caution" doctrine, pursuant to which "alleged misrepresentations in a stock offering are immaterial as a matter of law" if no "reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach, 355 F.3d at 173 (internal quotation marks omitted).

Second, "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'" because they are "too general to cause a reasonable investor to rely upon them." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks omitted); see also Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976, 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008) ("[E]xpressions of corporate optimism couched in subjective terms of belief, expectation, and intention . . . . signals to prospective investors that the predictions of the Company may not come to fruition.").

Third, there are narrower circumstances in which a statement of opinion, rather than fact, is actionable under the securities laws. See City of Westland Police, 129 F. Supp. 3d at 68-69. Opinions often include "qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed [and] marks the statement as reflecting the speaker's impression or point of view." New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 40-41 (2d Cir. 2023); see also Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1329 (11th Cir. 2019) (recognizing "a fair amount of overlap" in "discussions of . . . opinions, and forward-looking statements," with both "lead[ing] to the same bottom-line question: Did [defendant] make . . . a false representation that a reasonable investor would have relied on in light of the total mix of information available?"). A "sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong." Omnicare, 575 U.S. at 186.

There are three circumstances, however, where a statement of opinion may be actionable: (1) "the speaker did not hold the belief she professed," (2) the opinion contained untrue "embedded statements of fact," or (3) the opinion omits

38

facts "mak[ing] [the] statement of opinion . . . misleading to an ordinary investor." Id. at 185-87; see also Tongue v. Sanofi, 816 F.3d 199, 214 (2d Cir. 2016) (applying Omnicare to Exchange Act claims). Opinions omitting facts can mislead because, in the context of SEC filings, reasonable investors "properly may assume that expressions of opinion contained therein convey facts about how the speaker has formed the opinion." City of Westland Police, 129 F. Supp. 3d at 70 (internal quotations omitted).

To plead that an opinion is untrue, the plaintiff must "plead facts that, if true, would be sufficient to show that the speaker did not 'actually hold[] the stated belief.'" City of Westland Police, 129 F. Supp. 3d at 69 (quoting Omnicare 575 U.S. at 184)). To plead that an opinion contains an embedded untrue statement of fact, the plaintiff must show that "the embedded fact is not one as to which reasonable minds can differ." New England Carpenters, 122 F.4th at 42 (2d Cir. 2023). To plead that an opinion is misleading because of an omission, the plaintiff must "call into question the issuer's basis for offering the opinion." City of Westland Police, 129 F. Supp. 3d at 70 (internal quotation marks omitted). When a plaintiff challenges omissions in opinion statements in SEC filings, the plaintiff must also allege that omitted "facts conflict with what a reasonable investor

would take from the statement." Id. at 72 (internal quotation marks omitted).

### 2.   Financial Statements

The CAC alleges that the Financial Statements were materially false or misleading because they misled investors that USBTC was financially sound enough to sustain operations for twelve months and that its cash flows were improving. (See CAC ¶ 69.) The Court finds that the CAC failed to plead that the Financial Statements were material misstatements or omissions because the only evidence of falsity the CAC alleges are disclosures and projections in the SEC filings containing the Financial Statements and a statement made at a Hut 8 Retreat held several weeks after the most recent Financial Statement, which are insufficient under Rule 8 or Rule 9(b)'s pleading standard. (See CAC ¶¶ 70, 75, 81.) Regardless, the Financial Statements are inactionable because they are forward-looking statements accompanied by significant cautionary language and statements of opinion. Finally, the CAC fails to plead an Item 303 violation because it does not identify any financial information that was not disclosed.

Accordingly, on the basis of the following discussion, the Court **GRANTS** the Motion to Dismiss Counts I and II (the Securities Act Claims) as to Financial Statements Nos. 1-2

and 4 and Counts III and IV (the Exchange Act Claims) as to
Financial Statement No. 3.

a)    <u>Falsity</u>

First, the CAC asserts that the Financial Statements
were misleading considering USBTC's disclosed historic
financial statements and overly optimistic financial
projections. (<u>See</u> CAC ¶¶ 70-79.) Regarding USBTC's ability to
sustain operations for another twelve months, Lead Plaintiff
contends that USBTC's current assets to current liabilities
ratio and negative operating cash flows contained in the
Prospectus show that USBTC could not have continued
operations for a year. (<u>See</u> <u>id.</u> ¶¶ 71-74.) But in reaching
this conclusion, the CAC relies on disclosed financial
information, which the CAC does not allege was false. (<u>See</u>
Prospectus at 185, 224.) <u>See</u> <u>In re Hardinge, Inc. Sec. Litig.</u>,
696 F. Supp. 2d 309, 323 (W.D.N.Y. 2010) (no falsity when
plaintiffs did not allege "that any of the [embedded]
financial information reported was incorrect"). "[A]
violation of federal securities law cannot be premised upon
a company's disclosure of accurate historical data." <u>Boca</u>
<u>Raton Firefighters & Police Pension Fund v. Bahash</u>, 506 F.
App'x 32, 39 (2d Cir. 2012) (quoting <u>In re Sofamor Danek</u>
<u>Group, Inc.</u>, 123 F.3d 394, 401 n. 3 (6th Cir. 1997) (internal
quotations marks omitted)). To the extent the CAC alleges

41

that the Financial Statements omitted these financial disclosures, Defendants cannot be liable for omitting disclosed information. See In re KeySpan Corp., 383 F.Supp.2d at 377; In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), aff'd, 566 F. App'x 93 (2d Cir. 2014) ("Reasonable investors thus had ready access to the very information that the plaintiffs assert should have been disclosed.").

The Court is not persuaded by Lead Plaintiff's argument that, despite USBTC's financial disclosures, the Financial Statements were misleading because expert analysis would be required for the average investor to understand USBTC's financial condition. (See Opp'n. at 7-8.) In the cases Lead Plaintiff cites, defendants' disclosures did not include readily ascertainable information undercutting the alleged misstatements. See Sec. & Exch. Comm'n v. Medallion Fin. Corp., No. 21 Civ. 11125, 2024 WL 4227753, at *10 (S.D.N.Y. Sept. 18, 2024) (routine financial disclosures in SEC filings did not render the allegedly fraudulent valuation of subsidiary immaterial because those disclosures did not include the company's "third-party solicitations, cherry-picking of a valuation specialist, or disputes with its auditor"); In re Chi. Bridge & Iron Co. N.V. Sec. Litig., No. 17 Civ. 1580, 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020)

42

(despite analyzing public information, stock-analyst report was a corrective disclosure because the report discussed questionable accounting practices that were not disclosed).

Moreover, the CAC alleges that USBTC's projected free cash flow and projected EBITDA and EBITDA Margin for calendar year 2023 were overly optimistic considering USBTC's negative operating cash flow experienced in Fiscal 2023 and actual EBITDA and EBITDA Margin it achieved in Fiscal 2023. Hence, Lead Plaintiff contends, those over-optimistic projections further support falsity of the Financial Statements. (See CAC ¶¶ 76-79; 7th Amend. at 103; Prospectus at 103.) But immediately following the EBITDA, EBITDA Margin, and free cash flow projections, the Seventh Amendment and Prospectus disclose "material assumptions" Defendants relied upon "in arriving at USBTC's projected financial information." (7th Amend. at 103-04; Prospectus at 103.) Further, in that section, the Seventh Amendment and Prospectus cautioned that while "USBTC believe[d]" the material assumptions "were reasonable at the time the projected financial information was prepared," those assumptions "may not reflect actual future conditions," such that the projections should not "be relied upon as a current forecast of the near-term results that USBTC may achieve." (7th Amend. at 104; Prospectus at 104.) Defendants cannot be liable "on the basis of statements

that clearly 'bespeak caution.'" See <u>Luce v. Edelstein</u>, 802 F.2d 49, 56 (2d Cir. 1986) (affirming dismissal of Section 10(b) claim when challenged SEC filing "made it quite clear that its projections of potential cash and tax benefits were 'necessarily speculative in nature' and that '[n]o assurance [could] be given that these projections [would] be realized'"); <u>In re NovaGold Res. Inc. Sec. Litig.</u>, 629 F. Supp. 2d 272, 293, 295 (S.D.N.Y. 2009) (dismissing Section 11 claim when challenged "cost figure and economic viability prediction" were accompanied by a list of "the Project's expected costs based on a 'base case' of assumptions about metals prices, as well as 'estimates of annual production and cash costs'").

Second, the CAC contends that the Financial Statements were misleading because Leverton allegedly stated during a Hut 8 retreat held in mid-January 2024 that "the Merger saved USBTC from bankruptcy," revealing USBTC's true financial condition. (CAC ¶ 81.) But this assertion – made several weeks after the December 19, 2023, 10-Q, the latest SEC filing containing a Financial Statement – does not support that the Financial Statements were false at the time they were made. See <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.</u>, 75 F.3d 801, 812 (2d Cir. 1996) (failure to plead contemporaneous falsity in Section 10(b)

claim when alleged misstatement that retail sales were declining at a rate of 2.5 percent was followed by an announcement three weeks later that sales were declining at a rate of 8.3 percent); In re CIT Grp., Inc. Sec. Litig., 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (failure to plead contemporaneous falsity in Section 11 claim when defendants increased loan loss reserves three weeks after completing an initial public offering).

                    b)    Forward-Looking Statements

Regardless, each Financial Statement comprises an inactionable forward-looking statement accompanied by cautionary language.

First, all Financial Statements are forward-looking statements of financial performance and identified as such. See 15 U.S.C. § 77z-2(i)(1)(C); id. § 78u-5(i)(1)(C); Slayton, 604 F.3d at 766-67. Each SEC filing containing a Financial Statement included a disclaimer that "[f]orward-looking statements generally are identified by the words . . . 'anticipate' . . . [and] 'believe.'" (Initial Registration Statement at 25, 1st Amend. at 23; 2d Amend. at 24; 3d Amend. at 24; 4th Amend. at 23; 5th Amend. at 23; 6th Amend. at 23; 7th Amend. at 23; Prospectus at 23; Dec. 2023 10-Q at 3.) Financial Statements Nos. 1-3 state that USBTC "believes" that current cash on hand, subsequent debt and

equity financings, and/or proceeds from the sales of cryptocurrency and ongoing operations "will be sufficient" to meet operating and capital requirements for the next twelve months. Financial Statement No. 4 states that USBTC "does not anticipate it will continue to incur net losses for the foreseeable future." See, e.g., In re SunEdison, Inc. Sec. Litig., 300 F. Supp. 3d 444, 464 (S.D.N.Y. 2018) (statement that "[w]e believe our liquidity will be sufficient to support our operations for the next twelve months" was forward-looking).

Lead Plaintiff contends that the Financial Statements are not forward-looking because they misrepresent present facts. (See Opp'n. at 12.) But the only embedded present fact in Financial Statements Nos. 1-3 is the amount of "current cash on hand," which was disclosed. The availability and amount of "subsequent equity and debt financings" (Fin. Statement No. 1) and the amount of "proceeds from the sale of cryptocurrency and ongoing operations" (Fin. Statements Nos. 2-3) plainly refer to future sources of funds. Further, Lead Plaintiff contends that Financial Statement No. 4 misrepresents the present fact that "USBTC's trend of incurring net losses had not improved and would have continued." (Opp'n. at 12.) But Financial Statement No. 4 acknowledges that USBTC's net losses had not improved at the

time of the Statement's publication. The Statement in full
reads: "USBTC has incurred net losses since its inception but
does not anticipate it will continue to incur net losses for
the foreseeable future." USBTC's prediction that it would not
continue to incur net losses embodies a future statement. See
In re NovaGold Res., 629 F. Supp. 2d at 292 ("Any projection
or forward-looking statement necessarily has its basis in
current conditions, but this does not change the fact that it
uses those current conditions to make some kind of prediction
about the future.").

Second, each Statement is accompanied by meaningful
cautionary statements identifying important factors that
could cause actual results to differ materially. See 15 U.S.C.
§ 77z-2(c)(1)(A)(i); id. § 78u-5(c)(1)(A)(i). In Financial
Statement No. 1, USBTC professed that it believed "its
current cash on hand and subsequent debt and equity
financings" would be sufficient to sustain operations for a
year. Regarding subsequent financings, the Initial
Registration Statement and the First, Second, and Third
Amendments warned that "there can be no assurance that
additional funding will be available to USBTC for the
development of its business, which will require the
commitment of substantial resources," and cautioned that
"potential investors should consider that USBTC may be unable

to . . . raise sufficient funds in the capital markets to
effectuate its business plan." (Initial Registration
Statement at 39; 1st Amend. at 40; 2d Amend. at 42; 3d Amend.
at 42.)

In Financial Statements Nos. 2-3, USBTC asserted that it
believed "its current cash on hand, proceeds from the sale of
cryptocurrency and ongoing operations" would be sufficient to
sustain operations for a year. Regarding the sale of
cryptocurrency and USBTC's operations, the Prospectus and the
Fourth, Fifth, Sixth, and Seventh Amendments warned that
"potential investors should consider that USBTC may be unable
to . . . successfully implement or execute its business
plan." (4th Amend. at 41; 5th Amend. at 42; 6th Amend. at 42;
7th Amend. at 42; Prospectus at 42.) Those SEC filings also
cautioned that USBTC's Bitcoin mining business could be
negatively impacted by, among other things, the availability
of and rising costs of Bitcoin miners, changes to validating
blockchain transactions that could reduce demand for USBTC's
services, and any failure in critical plants, equipment,
power supplies, or network connectivity. (4th Amend. at 42-
45; 5th Amend. at 42-45; 6th Amend. at 42-45; 7th Amend. at
42-45.) The 2023 December 10-Q contains the above warnings,
as it incorporates the Prospectus by reference. (See 2023
Dec. 10-Q at 44.)

In Financial Statement No. 4, USBTC stated that it "does not anticipate it will continue to incur net losses for the foreseeable future." Regarding the possibility that USBTC would continue to incur losses the Registration Statement warned that "USBTC is an early-stage company with limited operating history and may never become profitable" and that, "[t]o date, USBTC has incurred losses . . . and may never become profitable." (Initial Registration Statement at 38; 1st Amend. at 40; 2d Amend. at 41-42; 3d Amend. at 42; 4th Amend. at 41; 5th Amend. at 41-42; 6th Amend. at 41-42; 7th Amend. at 41-42; Prospectus at 41-42.) As discussed above, the Registration Statement also described the risks that USBTC would be unable to secure funding and that various contingencies would negatively impact its Bitcoin mining operations.

Accordingly, the Court finds that each Financial Statement is accompanied by meaningful cautionary statements that render them inactionable under the PSLRA safe harbor provision and the bespeaks caution doctrine. See In re Gilat Satellite Networks, Ltd., No. 02 Civ. 1510, 2005 WL 2277476, at *11 (E.D.N.Y. Sept. 19, 2005) ("[T]he Second Circuit has at times applied the bespeaks caution doctrine in conjunction with the PSLRA safe harbor without distinguishing between the two.").

c)    <u>Opinions</u>

The Financial Statements are also inactionable statements of opinion. First, the Financial Statements are opinions regarding USBTC's "belie[f]" that it would have sufficient funds to maintain operations for twelve months and "anticipat[ion]" that it would not continue to incur net losses for the foreseeable future. <u>See</u> <u>New England Carpenters</u>, 122 F.4th at 40-41.

Second, even viewed in the light most favorable to the Lead Plaintiff, the CAC does not adequately allege that Defendants could not have believed what they professed. Lead Plaintiff argues that Defendants could not have believed the opinions because (1) Defendants were provided USBTC's due diligence information beginning in November 2022 – several months before the first Financial Statement was published on February 13, 2023 – and (2) Leverton stated that the Merger saved USBTC from bankruptcy at a Hut 8 retreat on January 14-17, 2024 – several weeks after the last Financial Statement was published on December 19, 2023. (<u>See</u> Opp'n. at 9-10; CAC ¶¶ 80-81, 125; Prospectus at 85.) But, as explained above, those facts do not sufficiently allege that the Defendants did not believe their opinions at the time the Financial Statements were made. <u>See</u> <u>In re Lululemon</u>, 14 F.Supp.3d at 578 (statements about the company's expectation regarding

product quality were not false or misleading because the complaint failed to allege "any facts that tend to show that the company did not believe this expectation at the time"). Regarding Leverton's alleged statement made weeks after the final Financial Statement, "[i]t is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." Lopez v. CTPartners Exec. Search Inc., 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (internal quotation marks omitted).

Third, Lead Plaintiff fails to allege that the opinions contained an embedded statement of untrue fact. As explained above, the only embedded statements of present fact in the Financial Statements were USBTC's "current cash on hand" (Fin. Statements Nos. 1-3) and "USBTC has incurred net losses since its inception" (Fin. Statement No. 4.) The SEC filings containing each Statement disclosed USBTC's current cash on hand. Lead Plaintiff does not allege that those disclosures were false or that USBTC had not incurred net losses since its inception.

Fourth, Lead Plaintiff does not plead facts showing that the opinions contained omissions that "conflict with what a reasonable investor would take from the statement itself." City of Westland Police, 129 F. Supp. 3d at 72 (internal quotations omitted). Given the litany of financial and risk

disclosures described above, a reasonable investor would not have taken the Financial Statements as guarantees. See Omnicare, 575 U.S. at 190 ("[A]n investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.").

> d)    Item 303

The CAC alleges that Financial Statement No. 4 violated Item 303 of SEC Regulation S-K, as that Statement misleadingly suggested that USBTC's trend of incurring net losses would not continue, the disclosed historical financial statements supported that USBTC would continue to incur net losses, USBTC was in imminent danger of bankruptcy, and these "undisclosed facts were known trends" likely to have an adverse impact on Hut 8's revenues and income from operations. (CAC ¶ 106.)

A defendant can be liable under Section 11 for Item 303 violations. See Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012). Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Therefore, a defendant may be liable under Item 303 if it failed to disclose a trend that "is both

[1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011) (quoting SEC Release No. 6835, 54 Fed. Reg. 22427, 22429 (May 18, 1989), 1989 WL 1092885, at *4 (internal quotation marks omitted)).

Further, Item 303 subsection (a) provides that the "discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a). In other words, Item 303's "essential obligation" is explaining "[i]f there has been an important change in [the] company's business or environment that significantly or materially decreases the predictive value of [the] reported results." Lowinger v. Pzena Inv. Mgmt., Inc., 341 F. App'x 717, 720 (2d Cir. 2009) (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1192 (11th Cir. 2002) (internal quotation marks omitted)).

Moreover, "[k]nowledge of a trend is an essential element triggering disclosure under Item 303." In re Noah Educ. Holdings, Ltd. Sec. Litig., No. 08 Civ 9203, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010). Although "Section 11

claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend." Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07 Civ. 10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010).

Here, the CAC fails to allege a violation of Item 303 because it "fail[s] to identify any adverse economic event or trend that occurred prior to the [Merger] that was not disclosed in the Offering Documents." Schaffer v. Horizon Pharma PLC, No. 16 Civ. 1763, 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018). Indeed, the CAC asserts that Financial Statement No. 4 omitted "undisclosed facts," but in the same sentence refers to "historical financial statements," which, as discussed above, were disclosed. (CAC ¶ 106.) Financial Statement No. 4 likewise disclosed that "USBTC has incurred net losses since its inception."

Additionally, the CAC fails to plead that the Defendants had actual knowledge that USBTC's net losses would continue. The CAC alleges that the Individual Defendants knew that USBTC faced imminent bankruptcy and had experienced negative cash flows by virtue of their positions within USBTC, Legacy Hut, and Hut 8 and their access to information exchanged during the Merger's diligence period. The CAC posits that the

Individual Defendants' knowledge is imputable to Hut 8. (See CAC ¶¶ 125, 140.) These allegations, however, do not support that the Individual Defendants knew that USBTC would continue to incur net losses at the time Financial Statement No. 4 was published. As discussed above, at a Hut 8 retreat on January 14-17, 2024, Leverton allegedly stated that the Merger saved USBTC from bankruptcy. That occurred more than a month after the Forms S-8 were published, which constituted the most recent SEC filings containing Financial Statement No. 4. It does not support a finding that the Individual Defendants knew that USBTC would continue to incur net losses.

\*\*\*

Accordingly, the Court **GRANTS** the Motion to Dismiss the Securities Act Claims as to Financial Statements Nos. 1-2 and 4 (Counts I and II) and the Exchange Act Claims as to Financial Statement No. 3 (Counts III and IV) because Lead Plaintiff has failed to plead that any Financial Statement is actionable under either the Securities Act or the Exchange Act. Therefore, Plaintiff has likewise failed to state a claim for control person liability under the Securities Act or Exchange Act. See In re Weight Watchers Int'l Inc. Sec. Litig., 504 F. Supp. 3d 224, 252 (S.D.N.Y. 2020) ("In light of the dismissal of the Section 11 and Section 10(b) claims against all Defendants, Plaintiffs' Sections 15 and 20(a)

claims, which rely on the same underlying factual allegations, are also dismissed.").

### 3. King Mountain Statements

The CAC alleges that the King Mountain Statements Nos. 1-3 are materially misleading because they failed to disclose energy issues that had materialized at the King Mountain JV when those Statements were made. (See CAC ¶¶ 91, 100.) Likewise, the CAC alleges that King Mountain Statement No. 4 is materially misleading because it failed to disclose that internet connectivity problems had materialized. (See id. ¶¶ 92, 100.) As explained above, Lead Plaintiff has Section 10(b) standing to challenge only King Mountain Statement No. 1. The Court finds that King Mountain Statement No. 1 is inactionable puffery under both the Securities Act and the Exchange Act, and that Lead Plaintiff failed to plead that King Mountain Statement No. 2 is materially false or misleading under the Securities Act. The Court finds, however, that the CAC adequately pleaded a material omission under Section 11 of the Securities Act as to King Mountain Statements Nos. 3-4. The CAC did not plead a violation of Item 105 as to King Mountain Statement No. 4, however, because the CAC does not demonstrate that Ho, Genoot, Leverton, or Hut 8 actually knew about the alleged internet problems.

Accordingly, the Court **GRANTS** the Motion to Dismiss the Lead Plaintiffs' Securities Act Claims as to King Mountain Statement Nos. 1-2 and 4 (insofar as Statement No. 4 is alleged to violate Item 105) (Counts I and II) and the Exchange Act Claims as to King Mountain Statement No. 1 (Counts III and IV). The Court finds, however, that the CAC adequately pleaded a material omission as to King Mountain Statements Nos. 3-4.

a)    Puffery

King Mountain Statement No. 1 is inactionable puffery. That Statement – asserting that the "USBTC team will bring significant leadership in energy orientation . . . which will enhance [Hut 8's] ability to better plan around" stable energy usage and fluctuating prices - is included in two places in the Registration Statement. First, as an answer to the question "[w]hy are the two companies proposing the Business Combination" as an example of "[k]ey strategic advantages of the Business Combination - [i]mproving [Hut 8's] energy expertise and hedging capabilities." (Registration Statement at 1-2.) Second, in the section listing "[t]he [Legacy Hut] Board's Reasons for the Business Combination." That section stated that "the [Legacy Hut] Board considered a number of factors, including . . . the [Legacy Hut] Board's belief that the USBTC team brings significant leadership in energy

57

origination, development, demand response, hedging, grid
stabilization, and analytics significantly enhancing [Legacy
Hut's] ability to mitigate fluctuating energy prices across
markets." (Initial Registration Statement at 80-81; 1st
Amend. at 84-85; 2d Amend. at 86-87; 3d Amend. at 86-87; 4th
Amend. at 85-86; 5th Amend. at 86-87; 6th Amend. at 87-88;
7th Amend. at 87-88; Prospectus at 87-88.)

"Up to a point, companies must be permitted to operate
with a hopeful outlook." Rombach, 355 F.3d at 174; see also
IBEW Loc. Union No. 58 v. Royal Bank of Scotland Grp., PLC,
783 F.3d 383, 392 (2d Cir. 2015) (statement that acquisition
was "off to a promising start" was puffery). The assertions
that the Legacy Hut Board's "belief" that USBTC would bring
"significant leadership" thus "enhancing" the ability to
mitigate energy price fluctuations is "too open-ended and
subjective to constitute a guarantee upon which a reasonable
investor would rely." Gross v. GFI Grp., Inc., 784 F. App'x
27, 30 (2d Cir. 2019) (internal quotation marks omitted); see
also In re Star Gas Sec. Litig., No. 04 Civ. 1766, 2006 WL
8439191, at *10 n.2 (D. Conn. Aug. 21, 2006) ("Vague
statements about industry leadership . . . are classic
puffery . . . ." (internal quotation marks omitted)).

Accordingly, King Mountain Statement No. 1 cannot
sustain a claim under Sections 11 or 15 of the Securities Act

or a claim under Sections 10(b) or 20(a) of the Exchange Act, and the Court **GRANTS** the Motion to Dismiss Counts I-IV as to King Mountain Statement No. 1.

b)  Falsity

Lead Plaintiff failed to allege facts showing that King Mountain Statement No. 2 is materially false or misleading. In full, that Statement reads, with the challenged portion bolded:

> Renewable energy sources powering USBTC's owned and operated sites include renewable energy and zero carbon emission energy from wind, hydro, and nuclear sources. As of January 31, 2023: . . . **The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sourced from ERCOT** which includes more than 40% zero carbon emission sources.

(Initial Registration Statement at 132; see CAC ¶ 89.) The CAC contends that King Mountain Statement No. 2 is materially misleading because it "failed to disclose the energy issues that had already materialized." (Id. ¶ 91.) In support, the CAC alleges that (1) CW 1 had daily discussions about the "ongoing energy issues" at the King Mountain JV; (2) Genoot complained about the King Mountain JV's efficiency; and (3) CW 1 saw evidence of energy issues in the Hashrate failure and energy usage reports. (Id. ¶¶ 93-96.) Even when viewed in the light most favorable to the Lead Plaintiff, none of the

59

foregoing allegations are relevant to the King Mountain JV's renewable energy sources. Further, the CAC does not dispute the veracity of the assertion that as of January 31, 2023, "at peak wind generation periods [the Echo facility] can draw up to 100% of the energy the wind project produces to power mining and hosting." Because there is not a "sufficiently close nexus" between King Mountain Statement No. 2 and the allegedly omitted information regarding power grid failures, the Court finds that the CAC failed to plead a material omission as to that Statement. In re Omega Healthcare, 563 F. Supp. 3d at 272.

Accordingly, the Court **GRANTS** the Motion to Dismiss the Securities Act Claims as to King Mountain Statement No. 2 (Counts I-II).

c)    Risks of Internet and Energy Problems

Lead Plaintiff sufficiently pleaded, however, that King Mountain Statements Nos. 3-4 were material omissions because the CAC sufficiently alleges that the King Mountain JV experienced energy and internet problems that were knowable before the Merger and that King Mountain Statements Nos. 3-4 did not disclose.

To state a Securities Act Section 11 claim based on a material omission, plaintiffs must sufficiently plead that the "allegedly omitted facts both existed, and were known or

knowable, at the time of the offering." <u>Lin v. Interactive Brokers Grp., Inc.</u>, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008). A fact is knowable if "the relevant event had already transpired at the time of the offering." <u>Winter v. Stronghold Digital Mining, Inc.</u>, 686 F. Supp. 3d 295, 306 (S.D.N.Y. 2023). Critically, "whether a fact was 'knowable' . . . is not the same as whether a defendant 'knew,' or 'should have known' of that fact." <u>Id.</u> (rejecting argument that plaintiff failed to plead defendants' knowledge because "knowledge is not an element of a plaintiff's prima facie case for Section 11" (internal quotation marks omitted)).

The bulk of the CAC's allegations regarding the King Mountain JV's energy and internet problems rests on CW 1's allegations. Courts in the Second Circuit allow "plaintiffs to rely on unnamed sources so long as '[the unnamed sources] are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" <u>New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.</u>, 709 F.3d 109, 123–24 (2d Cir. 2013) (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 314 (2d Cir. 2000) (applying <u>Novak</u> to Securities Act claims). Here, the CAC describes CW 1 and pleads the CW 1's allegations with sufficient particularity for the Court to credit them at this stage of

the litigation. See In re Tufin Software Techs. Ltd. Sec. Litig., No. 20 Civ. 5646, 2022 WL 596861, at *7-8 (S.D.N.Y. Feb. 25, 2022) (when applying Rule 8 to Section 11 claim, holding that confidential witness allegations were reliable because witnesses held positions at defendant company during the operative period, suggesting witnesses would have had knowledge of the subject of the alleged misstatement).

First, the CAC pleads specific facts showing that CW 1 would have knowledge of the King Mountain JV's energy and internet problems during the relevant period. The CAC asserts that CW 1 worked as a data analyst at Hut 8 in the months before the Merger and thereafter, that CW 1 had "daily discussions with the Director of Infrastructure before the Merger about the ongoing energy issues at the King Mountain JV," and that CW 1's duties included daily tracking of miner outages. (CAC ¶ 93; see id. ¶ 95.) Defendants argue that the Court should discount CW 1's allegations as "uncorroborated statements" and insufficiently particular. (Mem. at 10, 18.) But the cases Defendants cite adjudicate Section 10(b) claims subject to Rule 9(b)'s and the PSLRA's heightened pleading standard for securities fraud. See, e.g., Long Miao v. Fanhau, Inc., 442 F. Supp 3d 774, 790, 800 (S.D.N.Y. 2020). Under the less rigorous Rule 8 standard, however, the CAC's allegations

are sufficiently particular. See In re Tufin Software Techs.,
2022 WL 596861, at *7-8.

Second, the CAC pleads specific facts regarding the King
Mountain JV's energy and internet problems, which are
sufficient to support an inference under Rule 8 that the
problems occurred and were knowable. The CAC contends that CW
1 knew that Genoot complained about the King Mountain JV
miners' efficiency during general meetings; that the mining
data CW 1 analyzed showed that there were "energy issues in
the Hashrate failure and energy usage reports;" that CW 1
knew that King Mountain JV had inefficient miners that impeded
the ability to properly mine; and that during CW 1's time
with the Company there were "often dips" in network service
with "several outages and network failures," which were
"often significant" and caused by broken or offline miners.
(Id. ¶¶ 94, 96-98.) Further, the CAC pleads that CW 1 stated
that Operations senior management directed data analysts "to
classify the outages in a manner that masked their true
nature," such as by characterizing the miners as "overheated"
instead of offline, and that "over half, or more, outages
were falsely reclassified as overheated" (Id. ¶ 99.)

Further, King Mountain Statements Nos. 3-4 do not
disclose that the alleged energy and internet problems
occurred at the King Mountain JV. "[C]autionary words about

63

future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." Set Capital LLC. v. Credit Suisse Grp. AG, 996 F.3d 64, 85 (2d Cir. 2021) (bank's warning that hedging activity "could" impact note prices but that bank had "no reason to believe" it would was materially misleading when "three episodes of market volatility" had proved the price impact). "[W]arning that something 'may' occur when that event 'had' already occurred" is a misstatement of present fact, not "mere opinions of future possibilities." In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) (disclosure that mobile usage and product decisions "may negatively affect [defendant's] revenue" were materially misleading when those factors had adversely impacted revenue and the challenged registration statements "include[ed] positive statements, that clashed with [defendant's] risk warnings on the same issues"); cf. In re UiPath, Inc. Sec. Litig., 755 F. Supp. 3d 498, 514 (S.D.N.Y. 2024) (statements that allegedly failed to disclose known risks were not misleading because the challenged disclosures "were not purely hypothetical" and were accompanied by "adverse circumstances that the company was currently experiencing").

Here, although King Mountain Statements Nos. 3-4 are accompanied by significant risk disclosures about the King Mountain JV's power grid and potential internet disruptions, those disclosures are forward-looking hypotheticals that do not disclose that the King Mountain JV experienced energy and internet problems. (See, e.g., Initial Registration Statement at 42, 46-47, 58.) Accordingly, the Court finds that those Statements were misleading because they omitted energy and internet problems that materialized.

Defendants argue that, even if the CAC pleaded that the King Mountain JV experienced undisclosed energy and internet problems, the CAC failed to plead that those problems were material because (1) King Mountain is a joint venture that accounts for a small part of Hut 8's business, (2) the CAC does not allege a negative impact on the price of mining Bitcoin, USBTC, or Hut 8 as a whole, and (3) the problems were "commonplace connectivity issues" that would be within the a reasonable investor's common knowledge. (Reply at 4; see also Mem. at 18.) The extent of energy and internet problems at the King Mountain JV is a question of fact inappropriate at this stage. Further, the CAC asserts that a "major component of USBTC's business consisted of self-mining Bitcoin at its digital asset mining sites, including at the King Mountain JV," and that "reliable energy sources and

internet access were critical to the operations of such sites." (CAC ¶ 136; see also id. ¶ 110.) Accordingly, taking the CAC's allegations as true for the purposes of evaluating the Motion, the alleged energy and internet problems at the King Mountain JV are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." City of Westland Police, 129 F. Supp. 3d at 66-67 (internal quotation marks omitted). Therefore, the Court declines to dismiss Counts III and IV as to King Mountain Statements Nos. 3-4 on the basis that, according to Defendants, those Statements are immaterial.

d)    Item 105

The CAC alleges that King Mountain Statement No. 4 violated Item 105 of SEC Regulation S-K by misleadingly and inaccurately suggesting that internet disruptions were a potential risk when that risk had already materialized at the King Mountain JV. (See CAC ¶ 109.)

Item 105, formerly Item 503, requires that SEC offering documents provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Further, Item 105 requires that the "Risk Factors" section "[c]oncisely explain how each risk affects the registrant or the securities being offered." Id. § 229.105(b).

Whereas a claim for a material omission under Section 11 requires allegations that the omission was "knowable," a claim for a violation of Item 105 under Section 11 requires that plaintiffs "demonstrate actual knowledge of . . . [a] risk." In re HEXO Corp. Sec. Litig., 524 F. Supp. 3d 283, 300, 302 (S.D.N.Y. 2021) (internal quotation marks omitted); see also Lian v. Tuya Inc., No. 22 Civ. 6792, 2024 WL 966263, at *9 (S.D.N.Y. Mar. 5, 2024) ("Most courts . . . have concluded that Item 105 does impose a knowledge requirement . . . ."). A showing of actual knowledge requires "allegations of specific facts from which [a court] could draw the plausible inference that defendants had actual knowledge of the [the risk] at the time the registration statement was issued." Medina v. Tremor Video, Inc., 640 F. App'x 45, 48 (2d Cir. 2016) (internal quotation marks omitted) (discussing actual knowledge in the context of Item 303); see also Lian, 2024 WL 966263, at *7, 9 (applying Medina's actual knowledge standard to Item 105 and holding that plaintiffs failed to allege that defendant actually knew its customers falsified online reviews when plaintiffs relied on public reports of fake reviews but did not allege that defendant's customers were involved); cf. In re Chembio Diagnostics, Inc. Sec. Litig., 586 F. Supp. 3d 199, 230 (E.D.N.Y. 2022) (plaintiffs pleaded that defendant actually knew that its

COVID-19 test was not one hundred percent accurate when FDA informed defendant of independent evaluation revealing inaccuracy).

Generally, "management level" employees are sufficiently senior to "serve as proxies" for the corporation's mental state. Thomas v. Shiloh Indus., Inc., No. 15 Civ. 7449, 2017 WL 2937620, at *3, 3 n.1 (S.D.N.Y. July 7, 2017) (collecting cases). To determine who constitutes a management-level employee, courts consider "the individual's relative seniority at the issuing entity and the connection between the executive's role and the [challenged] statements." Barrett v. PJT Partners Inc., No. 16 Civ. 2841, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017).

Further, "courts have held that a company's risk disclosures are misleading in violation of Item 105 where the 'risk factors' reported in its Registration Statement had already materialized by the time of its IPO . . . ." Felipe v. Playstudios Inc., No. 22 Civ. 01159, 2024 WL 1380802, at *13 (D. Nev. Mar. 31, 2024) (Item 105 violation pleaded when risk factors warned that "game may be delayed" but did not disclose that game developer faced "abnormally large number of bugs" and risks had "already come to fruition"); see also Lilien v. Olaplex Holdings, Inc., 765 F. Supp. 3d 993, 1019 (C.D. Cal. 2025) (Item 105 violation pleaded when risk

68

disclosures "warned of the risk of new regulations affecting [defendant's] products without disclosing the E.U. ban on [product ingredient]" had already materialized); cf. Sharma v. Rent the Runway, Inc., 751 F. Supp. 3d 82, 118 (E.D.N.Y. 2024) (dismissing Item 105 claim when risk disclosures included that the defendant company "'in the past incurred' losses" from warned-of risk).

Here, as discussed above, the CAC plausibly alleges that material internet disruptions had occurred at the King Mountain JV prior to the Merger and that King Mountain Statement No. 4 failed to disclose that the risk had materialized. The CAC, however, fails to plead that Hut 8, Ho, Genoot, and Leverton had actual knowledge of the internet problems, rather than that the problems were merely knowable. The CAC alleges that, per CW 1, there were "often dips in the network service with several outages and network failures" and that outages of Bitcoin miners "were often significant and caused by . . . offline miners." (CAC ¶¶ 97-98.) Further, CW 1 stated that Operations senior management directed data analysts "to classify the outages in a manner that masked their true nature," such as by characterizing the miners as "overheated" instead of offline, and that "over half, or more, outages were falsely reclassified as overheated." (Id. ¶ 99.) The Court is not persuaded that one allegation pertaining to

69

unidentified "senior management" without a further explanation of the manager's (or managers') position within USBTC and whether he or she (or they) had any involvement in the challenged disclosures is sufficient to impute actual knowledge to Hut 8. See Barrett, 2017 WL 3995606, at *7.

Although the CW 1 asserts that "Genoot also complained about the efficiency of the King Mountain JV," that allegation is made within the CAC's section on the King Mountain energy problems and does not plausibly support that Genoot actually knew that internet issues contributed to the inefficiency. (CAC ¶ 94.) Likewise, the Short Seller Report's generic allegation that the King Mountain JV "has historically failed to provide . . . high-speed internet" and allegations from a separate proof of claim against a non-party filed in 2022 do not support that any Defendant actually knew about King Mountain JV's network disruptions when King Mountain Statement No. 4 was published. (Id. ¶ 116; see id. ¶¶ 117-18.) See Glover v. DeLuca, No. 03 Civ. 0288, 2006 WL 2850448, at *23 (W.D. Pa. Sept. 29, 2006) ("The Court declines to accept as evidence of scienter an allegation made in a separate lawsuit in another forum.").

Accordingly, the Court **GRANTS** the Motion to Dismiss the Securities Act Claims as to King Mountain Statements No. 4

(Counts I and II), insofar as Lead Plaintiff failed to allege that King Mountain Statement No. 4 violated Item 105.

D.    COUNT I: SECTION 11 REMAINING ELEMENTS

The Court holds that the CAC has pleaded the remaining elements of a Section 11 violation as to King Mountain Statements Nos. 3-4: that Lead Plaintiff purchased a registered security directly from the issuer or in the aftermarket following the offering and that Hut 8, Ho, Genoot, and Leverton participated in Hut 8's offering in a manner sufficient to give rise to liability under Section 11. See In re Morgan Stanley, 592 F.3d at 359-60.

First, the CAC alleged that because "Hut 8 was newly formed upon completion of the Merger, the only Hut 8 shares available in the market at that time when Lead Plaintiff and the Class acquired their shares . . . were shares issued pursuant to the Registration Statement or the Forms S-8." (CAC ¶ 166.) "That is all that is required at this preliminary stage." Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc., 718 F. Supp. 3d 344, 391 (S.D.N.Y. 2024) (collecting cases holding that at the pleading stage, Section 11 plaintiffs need only allege that they purchased shares issued pursuant to or traceable to the public offering).

Second, the CAC adequately alleges that Hut 8, Ho, Genoot, and Leverton participated in Hut 8's offering in a

manner sufficient to give rise to liability under Section 11, since the CAC pleads that Hut 8 is the issuer; Ho signed the Registration Statement and Forms S-8 and is identified as prospective director of Hut 8 in the Registration Statement; Leverton is identified as a prospective director of Hut 8 in the Registration Statement; and Genoot signed the Registration Statement and the Forms S-8. (See CAC ¶¶ 159-162.) See 15 U.S.C. § 77k(a)(1), (3), (b); In re Morgan Stanley, 592 F.3d at 359-60.

Accordingly, the Court **DENIES** the Motion to Dismiss Count I as to King Mountain Statements Nos. 3-4.

E.   COUNT II: SECTION 15

Section 15 of the Securities Act creates liability for individuals or entities that "control[] any person liable" under Sections 11 or 12. See 15 U.S.C. § 77o(a). To state a claim for control person liability under Section 15, "a plaintiff must allege [1] a primary violation by a controlled person, and [2] control by the defendant of the primary violator." In re Scottish Re Grp., 524 F. Supp. 2d at 387 (internal quotation marks omitted).

Here, The Court has already determined that the CAC has adequately pleaded a primary violation of Section 11 as to King Mountain Statements Nos. 3-4. Thus, Lead Plaintiff may succeed on the Section 15 claim if he can establish that all

Individual Defendants controlled Hut 8, the primary violator. (<u>See</u> CAC ¶ 170.)

Control for purposes of Section 15 is defined as "the power to direct or cause the direction of the management and policies of the [primary violators], whether through the ownership of voting securities, by contract, or otherwise." <u>In re Lehman Bros. Mortg.-Backed Sec. Litig.</u>, 650 F.3d 167, 185 (2d Cir. 2011) (internal quotation marks omitted). To survive a Rule 12(b)(6) motion, "a plaintiff must plead facts which support a reasonable inference that [defendants] had the potential power to influence and direct the activities of the primary violator." <u>In re Deutsche Telekom AG Sec. Litig.</u>, No. 00 Civ. 9475, 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002) (internal quotation marks omitted). The "act of signing a registration statement" is "a manifestation of the signer's responsibility for the information contained in the document and, therefore, sufficient to establish 'control person' status" at the pleading stage. <u>Fed. Hous. Fin. Agency v. UBS Americas, Inc.</u>, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012).

Here, the CAC alleges that Genoot and Ho signed each SEC filing in which King Mountain Statements Nos. 3-4 appeared: the Initial Registration Statement, each Amendment, and each Form S-8, which incorporated the Prospectus by reference. (<u>See</u> CAC ¶¶ 53, 55 58.)

Accordingly, the CAC states a Section 15 violation as to Genoot and Ho. Further, the CAC alleges that all Individual Defendants had the power to direct Hut 8 and caused the Company to violate Section 11 as described in Count I. Specifically, the Individual Defendants were involved in the daily activities of Legacy Hut or USBTC prior to the Merger and Hut 8 following the Merger, including the due diligence related to the Merger, and preparing and reviewing the Registration Statement and the Forms S-8, the contents of which the Individual Defendants had the power to control. (See CAC ¶ 170.) "At the pleading stage, the Court considers this sufficient." Sharma, 751 F. Supp. 3d at 122 (denying motion to dismiss Section 15 claim when complaint alleged that individual defendants signed the registration statement; had relationships with other directors, officers, and major stockholders of the primary violator; and participated in the preparation and dissemination of the challenged offering documents). Further, apart from arguing that the Section 15 claim fails because the CAC does not state a Section 11 claim, Defendants do not meaningfully address the Section 15 claim. See Panther Partners Inc. v. Jianpu Tech. Inc., No. 18 Civ. 9848, 2020 WL 5757628, at *17 (S.D.N.Y. Sept. 27, 2020) (denying motion to dismiss Section 15 claim when only grounds

for dismissal argued were based on the purported failure of Section 11 and 12 claims).

Accordingly, the Motion to Dismiss Count II as to King Mountain Statements Nos. 3-4 is **DENIED**.

F.    LEAVE TO AMEND

Lead Plaintiff has asked the Court to grant leave to amend in the event the Court finds that the CAC contains deficiencies. (See Opp'n. at 30.) When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit repleading. See Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires."). When a claim is dismissed as a matter of law because it fails to state a claim, however, repleading would be "futile." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).").

Here, because Lead Plaintiff lacks statutory standing under Section 10(b) of the Exchange Act to challenge Financial Statements Nos. 1-2 and 4 and King Mountain Statements Nos. 2-4, the Court **DENIES** leave to replead Counts III and IV as to those Statements. Moreover, the Court has determined that Financial Statements Nos. 1-4 are inactionable as a matter of law under both the Securities Act and the Exchange

75

Act because they are forward-looking statements of opinion accompanied by meaningful cautionary language. Moreover, Financial Statement No. 4 cannot sustain a claim for violation of Item 303 as a matter of law because the challenged information was disclosed. Finally, King Mountain Statement No. 1 is inactionable as a matter of law under both the Securities Act and the Exchange Act because it is corporate puffery. Hence, the Court **DENIES** leave to replead Counts I-IV as to the Financial Statements and King Mountain Statement No. 1.

The Court **GRANTS**, however, leave to replead Counts I-II as to King Mountain Statement No. 2, as Lead Plaintiff could plead facts showing that this Statement omits material information with "sufficiently close nexus" to the content of the Statement. In re Omega Healthcare, 563 F. Supp. 3d at 272.

Also, the Court **GRANTS** leave to replead Counts I-II as to an Item 105 violation via King Mountain Statement No. 4, as Lead Plaintiff could plead additional facts showing that Defendants had actual knowledge of the alleged undisclosed risk.

## V.    ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 52) (the "Motion") of defendants Hut 8 Corp. ("Hut 8"), Asher Genoot ("Genoot"), Michael Ho ("Ho"), Jaime Leverton ("Leverton"), and Shenif Visram ("Visram", collectively, the "Defendants") to dismiss the consolidated amended complaint (Dkt. No. 39) (the "Consolidated Amended Complaint") of lead plaintiff Abhishek Maheshwari ("Maheshwari") pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED** as to Count III and Count IV in their entirety; it is further

**ORDERED** that the Motion is **GRANTED** as to Count I and Count II as to as to Financial Statements Nos. 1-4, King Mountain Statements Nos. 1-2, and King Mountain Statement No. 4 insofar as King Mountain Statement No. 4 is alleged to violate 17 C.F.R. § 229.105(a) ("Item 105"); it is further

**ORDERED** that the Motion is **DENIED** as to Count I and Count II as to King Mountain Statements Nos. 3-4; and it is further

**ORDERED** that leave to amend is **GRANTED** as to Count I and Count II as to King Mountain Statement No. 2 and King Mountain Statement No. 4, to the extent King Mountain Statement No. 4 is alleged to violate Item 105; it is further

**ORDERED** that leave to amend is **DENIED** as to all remaining dismissed claims; and it is further

    **ORDERED** that Maheshwari is **GRANTED** leave to file an amended consolidated complaint no later than fourteen (14) days from the date of this Decision and Order.

**SO ORDERED.**

Dated:    12 September 2025
        New York, New York

                        Victor Marrero
                          U.S.D.J.